**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| IN RE: | CASE NO. 23-17590-EPK |
|---|---|
| MV REALTY PBC, LLC *et al.*, | CHAPTER 11 |
| Debtors. | (Joint Administration Pending) |

**DEBTORS' *EMERGENCY* MOTION FOR ENTRY OF**
**INTERIM AND FINAL ORDERS AUTHORIZING USE OF CASH**
**COLLATERAL AND REQUEST FOR EXPEDITED HEARING**

> **The Debtors respectfully request that an *emergency* hearing be conducted by the Court. Absent use of cash collateral, the Debtors run the risk of irreparable harm to their business.**

Each of the Debtors[1], by and through their proposed undersigned counsel, file this *Emergency Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral and Request for Expedited Hearing* ("Motion"), and in support of this Motion, state as follows:

**BRIEF STATEMENT OF RELIEF REQUESTED**

By this Motion, the Debtors respectfully request that the Court enter interim and final orders authorizing the Debtors' use of cash collateral in accordance with the budgets attached

---

[1] The last four digits of the Debtors' federal tax identification numbers are: *MV Realty, PBC LLC (6755), MV Realty Holdings, LLC (3483), MV Receivables II, LLC (9368), MV Receivables III 6793), LLC, MV Realty PBC, LLC (Pennsylvania) (7301), MV Realty of South Carolina, LLC (7322), MV Realty of North Carolina, LLC (3258), MV of Massachusetts, LLC (0864), MV Realty of Illinois, LLC (8814), MV Realty of Arizona, LLC (2725), MV Realty of Connecticut, LLC (8646), MV Realty PBC, LLC (Georgia) (6796), MV Realty of New Jersey, LLC (5008), MV Realty of Washington, LLC (7621), MV Realty of Maryland, LLC (9945), MV Realty of Virginia, LLC (2129), MV Realty of Tennessee, LLC (7701), MV Realty of Wisconsin, LLC (2683), MV Realty of Nevada, LLC (0799), MV Realty of Oregon, LLC (3046), MV Realty of Utah, LLC (4543), MV Realty of Minnesota, LLC (1678), MV Realty of Indiana, LLC (3566), MV Realty of Missouri, LLC (6503), MV Homes of New York, LLC (2727), MV Realty of Idaho, LLC (8185), MV Realty of Alabama, LLC (6462), MV Realty of Colorado, LLC (1176), MV Realty of Oklahoma, LLC (8174), MV Realty of Louisiana, LLC (3120), MV Realty of Kansas, LLC (2304), MV Realty of Kentucky, LLC (2302), MV Realty of California (7499), MV Realty of Texas, LLC (7182), MV Realty of Michigan, LLC (5280), and MV Realty of Ohio, LLC (0728).*

hereto as **Exhibit "<u>A</u>"** (interim) and **Exhibit "<u>B</u>"** (final), respectively. A copy of the proposed

interim order is attached hereto as **Exhibit "<u>C</u>"**.  A proposed final order shall be filed in advance

of the final hearing. The Debtors propose to use cash collateral, on an interim basis, for the

purposes of funding payroll, rent, insurance and other costs related to its business operations.

Approval of the instant Motion is necessary and critical to the Debtor's ongoing business

operations, as well as for the preservation of asset and collateral value.

The information relevant to the Court's consideration of this Motion is as follows:

- *Affected Secured Creditors:*   *Monroe Capital*
  *Goodwood Fund*

- *Basis for Secured Claims:*   <u>*Monroe Capital*</u>*:*
  *Security Agreements, Equity Pledge*
  *Agreements and Recorded UCC-1s*

  <u>*Goodwood I and II*</u>*:*
  *Security Agreement and Recorded UCC-1s*

- *Amount Owed[2]:*   *Monroe Capital ($40,0000,000.00)*
  *Goodwood I ($7,408,275.82)*
  *Goodwood II ($4,460,000.00)*

- *Proposed CC Use:*   *Approx. $1,036,500.00 (21-days)*

- *Stipulations by Debtors:*   *None (on an interim basis)*

- *Adequate Protection:*   *(a) Continuing Liens; and (b) Replacement*
  *Liens, but only to the extent the Continuing*
  *Liens are not sufficient to protect against*
  *diminution in the value of the Pre-Petition*
  *Collateral.*

## <u>JURISDICTION AND VENUE</u>

1.    This Court has jurisdiction over this Motion under 28 U.S.C. §§157 and 1334.

---

[2] The amounts are approximated, and the Debtors reserve all rights with respect to filing any objections to such claims for reasons including, but not limited, the amount of such claims and the extent, validity, and priority of liens.

Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding as defined in 28 U.S.C. §157(b)(2)(A) and (M).

2.      The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105, 361, 362, and 363.

## INTRODUCTION

<u>**A.**</u>      <u>**Filing**</u>

3.      On September 22, 2023, the Debtors each filed a voluntary petition under Chapter 11 of Title 11 of the United States Code. The Debtors are in possession of their assets and operating their businesses as debtors-in-possession pursuant to the authority of 11 U.S.C. §§ 1107 and 1108.

<u>**B.**</u>      <u>**Organizational Structure**</u>

4.      Debtor, MV Realty Holdings, LLC ("<u>Holdings</u>") is a Florida limited liability company and the sole owner of Debtor, MV Realty PBC, LLC a Florida limited liability company ("<u>PBC</u>"), and MV Brokerage, LLC ("<u>Brokerage</u>").

5.      PBC is the sole owner of the following debtors: (a) MV Realty Receivables II, a Florida limited liability company ("<u>Receivables II</u>"); (b) MV Realty Receivables III, a Florida limited liability company ("<u>Receivables III</u>"); (c) MV Realty of California, a California corporation ("<u>California</u>"); and (d) thirty-one (31) additional debtor subsidiaries (collectively, with California, the "<u>MV Realty Subs</u>"), each of which is a limited liability company organized under the laws of the states of Pennsylvania, South Carolina, North Carolina, Massachusetts, Illinois, Arizona, Connecticut, Georgia, New Jersey, Washington, Maryland, Virginia, Tennessee, Wisconsin, Nevada, Oregon, Utah, Minnesota, Indiana, Missouri, New York, Idaho, Alabama, Colorado, Oklahoma, Louisiana, Kansas, Michigan, Kentucky, Texas and Ohio. Each

of the MV Realty Subs is incorporated or organized under the laws of the respective states as follows: "*MV Realty of [state], LLC*" (with the exception of New York ("MV Homes of New York, LLC") and Massachusetts, ("MV of Massachusetts, LLC")).

