**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| IN RE: | CASE NO. 23-17590-EPK |
|---|---|
| MV REALTY PBC, LLC *et al.*, | CHAPTER 11 |
| Debtors. | (Joint Administration Pending) |

**DEBTORS' *EMERGENCY* MOTION FOR ORDER AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM AND BANK ACCOUNTS**

**The Debtors respectfully request that an *emergency* hearing be conducted by the Court. Absent use of the Debtors' cash management system, the Debtors run the risk of irreparable harm to their business.**

Each of the Debtors,[1] by and through their proposed undersigned counsel, and pursuant to the provisions of 11 U.S.C. §§ 105 and 363, file this *Emergency Motion For Order Authorizing*

---

1 The last four digits of the Debtors' federal tax identification numbers are: *MV Realty, PBC LLC (6755), MV Realty Holdings, LLC (3483), MV Receivables II, LLC (9368), MV Receivables III, LLC (6793), MV Realty PBC, LLC (Pennsylvania) (7301), MV Realty of South Carolina, LLC (7322), MV Realty of North Carolina, LLC (3258), MV of Massachusetts, LLC (0864), MV Realty of Illinois, LLC (8814), MV Realty of Arizona, LLC (2725), MV Realty of Connecticut, LLC (8646), MV Realty PBC, LLC (Georgia) (6796), MV Realty of New Jersey, LLC (5008), MV Realty of Washington, LLC (7621), MV Realty of Maryland, LLC (9945), MV Realty of Virginia, LLC (2129), MV Realty of Tennessee, LLC (7701), MV Realty of Wisconsin, LLC (2683), MV Realty of Nevada, LLC (0799), MV Realty of Oregon, LLC (3046), MV Realty of Utah, LLC (4543), MV Realty of Minnesota, LLC (1678), MV Realty of Indiana, LLC (3566), MV Realty of Missouri, LLC (6503), MV Homes of New York, LLC (2727), MV Realty of Idaho, LLC (8185), MV Realty of Alabama, LLC (6462), MV Realty of Colorado, LLC (1176), MV Realty of Oklahoma, LLC (8174), MV Realty of Louisiana, LLC (3120), MV Realty of Kansas, LLC (2304), MV Realty of Kentucky, LLC (2302), MV Realty of California (7499), MV Realty of Texas, LLC (7182), MV Realty of Michigan, LLC (5280,) and MV Realty of Ohio, LLC (0728)*.

*Continued Use of Existing Cash Management System and Bank Accounts* (the "Motion")[2], and in support thereof, state as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding as defined in 28 U.S.C. §157(b)(2)(A) and (M).

2. The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105 and 363.

**BACKGROUND**

***A. Filing***

3. On September 22, 2023, the Debtors each filed a voluntary petition under Chapter 11 of Title 11 of the United States Code. The Debtors are in possession of their assets and operating their businesses as debtors-in-possession pursuant to the authority of 11 U.S.C. §§ 1107 and 1108.

***B. Organizational Structure***

4. Debtor, MV Realty Holdings, LLC ("Holdings") is a Florida limited liability company and the sole owner of Debtor, MV Realty PBC, LLC a Florida limited liability company ("PBC"), and MV Brokerage, LLC ("Brokerage").

5. PBC is the sole owner of the following debtors: (a) MV Realty Receivables II, a Florida limited liability company ("Receivables II"); (b) MV Realty Receivables III, a Florida limited liability company ("Receivables III"); (c) MV Realty of California, a California

[2] The Debtors recognize that the Office of the United States Trustee may request relief be granted on an *interim* basis, so as to provide additional time to analyze the Debtors' requests. The Debtors have prepared an order on this basis.

corporation ("California"); and (d) thirty-one (31) additional debtor subsidiaries (collectively, with California, the "MV Realty Subs"), each of which is a limited liability company organized under the laws of the states of Pennsylvania, South Carolina, North Carolina, Massachusetts, Illinois, Arizona, Connecticut, Georgia, New Jersey, Washington, Maryland, Virginia, Tennessee, Wisconsin, Nevada, Oregon, Utah, Minnesota, Indiana, Missouri, New York, Idaho, Alabama, Colorado, Oklahoma, Louisiana, Kansas, Michigan, Kentucky, Texas and Ohio. Each of the MV Realty Subs is incorporated or organized under the laws of the respective states as follows: "*MV Realty of [state], LLC*" (with the exception of New York ("MV Homes of New York, LLC") and Massachusetts, ("MV of Massachusetts, LLC")).

