UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 23-17590-EPK |
| MV REALTY PBC, LLC *et al.*, | CHAPTER 11 |
| Debtors. | (Jointly Administered) |

**DEBTORS'** ***EMERGENCY*** **MOTION FOR ENTRY
OF ORDER DESIGNATING AND APPROVING NOTICE PROCEDURES**

> **The Debtors respectfully request that an *emergency* hearing be conducted by the Court. The Debtors wish to establish notice procedures in order to control costs.**

Each of the Debtors,[1] by and through their proposed undersigned counsel, and pursuant to the provisions of 11 U.S.C. § 105(a) and Bankruptcy Rules[2] 2002(a), (b), (c), (d), (f), and (m), file this *Emergency Motion For Entry of Order Designating and Approving Notice Procedures* (the "Motion"), and in support thereof, state as follows:

---

[1] The last four digits of the Debtors' federal tax identification numbers are: *MV Realty, PBC LLC (6755), MV Realty Holdings, LLC (3483), MV Receivables II, LLC (9368), MV Receivables III, LLC (6793), MV Realty PBC, LLC (Pennsylvania) (7301), MV Realty of South Carolina, LLC (7322), MV Realty of North Carolina, LLC (3258), MV of Massachusetts, LLC (0864), MV Realty of Illinois, LLC (8814), MV Realty of Arizona, LLC (2725), MV Realty of Connecticut, LLC (8646), MV Realty PBC, LLC (Georgia) (6796), MV Realty of New Jersey, LLC (5008), MV Realty of Washington, LLC (7621), MV Realty of Maryland, LLC (9945), MV Realty of Virginia, LLC (2129), MV Realty of Tennessee, LLC (7701), MV Realty of Wisconsin, LLC (2683), MV Realty of Nevada, LLC (0799), MV Realty of Oregon, LLC (3046), MV Realty of Utah, LLC (4543), MV Realty of Minnesota, LLC (1678), MV Realty of Indiana, LLC (3566), MV Realty of Missouri, LLC (6503), MV Homes of New York, LLC (2727), MV Realty of Idaho, LLC (8185), MV Realty of Alabama, LLC (6462), MV Realty of Colorado, LLC (1176), MV Realty of Oklahoma, LLC (8174), MV Realty of Louisiana, LLC (3120), MV Realty of Kansas, LLC (2304), MV Realty of Kentucky, LLC (2302), MV Realty of California (7499), MV Realty of Texas, LLC (7182), MV Realty of Michigan, LLC (5280,) and MV Realty of Ohio, LLC (0728)*.

[2] Federal Rules of Bankruptcy Procedure (Fed.R.Bankr.P.) (the "Bankruptcy Rules").

1

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A).

2. The statutory predicates for the relief requested herein are 11 U.S.C. § 105 and Bankruptcy Rules 2002(a), (b), (f), (m), and 3017(d), and Local Rule 2002-1(H).

## BACKGROUND

### *A.* *Filing*

3. On September 22, 2023, the Debtors each filed a voluntary petition under Chapter 11 of Title 11 of the United States Code. The Debtors are in possession of their assets and operating their businesses as debtors-in-possession pursuant to the authority of 11 U.S.C. §§ 1107 and 1108. The Debtors' Chapter 11 cases are being jointly administered.

### *B.* *Organizational Structure*

4. Debtor, MV Realty Holdings, LLC ("Holdings") is a Florida limited liability company and the sole owner of Debtor, MV Realty PBC, LLC a Florida limited liability company ("PBC"), and MV Brokerage, LLC ("Brokerage").

