**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | |
|---|---|
| IN RE:<br><br>MV REALTY PBC, LLC *et al.*,<br><br>Debtors. | CHAPTER 11<br><br>CASE NO. 23-17590-EPK<br><br>(Jointly Administered) |

# DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' JOINT PLAN OF REORGANIZATION

Michael D. Seese
SEESE, P.A.
Attorneys for Debtor
101 N.E. 3rd Avenue
Suite 1500
Ft. Lauderdale, FL 33301
Telephone: 954-745-5897

Dated: April 1, 2024
Ft. Lauderdale, Florida

**DISCLAIMER:**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF REORGANIZATION (THE "DISCLOSURE STATEMENT") AND EXHIBITS HERETO RELATE TO THE DEBTORS' JOINT PLAN OF REORGANIZATION (AS IT MAY BE AMENDED, SUPPLEMENTED OR OTHERWISE MODIFIED) (THE "PLAN"), AND ARE INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON SUCH PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ATTACHED OR REFERRED TO IN THE PLAN AND THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH 11 U.S.C. § 1125 AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER LAWS GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SEC APPROVED OR DISAPPROVED OF THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT AND EXHIBITS HERETO WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTOR.

NO PARTY IS AUTHORIZED TO PROVIDE TO ANY OTHER PARTY ANY INFORMATION CONCERNING THE PLAN OTHER THAN THE CONTENTS OF THIS DISCLOSURE STATEMENT. THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT RELY ON ANY INFORMATION,

REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN YOUR ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT MAY BE FORWARD-LOOKING PROJECTIONS AND FORECASTS BASED UPON CERTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES, AND ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THE PROJECTIONS AND FORECASTS SET FORTH HEREIN. NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT, EXPRESS OR IMPLIED, IS INTENDED TO GIVE RISE TO ANY COMMITMENT OR OBLIGATION OF THE DEBTOR OR WILL CONFER UPON ANY PERSON ANY RIGHTS, BENEFITS OR REMEDIES OF ANY NATURE WHATSOEVER.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR THE CONFIRMATION OF THE PLAN WILL CREATE ANY IMPLICATION, UNDER ANY CIRCUMSTANCES, THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE HEREOF OR THAT THE DEBTOR WILL BE UNDER ANY OBLIGATION TO UPDATE SUCH INFORMATION IN THE FUTURE.

ANY PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE DEBTORS. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE AT THE TIME THEY WERE MADE, MAY NOT BE ACHIEVED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTOR'S CONTROL. THE DEBTOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF ANY PROJECTIONS OR TO THE DEBTOR'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY MAY NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

# I.

# INTRODUCTION[1]

The Debtors[2] in this jointly administered Chapter 11 Case submit this Disclosure Statement in Support of the Debtors' Joint Plan of Reorganization (as amended, supplemented, or modified, the "Disclosure Statement") pursuant to section 1125 of the Code to holders of Claims against, and Equity Interests in, the Debtors in connection with (i) the solicitation of acceptances of the Joint Plan of Reorganization dated April 1, 2024 (as amended, supplemented or otherwise modified, the "Plan"), filed by the Debtors with the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division (the "Court") and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") scheduled in accordance with the Disclosure Statement Order. Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.

## A. General

The Debtors each filed a voluntary petition for relief under Chapter 11 of the Code on September 22, 2023 (the "Petition Date"). Since that time, the Debtors have continued in the possession of their assets and in the management of their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Code.

Chapter 11 is the principal business reorganization chapter of the Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and equity security holders. In addition to permitting rehabilitation of a debtor, another goal of

---

[1] Unless otherwise defined in the Disclosure Statement, capitalized terms shall have the meanings ascribed to such terms in the Plan.

[2] The Debtors and the last four digits of the Debtors' federal tax identification numbers are as follows: MV Realty, PBC LLC (Florida) (6755), MV Realty Holdings, LLC (3483), MV Receivables II, LLC (9368), MV Receivables III, LLC, MV Realty PBC, LLC (Pennsylvania) (7301), MV Realty of South Carolina, LLC (7322), MV Realty of North Carolina, LLC (3258), MV of Massachusetts, LLC (0864), MV Realty of Illinois, LLC (8814), MV Realty of Arizona, LLC (2725), MV Realty of Connecticut, LLC (8646), MV Realty PBC, LLC (Georgia) (6796), MV Realty of New Jersey, LLC (5008), MV Realty of Washington, LLC (7621), MV Realty of Maryland, LLC (9945), MV Realty of Virginia, LLC (2129), MV Realty of Tennessee, LLC (7701), MV Realty of Wisconsin, LLC (2683), MV Realty of Nevada, LLC (0799), MV Realty of Oregon, LLC (3046), MV Realty of Utah, LLC (4543), MV Realty of Minnesota, LLC (1678), MV Realty of Indiana, LLC (3566), MV Realty of Missouri, LLC (6503), MV Homes of New York, LLC (2727), MV Realty of Idaho, LLC (8185), MV Realty of Alabama, LLC (6462), MV Realty of Colorado, LLC (1176), MV Realty of Oklahoma, LLC (8174), MV Realty of Louisiana, LLC (3120), MV Realty of Kansas, LLC (2304), MV Realty of Kentucky, LLC (2302), MV Realty of California (7499), MV Realty of Texas, LLC (7182), MV Realty of Michigan, LLC (5280) and MV Realty of Ohio, LLC (0728).

chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity security holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession".

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the terms for satisfying claims against and interests in a debtor. Upon confirmation of a plan of reorganization, the plan is binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debts that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan. Under the Bankruptcy Code, a plan may also provide for the liquidation of a debtor's assets and the distribution of proceeds to the holders of allowed claims.

After a plan of reorganization or liquidation has been filed, holders of certain claims against, or equity interests in, a debtor are permitted to vote to accept or reject the plan. However, before soliciting any acceptances of the proposed plan, section 1125 of the Code requires a debtor to prepare a disclosure statement in accordance with, and containing adequate information as defined in, section 1125 of the Code.

## B. Disclosure Statement Overview

Attached as exhibits to this Disclosure Statement are copies of the following:

- Exhibit A – The Plan and Cash Flow Projections;
- Exhibit B – Disclosure Statement Order
- Exhibit C - Liquidation Analysis

In addition, a Ballot for the acceptance or rejection of the Plan was enclosed with the Disclosure Statement submitted to the holders of Claims and Interests that the Debtors believe were entitled to vote to accept or reject the Plan. For the reasons set forth hereinafter, no additional Ballot is required in connection with the Plan.

After notice and a hearing conducted by the Court on ____________________ the Court entered an order approving the Disclosure Statement, as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors and holders of interests to make an informed judgment whether to accept or reject the Plan, and establishing certain procedures with respect to the solicitation of votes to accept or reject the Plan (the "Disclosure Statement Order"). A copy of the Disclosure Statement Order was delivered with the Disclosure Statement.

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

**The Disclosure Statement Order sets forth in detail the deadlines, procedures, and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim or Equity Interest entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Code.**

## C. Holders of Claims and Interests Entitled to Vote

Pursuant to the Code, only holders of allowed claims or allowed interests in classes of claims or interests that are "impaired" within the meaning of section 1124 of the Code that are entitled to receive distributions under a proposed chapter 11 plan, are entitled to vote to accept or reject such plan. Classes of claims or interests in which the holders of such claims or interests are unimpaired under a Chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims or interests in which the holders of such claims or interests are impaired and are not entitled to receive any distributions under a proposed Chapter 11 plan are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

Under the Plan, Classes 2, 3, and 5 through 45 are Impaired and, therefore, the holders of the Allowed Claims in Classes are entitled to vote on the Plan. Classes 1 and 4 are Unimpaired and, therefore, holders of Allowed Claims and Interests in Classes 1 and 4 are deemed to have accepted the Plan.

## D. Voting Procedures

If you are entitled to vote to accept or reject the Plan, a Ballot for the purpose of voting on the Plan is enclosed with the Disclosure Statement and Disclosure Statement Order. If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you may have received separate Ballots which must be used for each separate Class of Claims. You should vote and return your Ballot(s) to:

**IF BY MAIL OR**
**HAND- OR OVERNIGHT-DELIVERY:**

Office of the Clerk of the Court
United States Bankruptcy Court
Flagler Waterview Building
1515 North Flagler Drive, Suite 801

West Palm Beach, Florida 33401

DO NOT RETURN YOUR NOTES OR SECURITIES WITH YOUR BALLOT.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER. ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE PLAN FOR PURPOSES OF TABULATING VOTES. NO ADDITIONAL VOTE IS REQUIRED IN CONNECTION WITH THE PLAN.

Any Claim or Interest in an Impaired Class as to which an objection or request for estimation is pending or which is scheduled by the Debtors as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Court temporarily allowing such Claim for the purpose of voting on the Plan.

If you are a holder of a Claim or Interest entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please contact counsel for the Debtors at the address or phone number listed in Section 12.10 of the Plan.

## E. Vote Required for Acceptance; Best Interests; Binding Effect

The Code defines acceptance of a plan by an Impaired class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Code defines acceptance of a plan by an Impaired class of interests as acceptance by holders of at least two-thirds in amount of the interests of that class that actually casts ballots. The vote of a holder of a claim or interest may be disregarded if the Court determines, after notice and a hearing, that the acceptance or rejection was not solicited or procured in good faith.

In addition, section 1129 of the Code requires that a plan of reorganization or liquidation be accepted by each holder of a claim or interest in an Impaired class or that the plan be found by the Court to provide the holder with at least as much value on account of the claim or interest as it would receive if the debtor were liquidated under Chapter 7 of the Code.

Confirmation of the Plan will make the Plan binding upon the Debtor, holders of Claims against, and Interests in, the Debtors, and other parties in interest regardless of whether they have accepted the Plan, and such holders of Claims and/or Interests will be prohibited from receiving payment from, or seeking recourse against, the Debtors, their Property or any assets that are distributed to other holders of Claims and/or Interests under the Plan. In addition, Confirmation of the Plan will enjoin creditors and interest holders from taking a wide variety of actions on account of a debt, claim, liability, interest or right that arose prior to the Confirmation Date. As of the Effective Date of the Plan, and to the fullest extent permitted by applicable law, Confirmation will also operate as a discharge of all Claims against, and Equity Interests in, the Debtors, to the fullest extent authorized by section 1141(d) of the Code.

## F. Confirmation Hearing

Pursuant to section 1128 of the Code, the Confirmation Hearing will be held on the date set forth in the Disclosure Statement Order, before The Honorable Erik P. Kimball, United States Bankruptcy Judge, at the United States Bankruptcy Court, Flagler Waterview Building, 1515 N. Flagler Drive, 8th Floor, Courtroom B, West Palm Beach, Florida 33401. The Court has directed that any objections to confirmation of the Plan be served and filed so that they are received consistent with the Disclosure Statement Order. The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or any adjourned Confirmation Hearing.

## G. Effective Date

The Plan may not be consummated immediately upon confirmation, but only upon the occurrence of the Effective Date. The Effective Date will not occur unless the conditions to confirmation and consummation are satisfied (or waived pursuant to, and in accordance with, the terms of the Plan). The Confirmation Order may be vacated if the conditions to the Effective Date are not timely met or waived.

Because of the condition(s) to the Effective Date provided in the Plan, a delay may occur between confirmation of the Plan and the Effective Date. There is no assurance that the condition(s) to the Effective Date will be fulfilled, or that any condition that is not fulfilled will be waived.

# II.

# OVERVIEW OF DISTRIBUTIONS UNDER THE PLAN[3]

The following briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan.

| Class | Type | Estimated Amounts | Treatment | Estimated Recovery |
|---|---|---|---|---|
| Class 1 | Allowed Other Priority Claims | $0.00 | N/A | N/A |
| Class 2 | Allowed Secured Claim of Monroe | $44,800,000.00 | See Plan | 100% |
| Class 3 | Allowed Secured Claim of Goodwood | $ | See Plan | 100% |
| Class 4 | Allowed Other Secured Claims | $0.00 | N/A | N/A |

[3] This table is only a summary of the classification and treatment of Claims and Interests under the Plan. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.

| | | | | |
|---|---|---|---|---|
| Class 5 | Allowed General Unsecured Claims (Government) | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 6 | Allowed Unsecured Claims Against MV Homes of New York, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 7 | Allowed Unsecured Claims Against MV of Massachusetts, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 8 | Allowed Unsecured Claims Against MV Realty of Alabama, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 9 | Allowed Unsecured Claims Against MV Realty of Arizona, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 10 | Allowed Unsecured Claims Against MV Realty of California, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 11 | Allowed Unsecured Claims Against MV Realty of Colorado, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 12 | Allowed Unsecured Claims Against MV Realty of Connecticut, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 13 | Allowed Unsecured Claims Against MV Realty of Idaho, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 14 | Allowed Unsecured Claims Against MV Realty of Illinois, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 15 | Allowed Unsecured Claims Against MV Realty of Indiana, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 16 | Allowed Unsecured Claims Against MV Realty of Kansas, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |

| | | | | |
|---|---|---|---|---|
| Class 17 | Allowed Unsecured Claims Against MV Realty of Kentucky, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 18 | Allowed Unsecured Claims Against MV Realty of Louisiana, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 19 | Allowed Unsecured Claims Against MV Realty of Maryland, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 20 | Allowed Unsecured Claims Against MV Realty of Michigan, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 21 | Allowed Unsecured Claims Against MV Realty of Minnesota, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 22 | Allowed Unsecured Claims Against MV Realty of Missouri, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 23 | Allowed Unsecured Claims Against MV Realty of New Jersey, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 24 | Allowed Unsecured Claims Against MV Realty of Nevada, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 25 | Allowed Unsecured Claims Against MV Realty of North Carolina, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 26 | Allowed Unsecured Claims Against MV Realty of Ohio, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 27 | Allowed Unsecured Claims Against MV Realty of Oklahoma, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 28 | Allowed Unsecured Claims Against MV Realty of Oregon, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |

| | | | | |
|---|---|---|---|---|
| Class 29 | Allowed Unsecured Claims Against MV Realty PBC, LLC (Florida) | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 30 | Allowed Unsecured Claims Against MV Realty PBC, LLC (Georgia) | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 31 | Allowed Unsecured Claims Against MV Realty PBC, LLC (Pennsylvania) | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 32 | Allowed Unsecured Claims Against MV Realty of South Carolina, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 33 | Allowed Unsecured Claims Against MV Realty of Tennessee, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 34 | Allowed Unsecured Claims Against MV Realty of Texas, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 35 | Allowed Unsecured Claims Against MV Realty of Utah, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 36 | Allowed Unsecured Claims Against MV Realty of Virginia, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 37 | Allowed Unsecured Claims Against MV Realty of Washington, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 38 | Allowed Unsecured Claims Against MV Realty of Wisconsin, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 39 | Allowed Unsecured Claims Against MV Realty Holdings, LLC | Unknown | Unsecured Claims Distribution (see Plan) | Unknown |
| Class 40 | Allowed Equity Interests in MV Holdings, LLC | N/A | Retain | Retain |
| Class 41 | Allowed Equity Interests in MV Realty PBC, LLC | N/A | Retain | Retain |
| Class 42 | Allowed Equity Interests in MV Realty Subs | N/A | Retain | Retain |

| | | | | |
|---|---|---|---|---|
| Class 43 | Allowed Equity Interests in MV Receivables II, LLC | N/A | Retain | Retain |
| Class 44 | Allowed Equity Interests in MV Receivables III, LLC | N/A | Retain | Retain |

The Debtors have scheduled the following claims: (a) Unsecured Claims in the amount of $59,000,000.00, (b) a Secured Claim in favor of Monroe in the amount of $44,800,000.00, and (c) a Secured Claim in favor of Goodwood in the amount of $12,000,000.00.

In reviewing the Claims Registers maintained by Epiq, the following category and amounts of claims are as follows: (a) Administrative: $1,929,533.70; (b) Priority: $2,286,580.71; (c) Secured: $1,891,532,937.61; and (d) Unsecured: $106,275,741.61. However, duplicate claims, including sizeable claims, have been filed in multiple cases, claims are miscategorized (for example, filed as administrative or secured claims when such claims are unsecured claims), and the Debtors have not analyzed the Claims to determine any other bases on which to object to claims.

# III.

# GENERAL INFORMATION

## A. Description and History of the Debtors

### 1. Formation and Ownership

MV Realty Holdings, LLC ("Holdings") is a Florida limited liability company and the sole owner of MV Realty PBC, LLC (Florida), a Florida limited liability company ("PBC FL"). PBC FL is the sole owner of the following: (a) MV Receivables II, LLC, a Delaware limited liability company; (b) MV Receivables III, LLC, a Delaware limited liability company; (c) MV Realty California, a California corporation ("MV CA"); and (d) thirty-one (31) separate subsidiaries, each of which is a limited liability company organized under the laws of the states of Pennsylvania, South Carolina, North Carolina, Massachusetts, Illinois, Arizona, Connecticut, Georgia, New Jersey, Washington, Maryland, Virginia, Tennessee, Wisconsin, Nevada, Oregon, Utah, Minnesota, Indiana, Missouri, New York, Idaho, Alabama, Colorado, Oklahoma, Louisiana, Kansas, Michigan, Kentucky, Texas and Ohio (collectively with MV CA, the "MV Realty Subs". The MV Realty Subs include MV MA, MV NC, MV NJ, MV IN, MV IN and MV OH. Each of the MV Realty Subs is incorporated or organized under the laws of the respective states: "MV Realty of California" and "MV Realty of [state], LLC" (with the exception of New York ("MV Homes of New York") and Massachusetts ("MV of Massachusetts").

### 2. Business Operations

PBC FL was founded in 2014 and initially operated as a traditional real estate brokerage firm. In October 2018, PBC FL began focusing its efforts on marketing a unique product to residential homeowners.

In or around October 2018, PBC FL implemented the "Homeowner Benefit Program" (the "HBP"). As part of the HBC, the MV Realty Subs enter HBAs with residential homeowners. The HBA is not a listing agreement but is a contract pursuant to which the MV Realty Subs pay an upfront cash payment to homeowners in exchange for the exclusive right to list a homeowner's home if the homeowner ever decides to sell their home. The homeowner is under no obligation to repay the upfront cash payment. The term of the HBA is forty (40) years subject to certain early termination events. In connection with a typical transaction, a homeowner enters into an HBA. Typically, a homeowner signs an acknowledgement as to the 40-year term and also executes a memorandum of the HBA, which is then recorded in the public record.

In accordance with an HBA, a selling homeowner lists their home with the applicable MV Realty Sub, or its assignee, which then lists and sells the home for a standard 6% commission, typically 3% paid to the listing agent and 3% paid to the buyer's agent. In the event the home does not sell within six (6) months, the homeowner has an opportunity to sell the property on their own for a period of sixty (60) days, subject to certain requirements, failing which the HBA rights remain with the MV Realty Sub.