6.      Brokerage is the sole owner of the following (collectively, the "MV Brokerage Subs"): (a) thirty-three (33) separate subsidiaries, each of which is a limited liability company organized under the laws of the states of Florida, Pennsylvania, South Carolina, North Carolina, Massachusetts, Illinois, Arizona, Connecticut, Georgia, New Jersey, Washington, Maryland, Virginia, Tennessee, Wisconsin, Nevada, Oregon, Utah, Minnesota, Indiana, Missouri, New York, Idaho, Alabama, Colorado, Oklahoma, Louisiana, Kansas, Michigan, Kentucky, Texas and Ohio; and (b) one subsidiary incorporated under the laws of the state of California. For the most part, the MV Brokerage Subs each operate as "*MV Brokerage of [state], LLC.*"

## C.      *Business Operations*

7.      PBC is the servicing entity, which operates primarily from premises located at 815 Broken Sound Parkway, Boca Raton, Florida 33487. Currently, PBC has 79 full-time employees, and also uses the services of 156 independent contractors, who receive 1099s.

8.      PBC was founded in 2014 and initially operated as a traditional real estate brokerage firm. In October 2018, PBC began focusing its efforts on developing and marketing a unique product to residential homeowners.

9.      In or around October 2018, PBC implemented the "Homeowner Benefit Program" (the "HBP"). As part of the HBC, the MV Realty Subs enter "Homeowner Benefit Agreements" (the "HBA") with residential homeowners. The HBA is not a listing agreement, but is a forward listing contract pursuant to which the MV Realty Subs pay an upfront cash payment to homeowners in exchange for the exclusive right to list a homeowner's home if and when the

homeowner decides to sell their home. The term of the HBA is forty (40) years subject to certain early termination events.

10.    In accordance with an HBA, a selling homeowner lists their home with the applicable MV Realty Sub, which then lists and sells the home for a standard commission, including any participating broker commission. In the event the home does not sell within six (6) months, the homeowner may terminate the HBA at no cost and without penalty. The HBA is not a listing agreement.

11.    In the event a homeowner breaches the HBA, which results in an early termination of the HBA, the MV Realty Subs are typically entitled to a termination fee equal to three percent (3%) of the greater of (a) the fair market value of the home at the time the HBA is executed, and (b) the fair market value at the time of breach or early termination.

12.    Additionally, the MV Realty Subs reserves the right to record a memorandum ("Memorandum"), or other similar notice, of the HBA in the public records in the county in which the real estate is located. Although the HBAs are governed by the laws of the state in which the HBA is entered, the terms of the HBAs and Memoranda are substantively consistent from state to state.

13.    At the present time, the MV Realty Subs are parties to approximately 34,000 HBAs.

### D.    *Financing – Goodwood I*

14.    On or about February 11, 2020, MV Receivables I, LLC ("Receivables I"), a wholly owned subsidiary of PBC, entered into a credit agreement (the "Goodwood I Credit Agreement") with Goodwood Fund, as the initial lender ("Goodwood Fund" and, together with other lenders under the Goodwood I Credit Agreement, the "Goodwood I Lenders"), and

Goodwood Inc., as agent ("Goodwood Inc."). The parties also executed, among other documents, a Security Agreement (the "Goodwood I Security Agreement" and, collectively with the Goodwood I Credit Agreement and other related documents, the "Goodwood I Loan Documents").

15.    PBC and Receivables I also entered a Purchase and Contribution Agreement (the "Purchase Agreement") pursuant to which Receivables I agreed to purchase HBAs acquired with amounts advanced under the terms of the Goodwood I Credit Agreement. The advance rate is typically sixty percent (60%) of discounted eligible receivables. The amount of $10,000,000.00 has been advanced under the Goodwood I Credit Agreement.

16.    Under the Goodwood I Security Agreement, Receivables I granted a security interest in and to its assets, including, without limitation, certain HBAs, accounts, receivables, and general intangibles, in favor of Goodwood Inc., as agent for the Goodwood I Lenders. PBC signed a limited guarantee of amounts owed by Receivables I under the Goodwood I Credit Agreement.

**E.    _Financing – Monroe Capital_**

17.    On or about July 28, 2021, Receivables II entered into a $40,000,000.00 senior secured delayed draw credit facility (the "Monroe Credit Facility") with Monroe Capital Management Advisors, LLC, as administrative and collateral agent ("Monroe Capital"), and the lenders under the Monroe Credit Facility (collectively, the "Monroe Lenders"). Receivables II and Monroe Capital executed, among other documents, a Credit Agreement (the "Monroe Credit Agreement"), Security Agreement (the "Monroe Security Agreement", and Pledge Agreement (the "Monroe Pledge Agreement" and, collectively with Monroe Credit Agreement, the Monroe Security Agreement, and related other agreements, the "Monroe Loan Documents").

18.     The Monroe Lenders have advanced the amount of $40,000,000.00 to Receivables II under the Monroe Credit Facility, the proceeds of which were to be used to acquire eligible receivables in accordance with the Monroe Credit Agreement and to fund operations and other related expenses.

19.     Under the Monroe Credit Facility, PBC, certain of the MV Realty Subs (New Jersey, Connecticut, Illinois, Massachusetts, North Carolina, South Carolina, and Georgia) (collectively, and excluding PBC, the "Initial MV Realty Guarantors") initially guaranteed the obligations of Receivables II. The Monroe Credit Facility was later guaranteed by subsequent MV Realty Subs, who organized and became parties to the Monroe Credit Facility and Monroe Loan Documents as the operation expanded.

20.     In accordance with the Monroe Pledge Agreement, (a) Holdings pledged its equity interest in in PBC, and (b) PBC pledged its membership interests in the MV Realty Subs, in favor of Monroe Capital, as collateral agent. All membership interests are uncertificated.

21.     In accordance with the Monroe Security Agreement, Receivables II, PBC, and the Initial MV Realty Guarantors, as well as any other MV Realty Subs who later joined the Monroe Credit Facility and Monroe Loan Documents, granted Monroe Capital a security interest in their assets, including, without limitation, accounts, documents, general intangibles, investment property, receivables, and receivables relating to the HBAs.

22.     Generally speaking, (a) the MV Realty Subs would entered into HBAs with homeowners, thus giving the MV Realty Subs the exclusive right to list homes in the event a homeowner ever decide to sell their home, (b) the receivables under the HBAs were to be sold or otherwise assigned to MV Receivables II, and (c) Monroe Capital then advanced at a rate of forty-five percent (45%) of the net present value of eligible receivables under the HBAs.

### *F.* *Consent and Confirmation Agreement*

23.     In or about July 2021, Monroe, Goodwood Inc., PBC and Receivables I entered into the Acknowledgement and Confirmation Agreement (the "<u>Confirmation Agreement</u>"), which was, essentially, an inter-creditor agreement, pursuant to which Monroe and Goodwood Inc. acknowledged and consented to the other's respective rights under the Monroe Capital Loan Documents and the Goodwood I Loan Documents, respectively.