6. Brokerage is the sole owner of the following (collectively, the "MV Brokerage Subs"): (a) thirty-three (33) separate subsidiaries, each of which is a limited liability company organized under the laws of the states of Florida, Pennsylvania, South Carolina, North Carolina, Massachusetts, Illinois, Arizona, Connecticut, Georgia, New Jersey, Washington, Maryland, Virginia, Tennessee, Wisconsin, Nevada, Oregon, Utah, Minnesota, Indiana, Missouri, New York, Idaho, Alabama, Colorado, Oklahoma, Louisiana, Kansas, Michigan, Kentucky, Texas and Ohio; and (b) one subsidiary incorporated under the laws of the state of California. For the most part, the MV Brokerage Subs each operate as "*MV Brokerage of [state], LLC.*"

### ***C. Business Operations***

7. PBC is the servicing entity, which operates primarily from premises located at 815 Broken Sound Parkway, Boca Raton, Florida 33487. Currently, PBC has 79 full-time employees, and also uses the services of 156 independent contractors, who receive 1099s.

8. PBC was founded in 2014 and initially operated as a traditional real estate brokerage firm. In October 2018, PBC began focusing its efforts on developing and marketing a unique product to residential homeowners.

9. In or around October 2018, PBC implemented the "Homeowner Benefit Program" (the "HBP"). As part of the HBC, the MV Realty Subs enter "Homeowner Benefit Agreements" (the "HBA") with residential homeowners. The HBA is not a listing agreement, but is a forward listing contract pursuant to which the MV Realty Subs pay an upfront cash payment to homeowners in exchange for the exclusive right to list a homeowner's home if and when the homeowner decides to sell their home. The term of the HBA is forty (40) years subject to certain early termination events.

10. In accordance with an HBA, a selling homeowner lists their home with the applicable MV Realty Sub, which then lists and sells the home for a standard commission, including any participating broker commission. In the event the home does not sell within six (6) months, the homeowner may terminate the HBA at no cost and without penalty. The HBA is not a listing agreement.

11. In the event a homeowner breaches the HBA, which results in an early termination of the HBA, the MV Realty Subs are typically entitled to a termination fee equal to three percent (3%) of the greater of (a) the fair market value of the home at the time the HBA is executed, and (b) the fair market value at the time of breach or early termination.

12. Additionally, the MV Realty Subs reserves the right to record a memorandum ("Memorandum"), or other similar notice, of the HBA in the public records in the county in which the real estate is located. Although the HBAs are governed by the laws of the state in

which the HBA is entered, the terms of the HBAs and Memoranda are substantively consistent from state to state.

13. At the present time, the MV Realty Subs are parties to approximately 34,000 HBAs.

***D. Financing – Goodwood I***

14. On or about February 11, 2020, MV Receivables I, LLC ("Receivables I"), a wholly owned subsidiary of PBC, entered into a credit agreement (the "Goodwood I Credit Agreement") with Goodwood Fund, as the initial lender ("Goodwood Fund" and, together with other lenders under the Goodwood I Credit Agreement, the "Goodwood I Lenders"), and Goodwood Inc., as agent ("Goodwood Inc."). The parties also executed, among other documents, a Security Agreement (the "Goodwood I Security Agreement" and, collectively with the Goodwood I Credit Agreement and other related documents, the "Goodwood I Loan Documents").

15. PBC and Receivables I also entered a Purchase and Contribution Agreement (the "Purchase Agreement") pursuant to which Receivables I agreed to purchase HBAs acquired with amounts advanced under the terms of the Goodwood I Credit Agreement. The advance rate is typically sixty percent (60%) of discounted eligible receivables. The amount of $10,000,000.00 has been advanced under the Goodwood I Credit Agreement.

16. Under the Goodwood I Security Agreement, Receivables I granted a security interest in and to its assets, including, without limitation, certain HBAs, accounts, receivables, and general intangibles, in favor of Goodwood Inc., as agent for the Goodwood I Lenders. PBC signed a limited guarantee of amounts owed by Receivables I under the Goodwood I Credit Agreement.