5. PBC is the sole owner of the following debtors: (a) MV Realty Receivables II, a Florida limited liability company ("Receivables II"); (b) MV Realty Receivables III, a Florida limited liability company ("Receivables III"); (c) MV Realty of California, a California corporation ("California"); and (d) thirty-one (31) additional debtor subsidiaries (collectively, with California, the "MV Realty Subs"), each of which is a limited liability company organized under the laws of the states of Pennsylvania, South Carolina, North Carolina, Massachusetts, Illinois, Arizona, Connecticut, Georgia, New Jersey, Washington, Maryland, Virginia, Tennessee,

Wisconsin, Nevada, Oregon, Utah, Minnesota, Indiana, Missouri, New York, Idaho, Alabama, Colorado, Oklahoma, Louisiana, Kansas, Michigan, Kentucky, Texas and Ohio. Each of the MV Realty Subs is incorporated or organized under the laws of the respective states as follows: "*MV Realty of [state], LLC*" (with the exception of New York ("MV Homes of New York, LLC") and Massachusetts, ("MV of Massachusetts, LLC")).

**C.**     **Business Operations**

6.     PBC is the servicing entity, which operates primarily from premises located at 815 Broken Sound Parkway, Boca Raton, Florida 33487. Currently, PBC has 79 full-time employees, and also uses the services of 156 independent contractors, who receive 1099s.

7.     PBC was founded in 2014 and initially operated as a traditional real estate brokerage firm. In October 2018, PBC began focusing its efforts on developing and marketing a unique product to residential homeowners.

8.     In or around October 2018, PBC implemented the "Homeowner Benefit Program" (the "HBP"). As part of the HBC, the MV Realty Subs enter "Homeowner Benefit Agreements" (the "HBA") with residential homeowners. The HBA is not a listing agreement but is a forward listing contract pursuant to which the MV Realty Subs pay an upfront cash payment to homeowners in exchange for the exclusive right to list a homeowner's home if and when the homeowner decides to sell their home. The term of the HBA is forty (40) years subject to certain early termination events.

9.     In accordance with an HBA, a selling homeowner lists their home with the applicable MV Realty Sub, which then lists and sells the home for a standard commission, including any participating broker commission. In the event the home does not sell within six (6)

3

months, the homeowner may terminate the HBA at no cost and without penalty. The HBA is not a listing agreement.

10. In the event a homeowner breaches the HBA, which results in an early termination of the HBA, the MV Realty Subs are typically entitled to a termination fee equal to three percent (3%) of the greater of (a) the fair market value of the home at the time the HBA is executed, and (b) the fair market value at the time of breach or early termination.

11 Additionally, the MV Realty Subs reserves the right to record a memorandum ("Memorandum"), or other similar notice, of the HBA in the public records in the county in which the real estate is located. Although the HBAs are governed by the laws of the state in which the HBA is entered, the terms of the HBAs and Memoranda are substantively consistent from state to state.

12. At the present time, the MV Realty Subs are parties to approximately 34,000 HBAs. The HBAs may be considered executory contracts.

### D.  *Financing – Goodwood I*

13. On or about February 11, 2020, MV Receivables I, LLC ("Receivables I"), a wholly owned subsidiary of PBC, entered into a credit agreement (the "Goodwood I Credit Agreement") with Goodwood Fund, as the initial lender ("Goodwood Fund" and, together with other lenders under the Goodwood I Credit Agreement, the "Goodwood I Lenders"), and Goodwood Inc., as agent ("Goodwood Inc."). The parties also executed, among other documents, a Security Agreement (the "Goodwood I Security Agreement" and, collectively with the Goodwood I Credit Agreement and other related documents, the "Goodwood I Loan Documents").

14. PBC and Receivables I also entered a Purchase and Contribution Agreement (the "Purchase Agreement") pursuant to which Receivables I agreed to purchase HBAs acquired with

amounts advanced under the terms of the Goodwood I Credit Agreement. The advance rate is typically sixty percent (60%) of discounted eligible receivables. The amount of $10,000,000.00 has been advanced under the Goodwood I Credit Agreement.

15. Under the Goodwood I Security Agreement, Receivables I granted a security interest in and to its assets, including, without limitation, certain HBAs, accounts, receivables, and general intangibles, in favor of Goodwood Inc., as agent for the Goodwood I Lenders. PBC signed a limited guarantee of amounts owed by Receivables I under the Goodwood I Credit Agreement.