In the event a homeowner breaches the HBA, the MV Realty Subs may be entitled to a termination fee or liquidated damages typically equal to three percent (3%) (the same amount to which the MV Realty Sub would have earned as a commission) of the greater of (a) the fair market value of the home at the time the HBA is entered, or (b) the fair market value at the time of breach or early termination. There are other early termination events provided for under the HBAs.

Additionally, each of the MV Realty Subs reserves the right to record a memorandum ("Memorandum"), which is executed separately by the homeowner, or other similar notice of the HBA in the public records in the county in which the real estate is located. Neither the HBA nor the Memorandum creates any current lien against a homeowner's property at the time the HBA is executed.

At the present time, the MV Realty Subs are parties to approximately 34,000 HBAs with residential homeowners (the "HBA Parties").

**B. Financing – Goodwood I**

On or about February 11, 2020, MV Receivables I, LLC ("Receivables I"), a wholly owned subsidiary of PBC FL, entered into a credit agreement (the "Goodwood I Credit Agreement") with Goodwood Fund, as the initial lender ("Goodwood Fund" and, together with other lenders under the Goodwood I Credit Agreement, the "Goodwood I Lenders"), and Goodwood Inc., as agent ("Goodwood Inc."). The parties also executed, among other documents, a Security Agreement (the "Goodwood I Security Agreement" and, collectively with the Goodwood I Credit Agreement and other related documents, the "Goodwood I Loan Documents").

PBC FL and Receivables I also entered a Purchase and Contribution Agreement (the "Purchase Agreement") pursuant to which Receivables I agreed to purchase HBAs acquired with

amounts advanced under the terms of the Goodwood I Credit Agreement. The advance rate is typically sixty percent (60%) of discounted eligible receivables. The amount of $10,000,000.00 has been advanced under the Goodwood I Credit Agreement.

Under the Goodwood I Security Agreement, Receivables I granted a security interest in and to its assets, including, without limitation, certain HBAs, accounts, receivables, and general intangibles, in favor of Goodwood Inc., as agent for the Goodwood I Lenders. PBC signed a limited guarantee of amounts owed by Receivables I under the Goodwood I Credit Agreement.

## C. Financing – Monroe Capital

On or about July 28, 2021, Receivables II entered into a $40,000,000.00 senior secured delayed draw credit facility (the "Monroe Credit Facility") with Monroe Capital Management Advisors, LLC, as administrative and collateral agent ("Monroe Capital"), and the lenders under the Monroe Credit Facility (collectively, the "Monroe Lenders"). Receivables II and Monroe Capital executed, among other documents, a Credit Agreement (the "Monroe Credit Agreement"), Security Agreement (the "Monroe Security Agreement", and Pledge Agreement (the "Monroe Pledge Agreement" and, collectively with Monroe Credit Agreement, the Monroe Security Agreement, and related other agreements, the "Monroe Loan Documents").

The Monroe Lenders have advanced the amount of $40,000,000.00 to Receivables II under the Monroe Credit Facility, the proceeds of which were to be used to acquire eligible receivables in accordance with the Monroe Credit Agreement and to fund operations and other related expenses.

Under the Monroe Credit Facility, PBC FL, certain of the MV Realty Subs (New Jersey, Connecticut, Illinois, Massachusetts, North Carolina, South Carolina, and Georgia) (collectively, and excluding PBC, the "Initial MV Realty Guarantors") initially guaranteed the obligations of Receivables II. The Monroe Credit Facility was later guaranteed by subsequent MV Realty Subs, who organized and became parties to the Monroe Credit Facility and Monroe Loan Documents as the operation expanded.

In accordance with the Monroe Pledge Agreement, (a) Holdings pledged its equity interest in PBC FL, and (b) PBC FL pledged its membership interests in the MV Realty Subs, in favor of Monroe Capital, as collateral agent. All membership interests are uncertificated.

In accordance with the Monroe Security Agreement, Receivables II, PBC FL, and the Initial MV Realty Guarantors, as well as any other MV Realty Subs who later joined the Monroe Credit Facility and Monroe Loan Documents, granted Monroe Capital a security interest in their assets, including, without limitation, accounts, documents, general intangibles, investment property, receivables, and receivables relating to the HBAs.

Generally speaking, (a) the MV Realty Subs would entered into HBAs with homeowners, thus giving the MV Realty Subs the exclusive right to list homes in the event a homeowner ever decide to sell their home, (b) the receivables under the HBAs were to be sold or otherwise assigned to MV Receivables II, and (c) Monroe Capital then advanced at a rate of forty-five percent (45%) of the net present value of eligible receivables under the HBAs. Monroe is currently owed approximately $55,000,000.00.

**D. Consent and Confirmation Agreement**

In or about July 2021, Monroe, Goodwood Inc., PBC FL and Receivables I entered into the Acknowledgement and Confirmation Agreement (the "Confirmation Agreement"), which was, essentially, an inter-creditor agreement, pursuant to which Monroe and Goodwood Inc. acknowledged and consented to the other's respective rights under the Monroe Capital Loan Documents and the Goodwood I Loan Documents, respectively.

**E. Financing - Goodwood II**

On November 4, 2022, MV Receivables III, LLC ("Receivables III"), Goodwood MV Realty LP, as the initial lender ("Goodwood MV" and, together with any other related lenders, the "Goodwood II Lenders"), and Goodwood, Inc. ("Goodwood Inc."), as agent, entered into a Credit Agreement (the "Goodwood II Credit Agreement"). The parties also executed, among other documents, a Security Agreement (the "Goodwood II Security Agreement" and, collectively with the Goodwood II Credit Agreement and other related documents, the "Goodwood II Loan Documents").

In accordance with the Goodwood II Credit Agreement, Receivables IIII agreed to purchase HBAs acquired with amounts advanced under the terms of the Goodwood II Credit Agreement. The advance rate was approximately sixty percent (60%) of the net present value of eligible receivables under the HBAs. The amount of $4,500,000.00 has been advanced.

Under the Goodwood II Security Agreement, Receivables III granted Goodwood Inc. a security interest in and to its assets, including, without limitation, the HBAs, accounts, receivables, and general intangibles. MV Brokerage signed a limited guarantee of amounts owed by Receivables III under the Goodwood II Credit Agreement.

**F. Other Financing**

In February 2023, Holdings executed senior notes with eight (8) shareholders of Holdings, who advanced a total of $12,968,000.00 (collectively, the "Shareholder Notes"). There is approximately $14,103,144.11 outstanding, including accrued interest, under the Shareholder Notes. The proceeds borrowed were used to fund operations.

Additionally, in 2021 and 2022, Holdings executed two (2) rounds of convertible notes, one of which converted. The later round, which was in the total amount of $6,070,000.00, has not been converted.

**G. Assets and Secured Obligations**

Monroe is currently owed approximately $44,800,000.00, while the Goodwood I Lenders and Goodwood II Lenders are owed approximately $7,408,275.82 and $4,460,000.00, respectively. As of September 5, 2023, the estimated net present value of the collateral securing the foregoing obligations is (a) $89,315,255.01 (Monroe), (b) $12,656,966.30 (Goodwood I), and

(c) $6,106,069.54 (Goodwood II). Holdings has additional HBAs with an aggregate net present value of approximately $12,861,536.97. Accordingly, the total net present value of HBAs exceeds $120,000,000.00 and there is potential equity for the benefit of unsecured creditors and equity holders.

## H. Events Leading to Bankruptcy

### 1. Monroe and Goodwood

Neither Monroe nor Goodwood had been paid since the end of 2022. As a result of discussions with Monroe, the Debtors were concerned that Monroe would exercise its rights under the Monroe Pledge Agreement in an effort to take control of the Debtors, potentially to the detriment of other remaining creditors, and, in particular, unsecured creditors.

### 2. State Litigation

Beginning on November 29, 2022, the states of Florida, New Jersey, and Indiana, the Commonwealths of Massachusetts and Pennsylvania, the Ohio Department of Commerce, Division of Real Estate and Professional Licensing, and the New Jersey Division of Consumer Affairs (collectively, the "States") commenced litigation against various Debtors (collectively, the "Primary State Actions"). A summary of each of the Primary State Actions is as follows:

#### a. The Florida Litigation

On November 29, 2022, the State of Florida filed a complaint for injunctive relief and other statutory relief against MV PBC and other non-debtor parties. The case is pending before the Circuit Court of the 13th Judicial Circuit in Hillsborough County, Florida, case number 22-CA-009958. There are 7,678 active HBAs in Florida.

#### b. The Massachusetts Litigation

On December 13, 2022, the Commonwealth of Massachusetts filed a complaint against MV PBC and MV MA. The case is pending before the Superior Court for Suffolk County, case number 2284CV-2823-BLS. There are 521 active HBAs in Massachusetts.

On February 27, 2023, the Superior Court in MA issued a preliminary injunction (the "MA Preliminary Injunction"). The MA Preliminary Injunction, among other things, (a) prohibits PBC FL and MV MA from originating new HBAs, or recording mortgages in connection with an HBA, and (b) ordered the removal of any and all mortgages under the name "MV Realty of Massachusetts, LLC". All mortgages in MA have been removed from the public records and, therefore, notwithstanding there has been no final adjudication on the merits in the MA Primary State Action, the Debtors have lost the benefit of valuable property rights.

#### c. The New Jersey Litigation

On June 3, 2023, the State of New Jersey and the New Jersey Division of Consumer Affairs filed a complaint against MV PBC, MV NJ and other non-debtor parties. The case is

pending before the Superior Court of New Jersey, Chancery Division, Essex County, case number There are 1,105 active HBAs in New Jersey. The State of New Jersey seeks various

**d. The North Carolina Litigation**

On March 30, 2023, the Sate of North Carolina filed a complaint against MV PBC, MV NC, and other non-debtor parties. The case is pending before the General Court of Justice, Superior Court Division, Wake County, case number 23CV006408-910. There are 2,079 active HBAs in North Carolina.

On September 18, 2023, the Superior Court in North Carolina issued a "Preliminary Injunction Order" (the "NC Preliminary Injunction"). The NC Preliminary Injunction directs, enjoins and prohibits the defendants (the "NC Defendants"), including MV NC and PBC FL, from, among other things: (a) asserting or representing to any North Carolina homeowner or other persons that the NC Defendants hold any valid lien, security interest, or any other encumbrance on any home subject of an HBA, or that the NC Defendants have the right to recover any early termination fee or liquidated damages in connection with an HBA; (b) commencing or continuing to prosecute or maintain any legal action to enforce an early termination fee, lien, or other encumbrances, except that the NC Defendants are permitted to file a legal action or arbitration proceeding – consistent with the terms of the HBAs – in an effort recover damages for breach of the HBA (or negotiate a settlement of its claim)[4]; (c) within 30 days, the NC Defendants shall record terminations of *all* memoranda filed on properties of North Carolina homeowners associated with an HBA, which terminations shall remain in place during the pendency of the North Carolina Primary State Action; and (d) within 14 days, the NC Defendants shall file cancellations of any *lis pendens*. In the North Carolina court's "Order and Opinion on Plaintiff's Amended Motion for Preliminary Injunction" (the "NC PI Order"), the North Carolina court found that "the following findings of fact, which are made solely for the purpose of resolving the present PI Motion and are not binding in any subsequent proceedings in this action." *See* PI Order, p.2, §1.

On September 26, 2023, the North Carolina court issued an order, *sua sponte*, staying the deadlines set forth in the NC Preliminary Injunction Order (the "NC Stay Order"). Although the deadlines in the NC Preliminary Injunction were stayed, the North Carolina court has since lifted the stay, which the NC Defendants have appealed. The North Carolina Supreme Court issued a partial stay of the NC Preliminary Injunction pending appeal. The NC Defendants maintain that

---

[4] Although the NC Preliminary Injunction prohibits the NC Defendants from commencing or continuing to prosecute or maintain any legal action to enforce an early termination fee, lien, or other encumbrances, the NC Defendants are permitted to file a legal action or arbitration proceeding – consistent with the terms of the HBAs – in an effort recover damages for breach of the HBA (or negotiate a settlement of its claim). And although the NC Defendants are prohibited from asserting or representing to any North Carolina homeowner or other persons that the NC Defendants hold any valid lien, security interest, or any other encumbrance on any home subject of an HBA, or that the NC Defendants may recover any early termination fee or liquidated damages in connection with an HBA, the NC Defendants are permitted to file a legal action or arbitration proceeding – consistent with the terms of the HBAs – in an effort recover damages for breach of the HBA (or negotiate a settlement of its claim).

the required removal of memoranda would cause irreparable harm or injury to the Debtors, since under North Carolina's newly enacted statute, effective August 24, 2023, the Debtors would likely be prohibited from re-recording memoranda in the event the Debtors ultimately prevail in the NC Primary State Action. The NC Preliminary Injunction has the absolute effect of dramatically reducing collections and rights of enforcement with respect to over 2,000 HBAs, which would result in a significant reduction in cash receipts by the Debtors without any final adjudication on the merits.

**e. <u>The Pennsylvania Litigation</u>**

On December 14, 2022, the Commonwealth of Pennsylvania filed a complaint against MV PA and a non-debtor party. The case is pending before the Court of Common Pleas of Philadelphia County, First Judicial Circuit, case number 221201288. There are 1,530 active HBAs in Pennsylvania.

**f. <u>The Indiana Litigation</u>**

On September 5, 2023, the State of Indiana filed a complaint against MV IN, MV Holdings, MV PBC and other non-debtor parties. The case is pending before the United States District Court for the Southern District of Indiana, case number 23-cv-01578-MPB-MG. There are 347 active HBAs in Indiana.

**g. <u>The Ohio Litigation</u>**

On February 15, 2023, the Ohio Department of Commerce, Divisions of Real Estate and Professional Licensing filed a complaint against MV OH and non-debtor parties. The case is pending before the Franklin County Court of Common Pleas, case number 23-CV-963. There are 869 active HBAs in Ohio.

In the Primary State Actions, the States allege wrongdoing primarily related to unfair or deceptive trade practices and also including telemarketing violations. The States further allege, among other things, that the filing of memoranda or similar notice, which provides constructive notice to the public of the existence of the HBA and its terms, unfairly or deceptively interferes with the homeowner's ability to sell the home or access financing with respect to their homes.

In several instances, the States allege that the Debtors made improper telephone solicitations to prospective customers without their consent. To date, the Debtors have not been provided with any of the actual names of homeowners or telephone numbers that are allegedly the subject of these solicitations. As a result, the Debtors have not had any meaningful opportunity to present in court the millions of lawfully obtained consents from prospective homeowners authorizing these very solicitations.

It is alleged that the Debtors sales and marketing practices "prey" upon customers who are elderly or of diminished financial means. To date, none of the States have produced any data, expert reports or analysis, or other evidence that would demonstrate such targeting actually exists or is reflected in the demographic composition of the portfolio of 34,000 HBAs. Moreover, an

initial review of the composition of the HBA portfolio suggests such allegations are without merit. The typical homeowner in an HBA owns a home with an average value exceeding $300,000, and the average age of homeowners under HBAs is 55 years old (and 72% of homeowners are under age 65). By comparison, the American Housing Survey 2021, based on US Census Bureau data, indicates that only 67.3% of homeowners in the country are under the age of 65. Thus, the homeowners under the HBAs are proportionally younger than a typical cross-section of homeowners overall in the United States.

It is also alleged and often strenuously implied in the Primary State Actions that a very significant portion of the Debtors' customers are aggrieved. However, Debtors dispute and question this allegation as being inaccurate and unsupported. The number of declarations or affidavits in support of the complaints filed by the States in the Primary State Actions, as well as the number of HBAs in each of the respective states are as follows, and actually reveal that the number of these customers is *de minimis* relative to the number of HBAs:

| State | States' Supporting Declarations/ Affidavits | Active HBAs[5] | Debtors' Supporting Declarations/Affidavits |
|---|---|---|---|
| New Jersey | None | 1,105 | 142 |
| Pennsylvania | None | 1,530 | 76 |
| Ohio | None | 869 | None |
| Indiana | None | 347 | None (filed in early September 2023) |
| Florida | 15 (3 of which from persons who are not parties to HBAs) | 7,678 | 454 |
| North Carolina | 16 | 2,079 | 250 |
| Massachusetts | 23 | 521 | 76 |

In contrast to the small number of sworn declarations or affidavits submitted by the States, the Debtors have obtained supporting sworn declarations or affidavits from HBA customers in Florida, North Carolina, New Jersey, Massachusetts, and Pennsylvania. The Debtors obtained at least 250 and more than 450 sworn statements or affidavits in North Caroline and Florida, respectively, from homeowners attesting that they understood the key terms and elements of the HBA.

[5] The Primary State Actions involve 14,129 out of a total of 33,959 HBAs nationwide. This equates to 41.61% of all HBAs. Conversely, nearly 60% of HBAs are not subject of the Primary State Actions.

The Debtors contend that the memoranda or other similar notice is separately signed and notarized by each homeowner under the HBA and is neither deceptive nor unfair. Rather, the memoranda or other similar notices were filed in accordance with the applicable law of each state and are intended to provide public notice of the HBA. The memoranda assist the MV Realty Subs with a fair and reasonable way of enforcing its limited contractual rights in the event the homeowner attempts to sell their home without using the MV Realty Sub as their agent.

It is also worth noting that the Debtors were previously represented by national and well-recognized local law firms prior to implementing the HBP in each state, who advised as to compliance with state and other applicable laws with respect to the sales and marketing of the HBP and HBAs, as well as with respect to the terms and conditions of the HBAs, the memoranda, and related agreements. In early 2022, the Debtors met with many state attorney generals and reviewed many aspects of the HBP including, without limitation, the term of the HBAs and specifically explained the recording of memoranda or other notices and the purpose and effect of doing so; no issues were raised by the various attorneys general with respect to the HBP or the memoranda or notice filings.

Although many States have included a request for preliminary injunctive relief in the Primary State Actions, only Massachusetts and North Carolina actually obtained preliminary injunctions. The NC Preliminary Injunction and the MA Preliminary Injunction were issued with no bond and prior to a final adjudication on the merits of the NC and MA Primary State Actions.

In the Primary State Actions, the Debtors were incurring approximately $800,000.00 per month in legal fees and costs. Members of Debtors' management were also spending an inordinate amount of time dealing with the litigation and responding to discovery requests and other investigative demands.

## I. <u>Other Litigation Related Matters</u>

In addition to the Primary State Actions, the Debtors also received and responded to civil investigative demands or requests for information from the following: (a) Minnesota Department of Commerce – March 28, 2022; (b) Idaho Department of Finance – September 7, 2022; (c) State of Idaho, Office of the Attorney General – October 12, 2022; (d) State of Maryland, Office of the Attorney General – November 9, 2022; (e) State of Colorado, Office of the Attorney General – January 13, 2023; (f) State of Minnesota, Office of the Attorney General – February 7, 2023; (g) State of New York, Office of the Attorney General – February 17, 2023; (h) Commonwealth of Kentucky – Office of the Attorney General – March 14, 2023; (i) State of Connecticut, Office of the Attorney General – April 5, 2023; (j) City of Chicago, Department of Law – April 19, 2023; (k) State of Illinois, Department of Financial and Professional Regulation – May 19, 2023; (l) State of Arizona, Office of the Attorney General – June 8, 2023; (m) State of Kentucky, Real Estate Division – July 10, 2023; (n) Commonwealth of Virginia, Office of the Attorney General – July 28, 2023; and (o) United States of America, Consumer Financial Protection Bureau – August 17, 2023.