### *G.* *Financing - Goodwood II*

24.     On November 4, 2022, MV Receivables III, LLC ("<u>Receivables III</u>"), Goodwood MV Realty LP, as the initial lender ("<u>Goodwood MV</u>" and, together with any other related lenders, the "<u>Goodwood II Lenders</u>"), and Goodwood, Inc. ("<u>Goodwood Inc.</u>"), as agent, entered into a Credit Agreement (the "<u>Goodwood II Credit Agreement</u>"). The parties also executed, among other documents, a Security Agreement (the "<u>Goodwood II Security Agreement</u>" and, collectively with the Goodwood II Credit Agreement and other related documents, the "<u>Goodwood II Loan Documents</u>").

25.     In accordance with the Goodwood II Credit Agreement, Receivables IIII agreed to purchase HBAs acquired with amounts advanced under the terms of the Goodwood II Credit Agreement. The advance rate was approximately sixty percent (60%) of the net present value of eligible receivables under the HBAs. The amount of $4,500,000.00 has been advanced.

26.     Under the Goodwood II Security Agreement, Receivables III granted Goodwood Inc. a security interest in and to its assets, including, without limitation, the HBAs, accounts, receivables, and general intangibles.  MV Brokerage signed a limited guarantee of amounts owed by Receivables III under the Goodwood II Credit Agreement.

*H*.      *Other Financing*

27**.**      In February 2023, Holdings executed senior notes with eight (8) shareholders of Holdings, who advanced a total of $12,968,000.00 (collectively, the "Shareholder Notes"). There is approximately $14,103,144.11 outstanding, including accrued interest, under the Shareholder Notes. The proceeds borrowed were used to fund operations.

28.      Additionally, in 2021 and 2022, Holdings executed two (2) rounds of convertible notes, one of which has since converted. The later round, which was in the total amount of $6,070,000.00, has not been converted.

*I*.      *Assets and Secured Obligations*

29.      Monroe is currently owed approximately $40,000,000.00, while the Goodwood I Lenders and Goodwood II Lenders are owed approximately $7,408,275.82 and $4,460,000.00, respectively. As of September 5, 2023, the net present value of the collateral securing the foregoing obligations is (a) $89,315,255.01 (Monroe), (b) $12,656,966.30 (Goodwood I), and (c) $6,106,069.54 (Goodwood II). Holdings has additional HBAs with an aggregate net present value of approximately $12,861,536.97. Accordingly, the total net present value of HBAs exceeds $120,000,000.00.

## EVENTS LEADING TO BANKRUPTCY

30.      Since November 29, 2022, the states of Florida, Pennsylvania, Massachusetts, Ohio, North Carolina, New Jersey, and Indiana commenced actions against certain of the MV Realty Subs (collectively, the "State Actions"). PBC is a named defendant in the State Actions commenced by the states of Florida, Pennsylvania, New Jersey, North Carolina, Massachusetts, and Indiana. Other individual officers and licensed real estate brokers working in connection

with the HBAs are named in nearly all State Actions. The allegations asserted in the State Actions range from telemarketing violations to unfair or deceptive trade practices.

31.     It is alleged in the State Actions that the filing of the memorandum, which provides constructive notice to the public of the existence of the HBA and its terms, unfairly or deceptively interferes with the homeowner's ability to sell the home.

32.     The Debtors contend that the memorandum, which is separately signed by each homeowner under the HBA, is neither deceptive nor unfair. Rather, the memorandum is filed in accordance with the applicable law of each state and serves the purpose intended by the applicable law of each state by providing public notice of the HBA.

33.     Moreover, in several instances, it is alleged in the State Actions that the Debtors made improper telephone solicitations to prospective customers without their consent.  To date, however, the Debtors have not had any meaningful opportunity to present in court the vast number of lawfully obtained consents from prospective homeowners authorizing these very solicitations.

34.     It has also been alleged in many of the State Actions that the Debtors' sales and marketing practices "prey" upon customers who are elderly or of diminished financial means. However, the Debtors strenuously disagree with such allegations as being unsupported by fact. The facts are that (a) the typical homeowner in an HBA owns a home with an average value exceeding $300,000, and (b) the average age of homeowners under HBAs is 55 years old (and 72% of homeowners are under age 65).  By comparison, the American Housing Survey 2021, based on US Census Bureau data, indicates that only 67.3% of homeowners in the country are under the age of 65. Thus, the homeowners under the HBAs are proportionally younger than a typical cross-section of homeowners overall in the United States.

35.     It is alleged or implied in the State Actions that a very significant portion of the Debtors' customers are aggrieved and have complained to state consumer protection authorities. However, this allegation is inaccurate and unsupported by the facts. For example, in North Carolina, over the 16-month period prior to the commencement of the State Action, the state consumer protection authorities made the Debtors aware of only twelve (12) consumer complaints (out of a total of 2,100 HBAs in North Carolina) regarding allegedly deceptive conduct by the Debtors.  These complaints came mostly from customers who alleged deception or unfairness by the Debtors only after the homeowner had breached the HBA. In contrast, the Debtors, in a mere 45-day period, following the commencement of the State Action in North Carolina, obtained at least 250 sworn statements from North Carolina homeowners attesting that they understood the key terms and elements of the HBA.

36.     It is also well worth noting that the Debtors previously engaged national and well-recognized local law firms prior to implementing the HBP in each state, who advised as to compliance with state and other applicable laws with respect to the sales and marketing of the HBP and HBAs, as well as with respect to the terms and conditions of the HBAs and related agreements.

37.     Accordingly, the defendants vigorously oppose the State Actions and contend that the HBAs comply with all applicable laws.

38.      Finally, there are other actions that have been commenced by real estate regulatory commissions that include both the MV Brokerage Subs and the individual licensed real estate agents and brokers in connection with their work on the HBAs.

39.     In defending against the State Actions and other regulatory matters, the Debtors have spent and incurred millions of dollars in legal fees, and the Debtors' personnel have devoted substantial time in assisting defense counsel.

40.     The Debtors commenced these Chapter 11 proceedings to protect and maximize the value of their assets and for the purpose of implementing one or more strategies aimed at alleviating or otherwise minimizing the financial strain of the State Actions. The Debtors also intend to protect the assets from any adverse creditor action, and otherwise preserving estate assets for the benefit of all creditors.

## RELIEF REQUESTED

41.     By this Motion, the Debtors seek interim and final orders authorizing the Debtors to use cash collateral to operate the Debtors' businesses.

42.     The Debtors seek authority to use cash collateral in accordance with the budgets attached hereto as **Exhibit "A"** and **Exhibit "B."**  Exhibit "A" represents the "interim budget" (the "Interim Budget"), which provides for the use of cash collateral pending a final hearing on this Motion (the "Interim Period") and includes disbursements necessary to avoid immediate and irreparable harm to the estate. Exhibit "B" represents the budget provides for the use of cash collateral following a final hearing on this Motion (the "Final Budget") (the Interim Budget and the Final Budget are hereinafter collectively referred to as the "Budgets").

## ARGUMENTS IN SUPPORT OF RELIEF REQUESTED

43.     Goodwood appears to hold a first-priority lien against the assets owned by MV Receivables I, LLC and Receivables III.