***E.*** ***Financing – Monroe Capital***

17. On or about July 28, 2021, Receivables II entered into a $40,000,000.00 senior secured delayed draw credit facility (the "Monroe Credit Facility") with Monroe Capital Management Advisors, LLC, as administrative and collateral agent ("Monroe Capital"), and the lenders under the Monroe Credit Facility (collectively, the "Monroe Lenders"). Receivables II and Monroe Capital executed, among other documents, a Credit Agreement (the "Monroe Credit Agreement"), Security Agreement (the "Monroe Security Agreement", and Pledge Agreement (the "Monroe Pledge Agreement" and, collectively with Monroe Credit Agreement, the Monroe Security Agreement, and related other agreements, the "Monroe Loan Documents").

18. The Monroe Lenders have advanced the amount of $40,000,000.00 to Receivables II under the Monroe Credit Facility, the proceeds of which were to be used to acquire eligible receivables in accordance with the Monroe Credit Agreement and to fund operations and other related expenses.

19. Under the Monroe Credit Facility, PBC, certain of the MV Realty Subs (New Jersey, Connecticut, Illinois, Massachusetts, North Carolina, South Carolina, and Georgia) (collectively, and excluding PBC, the "Initial MV Realty Guarantors") initially guaranteed the obligations of Receivables II. The Monroe Credit Facility was later guaranteed by subsequent MV Realty Subs, who organized and became parties to the Monroe Credit Facility and Monroe Loan Documents as the operation expanded.

20. In accordance with the Monroe Pledge Agreement, (a) Holdings pledged its equity interest in in PBC, and (b) PBC pledged its membership interests in the MV Realty Subs, in favor of Monroe Capital, as collateral agent. All membership interests are uncertificated.

21. In accordance with the Monroe Security Agreement, Receivables II, PBC, and the Initial MV Realty Guarantors, as well as any other MV Realty Subs who later joined the Monroe Credit Facility and Monroe Loan Documents, granted Monroe Capital a security interest in their assets, including, without limitation, accounts, documents, general intangibles, investment property, receivables, and receivables relating to the HBAs.

22. Generally speaking, (a) the MV Realty Subs would entered into HBAs with homeowners, thus giving the MV Realty Subs the exclusive right to list homes in the event a homeowner ever decide to sell their home, (b) the receivables under the HBAs were to be sold or otherwise assigned to MV Receivables II, and (c) Monroe Capital then advanced at a rate of forty-five percent (45%) of the net present value of eligible receivables under the HBAs.

***F. Consent and Confirmation Agreement***

23. In or about July 2021, Monroe, Goodwood Inc., PBC and Receivables I entered into the Acknowledgement and Confirmation Agreement (the "Confirmation Agreement"), which was, essentially, an inter-creditor agreement, pursuant to which Monroe and Goodwood Inc. acknowledged and consented to the other's respective rights under the Monroe Capital Loan Documents and the Goodwood I Loan Documents, respectively.

***G. Financing - Goodwood II***

24. On November 4, 2022, MV Receivables III, LLC ("Receivables III"), Goodwood MV Realty LP, as the initial lender ("Goodwood MV" and, together with any other related lenders, the "Goodwood II Lenders"), and Goodwood, Inc. ("Goodwood Inc."), as agent, entered into a Credit Agreement (the "Goodwood II Credit Agreement"). The parties also executed, among other documents, a Security Agreement (the "Goodwood II Security Agreement" and,

collectively with the Goodwood II Credit Agreement and other related documents, the "Goodwood II Loan Documents").

25. In accordance with the Goodwood II Credit Agreement, Receivables IIII agreed to purchase HBAs acquired with amounts advanced under the terms of the Goodwood II Credit Agreement. The advance rate was approximately sixty percent (60%) of the net present value of eligible receivables under the HBAs. The amount of $4,500,000.00 has been advanced.

26. Under the Goodwood II Security Agreement, Receivables III granted Goodwood Inc. a security interest in and to its assets, including, without limitation, the HBAs, accounts, receivables, and general intangibles. MV Brokerage signed a limited guarantee of amounts owed by Receivables III under the Goodwood II Credit Agreement.

### ***H. Other Financing***

27. In February 2023, Holdings executed senior notes with eight (8) shareholders of Holdings, who advanced a total of $12,968,000.00 (collectively, the "Shareholder Notes"). There is approximately $14,103,144.11 outstanding, including accrued interest, under the Shareholder Notes. The proceeds borrowed were used to fund operations.