### E.    *Financing – Monroe Capital*

16. On or about July 28, 2021, Receivables II entered into a $40,000,000.00 senior secured delayed draw credit facility (the "Monroe Credit Facility") with Monroe Capital Management Advisors, LLC, as administrative and collateral agent ("Monroe Capital"), and the lenders under the Monroe Credit Facility (collectively, the "Monroe Lenders"). Receivables II and Monroe Capital executed, among other documents, a Credit Agreement (the "Monroe Credit Agreement"), Security Agreement (the "Monroe Security Agreement", and Pledge Agreement (the "Monroe Pledge Agreement" and, collectively with Monroe Credit Agreement, the Monroe Security Agreement, and related other agreements, the "Monroe Loan Documents").

17. The Monroe Lenders have advanced the amount of $40,000,000.00 to Receivables II under the Monroe Credit Facility, the proceeds of which were to be used to acquire eligible receivables in accordance with the Monroe Credit Agreement and to fund operations and other related expenses.

18. Under the Monroe Credit Facility, PBC, certain of the MV Realty Subs (New Jersey, Connecticut, Illinois, Massachusetts, North Carolina, South Carolina, and Georgia) (collectively, and excluding PBC, the "Initial MV Realty Guarantors") initially guaranteed the

obligations of Receivables II. The Monroe Credit Facility was later guaranteed by subsequent MV Realty Subs, who organized and became parties to the Monroe Credit Facility and Monroe Loan Documents as the operation expanded.

19.     In accordance with the Monroe Pledge Agreement, (a) Holdings pledged its equity interest in in PBC, and (b) PBC pledged its membership interests in the MV Realty Subs, in favor of Monroe Capital, as collateral agent. All membership interests are uncertificated.

20.     In accordance with the Monroe Security Agreement, Receivables II, PBC, and the Initial MV Realty Guarantors, as well as any other MV Realty Subs who later joined the Monroe Credit Facility and Monroe Loan Documents, granted Monroe Capital a security interest in their assets, including, without limitation, accounts, documents, general intangibles, investment property, receivables, and receivables relating to the HBAs.

21.     Generally speaking, (a) the MV Realty Subs would entered into HBAs with homeowners, thus giving the MV Realty Subs the exclusive right to list homes in the event a homeowner ever decide to sell their home, (b) the receivables under the HBAs were to be sold or otherwise assigned to MV Receivables II, and (c) Monroe Capital then advanced at a rate of forty-five percent (45%) of the net present value of eligible receivables under the HBAs.

**F.      Consent and Confirmation Agreement**

22.     In or about July 2021, Monroe, Goodwood Inc., PBC and Receivables I entered into the Acknowledgement and Confirmation Agreement (the "Confirmation Agreement"), which was, essentially, an inter-creditor agreement, pursuant to which Monroe and Goodwood Inc. acknowledged and consented to the other's respective rights under the Monroe Capital Loan Documents and the Goodwood I Loan Documents, respectively.

**G.      Financing - Goodwood II**

23. On November 4, 2022, MV Receivables III, LLC ("Receivables III"), Goodwood MV Realty LP, as the initial lender ("Goodwood MV" and, together with any other related lenders, the "Goodwood II Lenders"), and Goodwood, Inc. ("Goodwood Inc."), as agent, entered into a Credit Agreement (the "Goodwood II Credit Agreement"). The parties also executed, among other documents, a Security Agreement (the "Goodwood II Security Agreement" and, collectively with the Goodwood II Credit Agreement and other related documents, the "Goodwood II Loan Documents").

24. In accordance with the Goodwood II Credit Agreement, Receivables IIII agreed to purchase HBAs acquired with amounts advanced under the terms of the Goodwood II Credit Agreement. The advance rate was approximately sixty percent (60%) of the net present value of eligible receivables under the HBAs. The amount of $4,500,000.00 has been advanced.