Additionally, (a) on December 13, 2023, the State of California filed a complaint against MV CA, MV Holdings, Receivables II, Receivables III, and other non-debtor parties with the Superior Court, County of Los Angeles, case number 238TCV30464, and (b) on January 31, 2024, the State of Georgia filed a complaint against MV PBC, MV Holdings, MV GA, Receivables II, Receivables III, and other non-debtor parties with the Superior Court of Fulton County, Georgia, case number 24CV001338.

**IV.**

**<u>EVENTS DURING THE CHAPTER 11 CASE</u>**

On September 22, 2023, each of the Debtors filed a voluntary petition under Chapter 11. The Debtors each remain in possession of their assets as debtors-in-possession pursuant to sections 1107 and 1108 of the Code. The following is a brief description of the major events during the Chapter 11 Case:

**1. “<u>First Day” Motions</u>**

The Debtors filed various “first day” motions with the Court, including, without limitation, the following:

(a) On September 23, 2023, the Debtors filed their *Ex-Parte Motions to Jointly Administer* the related Chapter 11 case, with Case No. 23-17590-EPK being designated as the lead case [ECF No. 2]. On September 25, 2023, the Court entered the *Order Granting Joint Administration* and designed *In re: MV Realty PBC, LLC, Case No. 23-17590-EPK* as lead case [ECF No. 18];

(b) On September 23, 2023, the Debtors filed the *Application for Entry of Order Authorizing Employment of Seese, P.A., As Counsel for Debtors in Possession, Effective September 22, 2023* [ECF No. 7] (the “<u>Seese Application</u>”). The Seese Application was granted by the Court’s *Order Authorizing the Employment of Seese, P.A., as Counsel for Debtors-in-Possession, Effective September 22, 2023* [ECF No. 151];

(c) On September 24, 2023, the Debtors filed the *Ex-Parte Motion for Authorization to File Consolidated Case Management Summary* [ECF No. 8], which was granted by the Court’s *Order Granting Ex-Parte Motion for Authorization to file Case Management Summary* [ECF No. 20];

(d) On September 24, 2023, the Debtors filed the *Emergency Motion for Entry of Order Authorizing Use of Cash Collateral and Setting Final Hearing* [ECF No. 10]. Thereafter, the Court entered the following orders authorizing use of cash collateral: (i) *Interim Order Authorizing Use of Cash Collateral and Setting Further Hearing* [ECF No. 48], (ii) *Second Interim Order Authorizing Use of Cash Collateral and Setting Further Hearing* [ECF No. 126], (iii) *Final Order Authorizing use of Cash Collateral and Setting Further Hearing* [ECF No. 142], and (iv) *Order Authorizing Continued Use of Cash Collateral* [ECF No. 613];

(e) On September 24, 2023, the Debtors filed the *Motion For Authority to Use Cash Management System and Bank Accounts* [ECF No. 11] (the “<u>Case Management Motion</u>”), which

was granted by Court's (i) *Interim Order Granting Debtors' Motion For Authority to Use Cash Management System and Bank Accounts and Setting Further Hearing* [ECF No. 44], and (ii) ; and

(f) On September 24, 2023, the Debtors filed the Debtor filed the *Emergency Motion For an Order Authorizing the Debtors to Pay Prepetition Wages, Commissions, Taxes and Other Withholdings, and to Pay and Offer Continued Benefits Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code* [ECF No. 12] (the "Wage Motion"), which was granted by the Court's *Order Granting Emergency Motion For an Order Authorizing the Debtors to Pay Prepetition Wages, Commissions, Taxes and Other Withholdings, and to Pay and Offer Continued Benefits Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code* [ECF No. 45].

**2. Form of Notice of Commencement and Proof of Claim**

On September 26, 2023, the Debtors filed the *Emergency Motion to Approve Form of Notice of Commencement and Proof of Claim* [ECF No. 21], which was granted by the Court's *Order Granting Emergency Motion to Approve Form of Notice of Commencement and Proof of Claim* [ECF No. 47].

**3. Designation of Notice and Notice Procedures**

On September 26, 2023, the Debtors filed the *Emergency Motion for Entry of Order Designating and Approving Notice Procedures* [ECF No. 22], which was granted by the Court's *Order Granting Emergency Motion for Entry of Order Designating and Approving Notice Procedures* [ECF No. 46].

**4. Claims and Notice Agent**

On October 2, 2023, the Debtors filed the *Emergency Application to Employ Epiq Corporate Restructuring, LLC as Notice, Claims, and Solicitation Agent, and Call Center Operator* [ECF No. 49], which was granted by the Court's *Order Granting Emergency Application to Employ Epiq Corporate Restructuring, LLC as Notice, Claims, and Solicitation Agent, and Call Center Operator* [ECF No. 63].

In coordination with Epiq Corporate Restructuring, LLC ("Epiq"), a case specific website was created for the benefit of creditors. The website is at (the "Case Website"):

https://dm.epiq11.com/case/mvrealtyholdings.

On the Case Website, creditors and parties in interest may filed proofs of claim, review claims, review and/or obtain copies of pleadings from the docket maintained by the Clerk of the Court and obtain contact information for professionals. Additionally, the Debtors arranged for Epiq to maintain a call center for purposes of answering general questions regarding the Debtors' Chapter 11 case, including information relating to filing proofs of claim. The Debtors coordinated with Epiq and the United States Trustee to provide notice of the Case Website and call center information to creditors.

**5. Retention of Professionals (Debtors)**

The Debtors filed the following applications to retain professionals (other than general bankruptcy counsel for the Debtors):

(a) On October 3, 2023, the Debtors filed the Emergency Application to Employ John C. Gekas, Esq. and Saul Ewing, LLP, as Special Litigation Counsel [ECF No. 53], which was granted by the Court's Order Authorizing Employment of Saul Ewing, LLP, as Special Litigation Counsel for the Debtors [ECF No. 107];

(b) On November 13, 2023, the Debtors filed the *Emergency Application to Employ Walter E. Brock, Esq. and Young Moore and Henderson, P.A. as Special Counsel* [ECF No. 200], which was granted by the Court's *Order Granting Debtors' Emergency Application to Employ Walter E. Brock, Esq. and Young Moore and Henderson, P.A. as Special Counsel* [ECF No. 316];

(c) On November 13, 2023, the Debtors filed the *Emergency Application to Employ David A. Wallace, Esq. and Carpenter Lipps LLP as Special Counsel* [ECF No. 201], which was granted by the Court's *Order Granting Debtors' Emergency Application to Employ David A. Wallace, Esq. and Carpenter Lipps LLP as Special Counsel* [ECF No. 602];

(d) On November 13, 2023, the Debtors filed the *Emergency Application to Employ Jordan C. May, Esq. and Frascona Joiner Goodman and Greenstein, PC. as Special Counsel* [ECF No. 202], which was granted by the Court's *Order Granting Debtors' Emergency Application to Employ Jordan C. May, Esq. and Frascona Joiner Goodman and Greenstein, PC. as Special Counsel* [ECF No. 315]; and

(e) On December 6, 2023, the Debtors filed the *Ex-Parte Motion for Order Expanding Scope of Retention of Young Moore Henderson, P.A.* [ECF No. 417], which was granted by the Court's *Order Granting Ex-Parte Motion for Order Expanding Scope of Retention of Young Moore Henderson, P.A.* [ECF No. 422].

**6. Official Committee of Holders of Homeowner Benefits Agreements and Retention of Counsel**

On December 28, 2023, the United States Trustee filed the *Corrected Appointment and Notice of Appointment of Committee of Home Benefits Agreement Holders* [ECF No. 519], which corrected the original *Appointment and Notice of Appointment of Committee of Home Benefits Agreement Holders* [ECF No. 278] filed on November 28, 2023. The effect of the foregoing was to appoint a 3-member committee ("Committee") of home benefits agreement holders.

Thereafter, on December 5, 2023, the Committee filed the *Amended Application of Committee of Home Benefits Agreement Holders for Order Authorizing Employment of Boies Schiller Flexner as Counsel Effective November 28, 2023* [ECF No. 412], which was granted by the Court's *Order Authorizing Employment of Boies Schiller Flexner LLP as Counsel for Official Committee of Home Benefits Agreement Holders* [ECF No. 452].

Monroe Capital Management Advisors, LLC filed a limited objection to the retention of Boise Schiller Flexner LLP as counsel for the Committee on the basis that such retention and the

related attorneys' fees and costs to be retained were unnecessary since the interests of holders of home benefit agreements were adequately represented by the various states attorney generals appearing in the Chapter 11 case.

**7. Interim Compensation Procedures for Professionals**

On October 20, 2023, the Debtors filed the *Motion for Entry of Order Authorizing and Establishing Monthly Compensation Procedures for Professionals* [ECF No. 106], which was granted by the Court's *Order Granting Debtors' Motion for Entry of Order Authorizing and Establishing Monthly Compensation Procedures for Professionals* [ECF No. 251]. In accordance with the compensation procedures approved by the Court, retained professionals are authorized to present monthly invoices to a designated service list, who then have 15 days to raise objections to the requests for payment. In the absence of any objection, the professionals are entitled to be paid 80% of the requested fees and 100% of the requested costs. In the event of any objection, the objection is resolved by the Court in the absence of any resolution. Retained professionals are not relieved of any requirement to file interim and final fee applications with the Court.

**8. Authority to Executed Subordination Agreements and to Release Recorded Memoranda and to Accept Payments**

On November 2, 2023, the Debtors filed the *Emergency Motion for Entry of Order Authorizing Debtors to Execute and Provide Subordination Agreements in Connection With Homeowner Refinancings* [ECF No. 161], which was granted by the Court's *Order Granting Debtors' Emergency Motion for Entry of Order Authorizing Debtors to Execute and Provide Subordination Agreements in Connection With Homeowner Refinancings* [ECF No. 196]. This motion was filed by the Debtors in order to cooperate with homeowners and lenders to facilitate homeowner refinancings.

On November 2, 2023, the Debtors filed the *Emergency Motion for Entry of Order Authorizing the Debtors to Release Memoranda or other Notices and to Accept Payments of Fees* [ECF No. 162], which was granted by the Court's *Order Granting Debtors' Emergency Motion for Entry of Order Authorizing the Debtors to Release Memoranda or other Notices and to Accept Payments of Fees* [ECF No. 197]. This motion was filed by the Debtors in order to cooperate with homeowners and facilitate homeowner sales of homes.

The states of Florida [ECF No. 169], Indiana [ECF Nos. 173 and 174], Massachusetts [ECF Nos. 175], Pennsylvania [ECF No. 176], North Carolina [ECF Nos. 177 and 178], Colorado [ECF No. 179], Maryland [ECF No. 181], and Tennessee [ECF No. 182] filed limited objections to the relief requested by the Debtors. Again, however, the Debtors' requests were granted by the Court.

**9. Schedules and Statement of Financial Affairs**

On October 31, 2023, the Debtors filed their schedules and statement of financial affairs in each of their respective cases. The schedules and statement of financial affairs for each of the Debtors are maintained on the case-specific docket maintained by the Clerk of the Court for each of the Debtors.

On March 19, 2024, each of the Debtors filed amended schedules and statement of financial affairs. The amended schedules and statement of financial affairs appear on the case-specific dockets maintained by the Clerk of the Court for each of the Debtors.

**10. Requests By States that the Automatic Stay is Inapplicable**

During the case, the following states (or state agencies) filed requests with the Court in an effort to obtain a determination that the automatic stay does not apply to the proceedings commenced by the states (or state agencies) on the basis that the proceedings were exercises of police and regulatory powers, all of which were granted by the Court: (a) Commonwealth of Massachusetts [ECF No. 64]; (b) North Carolina Real Estate Commission [ECF No. 82]; (c) State of North Carolina [ECF No. 98]; (d) State of New Jersey [ECF No. 117]; and (e) State of Pennsylvania [ECF No. 183]. All but one of the foregoing requests were unopposed by the Debtors. The Court granted the requests and held that the automatic stay does not apply to the state proceedings, as the proceedings were exercises of police and regulatory powers.

**11. Numerous Requests By Lenders for Relief from the Automatic Stay**

During the case, numerous lenders filed requests for relief from the automatic stay to enforce their respective remedies against homeowners who had defaulted under the terms and conditions of the loan documents between the parties. The lenders' requests were filed since the Debtors had recorded memoranda of the HBAs in the public record. The Debtors have not opposed these requests since the Debtors have no ownership interest in the properties. The Debtors prepared a "form" order granting the requests for relief from stay, which have been used in nearly all instances, which has resulted in considerable savings to the estate.

**12. Meeting of Creditors**

On November 7, 2023, the Debtors, by and through their counsel and designated representative appeared for the meeting of creditors conducted pursuant to section 341 of the Bankruptcy Code. At the request of the United States Trustee, the Debtors' representative and counsel agreed to appear in-person in Miami, Florida, although the case is pending in West Palm Beach, Florida. The meeting of creditors took place over a period of several hours. An audio recording of the meeting of creditors is posted on the case website maintained by Epiq Corporate Restructuring, the Court approved claims and notice agent serving in this case.

**13. Claims Bar Date**

The deadline for creditors to file claims was originally December 1, 2023. On November 22, 2023, the United States Trustee filed the *Motion to Extend Time to File Proofs of Claim* [ECF No. 263], which was granted by the Court's *Order Granting Motion to Extend Bar Date to File Proofs of Claim* [ECF No. 312] and extended the deadline for creditors to file proofs of claim to February 1, 2024. Thereafter, on January 18, 2024, the Official Committee of Home Benefits Agreement Holders filed the *Motion to Extend Time to File Proofs of Claim* [ECF No. 660], which was unopposed by the Debtors and granted by the Court's *Order Granting Motion to Extend Time to File Proofs of Claim* [ECF No. 780] and the *Amended Order Granting Motion to Extend Time to File Proofs of Claim* [ECF No. 956]. Consequently, the deadline for creditors (non-government) to file a proof of claim is April 1, 2024.

The deadline for government entities to file proofs of claim was March 20, 2024.

Epiq maintains a roster of all claims filed in the case, and copies of the filed claims are available on the Case Website.

**14. HBA Claims**

The Debtors currently have approximately 34,000 active HBAs. The original deadline for filing proofs of claims was December 1, 2023; however, the deadline was extended until February 1, 2024, and then, again, until April 1, 2024. Despite the extensions of the claims bar deadlines, the Debtors estimate that approximately 961 claims have been filed by HBA Parties (the "HBA Claims"). Of the HBA Claims filed, the Debtors estimate that approximately 125 HBA Claims have been filed by HBA Parties who actually paid money to the Debtors.

**14. Adversary Proceedings**

***A. MV Realty PBC, LLC, et al. v. State of Florida, et al., Case No. 23-01211-EPK (the "State Adversary Proceeding")***

On October 11, 2023, MV Realty PBC, LLC (Florida), MV Realty Holdings, LLC, MV Realty PBC, LLC (Pennsylvania), MV Realty New Jersey, LLC, MV Realty Ohio, LLC, MV Realty North Carolina, LLC, MV of Massachusetts, LLC, MV Realty Indiana, LLC, and MV Realty Illinois, LLC (collectively, the "Debtor Plaintiffs") filed a single-count adversary complaint against the States of Florida, North Carolina, Ohio, and Indiana, the Commonwealths of Massachusetts and Pennsylvania, New Jersey Division of Consumer Affairs, and Ohio Department of Commerce, Division of Real Estate and Professional Licensing (collectively, the "Defendants" or "States"). On October 11, 2023, the Debtor Plaintiffs filed an *Emergency Motion for Temporary Restraining Order and Preliminary Injunction.*

The Debtor Defendants were *not* seeking to enjoin the Primary State Litigation from proceeding or asking that the Court adjudicate the Primary State Litigation. Rather, the Debtor Defendants sought to enjoin the Defendants from taking any adverse action against property of the Debtor Plaintiffs' estate pending a final adjudication on the merits of the Primary State Litigation.

The Court denied the Debtor Plaintiffs' request for a temporary restraining order and scheduled a hearing on the Debtor Plaintiffs' request for a preliminary injunction, which was subsequently rescheduled for February 12-15, 2024. The Debtor Plaintiffs were also granted leave to file an amended complaint and request for injunctive relief.

On November 15, 2023, the Debtor Plaintiffs filed an Amended Complaint for Preliminary Injunction (the "Complaint") and an Amended Motion for Preliminary Injunction (the "PI Motion"). Again, the Debtor Defendants were *not* seeking to enjoin the Primary State Litigation from proceeding or asking that the Court adjudicate the Primary State Litigation. Rather, the Debtor Defendants sought to enjoin the Defendants from taking any adverse action against property of the Debtor Plaintiffs' estate pending a final adjudication on the merits of the Primary State Litigation. An evidentiary hearing on the PI Motion was scheduled for February 12-15, 2024.

Thereafter, the State filed their responses to the PI Motion and motions to dismiss the Complaint, and the Debtor Plaintiffs filed their responses/replies. Just prior to the hearing on the PI Motion, the Court dismissed the Amended Complaint during the course of hearings held on February 7, 2024, and, on February 7, 2024, the Court issued the *Order Abstaining From and Dismissing Adversary Complaint* [Adv. ECF No. 238]. Thereafter, the States of Florida and New Jersey and the Commonwealth of Massachusetts requested and were awarded costs in connection with the adversary proceeding.

Although the State Adversary Proceeding was dismissed by the Court, the Debtor Defendants were able to obtain a vast amount of discovery from the States, including, without limitation, the production of documents and depositions of consumers and representatives of the States, which will assist the Debtor Defendants in defending against the Primary State Litigation.

**B. *MV Realty North Carolina, LLC v. North Carolina Real Estate Commission, Case No. 23-01255-EPK (the "<u>NCREC Adversary Proceeding</u>")***

On December 8, 2023, MV Realty North Carolina, LLC filed a single ("<u>MV NC</u>") count adversary complaint against the North Carolina Real Estate Commission ("<u>NCREC</u>"). On December 8, 2023, the Debtor Plaintiffs filed a *Verified Emergency Motion for Temporary Restraining Order and Preliminary Injunction.* The Court denied MV NC's request for a temporary restraining order and scheduled a hearing on MV NC's request for a preliminary injunction. However, following the Court's dismissal of the State Adversary Proceeding, MV NC and NCREC filed a stipulation of dismissal of the NCREC Adversary Proceeding.

In the NCREC Adversary Proceeding, MV NC had sought to enjoin the NCREC from taking any adverse action against MV NC's brokerage license in the State of North Carolina pending a final adjudication on the merits. The NCREC had scheduled and later conducted an administrative hearing on the suspension or revocation of MV NC's brokerage license, which MV NC was scheduled on insufficient notice and without due process. The NCREC subsequently determined to revoke MV NC's brokerage license, and MV NC is awaiting a written decision. MV NC will then determine whether to pursue appellate rights.