44.     Monroe Capital appears to hold a first-priority lien against the assets owned by Receivables II, as well as pledges of (a) Holdings' equity in PBC, and (b) PBC's equity in the

MV Realty Subs. Monroe Capital appears to also hold first-priority liens against any assets owned by the remaining MV Realty Subs.

45.     The recorded liens may extend to collateral representing cash collateral within the meaning of 11 U.S.C. § 363(a).

46.     It is essential to the continued operation of the Debtors' businesses for the Debtors to have the ability to utilize cash collateral. Cash generated from the HBAs has been used to fund among, other things, rent, payroll, servicing, and legal fees. Again, PBC is the managing and servicing entity of the HBAs.

47.     The Debtors believe that adequate protection will be provided as a result of the equity cushions in favor of Goodwood and Monroe Capital, and by providing continuing and replacement liens proposed herein in favor of Goodwood and Monroe Capital. By way of example, the collateral securing the Monroe Loans has a net present value of over $89,000,000.00, while the collateral securing the Goodwood Loan has a net present value of over $13,000,000.00.  Under the Budgets, PBC projects collections of approximately $350,000.00 per week, or $1,400,000.00 per month. Considering the advance rates of 45% and 60%, respectively, Goodwood and Monroe Capital are oversecured.

48.     There is insufficient time for a full hearing to be held before the Debtors must use cash collateral. If this Motion is not considered on an expedited basis, and if the Debtors are denied the ability to immediately use cash collateral, there will be a direct and immediate material and adverse impact on the continuing operation of the Debtors' business and on the value of their assets and overall business operations. In order to continue its business operations in an effort to achieve a successful reorganization, the Debtors must use cash collateral in their ordinary business operations. The inability of the Debtors to meet ordinary business expenses

will result in irreparable injury to the Debtors and could negatively impact the Debtors' chances for a successful reorganization.

49.     If allowed to use cash collateral, the Debtors believe it can maintain their business operations.

## AUTHORITY IN SUPPORT OF RELIEF REQUESTED

50.     Pursuant to 11 U.S.C. § 363(c)(2)(B) of the Bankruptcy Code, a debtor-in-possession may use cash collateral with court approval after notice and a hearing. Section 363(e) of the Bankruptcy Code provides that, upon request of an entity that has an interest in property to be used by a debtor, the Court "shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Respectfully, the Court should approve the Debtor's proposed use of cash collateral because the interests in cash collateral of Popular Bank will be adequately protected during the Debtor's continued business operations.

51.     Adequate protection can be provided by a number of different methods. Section 361 of the Bankruptcy Code provides that adequate protection may be provided by (1) making "a cash payment or periodic cash payments to [an] entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title . . . results in a decrease in the value of [the] entity's interest in such property," (2) "providing to [an] entity an additional or replacement lien to the extent that such ... use . . . results in a decrease in the value of [the] entity's interest in such property" or (3) "granting such other relief . . . as will result in the realization by [an] entity of the indubitable equivalent of [the] entity's interest in such property." 11 U.S.C. §§ 361(1), (2), (3). Adequate protection may also be provided or otherwise realized by the existence of an equity cushion in the collateral.

52.     What constitutes adequate protection is determined on a case-by-case basis. *See MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396-97 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985). However, regardless of how adequate protection is provided, the focus of the requirement is to protect a secured creditor from diminution in value of its interest in the collateral during the period of use by the debtor. *See In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); *Delbridge v. Production Credit Ass'n & Fed. Land Bank*, 104 B.R. 824, 827-28 (E.D. Mich. 1989); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Ledgemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990).

53.     Adequate protection is necessary only to the extent the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such property." 11 U.S.C. §§ 361, 363(e); *see United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 370-73 (1988) (the "interest in property" entitled to protection is "the value of the collateral" securing the claim). As the court in *In re Megan Racine Assoc., Inc.*, 202 B.R. 660 (Bankr. N.D.N.Y. 1996) noted:

> Adequate protection . . . is intended to compensate a creditor for any decrease in the value of its security interest in collateral during the pendency of the debtor's reorganization that is due to the imposition of the stay or is traceable to the use of such property.

Id. at 663.

54.     The Debtors submit that Goodwood and Monroe Capital are over-secured when considering the value of the Debtors' accounts, HBAs, and eligible receivables.

55.     The Debtors believe that the equity cushions, as well as continuing and replacement liens, which will result in the interests of Goodwood and Monroe Capital being adequately protected.

56.     Based on the foregoing, the Debtors submit that the use of cash collateral is appropriate in accordance with the Budgets.

## REQUEST FOR PRELIMINARY HEARING

57.     The Debtors respectfully request that the Court conduct an emergency hearing pursuant to Federal Rule of Bankruptcy Procedure 4001(b)(2) and further conduct a final hearing on not less than 20 days' notice.  The Debtors request that the Court authorize the Debtors to use cash collateral on an interim basis pending a final hearing in accordance with the Interim Budget.

58.     The Debtors request that the Court conduct a final hearing and authorize the Debtors' use of cash collateral in accordance with the Final Budget.

## RESERVATION OF RIGHTS

59.     By submitting this request, the Debtors do not waive any rights, including without limitation, the right to (a) object, challenge or contest the extent, validity or priority of any of pre-petition lien(s), (b) value any or all of the collateral securing such liens, (c) contest or challenge whether any lien extends to cash collateral, and (d) object to any claim of any secured creditor.

**WHEREFORE,** the Debtors respectfully request that this Court (a) enter an interim order, in the form attached as *Exhibit "C,"* granting the Motion in the for their businesses in accordance with the Interim Budget attached as *Exhibit "A"*, (b) scheduling a final hearing in order to authorize the Debtors' use of cash collateral, and (c) entering a final order authorizing use of cash collateral in accordance with the proposed Final Budget attached as *Exhibit "B"* (the form of the proposed order shall be filed

with the Court in advance of the final hearing), as well as granting such other and further relief

that the Court may deem just and proper.

**RESPECTFULLY SUBMITTED** this 24th day of September 2023.

*I HEREBY CERTIFY* that I am admitted to the Bar of the United States District Court for the Southern District of Florida, and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

**SEESE, P.A.**
*Proposed* Attorneys for Debtors-in-Possession
101 N.E. 3rd Avenue
Suite 1500
Ft. Lauderdale, Florida 33301
Telephone: (954) 745-5897

By:      *s/Michael D. Seese*
      Michael D. Seese, Esq.
      Fla. Bar No. 997323
      mseese@seeselaw.com

## <u>CERTIFICATE OF EXIGENT CIRCUMSTANCES</u>

**I HEREBY CERTIFY** that an emergency hearing has been requested, since the relief requested is critical to the administration of this estate and to the Debtors' business operations in connection with this case. Absent use of cash collateral, the Debtors will be unable to operate and, therefore, the Debtors and the estate shall suffer immediate and irreparable harm.

<u>/s/ Michael D. Seese</u>
Michael D. Seese, Esq.