28. Additionally, in 2021 and 2022, Holdings executed two (2) rounds of convertible notes, one of which has since converted. The later round, which was in the total amount of $6,070,000.00, has not been converted.

### ***I. Assets and Secured Obligations***

29. Monroe is currently owed approximately $40,000,000.00, while the Goodwood I Lenders and Goodwood II Lenders are owed approximately $7,408,275.82 and $4,460,000.00, respectively. As of September 5, 2023, the net present value of the collateral securing the foregoing obligations is (a) $89,315,255.01 (Monroe), (b) $12,656,966.30 (Goodwood I), and (c)

$6,106,069.54 (Goodwood II). Holdings has additional HBAs with an aggregate net present value of approximately $12,861,536.97. Accordingly, the total net present value of HBAs exceeds $120,000,000.00.

## EVENTS LEADING TO BANKRUPTCY

30. Since November 29, 2022, the states of Florida, Pennsylvania, Massachusetts, Ohio, North Carolina, New Jersey, and Indiana commenced actions against certain of the MV Realty Subs (collectively, the "State Actions"). PBC is a named defendant in the State Actions commenced by the states of Florida, Pennsylvania, New Jersey, North Carolina, Massachusetts, and Indiana. Other individual officers and licensed real estate brokers working in connection with the HBAs are named in nearly all State Actions. The allegations asserted in the State Actions range from telemarketing violations to unfair or deceptive trade practices.

31. It is alleged in the State Actions that the filing of the memorandum, which provides constructive notice to the public of the existence of the HBA and its terms, unfairly or deceptively interferes with the homeowner's ability to sell the home.

32. The Debtors contend that the memorandum, which is separately signed by each homeowner under the HBA, is neither deceptive nor unfair. Rather, the memorandum is filed in accordance with the applicable law of each state and serves the purpose intended by the applicable law of each state by providing public notice of the HBA.

33. Moreover, in several instances, it is alleged in the State Actions that the Debtors made improper telephone solicitations to prospective customers without their consent. To date, however, the Debtors have not had any meaningful opportunity to present in court the vast number of lawfully obtained consents from prospective homeowners authorizing these very solicitations.

34. It has also been alleged in many of the State Actions that the Debtors' sales and marketing practices "prey" upon customers who are elderly or of diminished financial means. However, the Debtors strenuously disagree with such allegations as being unsupported by fact. The facts are that (a) the typical homeowner in an HBA owns a home with an average value exceeding $300,000, and (b) the average age of homeowners under HBAs is 55 years old (and 72% of homeowners are under age 65). By comparison, the American Housing Survey 2021, based on US Census Bureau data, indicates that only 67.3% of homeowners in the country are under the age of 65. Thus, the homeowners under the HBAs are proportionally younger than a typical cross-section of homeowners overall in the United States.

35. It is alleged or implied in the State Actions that a very significant portion of the Debtors' customers are aggrieved and have complained to state consumer protection authorities. However, this allegation is inaccurate and unsupported by the facts. For example, in North Carolina, over the 16-month period prior to the commencement of the State Action, the state consumer protection authorities made the Debtors aware of only twelve (12) consumer complaints (out of a total of 2,100 HBAs in North Carolina) regarding allegedly deceptive conduct by the Debtors. These complaints came mostly from customers who alleged deception or unfairness by the Debtors only after the homeowner had breached the HBA. In contrast, the Debtors, in a mere 45-day period, following the commencement of the State Action in North Carolina, obtained at least 250 sworn statements from North Carolina homeowners attesting that they understood the key terms and elements of the HBA.

36. It is also well worth noting that the Debtors previously engaged national and well-recognized local law firms prior to implementing the HBP in each state, who advised as to compliance with state and other applicable laws with respect to the sales and marketing of the

HBP and HBAs, as well as with respect to the terms and conditions of the HBAs and related agreements.

37. Accordingly, the defendants vigorously oppose the State Actions and contend that the HBAs comply with all applicable laws.

38. Finally, there are other actions that have been commenced by real estate regulatory commissions that include both the MV Brokerage Subs and the individual licensed real estate agents and brokers in connection with their work on the HBAs.