25. Under the Goodwood II Security Agreement, Receivables III granted Goodwood Inc. a security interest in and to its assets, including, without limitation, the HBAs, accounts, receivables, and general intangibles. MV Brokerage signed a limited guarantee of amounts owed by Receivables III under the Goodwood II Credit Agreement.

**H.    Other Financing**

26. In February 2023, Holdings executed senior notes with eight (8) shareholders of Holdings, who advanced a total of $12,968,000.00 (collectively, the "Shareholder Notes"). There is approximately $14,103,144.11 outstanding, including accrued interest, under the Shareholder Notes. The proceeds borrowed were used to fund operations.

27. Additionally, in 2021 and 2022, Holdings executed two (2) rounds of convertible notes, one of which has since converted. The later round, which was in the total amount of $6,070,000.00, has not been converted.

## *I.*     *Assets and Secured Obligations*

28.     Monroe is currently owed approximately $40,000,000.00, while the Goodwood I Lenders and Goodwood II Lenders are owed approximately $7,408,275.82 and $4,460,000.00, respectively. As of September 5, 2023, the net present value of the collateral securing the foregoing obligations is (a) $89,315,255.01 (Monroe), (b) $12,656,966.30 (Goodwood I), and (c) $6,106,069.54 (Goodwood II). Holdings has additional HBAs with an aggregate net present value of approximately $12,861,536.97. Accordingly, the total net present value of HBAs exceeds $120,000,000.00.

## EVENTS LEADING TO BANKRUPTCY

29.     Since November 29, 2022, the states of Florida, Pennsylvania, Massachusetts, Ohio, North Carolina, New Jersey, and Indiana commenced actions against certain of the MV Realty Subs (collectively, the "State Actions"). PBC is a named defendant in the State Actions commenced by the states of Florida, Pennsylvania, New Jersey, North Carolina, Massachusetts, and Indiana. Other individual officers and licensed real estate brokers working in connection with the HBAs are named in nearly all State Actions. The allegations asserted in the State Actions range from telemarketing violations to unfair or deceptive trade practices.

30.     It is alleged in the State Actions that the filing of the memorandum, which provides constructive notice to the public of the existence of the HBA and its terms, unfairly or deceptively interferes with the homeowner's ability to sell the home.

31.     The Debtors contend that the memorandum, which is separately signed by each homeowner under the HBA, is neither deceptive nor unfair. Rather, the memorandum is filed in accordance with the applicable law of each state and serves the purpose intended by the applicable law of each state by providing public notice of the HBA.

32. Moreover, in several instances, it is alleged in the State Actions that the Debtors made improper telephone solicitations to prospective customers without their consent. To date, however, the Debtors have not had any meaningful opportunity to present in court the vast number of lawfully obtained consents from prospective homeowners authorizing these very solicitations.

33. It has also been alleged in many of the State Actions that the Debtors' sales and marketing practices "prey" upon customers who are elderly or of diminished financial means. However, the Debtors strenuously disagree with such allegations as being unsupported by fact. The facts are that (a) the typical homeowner in an HBA owns a home with an average value exceeding $300,000, and (b) the average age of homeowners under HBAs is 55 years old (and 72% of homeowners are under age 65). By comparison, the American Housing Survey 2021, based on US Census Bureau data, indicates that only 67.3% of homeowners in the country are under the age of 65. Thus, the homeowners under the HBAs are proportionally younger than a typical cross-section of homeowners overall in the United States.

34. It is alleged or implied in the State Actions that a very significant portion of the Debtors' customers are aggrieved and have complained to state consumer protection authorities. However, this allegation is inaccurate and unsupported by the facts. For example, in North Carolina, over the 16-month period prior to the commencement of the State Action, the state consumer protection authorities made the Debtors aware of only twelve (12) consumer complaints (out of a total of 2,100 HBAs in North Carolina) regarding allegedly deceptive conduct by the Debtors. These complaints came mostly from customers who alleged deception or unfairness by the Debtors only after the homeowner had breached the HBA. In contrast, the Debtors, in a mere 45-day period, following the commencement of the State Action in North Carolina, obtained at

least 250 sworn statements from North Carolina homeowners attesting that they understood the key terms and elements of the HBA.