**15. <u>Motions to Dismiss</u>**

On February 27, 2024, the Committee filed its *Motion of Committee of Home Benefits Agreement Holders for Relief Under Section 1112(b) of the Bankruptcy Code* [ECF No. 959] (the "<u>Committee MTD</u>"), in which the Committee seeks dismissal of the Chapter 11 case for reasons including (a) other than the Primary State Actions, the Debtors were "free from interference by any secured lenders" and "had no significant looming creditors." The Committee also alleges that the Debtors can file "no confirmable plan of reorganization."

On March 12, 2024, the United States Trustee filed the *Motion to Dismiss or Convert* [ECF No. 1009] (the "<u>UST MTD</u>"), in which the United States Trustee seeks to dismiss the Chapter 11 case or convert the Chapter 11 case to Chapter 7. In support of the UST MTD, the United States Trustee alleges, among other things, that (a) the schedules and statement of financial affairs are not accurate and that the Debtors have not filed amended schedules and statement of financial affairs, (b) the estate experienced negative cash flow in January 2024, (c)

the number of the Debtors' employees has dropped, and (d) the Debtors have operated at a net loss since November 2023. Accordingly, the United States Trustee seeks to dismiss or convert the Chapter 11 case.

On April 1, 2024, the Debtors filed their *Response to Motion of Committee of Home Benefits Agreement Holders for Relief Under Section 1112(b) of the Bankruptcy Code, and Motion to Dismiss or Convert* [ECF No. 1167]. The Debtors intend to vigorously defend the Committee MTD and UST MTD and will argue there is no basis to dismiss or convert the Chapter 11 case. A dismissal of the Chapter 11 case would terminate the automatic stay and result in the recommencement of litigation against the Debtors. Likewise, the Secured Lenders would be permitted to seek to foreclose upon any liens recorded against substantially all of the Debtors' assets. Similarly, if converted, the Secured Creditors would likely seek relief from the automatic stay to enforce remedies against the Debtors and their assets, including, without limitation, foreclosing upon any liens recorded. The Debtors would no longer be able to service HBAs and the likelihood of recoveries for unsecured creditors would diminish substantially. The dismissal or conversion of the Chapter 11 case is *not* in the best interests of unsecured creditors and other parties in interest. Finally, the Committee MTD and the UST MTD contain inaccurate allegations in support of the relief requested.

**16. Disclosure Statement Hearing**

The Court conducted a disclosure statement hearing on ______________________.

**17. Monthly Operating Reports/U.S. Trustee Fees**

The Debtors have prepared and filed all monthly operating reports required pursuant to the Operating Guidelines for Debtors-in-Possession and paid all fees pursuant to 28 U.S.C. § 1930(a)(6). Copies of the monthly operating reports have been filed with the Court and are available for review. The Debtors are also current on fees owed pursuant to 28 U.S.C. § 1930(a)(6).

## V.

## THE PLAN OF REORGANIZATION

### A. Overview of Plan of Reorganization

**THE PLAN IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT. THE SUMMARY OF THE PLAN SET FORTH BELOW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PROVISIONS OF THE PLAN AND THE SUMMARY CONTAINED HEREIN, THE TERMS OF THE PLAN WILL GOVERN**

### B. Classification and Treatment of Claims Against the Debtors

The Plan classifies Claims and Interests separately and provides different treatment for different Classes of Claims and Interests in accordance with the Code. As described more fully below, the Plan provides, separately for each Class, that holders of certain Claims will receive

various amounts and types of consideration based on the different rights of the holders of Claims in each Class.

## C. Unclassified Claims

### 1. Allowed Administrative Claims.

Administrative Claims are Claims constituting a cost or expense of the administration of the Case allowed under sections 503(b) and 507(a)(2) of the Code. Such Claims include any actual and necessary costs and expenses of preserving the Estate of the Debtors, any actual and necessary costs and expenses of operating the business of the Debtors-in-Possession, any indebtedness or obligations incurred or assumed by the Debtors-in-Possession in connection with the conduct of the Debtors' businesses, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, all compensation and reimbursement of expenses to the extent Allowed by the Court under section 330, 331 or 503 of the Code, all costs associated with the cure of any executory contracts and unexpired leases between the Debtors and any Person, and any fees or charges assessed against the Estate of the Debtors under section 1930 of title 28 of the United States Code.

The notice of the Effective Date shall set forth the Administrative Claims Bar Deadline and shall constitute notice of such Administrative Claims Bar Deadline. Objections to requests for payment of Administrative Claims, other than requests for payment of Professional fee Claims, must be filed and served on the Plan Administrator and requesting party by Claims Objection Deadline (as defined below).

Except as otherwise provided in the Plan, and except to the extent that any entity entitled to payment of any Allowed Administrative Claim agrees to a different treatment, each holder of an Allowed Administrative Claim shall receive Cash in an amount equal to such Allowed Administrative Claim on the later of the Effective Date and the date such Administrative Claim becomes an Allowed Administrative Claim by Final Order, or as soon thereafter as is reasonably practicable after the Administrative Claims Bar Deadline. Notwithstanding the foregoing, Administrative Claims incurred in the ordinary course of the Debtors' business operations shall be paid in accordance with the terms and conditions agreed to by the Debtors and the holders of such ordinary course Administrative Claims.

Compensation of Professionals and reimbursement of expenses incurred by Professionals are Administrative Claims pursuant to sections 503(b)(2), 503(b)(3), 503(b)(4) and 503(b)(5) of the Code. All payments to Professionals will be made in accordance with the procedures established by the Code, the Rules and the Court relating to the payment of interim and final compensation for services rendered and reimbursement of expenses. The Court will review and determine all applications for compensation for services rendered and reimbursement of expenses.

All Professionals seeking an award by the Court of Professional fees and expenses shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date pursuant to section 330 of the Code and Rule 2016 by the Professional Fee Claims Bar Date. The notice of the Effective Date

shall set forth the Professional Fee Claims Bar Date and shall constitute notice of such Professional Fee Claims Bar Date.

Objections to any Professional fee Claims must be filed and served on the Plan Administrator and the requesting party by no later than twenty-one (21) days after service of the applicable application or such other time as may be established by the Court. Allowed Professional fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Court upon the earlier of (i) the Effective Date or (ii) the date upon which an order relating to any such Allowed Professional fee Claim is entered, and in each case, as soon as reasonably practicable. Awarded fees and costs shall be paid from any remaining balances of retainers on deposit with the applicable Professional and then from the Debtors' Cash.

**2. Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim under section 507(a)(8) of the Code has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive deferred Cash payments over a period not to exceed five years following the Petition Date equal to the amount of the Allowed Priority Tax Claims as of the Effective Date of the Plan.

**3. United States Trustee's Fees.**

The Debtors shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) through Confirmation on the Effective Date. The Reorganized Debtors shall further pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) for post-confirmation periods within the time periods set forth in 28 U.S.C. §1930(a)(6), until the earlier of the closing of this Case by the issuance of a Final Decree by the Court, upon the entry of an order of this Court dismissing this Case, or upon entry of an order converting this Case to another chapter under the Code, and the Reorganized Debtors shall file an appropriate post-Confirmation report indicating disbursements for the relevant periods.

**D. Classified Claims**

For purposes of this Plan, Claims against and Interests in the Debtor shall be classified and treated as follows:

**1. Class 1. Allowed Other Priority Claims**

(a) Description. Class 1 consists of the Allowed Other Priority Claims against the Debtors that are entitled to priority in accordance with section 507(a) of the Code (other than Administrative Claims, Secured Tax Claims and Priority Tax Claims). *The Debtors are unaware of any Allowed Other Priority Claims.*

(b) Treatment. Each holder of an Allowed Class 1 Claim shall receive, in full satisfaction, release and exchange for such Claim, Cash in an amount equal to the amount of such Allowed Other Priority Claim in accordance with section 1129(a)(9) of the Code on the later of the Effective Date or the date such Claim becomes an Allowed Class 1 Claim, or as soon thereafter as is reasonably practicable.

(c) Impairment. The Class 1 Claims are Unimpaired.

**2. Class 2. Allowed Secured Claim of Monroe**

(a) Description. Class 2 consists of the Allowed Secured Claim held by Monroe, which is secured by a first-priority Lien against the Monroe Portfolio.

(b) Treatment. Until such time as the Allowed Class 2 Claim is paid in full, the holder of the Allowed Class 2 Claim shall receive: (a) 100% of Net Proceeds of any Actions (excluding Avoidance Actions) and (b) following the funding of the Cash Reserve: (i) 98% of Net Cash Flow from Operations attributed solely to the Monroe Portfolio until such time as Distributions totaling $10,000,000.00 have been made to Monroe on account of the Allowed Class 2 Claim, (ii) 96% of Net Cash Flow from Operations attributed solely to the Monroe Portfolio until such time as Distributions totaling $20,000,000.00 have been made to Monroe on account of the Allowed Class 2 Claim, (iii) 94% of Net Cash Flow from Operations attributed solely to the Monroe Portfolio until such time as Distributions totaling $30,000,000.00 have been made to Monroe on account of the Allowed Class 2 Claim, (iv) 92% of the Net Cash Flow from Operations attributed solely to the Monroe Portfolio until such time as Distributions totaling $40,000,000.00 have been made to Monroe on account of the Allowed Class 2 Claim, (v) 80% of the Net Cash Flow from Operations attributed solely to the Monroe Portfolio until such time as the Allowed Class 2 Claim has been paid in full. Additionally, the Reorganized Debtors (or the Plan Administrator on behalf of the Reorganized Debtors) shall comply with all financial and other reporting covenants and consent rights in favor of Monroe in accordance with Article IX of the Plan. The Debtors and/or the Reorganized Debtors reserve the rights to, among other things, (a) object to the amount of the Claim of Monroe in excess of $44,800,000.00, (b) any interest, including, without limitation, default rate interest and post-Petition Date interest claimed by Monroe, (c) the amount of any Monroe Adequate Protection Claim, and (d) value the Collateral to which any Liens in favor of Monroe are asserted. The Allowed Class 2 Claim shall be entitled to payment of interest calculated upon the unpaid principal balance at the non-default, contract rate of interest provided for under the Monroe Loan Documents from and after the Effective Date unless otherwise agreed to by the Debtors and Monroe or by Final Order of the Court.

For the avoidance of doubt, the Allowed Class 2 Claim shall be subject to the rights, claims, defenses, and objections of the Debtors under the Final Cash Collateral Order, as well as the rights of the Committee to file and prosecute a Challenge Action, as defined under, and in accordance with, the Final Cash Collateral Order.

The holder of the Allowed Class 2 Claim shall retain the Liens securing the Allowed Class 2 Claim and shall retain all of its rights and remedies as a secured party, including, without limitation, such rights and remedies set forth in the Monroe Loan Documents, the Final Cash Collateral Order, and applicable law subject, however, to the reservations set forth herein.

(c) Impairment. The Class 2 Claim is Impaired.

**3. Class 3. Allowed Secured Claim of Goodwood**

(a) Description. Class 3 consists of the Allowed Secured Claim held by Goodwood that is secured by a first-priority Lien against the Goodwood Portfolio.

(b) Treatment. Until such time as the Allowed Class 3 Claim is paid in full, the holder of the Allowed Class 3 Claim shall receive: (a) 100% of Net Proceeds of any Actions (excluding Avoidance Actions) after the holder of Allowed Class 2 Claim is paid in full, and (b) following the creation of the Cash Reserve: (i) 98% of Net Cash Flow from Operations attributed solely to the Goodwood Portfolio until such time as the Allowed Class 3 Claim has been paid in full. The Allowed Class 2 Claim shall be entitled to payment of interest calculated upon the unpaid principal balance at the non-default, contract rate of interest provided for under the Monroe Loan Documents from and after the Effective Date unless otherwise agreed to by the Debtors and Monroe or by Final Order of the Court.

Additionally, the Reorganized Debtors (or the Plan Administrator on behalf of the Reorganized Debtors) shall comply with all financial and other reporting covenants and consent rights in favor of Goodwood in accordance with Article IX of the Plan. The Debtors and/or the Reorganized Debtors reserve the rights to, among other things, (a) object to the amount of the Claim of Goodwood, (b) any interest, including, without limitation, default rate interest and post-Petition Date interest claimed by Goodwood, (c) the amount of any Goodwood Adequate Protection Claim, and (d) value the Collateral to which any Liens in favor of Goodwood are asserted.

For the avoidance of doubt, the Allowed Class 3 Claim shall be subject to the rights, claims, defenses, and objections of the Debtors under the Final Cash Collateral Order, as well as the rights of the Committee to file a Challenge Action, as defined under, and in accordance with, the Final Cash Collateral Order.

The holder of the Allowed Class 3 Claim shall retain the Liens securing the Allowed Class 3 Claim and shall retain all of its rights and remedies as a secured party, including, without limitation, such rights and remedies set forth in the Goodwood Loan Documents, the Final Cash Collateral Order, and applicable law subject, however, to the reservations set forth herein.

(c) Impairment. The Class 3 Claim is Impaired.

**4. Class 4. Allowed Other Secured Claims**

(a) Description. Class 4 consists of Allowed Other Secured Claims against the Debtors, other than the Allowed Class 2 and Class 3 Claims. *The Debtors are unaware of any Allowed Class 4 Claims.*

(b) Treatment. The holders of Allowed Class 4 Claims shall receive, in full satisfaction, release and exchange for such Claim, at the sole option of the Debtors: (i) each holder of an Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Code, shall receive payment in full, in Cash, on the later of the Effective Date of the Plan and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is reasonably practicable; or (ii) the Collateral securing the Allowed Class 4 Claim shall be surrendered to the holder of the Allowed Class 4 Claim, thus resulting in the holder of the Allowed Class 4 Claim receiving the indubitable equivalent of its Secured Claim under section 1129(b)(2)(A)(iii). The Debtors reserve the right to obtain a determination of the value of any Secured Claim pursuant to

section 506 of the Code. In the event the Debtors obtain such a determination, each such holder receiving the treatment set forth in the preceding sentence of this Section 4.04(b)(i) or (ii) shall have an Allowed Unsecured Claim for the amount by which the amount of the Allowed Claim exceeds the value of the Collateral, that is Property of the Estate, securing such Allowed Claim.

(c) Impairment. The Class 4 Claims are Unimpaired.

**5. Class 5. Allowed General Unsecured Claims (Government)**

(a) Description. Class 5 consists of the Allowed General Unsecured Claims of Government Parties against the Debtors.

(b) Treatment. Each holder of an Allowed Class 5 Claim shall be paid such holder's Pro Rata Share of Unsecured Claims Distributions.

(c) Impairment. The Class 5 Claims are Impaired.

**6. Class 6. Allowed General Unsecured Claims of HBA Parties Against MV Homes of New York, LLC**

(a) Description. Class 6 consists of the Allowed General Unsecured Claims of HBA Parties against MV Homes of New York, LLC.

(b) Treatment. Each holder of an Allowed Class 6 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 6 Claims are Impaired.

**7. Class 7. Allowed General Unsecured Claims of HBA Parties Against MV of Massachusetts, LLC**

(a) Description. Class 7 consists of the Allowed General Unsecured Claims of HBA Parties against MV of Massachusetts, LLC.

(b) Treatment. Each holder of an Allowed Class 7 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 7 Claims are Impaired.

**8. Class 8. Allowed General Unsecured Claims of HBA Parties Against MV Realty of Alabama, LLC**

(a) Description. Class 8 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Alabaman, LLC.

(b) Treatment. Each holder of an Allowed Class 8 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 8 Claims are Impaired.

**9. <u>Class 9. Allowed General Unsecured Claims of HBA Parties Against MV Realty of Arizona, LLC</u>**

(a) <u>Description</u>. Class 9 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Arizona, LLC.

(b) <u>Treatment</u>. Each holder of an Allowed Class 9 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) <u>Impairment</u>. The Class 9 Claims are Impaired.

**10. <u>Class 10. Allowed General Unsecured Claims of HBA Parties Against MV Realty of California, LLC</u>**

(a) <u>Description</u>. Class 10 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of California, LLC.

(b) <u>Treatment</u>. Each holder of an Allowed Class 10 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) <u>Impairment</u>. The Class 10 Claims are Impaired.

**11. <u>Class 11. Allowed General Unsecured Claims of HBA Parties Against MV Realty of Colorado, LLC</u>**

(a) <u>Description</u>. Class 11 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Colorado, LLC.

(b) <u>Treatment</u>. Each holder of an Allowed Class 11 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) <u>Impairment</u>. The Class 11 Claims are Impaired.

**12. <u>Class 12. Allowed General Unsecured Claims of HBA Parties Against MV Realty of Connecticut, LLC</u>**

(a) <u>Description</u>. Class 12 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Connecticut, LLC.

(b) <u>Treatment</u>. Each holder of an Allowed Class 12 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) <u>Impairment</u>. The Class 12 Claims are Impaired.

**13. <u>Class 13. Allowed General Unsecured Claims of HBA Parties Against MV Realty of Idaho, LLC</u>**

(a) <u>Description</u>. Class 13 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Idaho, LLC.

(b) Treatment. Each holder of an Allowed Class 13 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 13 Claims are Impaired.

**14. Class 14. Allowed General Unsecured Claims of HBA Parties Against MV Realty of Illinois, LLC**

(a) Description. Class 14 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Illinois, LLC.

(b) Treatment. Each holder of an Allowed Class 14 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 14 Claims are Impaired.

**15. Class 15. Allowed General Unsecured Claims of HBA Parties Against MV Realty of Indiana, LLC**

(a) Description. Class 15 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Indiana, LLC.

(b) Treatment. Each holder of an Allowed Class 15 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 15 Claims are Impaired.

**16. Class 16. Allowed General Unsecured Claims of HBA Parties Against MV Realty of Kansas, LLC**

(a) Description. Class 16 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Kansas, LLC.

(b) Treatment. Each holder of an Allowed Class 16 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 16 Claims are Impaired.

**17. Class 17. Allowed General Unsecured Claims of HBA Parties Against MV Realty of Kentucky, LLC**

(a) Description. Class 17 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Kentucky, LLC.

(b) Treatment. Each holder of an Allowed Class 17 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 17 Claims are Impaired.

**18. Class 18. Allowed General Unsecured Claims of HBA Parties Against MV Realty of Louisiana, LLC**

(a) Description. Class 18 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Louisiana, LLC.

(b) Treatment. Each holder of an Allowed Class 18 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 18 Claims are Impaired.

**19. Class 19. Allowed General Unsecured Claims of HBA Parties Against MV Realty of Maryland, LLC**

(a) Description. Class 19 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Maryland, LLC.

(b) Treatment. Each holder of an Allowed Class 19 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 19 Claims are Impaired.

**20. Class 20. Allowed General Unsecured Claims of HBA Parties Against MV Realty of Michigan, LLC**

(a) Description. Class 20 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Michigan, LLC.