**EXHIBIT A**

*Interim Budget*

**MV Realty PBC, LLC**
21 day forecast 9/25/23 -10/15/23

| | 9/25/2023 | 9/26/2023 | 9/27/2023 | 9/28/2023 | 9/29/2023 | 10/2/2023 | 10/3/2023 | 10/4/2023 | 10/5/2023 | 10/6/2023 | 10/9/2023 | 10/10/2023 | 10/11/2023 | 10/12/2023 | 10/13/2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Balance** | 668,345.82 | 730,250.82 | 792,155.82 | 514,060.82 | 512,965.82 | 510,670.82 | 543,159.34 | 605,064.34 | 666,969.34 | 728,874.34 | 785,204.34 | 847,109.34 | 909,014.34 | 630,919.34 | 629,824.34 |
| **Receipts:** | | | | | | | | | | | | | | | |
| **Subtenant Rent** | | | | | - | 8,583.52 | | | | | | | | | |
| **Commission, total** | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 |
| ***Total Receipts*** | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 78,583.52 | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 70,000.00 |
| Other | | | | | | | | | | | | | | | |
| Dues | (640.00) | (640.00) | (640.00) | (640.00) | (640.00) | (640.00) | (640.00) | (640.00) | (640.00) | (640.00) | (640.00) | (640.00) | (640.00) | (640.00) | (640.00) |
| Advertising | (1,840.00) | (1,840.00) | (1,840.00) | (1,840.00) | (1,840.00) | (1,840.00) | (1,840.00) | (1,840.00) | (1,840.00) | (1,840.00) | (1,840.00) | (1,840.00) | (1,840.00) | (1,840.00) | (1,840.00) |
| Taxes | | | | | | | | | | | | | | | (550.00) |
| Utilities, 25th | (190.00) | (190.00) | (190.00) | (190.00) | (2,390.00) | (190.00) | (190.00) | (190.00) | (190.00) | (190.00) | (190.00) | (190.00) | (190.00) | (190.00) | (190.00) |
| Telecom, servicing | | | | (29,500.00) | | | | | | | | | | (29,500.00) | |
| Other/ misc | (815.00) | (815.00) | (815.00) | (815.00) | (815.00) | (815.00) | (815.00) | (815.00) | (815.00) | (815.00) | (815.00) | (815.00) | (815.00) | (815.00) | (815.00) |
| **Total Other Overhead, (servicing, telecom, other overhead)** | (3,485.00) | (3,485.00) | (3,485.00) | (32,985.00) | (5,685.00) | (3,485.00) | (3,485.00) | (3,485.00) | (3,485.00) | (3,485.00) | (3,485.00) | (3,485.00) | (3,485.00) | (32,985.00) | (4,035.00) |
| Payroll | | | (340,000.00) | | | | | | | | | | (340,000.00) | | |
| Contractors | | | | (8,500.00) | | | | | | | | | | (8,500.00) | |
| IT | (470.00) | (470.00) | (470.00) | (470.00) | (15,470.00) | (470.00) | (470.00) | (470.00) | (470.00) | (6,045.00) | (470.00) | (470.00) | (470.00) | (470.00) | (470.00) |
| Insurance, medical | | | | | (38,000.00) | | | | | | | | | | |
| Insurance, liability | | | | | | | | | | | | | | (25,000.00) | |
| Notary/filing (see Note 1) | (4,140.00) | (4,140.00) | (4,140.00) | (4,140.00) | (4,140.00) | (4,140.00) | (4,140.00) | (4,140.00) | (4,140.00) | (4,140.00) | (4,140.00) | (4,140.00) | (4,140.00) | (4,140.00) | (4,140.00) |
| Rent | | | | | | (38,000.00) | | | | | | | | | |
| Professional Fees | - | - | - | (25,000.00) | (9,000.00) | - | - | - | - | - | - | - | - | - | (750.00) |
| ***Total Disbursements*** | (8,095.00) | (8,095.00) | (348,095.00) | (71,095.00) | (72,295.00) | (46,095.00) | (8,095.00) | (8,095.00) | (8,095.00) | (13,670.00) | (8,095.00) | (8,095.00) | (348,095.00) | (71,095.00) | (9,395.00) |
| **Ending Balance** | 730,250.82 | 792,155.82 | 514,060.82 | 512,965.82 | 510,670.82 | 543,159.34 | 605,064.34 | 666,969.34 | 728,874.34 | 785,204.34 | 847,109.34 | 909,014.34 | 630,919.34 | 629,824.34 | 690,429.34 |

Note 1:
The stated amounts represent the costs which may be incurred by the Debtors in connection with removing memoranda from the public records, as per the directive entered on September 18, 2023 (the "NC Order") in the North Carolina State Action (the "NC Action") pending before the Superior Court for Wake County, North Carolina.  The Debtors intend to seek to stay the NC Action and the implementation of the NC Order, as the NC Order relates to property of the estate.