39. In defending against the State Actions and other regulatory matters, the Debtors have spent and incurred millions of dollars in legal fees, and the Debtors' personnel have devoted substantial time in assisting defense counsel.

40. The Debtors commenced these Chapter 11 proceedings to protect and maximize the value of their assets and for the purpose of implementing one or more strategies aimed at alleviating or otherwise minimizing the financial strain of the State Actions. The Debtors also intend to protect the assets from any adverse creditor action, and otherwise preserving estate assets for the benefit of all creditors.

## RELIEF REQUESTED

41. The Debtors respectfully request that the Court authorize the Debtors' continued use of the existing cash management system and bank accounts.

## ARGUMENTS IN SUPPORT OF RELIEF REQUESTED

### A. Cash Management

42. The Debtors request that they be permitted to continue using the following cash management system (collectively, the "Cash Management System"):

(a) PBC. PBC maintains the following six (6) accounts with Chase Bank

(collectively, the "PBC Accounts"): (i) one account is used for payroll purposes; funds are deposited from the Holding Accounts into the payroll account immediately in advance of payroll processing by either TriNet or ADP; the account is used for no other purpose (the "Payroll Account"); (ii) one account is a checking account and used as the main operating account; this account is used to pay the operating expenses of the business operation, as well as legal fees and costs, including in the form of check, ACH, and wire transfers; deposits into this account are derived from real estate closings and termination fees or the occasional refund/credit from routine operations/vendors (the "Operating Account"); (iii) one account is used for purposes of paying state and county filing fees, as well as a limited number of routine operating expenses, such as IT and association dues/subscriptions; the only source of funds deposited into this account is the Operating Account or the Holding Accounts; there is a debit card used in connection with this account, so that fees may be paid in various states (which only allow payment by credit or debit card); very little funds are deposited into this account except as needed for the foregoing expenses (the "Fee Account"); (iv) two (2) other accounts are used to receive funds from closings, representing commissions and termination fees (the "Commission/Fee Accounts"); PBC attempts to have funds deposited into these Commission/Fee Accounts depending on whether the amounts for deposit relate to an HBA included as part of the collateral pool for Monroe Capital or Goodwood; the depositing of such funds enables more accurate record keeping and reporting; following depositing, funds are then transferred to the Operating Account; and (v) Receivables II and Holdings each maintain an account at Chase Bank; these accounts are used as "hold" accounts received from the Operating Account and/or the Commission/Fee Accounts (collectively, the "Holding Accounts"); funds are transferred to the Holding Accounts on a regular basis as a control against fraud and unauthorized withdrawals, as details regarding Commission/Fee Accounts are widely distributed in connection with closings; account information for the Holding

Accounts is private; no disbursements are made from the Holding Account except internal transfers to one of the other disbursement accounts (Payroll Account, Operating Account, or Fee account).

(b) MV Realty Subs. Three (3) MV Realty Subs (New Jersey, Georgia, and Connecticut) had their own bank account with Bank of America; however, the accounts for New Jersey and Georgia have not been since 2021, and the account for Connecticut is only used in connection with a credit card issued on the account for purposes of paying filing fees. A fourth account at Bank of America was in the name of PBC and used for credit card transactions (primarily expenses related to marketing by in-house agents/brokers) but is now closed. Otherwise, the MV Realty Subs do not make disbursements from these accounts other than transfers to PBC.

43. Under the circumstances, maintaining the Cash Management System is both essential and in the best interests of the Debtors' estate and creditors.

44. If the Cash Management System is not approved, operations could be severely, and perhaps, irreparably, impaired.

**B. Use of Existing Bank Accounts**

45. The Debtors respectfully request authority to continue using each of their existing accounts with Chase Bank until such time as new "DIP" accounts may be opened.

46. The Delay in converting to new "DIP" accounts, as well as the potential issues relating to closing the existing accounts justify the relief sought herein. At the time, the Debtors are collecting approximately $1,400,000.00 per month, which translates, on average, to more than one hundred (100) closings per month, or an average of more than five (5) closings per day.

**C. Relief Requested Is Consistent with the Provisions of the Bankruptcy Code**

47. Bankruptcy courts routinely grant authority to continue utilizing existing cash management systems and treat requests for such authority as a relatively "simple matter." *In re*

*Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). In *In re Charter Co.*, 778 F.2d 617 (11th Cir. 1985), for example, the Eleventh Circuit Court of Appeals affirmed a District Court decision denying a creditor's motion for leave to appeal the Bankruptcy Court's cash management order, holding that authorizing the debtors to utilize their prepetition "routine cash management system" was "entirely consistent" with applicable provisions of the Bankruptcy Code. Id. at 621.