35. It is also well worth noting that the Debtors previously engaged national and well-recognized local law firms prior to implementing the HBP in each state, who advised as to compliance with state and other applicable laws with respect to the sales and marketing of the HBP and HBAs, as well as with respect to the terms and conditions of the HBAs and related agreements.

36. Accordingly, the defendants vigorously oppose the State Actions and contend that the HBAs comply with all applicable laws.

37. Finally, there are other actions that have been commenced by real estate regulatory commissions that include both the MV Brokerage Subs and the individual licensed real estate agents and brokers in connection with their work on the HBAs.

38. In defending against the State Actions and other regulatory matters, the Debtors have spent and incurred millions of dollars in legal fees, and the Debtors' personnel have devoted substantial time in assisting defense counsel.

39. The Debtors commenced these Chapter 11 proceedings to protect and maximize the value of their assets and for the purpose of implementing one or more strategies aimed at alleviating or otherwise minimizing the financial strain of the State Actions. The Debtors also intend to protect the assets from any adverse creditor action, and otherwise preserving estate assets for the benefit of all creditors.

**RELIEF REQUESTED**

40. The Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as <u>Exhibit</u> "<u>A</u>," designating and approving notice procedures in these Chapter 11 cases. Streamlined notice procedures will save the estate and creditors substantial amounts.

41. One or more of the Debtors are parties to approximately 34,000 HBAs.

42. In addition to the HBAs, the Debtors have approximately 120 creditors holding potential Claims against the estates.

43. Rule 2002-1(H)(1) of the Local Rules for the Court (the "Local Rules"), provides, in part, that in Chapter 11 cases having more than seventy five (75) parties of record, a party responsible for service may, *in lieu of service on all parties of record*, or must, if required by the Court or the Local Rules otherwise direct, serve the following parties (collectively, the "Master Notice Parties"): (a) the United States Trustee; (b) the Debtors; (c) counsel for the Debtors; (d) any indenture trustees; (e) any appointed statutory committee under section 1102 of the Bankruptcy Code and, before the appointment of any such committee, the list of twenty (20) largest unsecured creditors; (f) secured creditors; (g) the United States and its agencies as required under Bankruptcy Rule 2002(j); (h) those parties requesting notice in writing or filing a notice of appearance; (i) any examiner or trustee appointed in the Chapter 11 cases; and (j) any parties and entities (including governmental units) previously known to the Debtors to have a particularized interest in the subject of the notices required to be served.

44. Local Rule 2002-1(H)(3) provides that, except as otherwise provided by the Court, Local Rule 2002-1(H)(1) shall *not* apply to notices of the following (the "Critical LR Events"): (i) notice of commencement of the Chapter 11 cases and of the 341 meeting of creditors; (ii) proposed, sale, or lease of property outside the ordinary course of business; (iii) time fixed for filing objections to the disclosure statement and notice of the disclosure statement hearing; (iv) time fixed for filing objections to confirmation and notice of the confirmation hearing; (v) notices of hearing on the dismissal or conversion of the case; and (vi) notice of entry of an order confirmation a plan.

45. In addition to the Critical LR Events, Bankruptcy Rules 2002(a), (b), and (f) provide notice of the following must also be provided to all creditors (the "Critical BR Events" and, collectively with the Critcal LR Events, the "Critical Notice Events"): (i) notice of the deadline for filing proofs of claim; (ii) notice of hearing on any request for compensation and reimbursement of expenses in excess of $1,000.00; and (iii) notice of hearing on any approval of compromise or settlement (unless, the Court, for cause, orders otherwise).