(b) Treatment. Each holder of an Allowed Class 20 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 20 Claims are Impaired.

**21. Class 21. Allowed General Unsecured Claims of HBA Parties Against MV Realty of Minnesota, LLC**

(a) Description. Class 21 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Minnesota, LLC.

(b) Treatment. Each holder of an Allowed Class 21 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 21 Claims are Impaired.

**22. Class 22. Allowed General Unsecured Claims of HBA Parties Against MV Realty of Missouri, LLC**

(a) Description. Class 22 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Missouri, LLC.

(b) Treatment. Each holder of an Allowed Class 22 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 22 Claims are Impaired.

**23. Class 23. Allowed General Unsecured Claims of HBA Parties Against MV Realty of New Jersey, LLC**

(a) Description. Class 23 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of New Jersey, LLC.

(b) Treatment. Each holder of an Allowed Class 23 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 23 Claims are Impaired.

**24. Class 24. Allowed General Unsecured Claims of HBA Parties of MV Realty of Nevada, LLC**

(a) Description. Class 24 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Nevada, LLC.

(b) Treatment. Each holder of an Allowed Class 24 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 24 Claims are Impaired.

**25. Class 25. Allowed General Unsecured Claims of HBA Parties of MV Realty of North Carolina, LLC**

(a) Description. Class 25 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of North Carolina, LLC.

(b) Treatment. Each holder of an Allowed Class 25 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 25 Claims are Impaired.

**26. Class 26. Allowed General Unsecured Claims of HBA Parties of MV Realty of Ohio, LLC**

(a) Description. Class 26 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Ohio, LLC.

(b) Treatment. Each holder of an Allowed Class 26 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 26 Claims are Impaired.

**27. Class 27. Allowed General Unsecured Claims of HBA Parties of MV Realty of Oklahoma, LLC**

(a) Description. Class 27 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Oklahoma, LLC.

(b) Treatment. Each holder of an Allowed Class 27 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 27 Claims are Impaired.

**28. Class 28. Allowed General Unsecured Claims of HBA Parties of MV Realty of Oregon, LLC**

(a) Description. Class 28 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Oregon, LLC.

(b) Treatment. Each holder of an Allowed Class 28 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 28 Claims are Impaired.

**29. Class 29. Allowed General Unsecured Claims of HBA Parties of MV Realty PBC, LLC (Florida)**

(a) Description. Class 29 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty PBC, LLC (Florida).

(b) Treatment. Each holder of an Allowed Class 29 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 29 Claims are Impaired.

**30. Class 30. Allowed General Unsecured Claims of HBA Parties of MV Realty PBC, LLC (Georgia)**

(a) Description. Class 30 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty PBC, LLC (Georgia).

(b) Treatment. Each holder of an Allowed Class 30 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 30 Claims are Impaired.

**31. Class 31. Allowed General Unsecured Claims of HBA Parties of MV Realty PBC, LLC (Pennsylvania)**

(a) Description. Class 31 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty PBC, LLC (Pennsylvania).

(b) Treatment. Each holder of an Allowed Class 31Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 31 Claims are Impaired.

**32. Class 32. Allowed General Unsecured Claims of HBA Parties of MV Realty of South Carolina, LLC**

(a) Description. Class 32 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of South Carolina, LLC.

(b) Treatment. Each holder of an Allowed Class 32 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 32 Claims are Impaired.

**33. Class 33. Allowed General Unsecured Claims of HBA Parties of MV Realty of Tennessee, LLC**

(a) Description. Class 33 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Tennessee, LLC.

(b) Treatment. Each holder of an Allowed Class 33 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 33 Claims are Impaired.

**34. Class 34. Allowed General Unsecured Claims of HBA Parties of MV Realty of Texas, LLC**

(a) Description. Class 34 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Texas, LLC.

(b) Treatment. Each holder of an Allowed Class 34 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 34 Claims are Impaired.

**35. Class 35. Allowed General Unsecured Claims of HBA Parties of MV Realty of Utah, LLC**

(a) Description. Class 35 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Utah, LLC.

(b) Treatment. Each holder of an Allowed Class 35 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 35 Claims are Impaired.

**36. Class 36. Allowed General Unsecured Claims of HBA Parties of MV Realty of Virginia, LLC**

(a) Description. Class 36 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Virginia, LLC.

(b) Treatment. Each holder of an Allowed Class 36 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 36 Claims are Impaired.

**37. Class 37. Allowed General Unsecured Claims of HBA Parties of MV Realty of Washington, LLC**

(a) Description. Class 37 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Washington, LLC.

(b) Treatment. Each holder of an Allowed Class 37 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 37 Claims are Impaired.

**38. Class 38. Allowed General Unsecured Claims of HBA Parties of MV Realty of Wisconsin, LLC**

(a) Description. Class 38 consists of the Allowed General Unsecured Claims of HBA Parties against MV Realty of Wisconsin, LLC.

(b) Treatment. Each holder of an Allowed Class 38 Claim shall be entitled to each such holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 38 Claims are Impaired.

**39. Class 39. Allowed Unsecured Claims Against MV Realty Holdings, LLC**

(a) Description. Class 39 consists of the Allowed General Unsecured Claims against MV Realty Holdings, LLC.

(b) Treatment. Each holder of an Allowed Class 39 Claim shall receive each holder's Pro Rata Share of the Unsecured Claim Distributions.

(c) Impairment. The Class 39 Claims are Impaired.

**40. Class 40. Allowed Equity Interests in MV Realty Holdings, LLC**

(a) Description. Class 40 consists of Allowed Equity Interests in MV Realty Holdings, LLC.

(b) Treatment. The holders of Allowed Class 40 Equity Interests shall retain their Interests in the MV Realty Holdings, LLC subject, however, to the following: (i) the holders of Allowed Class 40 Equity Interests shall *not* be entitled to any Distributions under the Plan unless and until the holders of the Allowed Class 2, Allowed Class 3, Allowed Class 5, and Allowed Class 6 through Allowed Class 39 Claims are paid in full; (ii) in the event that any Class of Allowed Claims against MV Realty Holdings, LLC does not vote in favor of the Plan (a "Holdings Dissenting Class"), and unless the Allowed Claims of such Holdings Dissenting Class shall receive 100% of the Allowed Amount of such Claims in such Holdings Dissenting Class, an Equity Auction for the Equity Interests in MV Realty Holdings, LLC shall be implemented prior to the Effective Date of the Plan. Thereafter, any Distributions to holders of the Allowed Class 40 Interests shall be determined in accordance with applicable law.

(c) Impairment. The Class 40 Interests are Impaired.

**41. Class 41. Allowed Equity Interests in MV Realty PBC, LLC (Florida)**

(a) Description. Class 41 consists of Allowed Equity Interests in MV Realty PBC, LLC (Florida).

(b) Treatment. The holders of Allowed Class 41 Interests shall retain their Interests in MV Realty PBC, LLC subject, however, to the following: (i) the holders of Allowed Class 41 Equity Interests shall *not* be entitled to any Distributions under the Plan unless and until the holders of Allowed Class 2, Allowed Class 3, Allowed Class 5, and Allowed Class 6 through Allowed Class 38 Claims are paid in full; and (ii) in the event that any Class of Allowed Claims against MV Realty PBC, LLC does not vote in favor of the Plan (a "PBC Dissenting Class"), and unless the Allowed Claims of such PBC Dissenting Class shall receive 100% of the Allowed Amount of such Claims in such PBC Dissenting Class, an Equity Auction for the Equity Interests in MV Realty PBC, LLC (Florida) shall be implemented prior to the Effective Date of the Plan. Thereafter, any Distributions to holders of the Allowed Class 41 Interests shall be determined in accordance with applicable law.

(c) Impairment. The Class 41 Interests are Impaired.

**42. Class 42. Allowed Equity Interests in MV Realty Subs**

(a) Description. Class 42 consists of Allowed Equity Interests in the MV Realty Subs.

(b) Treatment. The holder of the Allowed Class 42 Interests shall retain its Interests in the MV Realty Subs subject, however, to the following: (i) the holders of Allowed Class 42 Equity Interests shall receive all Net HBA Proceeds on account of HBAs, which shall be used for the purposes of paying Operating Expenses. Thereafter, Net Cash Flow From Operations shall be used for purposes of funding Distributions on account of Allowed Claims in accordance with the Plan; (ii) in the event of any Allowed Unsecured Claims against any MV Realty Sub, if any such Class of Allowed Claims against any MV Realty Sub does not vote in favor of the Plan (a "Sub Dissenting Class") and shall not receive 100% of the Allowed Amount of such Claims in such Sub Dissenting Class, an Equity Auction for the Equity Interests in any such MV Realty Sub shall be implemented prior to the Effective Date of the Plan. Notwithstanding the foregoing, the

holder of the Equity Interest in any MV Realty Sub, including following a Equity Auction, reserves the right to liquidate and dissolve any MV Realty Sub.

(c) Impairment. The Class 42 Interests are Impaired.

**43. Class 43. Allowed Equity Interests in MV Receivables II, LLC**

(a) Description. Class 43 consists of Allowed Equity Interests in MV Receivables II, LLC.

(b) Treatment. The holders of Allowed Class 43 Equity Interests shall retain their Interests in the MV Receivables II, LLC subject, however, to the following: (i) the holders of Allowed Class 43 Equity Interests shall receive all Net HBA Proceeds on account of HBAs, which shall be used for the purposes of paying Operating Expenses. Thereafter, Net Cash Flow From Operations shall be used for purposes of funding Distributions on account of Allowed Claims in accordance with the Plan; (ii) in the event of any Allowed Unsecured Claims against MV Receivables II, LLC, if any such Class of Allowed Unsecured Claims does not vote in favor of the Plan (a "MV II Dissenting Class") and shall not receive 100% of the Allowed Amount of such Claims in such MV II Dissenting Class, an Equity Auction for the Equity Interests in MV Receivables II, LLC shall be implemented prior to the Effective Date of the Plan. Notwithstanding the foregoing, the holder of the Equity Interest in MV Receivables II, LLC, including following a Equity Auction, reserves the right to liquidate and dissolve MV Receivables II, LLC.

(c) Impairment. The Class 43 Interests are Impaired.

**44. Class 44. Allowed Equity Interests in MV Receivables III, LLC**

(a) Description. Class 44 consists of Allowed Equity Interests in MV Receivables III, LLC.

(b) Treatment. The holders of Allowed Class 44 Equity Interests shall retain their Interests in the MV Receivables III, LLC subject, however, to the following: (i) the holders of Allowed Class 44 Equity Interests shall receive all Net HBA Proceeds on account of HBAs, which shall be used for the purposes of paying Operating Expenses. Thereafter, Net Cash Flow From Operations shall be used for purposes of funding Distributions on account of Allowed Claims in accordance with the Plan; (ii) in the event of any Allowed Unsecured Claims against MV Receivables III, LLC, if any such Class of Allowed Unsecured Claims does not vote in favor of the Plan (a "MV III Dissenting Class") and shall not receive 100% of the Allowed Amount of such Claims in such MV III Dissenting Class, an Equity Auction for the Equity Interests in MV Receivables III, LLC shall be implemented prior to the Effective Date of the Plan. Notwithstanding the foregoing, the holder of the Equity Interest in MV Receivables III, LLC, including following a Equity Auction, reserves the right to liquidate and dissolve MV Receivables III, LLC.

(c) Impairment. The Class 44 Interests are Impaired.

**E. HBA Adjudication Program**

On the Effective Date of the Plan, the Reorganized Debtors shall implement the "HBA Adjudication Program" (the "HBAAP"), which shall include and provide for the following:

1. Within thirty (30) Business Days following the Effective Date of the Plan, the Reorganized Debtors shall send to each and every known HBA Party a written notice (the "HBAAP Notice") which shall: (i) further disclose the 40-year term of the HBAs and identify the 3% termination fee; (ii) provide a summary of events constituting a breach or default by the HBA Party under the HBAs; (iii) further disclose the fact that a memorandum, mortgage, or other similar instrument has been filed or recorded by a Debtor in the applicable real property records; and (v) attach a copy of the memorandum, mortgage, or other instrument filed or recorded.

2. The HBAAP Notice shall also afford the HBA Party the option of opting in to the HBAAP, which the HBA Party shall have the right to do for a period of one-hundred twenty (120) days following the date of the HBAAP Notice (the "HBAAP Option Period").

3. If an HBA Party elects to opt-in to the HBAAP during the HBAAP Option Period, the HBA Party shall have the right to rescind its respective HBA either (i) for "cause" (as defined below) or (ii) in exchange for a payment, in each case subject to the terms, conditions, and procedures set forth below:

(a) Rescission for Cause Option:

i. An HBA Party may elect to rescind the HBA for "cause" (as defined below) by delivering a letter or other written notice (the "Rescission for Cause Notice"), along with such other documentation or evidence to substantiate the existence of "cause," so as to be received by the Reorganized Debtors at the address included on the HBAAP Notice prior to the expiration of the HBAAP Option Period. For purposes hereof, "cause" shall be limited to the following: (1) evidence that the HBA Party attempted to rescind the HBA within three (3) days following execution of the HBA but was unable to obtain confirmation that the HBA was rescinded; (2) evidence that the HBA Party was incapacitated or incompetent at the time the HBA was executed; (3) evidence that the HBA Party was fraudulently induced into executing the HBA; or (4) evidence of other circumstances justifying rescission of the HBA.

ii. The Recission for Cause Notice shall be reviewed by a committee (the "Review Committee") comprised of the following: (1) a member designated by the Reorganized Debtors; (2) the Plan Administrator; and (3) an independent member (the "Independent Member") jointly designated by the the Committee and Monroe (or an Independent Member approved by the Court in the event that the Plan the Committee and Monroe cannot jointly agree on such Independent Member).

iii. Any decision by the Review Committee with respect to the existence or nonexistence of "cause" (the "Cause Decision") shall be by majority vote and must include the vote of the Independent Member. The Reorganized Debtors shall be responsible for delivering the Cause Decision, in writing, to the HBA Party.

iv. If the Review Committee finds that sufficient "cause" exists to rescind an HBA, as indicated in the Cause Decision, (1) the applicable HBA shall be deemed rescinded without any further action on the part of the applicable HBA Party, (2) such HBA Party shall not be required to repay or return any amounts it received from the Debtors in connection with the execution of the HBA, and (3) and the HBA Party shall be deemed to have released any Claims against the Debtors or Reorganized Debtors and shall not participate in any distributions under the Plan.

v. If the Review Committee finds that "cause" does not exist to rescind an HBA, then the HBA Party shall have thirty (30) days from the date of the delivery of the applicable Cause Decision (the "HBA Party Objection Period") to either (i) contest the Cause Decision by sending written notice of its objection to such Cause Decision (the "HBA Party Objection") to the Reorganized Debtors at the address indicated on the HBA Notice, in which case the dispute shall be referred for binding arbitration, the costs of which shall be shared equally by the Reorganized Debtors and the HBA Party asserting the HBA Party Objection., or (ii) opting for the Recission for Payment Option .prior to the expiration of HBA Party Objection Period. If the HBA Party does not timely deliver an HBA Party Objection, then the Cause Decision shall be final and binding on such HBA Party, and the underlying HBA shall remain and full force and effect.

(b) Rescission in Exchange for Payment Option.

i. An HBA Party may alternatively elect to rescind the HBA by ("Rescission for Payment Option"): (1) returning to the Reorganized Debtors the form attached to the HBA Option Notice indicating such election and (2) providing payment via such electronic means as may be agreed to between the HBA Party and the Reorganized Debtors in the amount indicated on the applicable HBA Option Notice (the "Payment Election Package"). The Payment Election Package must delivered by an HBA Party so as to be received by the Reorganized Debtors at the address included on the HBAAP Notice prior to the expiration of the HBAAP Option Period.

ii. In the event the Review Committee determines that the Payment Election Package has been properly delivered (as determined by majority vote, including the vote of the Independent Member), then (1) the applicable HBA shall be deemed rescinded and the recorded memorandum shall be terminated or removed without any further action on the part of the applicable HBA Party, (2) such HBA Party shall not be required to repay or return any other amounts it received from the Debtors in connection with the execution of the HBA, and (3) and the HBA Party shall be deemed to have released any Claims against the Debtors or Reorganized Debtors and shall not participate in any distributions under the Plan.

4. Any HBA Party who is authorized to rescind his or her HBA for cause or for payment in accordance with the terms and conditions of the HBAAP shall be deemed to have waived any Claim against the Debtors, their estates, the Plan Administrator, or the Reorganized Debtors.

5. Any HBA Party who does not timely opt-in to the HBAAP during the HBAAP Option Period by timely delivering either a Recission for Cause Notice or a Payment Election Package shall be deemed to have irrevocably waived any such right and shall remain bound by the terms and conditions of the HBA, which shall remain in full legal force and effect.

6. The form of the HBAAP Notice shall be filed as a supplement to the Plan in advance of the Confirmation Hearing, and the Debtors shall seek approval thereof at the Confirmation Hearing.

## F. Treatment of Executory Contracts and Unexpired Leases

### 1. Assumption or Rejection of Executory Contracts and Unexpired Leases

#### A. Executory Contracts and Unexpired Leases

The Code grants the Debtors the power, subject to the approval of the Court, to assume or reject executory contracts and unexpired leases. If an executory contract or unexpired lease is rejected, the other party to the agreement may file a claim for damages incurred by reason of the rejection. In the case of rejection of leases of real property, such damage claims are subject to certain limitations imposed by the Code.

Pursuant to sections 365(a) and 1123(b)(2) of the Code, all executory contracts and unexpired leases between either of the Debtors and any Person shall be deemed rejected as of the Effective Date, except for any executory contract or unexpired lease (i) which are being assumed pursuant to the terms of this Plan, (ii) which previously has been assumed or rejected pursuant to an order of the Court entered prior to the Effective Date, or (iii) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed and served prior to Confirmation. Notwithstanding the foregoing, the Debtors and the Roerganized Debtors, as the case may be, reserve the right to seek and obtain an extension of the time within which to assume or reject any unexpired lease or executory contract.

#### B. Schedules of Rejected Executory Contracts and Unexpired Leases; Inclusiveness

Each executory contract and unexpired lease that relates to the use or occupancy of real property shall be deemed to include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, and (ii) all executory contracts or unexpired leases appurtenant to the premises, including, without limitation, all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vault, tunnel or bridge agreements or franchises, and any other interests in real estate or rights in rem relating to such premises, unless any of the foregoing agreements previously have been assumed.

#### C. Insurance Policies

Each of the Debtor's insurance policies and any agreements, documents or instruments relating thereto, including without limitation, any retrospective premium rating plans relating to

such policies, shall be treated as executory contracts under the Plan. Notwithstanding the foregoing, distributions under the Plan to any holder of a Claim covered by any insurance policies and related agreements, documents or instruments that are assumed hereunder, shall comply with the treatment provided under the Plan. Nothing contained in the Plan shall constitute or be deemed a waiver or release of any Action that the Debtors may hold against any entity, including, without limitation, the insurers under any of the Debtors' policies of insurance.