**EXHIBIT B**

*Final Budget*

**MV Realty PBC, LLC**
**90 day forecast - through 12/22/2023**

| week ending: | 9/29/2023 | 10/6/2023 | 10/13/2023 | 10/20/2023 | 10/27/2023 | 11/3/2023 | 11/10/2023 | 11/17/2023 | 11/24/2023 |
|---|---|---|---|---|---|---|---|---|---|
| **Beginning Balance** | **668,345.82** | **340,670.82** | **595,204.34** | **481,179.34** | **706,954.34** | **139,779.34** | **358,387.86** | **662,337.86** | **565,812.86** |
| Receipts: | | | | | | | | | |
| **Subtenant Rent** | - | 8,583.52 | - | - | - | 8,583.52 | - | - | - |
| *Commission, total* | *350,000.00* | *350,000.00* | *350,000.00* | *350,000.00* | *350,000.00* | *350,000.00* | *350,000.00* | *350,000.00* | *350,000.00* |
| ***Total Receipts*** | **350,000.00** | **358,583.52** | **350,000.00** | **350,000.00** | **350,000.00** | **358,583.52** | **350,000.00** | **350,000.00** | **350,000.00** |
| Other | | | | | | | | | |
| dues | (3,200.00) | (3,200.00) | (3,200.00) | (3,200.00) | (3,200.00) | (3,200.00) | (3,200.00) | (3,200.00) | (3,200.00) |
| advertising | (9,200.00) | (9,200.00) | (9,200.00) | (9,200.00) | (9,200.00) | (9,200.00) | (9,200.00) | (9,200.00) | (9,200.00) |
| Taxes | | | (550.00) | | | | | (550.00) | |
| Utilities, 25th | (3,150.00) | (950.00) | (950.00) | (950.00) | (3,150.00) | (950.00) | (950.00) | (950.00) | (950.00) |
| Telecom, servicing | (29,500.00) | | (29,500.00) | | (29,500.00) | | | (29,500.00) | |
| Other/ misc | (4,075.00) | (4,075.00) | (4,075.00) | (4,075.00) | (4,075.00) | (4,075.00) | (4,075.00) | (4,075.00) | (4,075.00) |
| **Total Other Overhead,  (servicing, telecom, other overhead)** | **(49,125.00)** | **(17,425.00)** | **(47,475.00)** | **(17,425.00)** | **(49,125.00)** | **(17,425.00)** | **(17,425.00)** | **(47,475.00)** | **(17,425.00)** |
| Payroll | (340,000.00) | | (340,000.00) | | (340,000.00) | | | (340,000.00) | |
| Contractors | (8,500.00) | | (8,500.00) | | | (8,500.00) | | | |
| IT | (17,350.00) | (7,925.00) | (2,350.00) | (2,350.00) | (2,350.00) | (17,350.00) | (7,925.00) | (2,350.00) | (2,350.00) |
| Insurance, medical | (38,000.00) | | | | | (38,000.00) | | | |
| Insurance, liability | | | (25,000.00) | | | | | (25,000.00) | |
| Legal | (170,000.00) | (20,000.00) | (20,000.00) | (20,000.00) | (470,000.00) | (20,000.00) | (20,000.00) | (20,000.00) | (20,000.00) |
| Notary/filing (see Note 1) | (20,700.00) | (20,700.00) | (20,700.00) | (8,700.00) | (700.00) | (700.00) | (700.00) | (700.00) | (700.00) |
| Rent | | (38,000.00) | | | | (38,000.00) | | | |
| Prof Fees | | | | | | | | | |
| Debtor (excludes retainer) | | | | (75,000.00) | | | | | (75,000.00) |
| CRO | (25,000.00) | | | | (25,000.00) | | | | |
| Other Professional fees | (9,000.00) | | | (750.00) | (30,000.00) | | | (2,500.00) | |
| **Total Professional Fees** | **(34,000.00)** | **-** | **-** | **(75,750.00)** | **(55,000.00)** | **-** | **-** | **(2,500.00)** | **(75,000.00)** |
| ***Total Disbursements*** | **(677,675.00)** | **(104,050.00)** | **(464,025.00)** | **(124,225.00)** | **(917,175.00)** | **(139,975.00)** | **(46,050.00)** | **(446,525.00)** | **(115,475.00)** |
| **Ending Balance** | **340,670.82** | **595,204.34** | **481,179.34** | **706,954.34** | **139,779.34** | **358,387.86** | **662,337.86** | **565,812.86** | **800,337.86** |

Note 1:
The stated amounts represent the costs which may be incurred by the Debtors in connection with removing memoranda from the public records, as per the directive entered on September 18, 2023 (the "NC Order") in the North Carolina Stat
pending before the Superior Court for Wake County, North Carolina.  The Debtors intend to seek to stay the NC Action and the implementation of the NC Order, as the NC Order relates to property of the estate.

| 12/1/2023 | 12/8/2023 | 12/15/2023 | 12/22/2023 |
|---:|---:|---:|---:|
| 800,337.86 | 142,246.38 | 446,196.38 | 349,671.38 |
| 8,583.52 | | - | - |
| *350,000.00* | *350,000.00* | *350,000.00* | *350,000.00* |
| 358,583.52 | 350,000.00 | 350,000.00 | 350,000.00 |
| (3,200.00) | (3,200.00) | (3,200.00) | (3,200.00) |
| (9,200.00) | (9,200.00) | (9,200.00) | (9,200.00) |
| | | (550.00) | |
| (3,150.00) | (950.00) | (950.00) | (950.00) |
| (29,500.00) | | (29,500.00) | |
| (4,075.00) | (4,075.00) | (4,075.00) | (4,075.00) |
| **(49,125.00)** | **(17,425.00)** | **(47,475.00)** | **(17,425.00)** |
| (340,000.00) | | (340,000.00) | |
| (8,500.00) | | (8,500.00) | |
| (17,350.00) | (7,925.00) | (2,350.00) | (2,350.00) |
| (38,000.00) | | | |
| | | (25,000.00) | |
| (470,000.00) | (20,000.00) | (20,000.00) | (20,000.00) |
| (700.00) | (700.00) | (700.00) | (700.00) |
| (38,000.00) | | | |
| (25,000.00) | | | |
| (30,000.00) | | (2,500.00) | |
| **(55,000.00)** | **-** | **(2,500.00)** | **-** |
| (1,016,675.00) | (46,050.00) | (446,525.00) | (40,475.00) |
| 142,246.38 | 446,196.38 | 349,671.38 | 659,196.38 |

ce Action (the "NC Action")