48. In order to facilitate business operations and to preserve value, it is critical that the Cash Management System be approved. Accordingly, it is appropriate and entirely consistent with applicable provisions of the Bankruptcy Code and case law for the Court to approve the Cash Management System and use of existing bank accounts.

**WHEREFORE,** the Debtors respectfully request that the Court grant this Motion and enter an order approving and authorizing the Cash Management System, as well as the temporary use of existing bank accounts, as requested herein, the proposed form of which is attached hereto as Exhibit "A", as well as granting any other and further relief that the Court may deem just and proper.

**CERTIFICATE OF EXIGENT CIRCUMSTANCES**

**I HEREBY CERTIFY** that an emergency hearing has been requested, since the relief requested may be critical to the administration of this estate and to the Debtors' business operations.

**SEESE, P.A.**
*Proposed* Attorneys for Debtors-in-Possession
101 N.E. 3rd Avenue
Suite 1500
Ft. Lauderdale, Florida 33301
Telephone No.: (954) 745-5897
mseese@seeselaw.com

By: ***s/Michael D. Seese***
Michael D. Seese, Esq.
Fla. Bar No. 997323

**EXHIBIT A**

***Proposed Order***

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| IN RE:<br><br>MV REALTY PBC, LLC *et al.*,<br><br>Debtors. | CASE NO. 23-17590-EPK<br><br>CHAPTER 11<br><br>(Joint Administration Pending) |
|---|---|

***INTERIM* ORDER GRANTING DEBTORS' *EMERGENCY* MOTION FOR ORDER AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM AND BANK ACCOUNTS**

**THIS CAUSE** came before the Court on _____________________ 2023, at ___________ upon the scheduled hearing (the "Hearing")[1] on the *Emergency Motion For Order Authorizing Continued Use of Existing Cash Management System and Bank Accounts* [ECF No. _____] (the "Motion"), and the Court, having reviewed the file, having heard the presentation of counsel,

[1] Unless defined in this Order, defined terms shall have the meanings ascribed to such terms in the Motion.

having determined that good and sufficient cause exist in support of the relief requested, and for the reasons stated on the record of the Hearing, and the Court being otherwise fully advised in the premises, it is

**ORDERED** as follows:

1. The Motion is **GRANTED** on an *interim* basis as provided herein.

2. The proposed Cash Management System, as defined and more fully described in the Motion, is approved, and the Debtors are authorized to continue to use the Cash Management System, pending a Final Hearing.

3. The Debtors are authorized to continue using their existing bank accounts as described in the Motion pending the opening of debtor-in-possession accounts in place of existing bank accounts; *provided, however,* the Debtors shall not be required to reference "debtor-in-possession" or case name or number, provided that any such bank account is designated as an authorized depository by the United States Trustee pursuant to the United States Trustee Guidelines. Notwithstanding the foregoing, the Debtors shall account for all receipts and disbursements made from and after September 22, 2023.

4. The Debtors are authorized to deposit funds into and make disbursements by all usual means, including checks, wire transfers, and other debits, and to pay any bank fees associated with such accounts.

5. The relief granted by this Order shall be extended to any new bank account hereafter opened by the Debtors, including, without limitation, any debtor-in-possession account, provided that any new bank account is designated as an authorized depository by the United States Trustee pursuant to the United States Trustee Guidelines.

6. **A final hearing (the "Final Hearing") on the Motion shall be held on ____________________, at _________, at United States Bankruptcy Court, Flagler Waterview Building, 1515 North Flagler Drive, Suite 801, Courtroom 8, West Palm Beach, FL 33401.**

7. The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

###

Submitted by:

Michael D. Seese, Esq.
Seese, P.A.
101 N.E. 3rd Avenue
Suite 1500
Ft. Lauderdale, FL 33301
Telephone No.: (954) 745-5897
mseese@seeselaw.com

Copies to:

Michael D. Seese, Esq., who is directed to serve a copy of this Order upon all non-registered users or registered users who have yet to appear electronically in this case and file a conforming certificate of service.