46. Finally, Bankruptcy Rule 2002(d) provides, in part, that equity security holders are entitled to notice of the following (collectively, the "Equity Events"): (i) the order for relief; (ii) any meeting of equity security holders; (iii) the hearing on the sale of substantially all of a debtor's assets; (iv) the hearing on dismissal or conversion of the Chapter 11 cases; (v) the deadline to objection to the disclosure statement and the hearing on approval of the disclosure statement; and (vi) the deadline to object to confirmation and the hearing to consider confirmation of the plan.

47. Banrkuptcy Rule 2002(m) provides, in part, that the Court may, from time to time, enter orders designating matters in the Chapter 11 cases.

48. By separate application, the Debtors shall be requesting authority to retain a claims and notice agent (the "Claims and Notice Agent"). Among other things, the Claims and Notice Agent shall create a case-specific website to which copies of critical pleadings and deadlines shall be posted (the "Case Portal"). Additionally, the Debtors are filing a request to approve the form of notice of commencement, which shall contain the deadlines for filing proofs of claim and the date for the 341 meeting of creditors (the "Notice of Commencement"), as well as the proposed form of proof of claim (the "Proof of Claim Form").

49. Again, there are more than 100 creditors holding potential Claims, and an additional 34,000 parties to HBAs (collectively, the "HBA Parties"), in these Chapter 11 cases. Accordingly,

in order to save substantial costs associated with copying and postage, the Debtors propose the following notice procedures (collectively, the "Notice Procedures"):

    (a)    Copies of the Notice of Commencement and the proposed Proof of Claim Form shall be served on all creditors and HBA Parties, including, without limitation, the Master Notice Parties;

    (b)    Written notice shall be provided to all creditors, equity security holders, and HBA Parties, including, without limitation, Master Notice Parties, informing such parties that they may access the Case Portal for purposes of reviewing pleadings and filing proofs of claims;

    (c)    Copies of all pleadings and notices shall be provided to the Master Notice Parties;

    (d)    Equity security holders shall be served with copies of pleadings and notices pertaining to Equity Events, unless any equity security holder becomes a Master Notice Party, in which case any such equity such holder shall be served with copies of all notices and pleadings served on Master Notice Parties;

    (e)    All creditors, other than HBA Parties, shall be provided with pleadings and notices pertaining to the Critical Notice Events, except for any notice of hearing on requests for compensation and reimbursement of expenses, which notices shall be provided only to the Master Notice Parties;

    (f)    Written notice that a pleading pertaining specifically to a Critical Notice Event has been posted on the Case Portal shall be provided to the HBA Parties. The Debtors shall request from the Court, in advance, approval as to the form and content of written notice of any Critical Notice Event prior to sending to

any HBA Parties; *provided, however*, and notwithstanding anything herein to the contrary, the HBA Parties shall not be provided with any notices or written notices (including, without limitation, any notices of hearing) pertaining to requests for compensation and reimbursement of expenses;

(g) The states, state representatives, and any state agency, including their counsel of record, in any State Action shall be provided with notice of any Critical Notice Events; and

(h) The Notice Procedures may be modified, for good and sufficient cause, upon filing of an appropriate motion and subject to further order of the Court.

50. The Debtors respectfully submit that good and sufficient cause exists in support of the relief requested in this Motion. In light of the extent of the potential parties in interest, the costs incurred by the estates could easily reach into the hundreds of thousands of dollars in the absent of an order by the Court designating notice procedures.

51. The proposed Notice Procedures have been developed in a manner to provide reasonable, fair, and cost-effective notices in these Chapter 11 cases.

## **RESERVATION OF RIGHTS**

52. Nothing contained herein is intended or should be construed as a waiver of any rights, claims, objections, and defenses of the Debtors under applicable bankruptcy and/or non-bankruptcy law, including, without limitation, the rights to object to any Claim, as such term is defined under the Bankruptcy Code, for any reason. Any and all of the Debtors' rights, claims, objections, and defenses, including, without limitation, any rights of setoff, are expressly preserved.

**WHEREFORE,** the Debtors respectfully request that the Court grant this Motion and enter an order, the proposed form of which is attached hereto as <u>Exhibit</u> "<u>A</u>," designating and approving the proposed Notice Procedure, as well as granting any other and further relief that the Court may deem just and proper.