**D. Homeowner Benefit Agreements**

HBAs are treated as executory contracts. All HBAs shall be deemed assumed by the Debtors as of the Effective Date. In the event an HBA Party has *not* filed a timely proof of claim, there shall not be any cure amount owed as a condition to assuming the HBA. In the event an HBA Party has timely filed a proof of claim, the Debtors shall have the right to object to any such claim and to assert that no cure amount is owed as a condition to assuming the HBA. Notwithstanding the assumption of an HBA, an HBA Party shall still have the right to participate in the HBAAP.

In connection with the HBAs, the Reorganized Debtors shall commence the following immediately after the Effective Date of the Plan:

1. The Reorganized Debtors shall send out annual notices to HBA Parties reminding them of the HBA;

2. A database shall be created for real estate agents to access which will allow them to search for HBA Parties to determine if they have an HBA in place, so as to avoid any situation where third-party agents work with an HBA Party to list their home unaware that the HBA Party has an HBA with the Debtors;

3. Currently, the HBAs provide a 2-month period for a third-party agent to secure an offer for the sale of a property in the event that MV Realty is unsuccessful in procuring a purchaser, plus an additional 2-month period for the third-party agent to close the sale of the property. The Reorganized Debtors shall instead allow a single 4-month period for a third-party agent to procure a purchaser and close a sale of the property;

4. The Plan Administrator shall, consistent with Debtors' pre-petition practices, offer both subordination or termination with subsequent refiling if permitted under applicable law of any filing with a county recorder's office in the event an HBA Party requests same in connection with a refinancing, home equity loan, or similar transaction.

5. The Reorganized Debtors shall not, consistent with Debtors' pre-petition practices, require any termination fee in the event of (i) a death of an HBA Party; (ii) a foreclosure of property subject of an HBA; (iii) a bona fide inter-family transfer as defined in the HBA;

6. The Reorganized Debtors shall not, consistent with Debtors' pre-petition practices, commence any foreclosure proceeding, or exercise any other right of sale in connection with a breach of an HBA; and

7. The Reorganized Debtors shall waive any unilateral right to act as a non-agent facilitator and afford HBA Parties the right to choose the type of representation permissible under applicable state law.

**E. Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases**

Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Article VI of the Plan, and (ii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to the Plan subject, however, to the provisions of Section 6.01A of the Plan.

**2. Cure of Defaults**

Subject to the provisions of Section 6.01D of the Plan, to the extent that cure payments are due with respect to an executory contract or unexpired lease to be assumed pursuant to the Plan, the amount of such cure payment shall be listed in the motion filed as contemplated under Section 6.01A of this Plan. To the extent that the non-debtor party to any executory contract or unexpired lease disagrees with the cure amount disclosed, such party must file a notice of dispute with the Court and serve such notice on the Debtors by no later than five (5) days prior to the Confirmation Hearing unless otherwise ordered by the Court. Except as may otherwise be agreed to by the parties, within sixty (60) days after the Effective Date, the Reorganized Debtors, or the party receiving an assignment of any unexpired lease or executory contract, shall cure any and all undisputed defaults under any executory contract or unexpired lease assumed pursuant to the Plan in accordance with section 365(b)(1) of the Code. All disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Debtors' liability with respect thereto, or as may otherwise be agreed to by the parties. If there are any objections filed, the Court shall hold a hearing. In the event the Court determines that the cure amount is greater than the cure amount listed by the Debtors, the Reorganized Debtorsmay elect to reject the contract or unexpired lease and not pay such greater cure amount.

**3. Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan**

***Claims arising out of the rejection of an executory contract or unexpired lease pursuant to the Plan must be filed with the Court and/or served upon the Debtors or the Reorganized Debtors or as otherwise may be provided in the Confirmation Order, by no later than thirty (30) days after the later of (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease, and (ii) notice of entry of the Confirmation Order. Any Claim not filed within such time will be forever barred from assertion against the***

***Debtors, Estate, the Reorganized Debtors and Property of the Estate. Unless otherwise ordered by the Court, all Claims arising from the rejection of executory contracts and unexpired leases shall be treated as Unsecured Claims under the Plan.***

## G. Plan Administrator

### 1. Appointment of Plan Administrator

A Plan Administrator shall be jointly selected by the Debtors and the other Consultation Parties, subject, however, to approval of the Court, and shall be subject to the terms of an engagement agreement in form and substance acceptable to the Debtors and the other Consultation Parties (the "Plan Administrator Agreement"). The Plan Administrator shall be appointed as of the Effective Date. The Plan Administrator shall be an independent fiduciary and shall not serve at the discretion or direction of the Debtors, the Reorganized Debtors or their boards of managers or directors.

The Plan Administrator shall comply with a budget (the "Plan Administrator Budget") which shall set forth the Plan Administrator's estimated cash flow and expenses for the administration of its duties and responsibilities under the Plan and which shall otherwise be in form and substance acceptable to Monroe and the Committee. The Plan Administrator Budget shall be attached to the Plan Administrator Agreement and may be amended at any time with the advance written consent of Monroe and the Committee.

### 2. Duties and Responsibilities of the Plan Administrator

On and after the Effective Date, the Plan Administrator shall have the power and responsibility to do take all actions contemplated by the Plan to be done by the Plan Administrator in accordance with the Plan Administrator Agreement, including, without limitation:

(a) investigating, pursuing, prosecuting, compromising and/or otherwise resolve any D&O Actions, and Avoidance Actions against, and objections to Claims filed by, Insiders;

(b) making Distributions on account of Allowed Claims under the Plan;

(c) reviewing financial statements of the Reorganized Debtors;

(d) hiring any professionals in connection with fulfilling the duties set forth in this Section 7.02; and

(e) carrying out any other duties or responsibilities expressly described in the Plan and the Plan Administrator Agreement.

**3. Compensation of the Plan Administrator and Other Professionals**

The Plan Administrator shall be paid on an hourly or monthly fee basis subject to the consent of the Reorganized Debtors, Monroe, and the Committee, and subject to the approval of the Court. Following the Effective Date, all Professionals (including the Plan Administrator and his Professionals) shall be obligated to file applications for allowance of compensation and reimbursement of expenses in accordance with section 330 of the Code, Rule 2016 of the Rules and the United States Trustee's Guidelines and Local Rules of the Court. The Plan Administrator shall select and retain Professionals, subject to the approval of the Court, in a manner that is cost-effective for the Reorganized Debtors and Creditors holding Allowed Claims, including, but not limited to, hiring Professionals on a contingency fee basis.

**4. Post-Effective Date Funding**

Following the Effective Date, Monroe shall be authorized, but shall not be obligated, to provide funding to the Plan Administrator if reasonably necessary for the Plan Administrator to carry out his duties under the Plan; *provided* that such funding shall be on terms and conditions acceptable to Monroe. In the event Monroe provides any such post-Effective Date funding, then the Plan Administrator shall repay such funding (including any interest and other fees and expenses, including attorneys' fees) prior to making any further Distributions under the Plan.

**5. Service and Termination of Plan Administrator**

The Plan Administrator shall serve in such capacity until the earliest of (i) entry of a final decree and order closing the Case, (ii) completion of his or her duties set forth in Section 7.02 of the Plan, as determined by order of the Court; and (iii) the Plan Administrator's resignation; provided, however, that the Plan Administrator may be terminated, for cause, by order of the Court.

**6. Successor Plan Administrator**

In the event the Plan Administrator resigns or is terminated, a successor Plan Administrator shall be appointed by the Court.

**H. Provisions Regarding Voting and Distributions Under the Plan and Treatment of Disputed, Contingent and Unliquidated Claims and Interests**

**1. Voting of Claims and Equity Interests**

Each holder of an Allowed Claim or Interest in an Impaired Class of Claims or Equity Interests that is entitled to vote on the Plan pursuant to the Code shall be entitled to vote separately to accept or reject the Plan as provided in such order as may be entered by the Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Court.

**2. Nonconsensual Confirmation ("Cramdown")**

Notwithstanding that any Impaired Class of Claims or Interests entitled to vote does not accept the Plan by the statutory majorities required by section 1126(c) of the Code, the Debtors are requesting confirmation of the Plan under the cram down provisions of section 1129(b) of the Code.

**3. Method of Distribution Under the Plan**

(a) Subject to Rule 9010, and except as otherwise provided in this Section 8.03 of the Plan, all Distributions to holders of Allowed Claims under the Plan shall be made by the Plan Administrator. Distributions to holders of Allowed Claims shall be delivered to the address of such holders as listed on the Schedules as of the Effective Date unless the Debtors or the Plan Administrator has been notified in writing of a change of address, including by the filing of a proof of Claim by such holder that provides an address different from the address reflected on the Schedules.

(b) Any payment of Cash made by the Plan Administrator pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer.

(c) Any payment or Distribution required to be made by the Plan Administrator under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

(d) No payment of Cash less than one hundred dollars ($100.00) shall be made by the Plan Administrator to any holder of a Claim unless a request therefor is made in writing to the Plan Administrator, or unless the Distribution is a final Distribution.

(e) When any Distribution on account of an Allowed Claim pursuant to the Plan would otherwise result in a Distribution that is not a whole number, the actual Distribution shall be rounded as follows: (i) fractions of ½ or greater shall be rounded to the next higher whole number, and (ii) fractions of less than ½ shall be rounded to the next lower whole number. Cash to be distributed pursuant to the Plan shall be adjusted as necessary to account for the rounding provided in this Section 8.03(e) of the Plan.

(f) Any Distributions of Cash or other property under the Plan which are unclaimed for a period of six (6) months after the Distribution Date shall be vested in the Plan Administrator for Distribution in accordance with the Plan and any entitlement of any holder of any Claim to such Distributions shall be extinguished and forever barred.

(g) At the close of business on the Effective Date, the claims register shall be closed, and there shall be no further changes in the record holders of any Claims. The Plan Administrator shall have no obligation to recognize any transfer of any Claims occurring after the Effective Date; provided, however, that the foregoing will not be deemed to prohibit the sale or transfer of any Claim prior to the Effective Date. The Plan Administrator shall instead be entitled to recognize and deal for all purposes under the Plan with only those record holders as of the close of business on the Effective Date.

**4. Distributions Withheld for Disputed General Unsecured Claims**

**(a) Establishment and Maintenance of Reserve**

On any Distribution Date, the Plan Administrator shall reserve from the Distributions to be made on such dates to the holders of Allowed Claims, an amount equal to one-hundred percent (100%) of the Distributions to which holders of Disputed Claims would be entitled under the Plan as of such dates if such Disputed Claims were Allowed Claims in their Disputed Amounts or as estimated by the Debtors or the Plan Administrator, as applicable, or the Court in accordance with Section 8.09 of the Plan (the "Disputed Claims Reserve").

**(b) Property Held in Disputed Claims Reserve**

Cash in the Disputed Claims Reserve shall (together with all other accretions or distributions thereon) be held in trust by the Plan Administrator for the benefit of the potential recipients of such Cash.

**(c) Distributions Upon Allowance of Disputed General Unsecured Claims**

The holder of a Disputed Claim that becomes an Allowed Claim subsequent to any Distribution Date shall receive Distributions of Cash and any other consideration from the Disputed Claims Reserve from the Plan Administrator within ten (10) days following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order. Such Distributions shall be made in accordance with the Plan.

**(d) Expenses of Disputed Claims Reserve**

Except as otherwise ordered by the Court, the amount of any reasonable expenses incurred by the Plan Administrator on or after the Effective Date with respect to the Disputed Claims Reserve shall be paid by the Plan Administrator from Cash otherwise available for Distributions under the Plan.

**5. Procedures for Allowance or Disallowance of Disputed Claims**

**(a) Objections to and Resolution of Administrative Claims and Claims**

Except as to applications for allowance of compensation and reimbursement of expenses under sections 330 and 503 of the Code, (a) the Debtors or the Reorganized Debtors, as the case may be, shall have the exclusive right to make and file objections to non-Insider Claims (including Administrative Claims), including subsequent to the Effective Date, and (b) the Plan Administrator shall have the exclusive right to make and file objections to Insider Claims. All objections shall be litigated to Final Order. The Debtors, the Reorganized Debtors or the Plan Administrator, as the case may be, shall have the authority to compromise, settle, otherwise resolve or withdraw any of its objections without approval of the Court, except as otherwise provided herein. Unless otherwise ordered by the Court, the Debtors, the Reorganized Debtors, and the Plan Administrator, as the case may be, shall file all objections to Claims and serve such objections upon the holder of the Claim as to which the objection is made as soon as is practicable, but in no event later than one hundred twenty (120) days after the Effective Date or such later date as may be approved by the Court (the "Claims Objection Deadline"). The Debtors or the Reorganized Debtors, as the case may be, shall have the right to object to Administrative Claims as such claims arise in the ordinary course of business. The Plan Administrator shall bear

all costs and expenses relating to the investigation and prosecution of Disputed Claims from and after the Effective Date.

**(b) No Distribution Pending Allowance**

Notwithstanding any other provision of the Plan, if any portion of a Claim is disputed, the full amount of such Claim shall be treated as a Disputed Claim for purposes of this Plan, and no payment or Distribution provided under the Plan shall be made on account of such unless and until such Disputed Claim becomes an Allowed Claim (in whole or in part).

**(c) Disallowed Claims**

All Claims or Interests held by Persons against whom the Debtors, the Reorganized Debtors, or the Plan Administrator have commenced an Action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Code, shall be deemed "disallowed" Claims or Interests pursuant to section 502(d) of the Code and holders of such Claims or Interests shall not be entitled to vote to accept or reject the Plan. Claims or Interests that are deemed disallowed pursuant to this Section 5.05(e) of the Plan shall continue to be disallowed for all purposes until the Action against such party has been settled or resolved by Final Order and any sums due to the Estate from such party have been paid.

**6. <u>Setoffs and Recoupment</u>**

The Plan Administrator shall not be required to, set off (pursuant to the provisions of sections 553 and 362 of the Code or other applicable law) against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim, any Claims of any nature whatsoever that the Plan Administrator (on behalf of the Debtors or Reorganized Debtors) may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Plan Administrator (on behalf of the Debtors or Reorganized Debtors) of any setoff or recoupment right they may have against the holder of such Claim.

**7. <u>Allocation of Plan Distributions Between Principal and Interest</u>**

To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

**8. <u>Estimations of Claims</u>**

For purposes of calculating and making Distributions under the Plan, the Plan Administrator shall be entitled to estimate, in good faith and with due regard to litigation risks associated with Disputed Claims, the maximum dollar amount of Allowed and Disputed Claims, inclusive of contingent and/or unliquidated Claims in a particular Class. The Debtors or the Plan Administrator, as applicable, may at any time request that the Court estimate any contingent or

unliquidated Claim pursuant to section 502(c) of the Code or otherwise regardless of whether the Debtors or the Plan Administrator previously objected to such Claim or whether the Court has ruled on any such objection, and the Court will retain jurisdiction to estimate any Claim at any time during litigation concerning such objection to any Claim, including without limitation, during the pendency of any appeal relating to any such objection. In the event that the Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute either the Allowed Amount of such Claim or a maximum limitation on the amount of such Claim, as determined by the Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Plan Administrator, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. All of the foregoing objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Court.

**9. No Recourse**

Notwithstanding that the Allowed Amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Code and Rules or is Allowed in an amount for which after application of the payment priorities established by the Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no Claim holder shall have recourse against the Plan Administrator, the Debtors, the Reorganized Debtors, or any of their Professionals, consultants, partners or Affiliates or their respective successors or assigns, or any of their respective property. However, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Code. THE ESTIMATION OF CLAIMS AND ESTABLISHMENT OF RESERVES UNDER THE PLAN MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS.

**10. Amendments to Claims**

A Claim may be amended prior to the Confirmation Date only as agreed upon by the Consultation Parties and the holder of such Claim, or as otherwise permitted by the Court, the Rules or applicable law. After the Confirmation Date, a Claim may not be amended without the authorization of the Court. Any amendment to a Claim filed after the Confirmation Date shall be deemed disallowed in full and expunged without any action by the Plan Administrator, the Debtors, the Reorganized Debtors or the Estate, unless the Claim holder has obtained prior Court authorization for the filing of such amendment.

**11. Post-Petition Interest on Claims**

Unless expressly provided in the Plan, the Confirmation Order, by order of the Court, or any contract, instrument, release, settlement, or other agreement entered into in connection with the Plan, Post-Petition Interest shall not accrue on or after the Petition Date on account of any Claim.

**I. Implementation and Effect of Confirmation of the Plan**

**1. General**

Upon confirmation of the Plan, and in accordance with the Confirmation Order, the Debtors, Reorganized Debtors, and the Plan Administrator, as the case may be, will be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan. In addition to the provisions set forth elsewhere in the Plan, the following shall constitute the means for implementation of the Plan.

Distributions under the Plan shall be made from Cash available for Distributions in accordance with the Plan. Such Cash shall include available Cash on hand, as well as Net Cash Flow from Operations, Net Proceeds of Actions, D&O Claims Proceeds, and Equity Auction Proceeds. Attached hereto as **Exhibit "A"** are the Reorganized Debtors' financial projections, which demonstrate the ability to fund Distributions under the Plan. The Debtors have filed two (2) sets of financial projections. The first set of projections assumes that the Debtors prevail in the Primary State Actions, while the second set of projections assumes that the Debtors do *not* prevail in the Primary State Actions.

Beginning in 2025, the Reorganized Debtors expect to transition from having a team of agents, to operating under third-party "flat fee brokerages." These "flat fee brokerages" will allow the current team of agents to provide full real estate listing services, while paying a flat fee, typically $200.00 or less per transaction, to the "flat fee brokerage," while still enabling the Reorganized Debtors to receive the full commission. This will result in decreased costs related to the ongoing payment of salaries to the Reorganized Debtors' licensed brokers, as well as eliminating certain costs in connection with dues and rent obligations necessary to maintain individual brokerages in all 32 states.

**2. Post-Confirmation Management of the Reorganized Debtors**

The Reorganized Debtors shall be managed by the following: (a) Antony Mitchell, CEO ($22,180.13 per month); (b) David Manchester, COO ($22,180.13 per month); (c) Amanda Zachman, Broker ($22,180.13 per month), subject to the oversight of the Boards of Managers or Directors. The foregoing management of the Reorganized Debtors shall be diligent and dedicate the time necessary to the post-confirmation administration of the business of the Reorganized Debtors.

All decisions of the Boards shall be made by majority vote of the members thereof with the exception of the Major Decisions (defined in Section 9.04 of the Plan), which shall require the majority vote of the members, including the vote of the Independent Member. Members of the Boards shall not be paid any compensation for serving on the Boards.

**3. Financial Covenants and Reporting Requirements**

Following the Effective Date, the Approved Budget shall be (a) updated every 4 weeks, if reasonably necessary and practical and (b) subject in form and substance to the approval of Monroe and Goodwood until such time as the Allowed Class 2 and 3 Claims, as the case may be, are paid in full. Any Approved Budget may be amended with the prior written consent of Monroe and Goodwood. Cash receipts shall be reported to Monroe and Goodwood on a weekly basis.