**MV Realty PBC, LLC**
**90 day forecast - through 12/22/2023**

*week ending:*

| | 9/29/2023 | 10/6/2023 | 10/13/2023 | 10/20/2023 | 10/27/2023 | 11/3/2023 | 11/10/2023 | 11/17/2023 | 11/24/2023 | 12/1/2023 | 12/8/2023 | 12/15/2023 | 12/22/2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Balance** | 668,345.82 | 340,670.82 | 595,204.34 | 481,179.34 | 706,954.34 | 139,779.34 | 358,387.86 | 662,337.86 | 565,812.86 | 800,337.86 | 142,246.38 | 446,196.38 | 349,671.38 |
| **Receipts:** | | | | | | | | | | | | | |
| **Subtenant Rent** | - | 8,583.52 | - | - | - | 8,583.52 | - | - | - | 8,583.52 | - | - | - |
| **Commission, total** | *350,000.00* | *350,000.00* | *350,000.00* | *350,000.00* | *350,000.00* | *350,000.00* | *350,000.00* | *350,000.00* | *350,000.00* | *350,000.00* | *350,000.00* | *350,000.00* | *350,000.00* |
| ***Total Receipts*** | **350,000.00** | **358,583.52** | **350,000.00** | **350,000.00** | **350,000.00** | **358,583.52** | **350,000.00** | **350,000.00** | **350,000.00** | **358,583.52** | **350,000.00** | **350,000.00** | **350,000.00** |
| Other | | | | | | | | | | | | | |
| dues | (3,200.00) | (3,200.00) | (3,200.00) | (3,200.00) | (3,200.00) | (3,200.00) | (3,200.00) | (3,200.00) | (3,200.00) | (3,200.00) | (3,200.00) | (3,200.00) | (3,200.00) |
| advertising | (9,200.00) | (9,200.00) | (9,200.00) | (9,200.00) | (9,200.00) | (9,200.00) | (9,200.00) | (9,200.00) | (9,200.00) | (9,200.00) | (9,200.00) | (9,200.00) | (9,200.00) |
| Taxes | | | (550.00) | | | | | (550.00) | | | | (550.00) | |
| Utilities, 25th | (3,150.00) | (950.00) | (950.00) | (950.00) | (3,150.00) | (950.00) | (950.00) | (950.00) | (950.00) | (3,150.00) | (950.00) | (950.00) | (950.00) |
| Telecom, servicing | (29,500.00) | | (29,500.00) | | (29,500.00) | | | (29,500.00) | | (29,500.00) | | (29,500.00) | |
| Other/ misc | (4,075.00) | (4,075.00) | (4,075.00) | (4,075.00) | (4,075.00) | (4,075.00) | (4,075.00) | (4,075.00) | (4,075.00) | (4,075.00) | (4,075.00) | (4,075.00) | (4,075.00) |
| **Total Other Overhead, (servicing, telecom, other overhead)** | **(49,125.00)** | **(17,425.00)** | **(47,475.00)** | **(17,425.00)** | **(49,125.00)** | **(17,425.00)** | **(17,425.00)** | **(47,475.00)** | **(17,425.00)** | **(49,125.00)** | **(17,425.00)** | **(47,475.00)** | **(17,425.00)** |
| Payroll | (340,000.00) | | (340,000.00) | | (340,000.00) | | | (340,000.00) | | (340,000.00) | | (340,000.00) | |
| Contractors | (8,500.00) | | (8,500.00) | | | (8,500.00) | | (8,500.00) | | (8,500.00) | | (8,500.00) | |
| IT | (17,350.00) | (7,925.00) | (2,350.00) | (2,350.00) | (2,350.00) | (17,350.00) | (7,925.00) | (2,350.00) | (2,350.00) | (17,350.00) | (7,925.00) | (2,350.00) | (2,350.00) |
| Insurance, medical | (38,000.00) | | | | | (38,000.00) | | | | (38,000.00) | | | |
| Insurance, liability | | | (25,000.00) | | | | | (25,000.00) | | | | (25,000.00) | |
| Legal | (170,000.00) | (20,000.00) | (20,000.00) | (20,000.00) | (470,000.00) | (20,000.00) | (20,000.00) | (20,000.00) | (20,000.00) | (470,000.00) | (20,000.00) | (20,000.00) | (20,000.00) |
| Notary/filing (see Note 1) | (20,700.00) | (20,700.00) | (20,700.00) | (8,700.00) | (700.00) | (700.00) | (700.00) | (700.00) | (700.00) | (700.00) | (700.00) | (700.00) | (700.00) |
| Rent | | (38,000.00) | | | | (38,000.00) | | | | (38,000.00) | | | |
| Prof Fees | | | | | | | | | | | | | |
| Debtor (excludes retainer) | | | | (75,000.00) | | | | | (75,000.00) | | | | |
| CRO | (25,000.00) | | | | (25,000.00) | | | | | (25,000.00) | | | |
| Other Professional fees | (9,000.00) | | | (750.00) | (30,000.00) | | | (2,500.00) | | (30,000.00) | | (2,500.00) | |
| **Total Professional Fees** | **(34,000.00)** | **-** | **-** | **(75,750.00)** | **(55,000.00)** | **-** | **-** | **(2,500.00)** | **(75,000.00)** | **(55,000.00)** | **-** | **(2,500.00)** | **-** |
| ***Total Disbursements*** | **(677,675.00)** | **(104,050.00)** | **(464,025.00)** | **(124,225.00)** | **(917,175.00)** | **(139,975.00)** | **(46,050.00)** | **(446,525.00)** | **(115,475.00)** | **(1,016,675.00)** | **(46,050.00)** | **(446,525.00)** | **(40,475.00)** |
| **Ending Balance** | **340,670.82** | **595,204.34** | **481,179.34** | **706,954.34** | **139,779.34** | **358,387.86** | **662,337.86** | **565,812.86** | **800,337.86** | **142,246.38** | **446,196.38** | **349,671.38** | **659,196.38** |

Note 1:
The stated amounts represent the costs which may be incurred by the Debtors in connection with removing memoranda from the public records, as per the directive entered on September 18, 2023 (the "NC Order") in the North Carolina State Action (the "NC Action") pending before the Superior Court for Wake County, North Carolina. The Debtors intend to seek to stay the NC Action and the implementation of the NC Order, as the NC Order relates to property of the estate.

**EXHIBIT C**

*Interim Order*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| IN RE: | CASE NO. 23-17590-EPK |
|---|---|
| MV REALTY PBC, LLC *et al.*, | CHAPTER 11 |
| Debtors. | (Joint Administration Pending) |

**INTERIM ORDER AUTHORIZING USE OF CASH**
**COLLATERAL AND SETTING FURTHER HEARING**

**THIS MATTER** came before the Court on _____, at _____, upon the

scheduled emergency hearing (the "Hearing") on the Debtors' *Emergency Motion for Entry of*

*Interim and Final Orders Authorizing Use of Cash Collateral and Request for Expedited Hearing*

[ECF No. _____] (the "Motion"), and the Court, having (a) reviewed the file, (b) reviewed the

"Interim Budget" attached to the Motion as **Exhibit "A"**, (c) heard the presentations of counsel,

(d) heard the proffered testimony, which was uncontroverted, (e) found that good and sufficient

notice was provided in accordance with Federal Rule of Bankruptcy Procedure 4001-2, (f) found that good and sufficient cause exists in support of relief on an emergency basis; and (g) found that the requested use of cash collateral in accordance with the Interim Budget is necessary in order to avoid immediate and irreparable harm to the Debtors' estate. Accordingly, the Court being otherwise fully advised in the premises and based further on the entire record of the Hearing, it is

**ORDERED** as follows:

1.      The Motion is GRANTED as provided in this "Interim Order."

2.      The Debtors are authorized to use "cash collateral," as that term is defined in 11 U.S.C. § 363(a) (the "Cash Collateral"), upon the following terms and conditions:

(A)      The Debtors may use Cash Collateral solely for the purpose of funding those expenses in accordance with the Interim Budget, a copy of which is attached hereto as Exhibit "A" and incorporated herein by reference, together with any additional amounts to which the Secured Creditors (hereinafter defined) have afforded prior written consent, *subject, however*, to payment of any fees to the Clerk of the Court.