## CERTIFICATE OF EXIGENT CIRCUMSTANCES

**I HEREBY CERTIFY** that an emergency hearing has been requested, since the relief requested is necessary to establish notice procedures and control the substantial expenses incurred by the Debtors and associated with postage and copying.

> **SEESE, P.A.**
> *Proposed* Attorneys for Debtors-in-Possession
> 101 N.E. 3rd Avenue
> Suite 1500
> Ft. Lauderdale, Florida 33301
> Telephone No.: (954) 745-5897
> mseese@seeselaw.com
>
> By: _____*s/Michael D. Seese*_____
> Michael D. Seese, Esq.
> Fla. Bar No. 997323

**EXHIBIT A**

*Proposed Order*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| IN RE: | CASE NO. 23-17590-EPK |
|---|---|
| MV REALTY PBC, LLC *et al.,* | CHAPTER 11 |
| Debtors. | (Jointly Administered) |

**ORDER GRANTING**
**DEBTORS'** *EMERGENCY* **MOTION FOR ENTRY**
**OF ORDER DESIGNATING AND APPROVING NOTICE PROCEDURES**

**THIS CAUSE** came before the Court on _____ upon the scheduled emergency hearing (the "Hearing") on the *Debtors' Emergency Motion for Entry of Order Designating and Approving Notice Procedures* (the "Motion")[1] [ECF No. _____], and the Court, having reviewed the file, having heard the presentation of counsel, having determined that good

---

[1] Unless defined in this Order, defined terms shall have the meanings ascribed to such terms in the Motion.

and sufficient cause exist in support of granting relief on an emergency basis, and the Court being otherwise fully advised in the premises, it is

**ORDERED** as follows:

1. The Motion is **GRANTED** as provided herein.

2. The following Notice Procedures are established and approved in their entirety:

(a) Copies of the Notice of Commencement and the proposed Proof of Claim Form shall be served on all creditors and HBA Parties, including, without limitation, the Master Notice Parties;

(b) Written notice shall be provided to all creditors, equity security holders, and HBA Parties, including, without limitation, Master Notice Parties, informing such parties that they may access the Case Portal for purposes of reviewing pleadings and filing proofs of claims;

(c) Copies of all pleadings and notices shall be provided to the Master Notice Parties;

(d) Equity security holders shall be served with copies of pleadings and notices pertaining to Equity Events, unless any equity security holder becomes a Master Notice Party, in which case any such equity such holder shall be served with copies of all notices and pleadings served on Master Notice Parties;

(e) All creditors, other than HBA Parties, shall be provided with pleadings and notices pertaining to the Critical Notice Events, except for any notice of hearing on requests for compensation and reimbursement of expenses, which notices shall be provided only to the Master Notice Parties;

(f) Written notice that a pleading pertaining specifically to a Critical Notice Event has been posted on the Case Portal shall be provided to the HBA Parties. The Debtors shall request from the Court, in advance, approval as to the form and content of written notice of any Critical Notice Event prior to sending to any HBA Parties; *provided, however*, and notwithstanding anything herein to the contrary, the HBA Parties shall not be provided with any notices or written notices (including, without limitation, any notices of hearing) pertaining to requests for compensation and reimbursement of expenses;

(g) The states, state representatives, and any state agency, including their counsel of record, in any State Action shall be provided with notice of any Critical Notice Events; and

(h) The Notice Procedures may be modified, for good and sufficient cause, upon filing of an appropriate motion and subject to further order of the Court.

3. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

###

Submitted by:

Michael D. Seese, Esq.
Seese, P.A.
101 N.E. 3rd Avenue, Suite 1500
Ft. Lauderdale, FL 33301
Telephone No.: (954) 745-5897
mseese@seeselaw.com

Copies to:

Michael D. Seese, Esq., who is directed to serve a copy of this Order upon all non-registered users or registered users who have yet to appear electronically in this case and file a conforming certificate of service.