The Reorganized Debtors shall participate on biweekly calls with Monroe and Goodwood and provide financial and litigation updates. The Reorganized Debtors shall also provide monthly financial reporting to Monroe, Goodwood, and the Plan Administrator.

**4. Consent Rights**

The Independent Member of the Boards shall be selected by Monroe, who shall serve on the Board until such time as the Allowed Class 2 Claim is paid in full.. The following decisions shall be subject to the majority vote of the Boards including, without limitation, the vote of the Independent Member (collectively, the "Major Decisions"): (a) hiring of new counsel to defend against any federal and state litigation, any professional negligence claims; (b) the decision to settle any federal or state litigation, or any professional negligence claims; (c) the sale of any portion of HBAs outside the ordinary course of business; (d) any sale, merger, or other restructuring transaction outside the ordinary course of business; and (e) any non-budgeted expense in excess of $50,000.00. Except as otherwise provided herein, the Reorganized Debtors shall be authorized to operate their businesses in the ordinary course of business, including, without limitation, the right to terminate any HBA.

**5. Liquidation Analysis**

Attached hereto as **Exhibit "B"** is a liquidation analysis. In the event of a liquidation, the Debtors do not believe the value of the HBAs would be worth more than the Allowed Class 2 and Allowed Class 3 Claims. In a liquidation, the Net Proceeds of Actions and Net Proceeds of D&O Claims would be distributed, as currently provided under the Plan; however, it is likely that the holders of Allowed Class 2 and Allowed Class 3 Claims would potentially have larger deficiency claims and, therefore, holders of Allowed Unsecured Claims would receive far less than currently provided under the Plan. Accordingly, the Debtors estimate that holders of the Allowed Claims stand to receive more under the Plan rather than in liquidation. Additionally, liquidation would likely occur in a Chapter 7 bankruptcy case. In Chapter 7, a trustee would be appointed, who would likely retain counsel and possibly accountants. It is likely that a trustee would realize less for the Debtors' assets.

Notwithstanding anything in the Plan to the contrary, in the event any additional State actions results in the inability of the Reorganized Debtors to operate profitably, the Reorganized Debtors, in consultation with the Plan Administrator and the Consultation Parties, and subject to the votes of the Board of Managers and Directors, reserve the right to liquidate any remaining assets of the Reorganized Debtors for purposes of making Distributions in accordance with the Plan.

**6. Effectiveness of Instruments and Agreements**

On the Effective Date, all documents described in and all other agreements entered into or documents issued pursuant to the Plan and/or any agreement entered into or instrument or document issued in connection with any of the foregoing, as applicable, shall become effective and binding upon the parties thereto in accordance with their respective terms and conditions and shall be deemed to become effective simultaneously.

7. **<u>Distributions</u>**

Distributions shall be made by the Plan Administrator in accordance with the Plan.

8. **<u>Corporate Action</u>**

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the members, managers, board of managers, shareholders, officers, or directors of the Debtors under the Plan, shall be deemed to have occurred and shall be in full force and effect from and after the Effective Date pursuant to the applicable limited liability law, without any requirement of further action by the shareholders, officers, or directors of the Debtors.

9. **<u>No Change of Control</u>**

Any acceleration, vesting or similar change of control rights of any Person under employment, benefit or other arrangements with the Debtors that could otherwise be triggered by the entry of the Confirmation Order or the consummation of the Plan or any of the transactions contemplated thereby shall be deemed to be waived and of no force or effect.

10. **<u>Term of Bankruptcy Injunction or Stays</u>**

All injunctions or stays provided for in this Case under sections 105 or 362 of the Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date unless otherwise ordered by the Court.

11. **<u>Causes of Action</u>**

As of the Effective Date, pursuant to section 1123(b)(3)(B) of the Code, the Reorganized Debtors and the Plan Administrator, as the case may be, shall have the sole authority to commence and prosecute, for the benefit of the Estates (and shall be substituted for the Debtors as the party in interest in), any and all Actions accruing or having accrued to the Debtors in accordance with the terms and conditions of the Plan, including, without limitation, (i) any Actions arising from or relating to D&O Claims, (ii) any Avoidance Actions, (iii) any other Actions arising under sections 510, 542, 544, 545, 547, 548, 549, 550, 551 and 553 of the Code, (iv) Actions against any HBA Party, including, without limitation, claims for any past or future violation of any HBA, (v) Actions to recover attorneys' fees or costs against any third party, including, without limitation, pursuant to any statutory right to recover such attorneys' fees and costs, and (vi) any Actions for professional negligence, including, without limitation, Actions against any law firm and/or legal counsel for services rendered to or on behalf of the Debtors or any related third parties in connection with or relating to, but not necessarily limited to, the HBAs, any homeowner benefit program, or any related matter or issue. A potential claim for professional negligence may exist or arise against Holland & Knight relating to, and arising from, professional services to the Debtors, rendered including, without limitation, in connection with the Homeowner Benefit Program, the HBAs, and any and all related documents. The Reorganized Debtors and the Plan Administrator shall use their commercially reasonable best efforts to commence and thereafter diligently pursue all such Actions as soon as practicable following the occurrence of the Effective Date. For the avoidance of doubt, the existence of any

adequate protection liens on Actions securing any Allowed Monroe Adequate Protection Claims and/or Allowed Goodwood Adequate Protection Claims shall not limit or restrict the authority of the Reorganized Debtors or the Plan Administrator to commence and/or prosecute any such Actions pursuant hereto.

**12. Objections to Claims**

The Debtors, the Reorganized Debtors and the Plan Administrator, as the case may be, shall pursue any objections to Claims in accordance with the terms set forth in this Plan.

**13. Settlements**

After the Effective Date, and except as otherwise provided herein, the Reorganized Debtors and the Plan Administrator, as the case may be in accordance with the Plan, shall have the authority to compromise and settle, otherwise resolve, discontinue, abandon, or dismiss all such Actions with the approval of the Court. Any settlement or compromise of any Action or objection to Claim shall be subject to final approval of the Court and the standards applicable under Rule 9019.

**14. Discharge of Debtors**

To the fullest extent permitted by applicable law, the rights afforded herein and the treatment of all Claims and Interests herein shall be in exchange for and in complete satisfaction, discharge and release of Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Commencement Date, against the Debtors and the Debtors in Possession, the Estate, or any of the assets or properties under the Plan. Except as otherwise provided herein, (i) on the Effective Date, all such Claims against, and Interests in, the Debtors shall be satisfied, discharged and released in full, and (ii) all Persons shall be precluded and enjoined from asserting against the Debtors, Reorganized Debtors, the Plan Administrator, or Property of the Estate any other or further Claims or Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date, whether or not such holder has filed a proof of Claim or Proof of Interest and whether or not such holder has voted to accept or reject the Plan. Notwithstanding the foregoing, nothing in the Plan shall release, discharge, enjoin or preclude any Claim that has not arisen as of the Effective Date that any governmental unit may have against the Debtors and nothing in the Plan shall release, nullify or enjoin the enforcement of any liability to a governmental unit under environmental statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of the Confirmation Order.

**15. Injunction Related to Discharge**

***Except as otherwise expressly provided in the Plan, the Confirmation Order or a separate order of the Court, all Persons who have held, hold or may hold Claims against or Interests in the Debtors, are permanently enjoined, on and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Interest, (ii) enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against the Debtors on account of any such Claim or Interest, (iii) creating, perfecting or enforcing any Lien or asserting control***

***of any kind against the Debtors or against the property or interests in property of the Debtors on account of any such Claim or Interest, and (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or against the property or interests in property of the Debtors on account of any such Claim or Interest. Such injunctions shall extend to successors and assigns of the Debtors and its properties and interests in property.***

**16. <u>Injunction Against Interference with the Plan</u>**

***Upon the entry of a Confirmation Order with respect to the Plan, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, partners, members or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan, except with respect to actions any such entity may take in connection with the pursuit of appellate rights.***

**17. <u>Channeling Injunction</u>**

***To the maximum extent allowed under appliable law, the the Debtors or Reorganized Debtors, as applicable, request a channeling injunction, which shall channel any Claims that arose, accrued, or may have been brought prior to Confirmation of the Plan, regardless of whether such Claims are initiated, asserted, or filed against any of the Debtors or Reorganized Debtors, post-Confirmation. The channeling injunction shall also apply to any monetary claims of any State unless such Claims are waived or discharged and regardless of whether any such State is exercising its police and regulatory power within the meaning of section 362(b)(4) of the Code.***

**J. Confirmation and Effectiveness of the Plan**

**1. <u>Conditions Precedent to Confirmation</u>**

The Plan shall not be confirmed by the Court unless and until the following conditions shall have been satisfied or waived pursuant to Section 10.04 of the Plan:

(a) The Confirmation Order shall be in form and substance reasonably acceptable to the Consultation Parties and shall include, among other things, a finding of fact that the Debtors and their members, managers, boards of managers, shareholders, officers, directors, employees, advisors, attorneys, and agents acted in good faith within the meaning of and with respect to all of the actions described in section 1125(e) of the Code and are, therefore, not liable for the violation of any applicable law, rule or regulation governing such actions; and

(a) The Clerk of the Court shall have entered the Confirmation Order on the Docket.

### 2. Conditions Precedent to Effectiveness

The Plan shall not become effective unless and until the following conditions have been satisfied or waived pursuant to Section 10.04 of the Plan:

(a) The Confirmation Order shall have been entered and shall be a Final Order (with no modification or amendment thereof), and there shall be no stay or injunction that would prevent the occurrence of the Effective Date; and

(b) The statutory fees owing to the United States Trustee shall have been paid in full.

### 3. Notice of Effective Date

On or before five (5) Business Days after the Effective Date, the Plan Administrator shall mail or cause to be mailed to holders of all Claims and Interests a notice that informs such holders of (a) the occurrence of the Effective Date, (b) notice of the Administrative Claims Bar Deadline and Professional Fee Claims Bar Date, and (c) such other matters as the Plan Administrator deems appropriate or as may be ordered by the Court.

### 4. Effect of Failure of Conditions

If each condition to the Effective Date specified in the Plan has not been satisfied or duly waived within ninety (90) days after the Confirmation Date, then upon the filing of a motion by the Debtors made before the time that all conditions have been satisfied or duly waived, the Confirmation Order will be vacated by the Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated, the Plan shall be deemed null and void in all respects, including without limitation the discharge of Claims pursuant to section 1141 of the Code and the assumptions or rejections of executory contracts and unexpired leases as provided by the Plan, and nothing contained herein shall (1) constitute a waiver or release of any Action by, or Claims against, the Debtors, or (2) prejudice in any manner the rights of the Debtors, and any Creditor or party in interest.

### 5. Waiver of Conditions

The Consultation Parties may waive in writing one or more of the conditions precedent to confirmation of the Plan, or the condition precedent to effectiveness of the Plan, without further notice to parties in interest or the Court without a prior hearing.

## K. Summary of Other Provisions of the Plan

The following paragraphs summarize certain other significant provisions of the Plan. The Plan should be referred to for the complete text of these and other provisions of the Plan.

**1. Retention of Jurisdiction**

(a) to hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, if any are pending, and the allowance or disallowance of Claims resulting, therefrom;

(b) to determine any and all adversary proceedings, motions, applications and contested matters, and other litigated matters pending on the Confirmation Date;

(c) to hear and determine all Actions, including, without limitation, Actions commenced by the Debtors, Reorganized Debtors, Plan Administrator, or any other party in interest with standing to do so, pursuant to sections 505, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Code, collection matters related thereto, and settlements thereof;

(d) to hear and determine any objections to or the allowance, classification, priority, compromise, estimation or payments of any Administrative Claims, Claims or Interests;

(e) to ensure that Distributions to holders of Allowed Claims are accomplished as provided in the Plan;

(f) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(g) to issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Code;

(h) to consider any amendments to or modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in the Plan, or any order of the Court, including, without limitation, the Confirmation Order;

(i) to hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 330, 331, and 503(b) of the Code;

(j) to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

(k) to recover all Assets of the Debtors and Property of the Estate, wherever located;

(l) to determine any Claim of or any liability to a governmental unit that may be asserted as a result of the transactions contemplated herein;

(m) to enforce the Plan, the Confirmation Order and any other order, judgment, injunction or ruling entered or made in the Case, including, without limitation, the discharge, injunction, exculpation and releases provided for in the Plan;

(n) to take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

(o) to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Code (including, but not limited to, an expedited determination under section 505(b) of the Code of the tax liability of the Debtors for all taxable periods through the Effective Date for all taxable periods of the Debtors through the liquidation and dissolution of such entity);

(p) to hear any other matter not inconsistent with the Code; and

(q) to enter a final decree closing the Case; provided however, that nothing in the Plan shall divest or deprive any other court or agency of any jurisdiction it may have over the Debtors under applicable environmental laws.

**2. Effectuating Documents and Further Transactions.**

The Debtors, the Reorganized Debtors, and the Plan Administrator, as the case may be, are authorized to execute, deliver, file, or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to implement, effectuate and further evidence the terms and conditions of the Plan and any notes or other interests issued pursuant to the Plan.

**3. Exemption from Transfer Taxes**

From and after the Confirmation Date, and pursuant to section 1146(a) of the Code, the issuance, transfer or exchange of notes or other interests under the Plan, including creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated by the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

**4. Authorization to Request Prompt Tax Determinations.**

The Debtors are authorized to request an expedited determination under section 505(b) of the Code of the tax liability of the Debtors, for all taxable periods through the Effective Date.

**5. Exculpation.**

***Subject to the occurrence of the Effective Date, neither the Debtors, the Plan Administrator, nor any of their respective members, agents, financial advisors, attorneys, employees, holders of Interests, Affiliates and representatives (the "Exculpated Parties") shall have or incur any liability to any holder of a Claim or Interest for any act or omission in connection with, related to, or arising out of, the Case, the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan; provided, however, that the foregoing shall not operate as a waiver or release for (i) any express contractual obligation owing by any such Person, (ii) willful misconduct or gross negligence, and (iii) with respect to Professionals, liability arising from claims of professional negligence which shall be governed by the standard of care***

***otherwise applicable to professional negligence claims under applicable non-bankruptcy law, and, in all respects, the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; provided further that nothing in the Plan shall, or shall be deemed to, release the Exculpated Parties, or exculpate the Exculpated Parties with respect to, their respective obligations or covenants arising pursuant to the Plan; provided further that the foregoing shall not operate as a waiver or release of Claims by governmental entities arising under environmental laws.***

**6. Injunction Relating to Exculpation**

***The Confirmation Order will contain an injunction, effective on the Effective Date, permanently enjoining the commencement or prosecution by the Debtors, the Reorganized Debtors, the Plan Administrator, and any other Person, whether derivatively or otherwise, of any Action or causes of action exculpated, released or discharged pursuant to this Plan against the Exculpated Parties.***

**7. Amendment or Modification of Plan**

Alterations, amendments, or modifications of the Plan may be proposed in writing by the Debtors (with the consent of the Consultation Parties) at any time prior to the Confirmation Date in conformity with section 1127(a) of the Code, provided that the Plan, as altered, amended, or modified, satisfies the conditions of sections 1122, 1123 and 1129 of the Code, and the Debtors shall have complied with section 1125 of the Code. The Plan may be altered, amended or modified by the Debtors (with the consent of the Consultation Parties) at any time after the Confirmation Date in conformity with section 1127(b) of the Code, provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Code and the Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Code and the circumstances warrant such alterations, amendments or modifications. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

Prior to the Effective Date, the Debtors (with the consent of the Consultation Parties) may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Court.

**8. Severability**

In the event the Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void or unenforceable, such provision shall be invalid, void or unenforceable with respect to the holder or holders of such Claims or Interests as to which the provision is determined to be invalid, void or unenforceable. The invalidity, voidability or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan. The Court, at the request of the Debtors or the Plan Administrator, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as

altered or interpreted. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**9. Revocation or Withdrawal of the Plan**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Actions by or against the Debtors or any other Person, an admission against interests of the Debtors, nor shall it prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

**10. Binding Effect Notices**

The Plan shall be binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, and their respective successors and assigns.

**11. Notices**

All notices, requests and demands to be made pursuant to or in accordance with the Plan shall be in writing and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**If to the Debtors or Reorganized Debtors:**

MV Realty
Attn: Antony Mitchell
1451 W. Cypress Creek
Suite 300
Fort Lauderdale, Florida 33309

**With copies to:**

Seese, P.A.
Attention: Michael D. Seese, Esq.
101 N.E. 3rd Avenue, Suite 1500
Ft. Lauderdale, Florida 33301
Telephone No. (954) 745-5897
mseese@seeselaw.com

**If to Monroe:**

Katten Muchin Rosenman LLP
Attention: Peter A. Siddiqui, Esq.
525 W. Monroe Street
Chicago, Illinois 60661-3693

Telephone No. (312) 902-5455
Peter.siddiqui@katten.com

**If to the Committee:**

Boies Schiller Flexner LLP
Attention: John Kucera, Esq.
1401 New York Avenue, N.W.
Washington, D.C. 20005

**If to the Plan Administrator:**

[TBA]

**12. Governing Law**

Except to the extent the Code, Rules or other federal law is applicable, or to the extent the Plan or any agreement entered into pursuant to the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida, without giving effect to the principles of conflicts of law of such jurisdiction.

**13. Withholding and Reporting Requirements**

In connection with the consummation of the Plan, the Debtors, the Reorganized Debtors, and the Plan Administrator shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

**14. Section 1125(e) of the Code**

As of the Confirmation Date, the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Code. As of the Confirmation Date, the Debtors and shareholders, officers, directors, managers, members, agents, financial advisors, attorneys, employees, equity holders, partners, Affiliates and representatives shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Code in the offer and issuance of the new securities hereunder and, therefore, are not, and on account of such offer, issuance and solicitation shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections hereof or other offer under the Plan.

**15. Filing of Additional Documents**

On or before Substantial Consummation of the Plan, the Debtors shall file with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**16. No Admissions**

Notwithstanding anything in the Plan to the contrary, nothing contained in the Plan shall be deemed as an admission by any Person with respect to any matter set forth in the Plan or herein.

**17. Waiver of Bankruptcy Rule 3020(e) and 7062**

The Debtors may request that the Confirmation Order include (a) a finding that Rules 3020(e) and 7062 shall not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

**18. Time**

In computing any periods of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Court, the provisions of Rule 9006 shall apply.

**19. Substantial Consummation**

The Plan shall be deemed to be Substantially Consummated in accordance with sections 1101 and 1127(b) of the Code.