(B)      As adequate protection for the interests of Goodwood and Monroe Capital (collectively, the "Secured Creditors") in the Cash Collateral, and not to exceed the amount of Cash Collateral used by the Debtors, the Secured Creditors are granted, without any further action, continuing liens ("Continuing Liens") as of the Petition Date on and security interests in all property of the Debtors of the same description, type and nature as was subject to the Secured Creditors' pre-petition liens and security interests with such Continuing Liens to have the same extent, validity and priority as existed as of the Petition Date; *provided, however*, that the Continuing Liens shall be at all times subject and junior to the Administrative Carveout (as hereinafter defined) and any Professional Fee Carveout (as hereinafter defined).  For avoidance of

doubt, the Continuing Liens shall not attach to any causes of action that could be brought under §§ 544-548 of the Bankruptcy Code or any applicable state fraudulent-transfer or any similar statute;

(C)    As additional adequate protection for the Debtors' use of Cash Collateral, but only to the extent that the Continuing Liens are not sufficient to protect against any diminution in the value of the Prepetition Collateral as a result of such use of Cash Collateral, the Secured Creditors shall be granted, without any further action, valid, binding, enforceable, fully perfected, replacement liens and first priority security interests in the Debtors' presently owned or hereafter acquired property and assets, whether such property and assets were acquired before or after the Petition Date, of any kind or nature, whether real or personal, tangible or intangible, wherever located, and the proceeds and products thereof (the "Replacement Liens") junior only to: (i) the Administrative Carveout (as hereinafter defined) and any Professional Fee Carveout (as hereinafter defined); and (ii) valid, enforceable, properly perfected and unavoidable prepetition liens existing on the Petition Date upon assets that do not constitute Prepetition Collateral. The Replacement Liens shall not attach to any causes of action that could be brought under §§ 544-548 of the Bankruptcy Code or any applicable state fraudulent-transfer statute or any similar statute;

(D)    The Continuing Liens and Replacement Liens shall be deemed duly and automatically perfected under all applicable laws, and no further notice, filing, recordation or order shall be required to effectuate such perfection.  Debtors and Secured Creditors shall not be required to execute mortgages, security agreements, corporate resolutions or other documents or record further financing statements or take any other steps under applicable law, or otherwise, to create or perfect the Continuing Liens and Replacement Liens authorized hereunder.

(E)     The Continuing Liens and Replacement Liens shall be at all times subject and junior to: (i) all unpaid fees required to be paid to the Clerk of the Court (collectively, the "Administrative Carveout"); and (ii) any carveout for the benefit of professionals agreed to by Secured Creditors as part of any final cash collateral order (the "Professional Fee Carveout" and, together with the Administrative Carveout, the "Carveouts");

(F)     The Debtors shall provide the Secured Creditors, if requested in writing, monthly reports, commencing on October 25, 2023, for September 2023, and each month thereafter, disclosing actual monthly receipts and disbursements. Finally, the Debtors shall maintain customary insurance necessary to insure the collateral.

(G)     The Debtors' authorization to use Cash Collateral shall be effective through and including the date of the Final Hearing (defined hereinafter) (the "Interim Period"), unless otherwise terminated in accordance with this Interim Order;

(H)     The Debtors' authorization to use the Cash Collateral shall terminate on the earlier of: (i) the expiration of the Interim Period; (ii) by entry of a further order of this Court; or (iii) the occurrence of any of the following (an "Event of Default") unless such Event of Default is otherwise waived by the affected Secured Creditor:

(i)     the failure of Debtors to materially comply with the terms and provisions of this Interim Order; *provided* that the Secured Creditors shall notify Debtors' counsel in writing by telephone facsimile or e-mail of any noncompliance by Debtors with the terms and provisions of this Interim Order, and the Debtors shall have three (3) business days from the sending of the notice to cure such noncompliance;

(ii)     any post-petition lien (other than any lien(s) recorded against the property as of the petition date) is recorded against the assets of the bankruptcy estate, except any lien granted on assets of the bankruptcy estate to secure post-petition financing to which lien the Secured Creditors have consented or which has been granted pursuant to an order of this Court; or

(iii)    the appointment of a trustee or an examiner, or conversion of this case to a Chapter 7 case.

(I)    Upon the occurrence of an Event of Default, (i) the Debtors shall no longer have authority to use Cash Collateral, but any and all accrued amounts under the Carveouts, through the date of Event of Default, shall be unaffected by the Event of Default, and (ii) the Secured Creditors shall be entitled to an expedited hearing, on at least seventy-two (72) hours' notice to the Debtors and their counsel and any other party or entity who may claim a lien against the Debtors' assets.  Notwithstanding an Event of Default, the foregoing is without prejudice to the rights of the Debtors to oppose such relief and to otherwise seek and obtain an entry of an order by the Court authorizing continued use of Cash Collateral; and

(J)    The Debtors shall cause to be served on the Secured Creditors and their counsel copies of all pleadings, notices, proposed orders, and other papers tendered to or filed by Debtors with this Court in connection with this Chapter 11 case.

3.    Nothing herein contained shall constitute an acknowledgment that the Secured Creditors are adequately protected nor shall it prejudice, impair or otherwise affect the rights of the Secured Creditors under the Bankruptcy Code and Bankruptcy Rules or other applicable law; *provided, however,* the foregoing shall be without prejudice to or waiver of the Debtors' rights, claims, and defenses hereunder or under the applicable provisions of the Bankruptcy Code and other applicable law, and the Debtors reserve any and all rights to challenge and/or seek a determination as to: (a) the extent to which any of the Secured Creditors is entitled to any Continuing Liens or Replacement Liens; (b) the value of any collateral, including, without limitation, Prepetition Collateral; (c) object to the extent, validity, or priority of any liens recorded or asserted by any of the Secured Creditor; (d) object to any claim of the Secured Creditors,

including, without limitation, any claim for post-petition interest, fees, or costs; or (e) file any avoidance action under Chapter 5 of the Bankruptcy Code.

4.      Nothing contained herein shall be construed or deemed a waiver of any claims by any third parties.

5.      The Debtors shall not engage in any transaction which is not in the ordinary course of its business, except as otherwise authorized by the Court.

6.      Unless agreed to in writing by the affected Secured Creditors or authorized by this Court, the Debtors shall not create, assume, or hereafter cause to exist any lien or security interest in the property of the estate or the Cash Collateral in favor of any entity other than Secured Creditors.

7.      Any and all controversies or disputes over the interpretation or performance of the terms and conditions of this Interim Order shall be determined by this Court upon application or motion made by the Secured Creditors, Debtors or other parties-in-interest; Debtors and the Secured Creditors agree that any such application or motion by either of them may be heard on at least seventy-two (72) hours' notice to the other party; the foregoing shall include, without limitation, any motion to compel performance of the terms and provisions of this Interim Order.

8.      This Interim Order shall not be construed as consent by the Secured Creditors to the assessment of their collateral or the Cash Collateral pursuant to 11 U.S.C. § 506(c).

9.      This Interim Order is without prejudice to the rights of Debtors and the Secured Creditors to seek modification of it or relief in accordance with applicable law.

10.      **A final hearing (the "_Final Hearing_") on the Motion shall be held on _____, at _____, at United States Bankruptcy Court, Flagler**

**Waterview Building, 1515 North Flagler Drive, Suite 801, Courtroom 8, West Palm Beach,**

**FL 33401.**

        11.     The Court retains jurisdiction with respect to all matters arising from or related to

the implementation of this Interim Order.

###

Submitted by:

Michael D. Seese, Esq.
Seese, P.A.
101 N.E. 3rd Avenue, Suite 1500
Ft. Lauderdale, FL 33301
Telephone No.: (954) 745-5897
mseese@seeselaw.com

Copies to:

Michael D. Seese, Esq., who is directed to serve a copy of this Order upon all non-registered users
or registered users who have yet to appear electronically in this case and file a conforming
certificate of service.