**20. Post-Confirmation Conversion/Dismissal**

A creditor or party in interest may bring a motion to convert or dismiss the Case under section 1112(b)(7) of the Code after entry of the Confirmation Order if there is a default in performing the conditions to effectiveness of the Plan. If the Court orders the Case converted to Chapter 7 after the entry of the Confirmation Order, this Plan provides that property of the Debtors' Estate that have not been disbursed pursuant to the provisions herein will revest in the Chapter 7 estate and that the automatic stay will be reimposed upon the revested property to the extent that relief from the stay was not previously authorized by the Court during the pendency of the Case. The Confirmation Order may also be revoked under certain limited circumstances. The Court may revoke the Confirmation Order if and only if such order was procured by fraud and if a party in interest brings a motion to revoke such Confirmation Order within 180 days after the entry of the Confirmation Order.

**21. Final Decree**

The Plan Administrator shall be responsible for filing a motion with the Court to obtain a final decree to close the Case.

**22. Inconsistency**

In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall govern.

**23. <u>No Interest or Attorneys' Fees</u>**

Except as otherwise provided under the Plan, or as ordered by the Court, no interest, penalty, or other charge, including any late charge, arising from and after the Petition Date, an no award or reimbursement of any attorneys' fees or other related cost or disbursement, shall be allowed on, or in connection with, any Claim, unless otherwise provided under the Plan or awarded by the Court.

**24. <u>Successors and Assigns</u>**

This Plan and all the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

**25. <u>Headings</u>**

The headings of articles, paragraphs and sub-paragraphs in this Plan are inserted for convenience only and shall not affect the interpretation of any provision of this Plan.

**26. <u>No Penalty for Prepayment</u>**

The Debtors, Reorganized Debtors or the Plan Administrator, as the case may be, shall at any time be permitted to prepay, in whole or in part, any claim treated under this Plan. Neither the Debtors, Reorganized Debtors nor the Plan Administrator shall be liable for payment of any sum or interest in the form of a penalty relating to the partial or full prepayment of any claim treated under this Plan, as permitted herein.

**27. <u>Savings Clause</u>**

Any minor defect or inconsistency in the Plan may be corrected or amended by the Confirmation Order.

**28. <u>Remedy of Defects</u>**

After the Effective Date, the Reorganized Debtors or the Plan Administrator, as the case may be, may, with approval of the Court, and so long as it does not materially and adversely affect the interests of Creditors, remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and effect of the Plan and in form and substance satisfactory to the Plan Administrator.

## VI.

## <u>CERTAIN RISK FACTORS TO BE CONSIDERED</u>

**HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO**

**ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

## A. Risk that Distributions Will be Less than Estimated by the Debtors

The ultimate recoveries under the Plan to holders of Claims are uncertain. The factors specified below assume that the Plan is approved by the Court and that the conditions precedent on the Effective Date of the Plan are satisfied or otherwise waived.

The Debtors and the Plan Administrator reserve the right to object to the amount or classification of any Claim or Equity Interest. Thus, the estimates set forth in this Disclosure Statement cannot be relied upon by any creditor whose Claim or Equity Interest is subject to a successful objection. Any holder of such Claim or Equity Interest may not receive the estimated Distributions set forth herein. The projected Distributions attached hereto as **Exhibit "C"** may not be realized for reasons including, but not limited to, the amounts of Allowed Claims may be greater and/or the value of the collected assets may be less.

**A SUBSTANTIAL AMOUNT OF TIME MAY ELAPSE BETWEEN THE EFFECTIVE DATE AND THE RECEIPT OF A FINAL DISTRIBUTION UNDER THE PLAN, BECAUSE: (I) THE VARIOUS CLASSES OF CLAIMS, AS WELL AS THE CATEGORIES OF ADMINISTRATIVE AND PRIORITY TAX CLAIMS, MAY HAVE SUBSTANTIAL AND/OR COMPLICATED DISPUTED CLAIMS; AND (II) THE REORGANIZED DEBTORS AND THE PLAN ADMINISTRATOR MAY NOT REALIZE RECOVERIES FOR A DELAYED PERIOD RELATING TO ACTIONS.**

## B. Operations and Financial Condition of Reorganized Debtors

### 1. Objections to Classifications

Section 1122 of the Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Proponents believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Code. However, there can be no assurance that the Court would reach the same conclusion.

### 2. Risk of Non-confirmation of the Plan

Even if all Impaired Classes accept the Plan, the Plan might not be confirmed by the Court. Section 1129 of the Code sets forth the requirements for the confirmation and requires, among other things, that the confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, unless the plan provides for liquidation of a debtor's assets, and that the value of distributions to dissenting creditors and holders of interests not be less than the value of distributions such creditors and holders of interests would receive if the debtor was liquidated under Chapter 7 of the Code. There can be no assurance, however, that the Court would also conclude that the requirements for confirmation of the Plan have been satisfied.

## C. Litigation

The Debtors are currently parties to several litigation matters being prosecuted by States. There is also the possibility that other litigation matters could be filed against one or more of the Reorganized Debtors. Although the Reorganized Debtors intend to vigorously defend against the litigation, there are risks associated with any litigation. These risks include, but are not limited to, the Reorganized Debtors losing the benefit of some or all memoranda and other recorded notices or the HBAs being deemed unenforceable. If this was to occur, the Reorganized Debtors would lose the benefit of nearly all sources of revenue with which to fund operations and Distributions to holders of Allowed Claims, other than Net Proceeds of Actions.

# VII.

# CONFIRMATION OF THE PLAN

Under the Code, the following steps must be taken to confirm the Plan:

## A. The Confirmation Hearing

The Code requires the Court, after notice, to hold a confirmation hearing before a plan of reorganization may be confirmed. The Confirmation Hearing in respect of the Plan has been scheduled in accordance with the Disclosure Statement Order, before the Honorable Erik P. Kimball, United States Bankruptcy Judge, at the United States Bankruptcy Court, Flagler Waterview Building, 1515 N. Flagler Drive, 8th Floor, Courtroom B, West Palm Beach, Florida, 33401. The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to Confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or number and type of shares of Interest held by the objector. The Court has directed that objections, if any, to Confirmation of the Plan be served and filed so that they are received in accordance with the Disclosure Statement Order. The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or any adjourned Confirmation Hearing.

Objections to Confirmation of the Plan are governed by Rule 9014.

## B. Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Court will confirm the Plan only if all of the requirements of section 1129 of the Code are met. Among the requirements for Confirmation of a plan are that the plan is (i) accepted by all Impaired classes of Claims and Interests or, if rejected by an impaired class, that the plan “does not discriminate unfairly” and is “fair and equitable” as to such class, (ii) feasible and (iii) in the “best interests” of creditors and holders of equity interests that are impaired under the plan.

### 1. Unfair Discrimination and Fair and Equitable Tests

To obtain nonconsensual confirmation of the Plan, the Court must determine that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting Class. The Code provides a non-exclusive definition of the phrase "fair and equitable." The Code establishes "cram down" tests for secured creditors, unsecured creditors and equity security holders, as follows:

(a) Secured Creditors. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) of this subparagraph.

(b) Unsecured Creditors. Either (i) each non-accepting impaired unsecured creditor class receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c) Equity Interests. Either (i) each holder of an Equity Interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan.

### 2. Feasibility

The Code permits a plan to be confirmed if it is not likely to be followed by liquidation or the need for further financial reorganization unless the plan provides for liquidation of a debtor's assets.

### 3. Best Interests Test

With respect to each Impaired Class of Claims and Equity Interests, confirmation of a plan requires that each holder of a Claim or Equity Interest either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Code. To determine what holders of Claims and Interests of each impaired class would receive if the Debtor was liquidated under Chapter 7, the Court must determine the dollar amount that would be generated from the liquidation of the Debtor's Assets and properties in the context of a hypothetical Chapter 7 liquidation case.

***In the event of conversion to Chapter 7, the Debtors' business operations would cease. The Debtors would lose the economic benefits of the HBAs. Consequently, the Secured***

***Creditors have large deficiency claims, which would substantially dilute any recoveries for holders of Allowed Unsecured Claims. Any Cash available for Distributions would be further reduced by the amount of the costs and expenses of liquidation under Chapter 7, which the Debtors believe would be significantly higher as a result of a Chapter 7 Trustee's lack of familiarity with the Debtors, creditors and events occurring throughout the Case. These fees and costs would be in addition to any unpaid Administrative Claims incurred in connection with the Case while pending under Chapter 11.***

Again, the costs of liquidation under Chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those that might be payable to attorneys, accountants, and other professionals that such a trustee might engage, who are not nearly as familiar with the Debtors, their business dealings, and the Case. The foregoing types of claims and other claims resulting from the pending Chapter 11 case, including any unpaid expenses incurred by the Debtor during the Chapter 11 case such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay general unsecured claims. The fees and costs which would be incurred in a Chapter 7 would far outweigh any benefit from conversion.

To determine if the Plan is in the best interests of each Impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtors' Assets, after subtracting the amount attributable to the foregoing claims, are then compared with the value of the property offered to such classes of claims and interests under the plan.

After considering the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in this Case, including, without limitation, the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim or Equity Interest with a recovery that is most likely higher than such holder would receive pursuant to liquidation of the Debtors under Chapter 7.

***Attached hereto as Exhibit C is a liquidation analysis demonstrating that the Plan provides substantially higher distributions than holders of Allowed Claims and Equity Interests would receive in Chapter 7.***

Finally, under the Plan, HBA Parties are afforded the right to rescind their HBAs for "cause" or without cause for payment. While the Debtors vehemently dispute the claims being prosecuted by States, the Debtors submit that the foregoing options afforded to HBA Parties are more cost-efficient than litigating outside bankruptcy. Furthermore, the HBAAP affords HBA Parties the option of remaining parties to the HBAs.

## VIII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Proponents have evaluated alternatives to the Plan. After studying these alternatives, the Proponents have concluded that the Plan is the best alternative and will maximize recoveries

by parties in interest, assuming confirmation of the Plan. The following discussion provides a summary of the Proponents' analysis leading to its conclusion that a dismissal or alternative plan of liquidation would not provide the highest value to parties in interest.

**A. Liquidation Under Chapter 7**

Attached hereto as Exhibit C is a liquidation analysis demonstrating that the Plan provides substantially higher distributions than holders of Allowed Claims and Equity Interests would receive in a Chapter 7 liquidation. Again, in Chapter 7, the Debtors' business operations would cease and there is a substantial likelihood that no value would be realized on account of the HBAs. Consequently, the Secured Creditors would most likely have substantially Unsecured Claims, which would dilute any Distributions to which holders of Allowed Unsecured Claims would be entitled. In a Chapter 7, Distributions would be further diluted by the fees and costs incurred by a Chapter 7 trustee and his or her professionals, including, without limitation, attorneys and accountants.

The Debtors believe that Distributions to holders of Allowed Claims are substantially higher than in Chapter 7.

**B. Dismissal**

If the Plan is not confirmed, the Court could dismiss the Case. If the Case is dismissed, it is likely that litigation would ensue and there would be no potential means for orderly distribution to creditors. The Debtors would also lose the benefit of the automatic stay in connection with other litigation currently stayed. The Plan provides for a more efficient and orderly distribution of assets to holders of Allowed Claims.

## IX.

## FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**A. Introduction**

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims. The following summary does not address the federal income tax consequences to holders whose Claims are entitled to reinstatement or payment in full in cash under the Plan (e.g., holders of Administrative Claims, Other Priority Claims, and Secured Claims).

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to

the interpretation that the IRS will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities).

This discussion assumes that the various debt and other arrangements to which the Debtor is a party will be respected for federal income tax purposes in accordance with their form.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## B. Consequences to the Debtors

### 1. Cancellation of Debt

The Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes - such as net operating loss ("NOL") carryforwards, current year NOLs, tax credits and tax basis in assets --by the amount of any cancellation-of-indebtedness income ("COD") realized by such debt in connection with the bankruptcy case. COD is the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds the fair market value of any consideration given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the cancelled debt would have given rise to a tax deduction). On August 29, 2003, the IRS issued proposed and temporary regulations addressing the method for applying the attribute reduction described above to an affiliated group filing a consolidated federal income tax return. The regulations are effective with respect to COD occurring after August 29, 2003. Under these regulations, the attributes of the debtor member are first subject to reduction. These attributes include: (1) consolidated attributes of the debtor member; (2) attributes that arose in separate return limitation years of the debtor member; and (3) the basis of property of the debtor member. To the extent that the excluded COD exceeds the attributes of the debtor member, the regulations generally require the reduction of attributes of other members. If the attributes of the debtor member reduced under the above rules is the basis of stock of another member of the group, a "look-through rule" applies requiring that corresponding adjustments be made to the attributes of the lower-tier member.

As a result of the potential discharge of Claims pursuant to the Plan, the Debtors may realize COD. The extent of such COD and resulting tax attribute reduction will depend, in part, on the value of Distributions. Consequently, there could be material reductions the attributes (including consolidated NOL carryforwards and current year NOLs (if any)) of the Debtor. Other tax attributes may also be reduced. To the extent that asset basis is reduced, depreciation or

amortization of assets would also be reduced, and gain recognized (and therefore tax imposed) in connection with the disposition of such assets may be increased.

## C. Consequences to Holders of Certain Claims

### 1. Consequences to Holders of Unsecured Claims

Pursuant to the Plan, holders of Unsecured Claims will receive, in satisfaction and discharge of their Claims, Cash. However, in the event that holders of Allowed Unsecured Claims are not aid in full, there may be tax consequences. Holders of Allowed Unsecured Claims may wish to consult with their tax advisors on the effects of the Plan.

### 2. Distributions in Discharge of Accrued but Unpaid Interest

In general, to the extent that any amount received by a holder of a Claim is received in satisfaction of accrued interest, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed or amortized original issue discount ("OID") was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a security, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly, it is also unclear whether, by analogy, a holder of a Claim with previously included OID that is not paid in full would be required to recognize a capital loss rather than an ordinary loss.

Pursuant to the Plan, all distributions in respect of Claims will be allocated first to the principal amount of such Claims, as determined for federal income tax purposes, and thereafter, to the portion of such claim, if any representing accrued but unpaid interest. However, there is no assurance that such allocation will be respected by the IRS.

Each holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest or amortized OID for tax purposes.

### 3. Information Reporting and Withholding

All distributions to holders of Claims under the Plan are subject to any applicable withholding (including employment tax withholding). Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding". Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**The foregoing summary has been provided for informational purposes only. All holders of Claims are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences applicable under the Plan.**

## X.

## CONCLUSIONS AND RECOMMENDATIONS

Based upon the foregoing, the Debtors believe that Confirmation of the Plan will provide the greatest recovery for all holders of Allowed Claims against the Debtors and recommend that all holders of Allowed Claims and Interests in Classes that are Impaired and entitled to vote on the Plan vote to accept the Plan.

*/s/ Michael D. Seese*
Michael D. Seese, Esq.
(FBN 997323)
SEESE, P.A.
101 N.E. 3rd Avenue
Suite 1500
Ft. Lauderdale, FL 33301
Telephone No.: (954) 745-5897
mseese@seeselaw.com

*Attorneys for Debtors-in-Possession*

MV Realty Holdings, LLC,
a Florida limited liability company

By: [signature]
Antony Mitchell, CEO

Date: 4/2/24

MV Realty PBC, LLC,
a Florida limited liability company

By: [signature]
Antony Mitchell, CEO

Date: 4/2/24

MV Receivables II, LLC,
a Florida limited liability company

By: [signature]
Antony Mitchell, CEO

Date: 4/2/24

MV Receivables III, LLC,
a Florida limited liability company

By: [signature]
Antony Mitchell, Manager

Date: 4/2/24

MV Realty PBC, LLC,
a Pennsylvania limited liability company

By:______________________
Antony Mitchell, CEO

MV Realty of South Carolina, LLC,
a South Carolina limited liability company

By:______________________
Antony Mitchell, CEO

MV Realty of North Carolina, LLC,
a North Carolina limited liability company

By:______________________
Antony Mitchell, CEO

MV Realty of Massachusetts, LLC,
a Massachusetts limited liability company

By:______________________
Antony Mitchell, CEO

MV Realty of Illinois, LLC,
an Illinois limited liability company

By:______________________
Antony Mitchell, CEO

MV Realty of Arizona, LLC,
an Arizona limited liability company

By:______________________
Antony Mitchell, CEO

MV Realty of Connecticut, LLC,
a Connecticut limited liability company

By:______________________
Antony Mitchell, CEO

MV Realty PBC, LLC,
a Georgia limited liability company

By:______________________
Antony Mitchell, CEO

MV Realty of New Jersey, LLC,
a New Jersey limited liability company

By:______________________
Antony Mitchell, CEO

MV Realty of Washington, LLC,
a Washington limited liability company

By:______________________
Antony Mitchell, CEO

MV Realty of Maryland, LLC,
a Maryland limited liability company

By:______________________
Antony Mitchell, CEO

MV Realty of Virginia LLC,
a Virginia limited liability company

By:______________________
Antony Mitchell, CEO

MV Realty Tennessee, LLC,
a Tennessee limited liability company

By:________________________
Antony Mitchell, CEO

MV Realty of Wisconsin, LLC,
a Wisconsin limited liability company

By:________________________
Antony Mitchell, CEO

MV Realty of Nevada, LLC,
a Nevada limited liability company

By:________________________
Antony Mitchell, CEO

MV Realty of Oregon, LLC,
an Oregon limited liability company

By:________________________
Antony Mitchell, CEO

MV Realty of Utah, LLC,
a Utah limited liability company

By:________________________
Antony Mitchell, CEO

MV Realty of Minnesota, LLC,
a Minnesota limited liability company

By:________________________
Antony Mitchell, CEO

MV Realty of Indiana, LLC,
an Indiana limited liability company

By:________________________
Antony Mitchell, CEO

MV Realty of Missouri, LLC,
a Missouri limited liability company

By:________________________
Antony Mitchell, CEO

MV Homes of New York, LLC,
a New York limited liability company

By:________________________
Antony Mitchell, CEO

MV Realty of Idaho, LLC,
an Idaho limited liability company

By:________________________
Antony Mitchell, CEO

MV Realty of Alabama, LLC,
an Alabama limited liability company

By:________________________
Antony Mitchell, CEO

MV Realty of Colorado, LLC,
a Colorado limited liability company

By:________________________
Antony Mitchell, CEO

MV Realty of Oklahoma, LLC,
an Oklahoma limited liability company

By:____________________________
Antony Mitchell, CEO

MV Realty of Louisiana, LLC,
a Louisiana limited liability company

By:____________________________
Antony Mitchell, CEO

MV Realty of Kansas, LLC,
a Kansas limited liability company

By:____________________________
Antony Mitchell, CEO

MV Realty of Kentucky, LLC,
a Kentucky limited liability company

By:____________________________
Antony Mitchell, CEO

MV Realty of California, Inc.,
a California corporation

By:____________________________
Antony Mitchell, CEO

MV Realty of Texas, LLC,
a Texas limited liability company

By:____________________________
Antony Mitchell, CEO

MV Realty of Michigan, LLC,
a Michigan limited liability company

By:____________________________
Antony Mitchell, CEO

MV Realty of Ohio, LLC,
a Ohio limited liability company

By:____________________________
Antony Mitchell, CEO