UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 23-17590-EPK

IN RE:

MV REALTY PBC, LLC, et al.,

Debtors.
_______________________________/

MOTION FOR RELIEF UNDER SECTION 1112(B) (959) AND MOTION TO DISMISS OR CONVERT CASE (1009)

April 3, 2024

The above-entitled cause came on for hearing before the Honorable ERIK P. KIMBALL, Chief Judge of the UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, at 1515 North Flagler Drive, West Palm Beach, Palm Beach County, Florida, on April 3, 2024 commencing at or about 2:00 p.m., and the following proceedings were had:

Transcribed from a Digital Recording By:
Anna M. Meagher, Shorthand Reporter

APPEARANCES:

Seese, P.A., by
Michael D. Seese, Esq.
On behalf of the Debtors
Email: Mseese@seeselaw.com

Office of the U.S. Trustee
Department of Justice
Heidi A. Feinman, Staff Attorney
Martin Ochs, Staff Attorney
Email: Heidi.A.Feinman@usdoj.gov

Fender, Bolling and Paiva, P.A., by
G. Steven Fender, Esquire
Local counsel on behalf of the State of North Carolina
Email: Steven.fender@fender-law.com

ALSO PRESENT:

Gwendolyn McClam
Valerie Jones
Rosilee Ells
Gary Jean-Louis
Sabrina German
Cassia Thomas
Losie Toussaint
Maricelle Volcy
Orlando Diaz
Joan Simmons
Stuart Jacobs

VIA ZOOM VIDEO CONFERENCE:

Katten Muchin Rosenman, by
Peter A. Siddiqui, Esquire
On behalf of Monroe Capital Management Advisors, LLC
Email: Peter.siddiqui@katten.com

Berger Singerman, LLP, by
Jordi Guso, Esquire
On behalf of Monroe Capital Advisors, LLC
Email: Jguso@bergersingerman.com

Continued...

North Carolina Department of Justice, by
Brian Rabinovitz, Special Deputy AG
Keith Turner Clayton, Special Deputy AG
On behalf of the State of North Carolina
Email: Brabinovitz@ncdoj.gov
Email: Kclayton@ncdoj.gov

Bast Amron LLP, by
Scott N. Brown, Esquire
Local Counsel to the State of North Carolina
Email: Sbrown@bastamron.com

Boies Schiller Flexner, LLP, by
John Kucera, Esquire
Megan Nyman, Esquire
On behalf of the Official Committee of HBA Holders
Email: Jkucera@bsfllp.com
Email: Mnyman@bsfllp.com

Massachusetts Office of the Attorney General, by
Daniel Bahls, Asst. Attorney General
On behalf of the Commonwealth of Massachusetts
Email: Daniel.bahls@mass.gov

Pennsylvania Office of Attorney General, by
Debra Djupman Warring, Asst. Attorney General
Lauren Michaels, Asst. Attorney General
On behalf of the Commonwealth of Pennsylvania
Office of Attorney General
Email: Dwarring@attorneygeneral.gov
Email: Lmichaels@attorneygeneral.gov

Georgia Office of the Attorney General, by
Jacquelyn L. Kneidel, Asst. Attorney General
On behalf of the State of Georgia
Email: Jkneidel@law.ga.gov

Kass Shuler Law Firm, by
Nicole M. Noel, Esquire
On behalf of Arvest Bank, Crosscountry
Mortgage, LLC, and RP Funding, Inc.
Email: Bankruptcynotices@kasslaw.com

Continued...

Florida Office of the Attorney General, by
Ellen Koehler Lyons, Asst. Attorney General
On behalf of the State of Florida
Email: Ellen.lyons@myfloridalegal.com

Maryland Office of the Attorney General, by
Kira Wilpone-Welborn, Asst. Attorney General
On behalf of the State of Maryland
Email: Kwilpone-welborn@oag.state.md.us

New York State Office of the Attorney General, by
Justin L. Haines, Asst. Attorney General
Laura Revercomb, Asst. Attorney General
On behalf of the State of New York

Indiana Office of the Attorney General, by
Heather Crockett, Asst. Attorney General
On behalf of the State of Indiana
Email: Heather.Crockett@atg.in.gov

Office of the Ohio Attorney General, by
Travis Garrison, Asst. Attorney General
On behalf of Ohio Department of Commerce, Division of Real Estate and Professional Licensing
Email: Travis.Garrison@ohioago.gov

Tennessee Attorney General's Office, by
Stuart F. Wilson-Patton, Asst. Attorney General
On behalf of the State of Tennessee
Email: Stuart.wilson-patton@ag.tn.gov

Law Office of Robert A. Gusrae, by
Robert A. Gusrae, Esquire
On behalf of Charnella Rosenthal
Email: Gusraelaw@gmail.com

Missouri Office of Attorney General, by
Nathaniel Brancato, Asst. Attorney General
On behalf of the State of Missouri
Nathaniel.brancato@ago.mo.gov

Continued...

Oregon Dept. Of Justice, by
Justin D. Leonard, Esquire
On behalf of the State of Oregon
Email: Justin.leonard@doj.state.or.us

Connecticut Office of the Attorney General, by
Rebecca Quinn, Asst. Attorney General
On behalf of the State of Connecticut

Pack Law, by
Joseph A. Pack, Esquire
Jessey Krehl, Esquire
On behalf of the National Consumer Law Center
Email: Joe@packlaw.com
Email: Jessey@packlaw.com

United States Attorney's Office, by
Raychelle A. Tasher, Asst. U.S. Attorney
Email: Raychelle.tasher@usdoj.gov

National Consumer Law Center, by
John Rao, Senior Attorney

Consumer Financial Protection Bureau, by
David Dudely, Enforcement Attorney

ALSO PRESENT VIA ZOOM:
Jordan Serlin, Chairman of the HBA Committee
Mary Garrow
William Moleterno
Christ Dellinger
Shawna Shaw
Christina Johnson
Gwendolyn Brown
Sui Poon
Ellen Robinson
Jennifer Interiano
Shandly McKnight
\- - - - - - -

THE COURT: All right. Next I'm going to call MV Realty PBC, LLC. And for those of you who are listening who have not attended a hearing here by Zoom or in person, there's a lot of debtors in that case. It's a very long list of 36, I believe, entities all of which have the MV Realty name in them. It's Case No. 23-17590.

We have an extremely large number of participants on Zoom, so I'm going to ask Ms. Leonard to walk through those Zoom participants and take their appearances, and then I'll hear from the people who are in the courtroom.

Now, if there are individuals here who want to talk today, then at the beginning of the hearing if you could -- and when I let you know -- come up to the podium and just give your names, and then you can go back and sit down, and we'll move through the hearing. You don't have to appear. That's what we mean by coming up to the podium and saying your name. You can just listen if you want to. But if you want to have your name in the record and be able to speak later in the hearing, you should come up when I direct and state your name on the record.

So, Ms. Leonard, why don't you go an ahead.

THE CLERK: Mr. Gekas.

(No audible answer.)

THE CLERK: Ms. de Cespedes.

(No audible answer.)

THE CLERK: Mr. Mitchell.

MR. MITCHELL: Good afternoon, your Honor.

THE CLERK: Thank you.

Mr. Ochs.

MS. FEINMAN: Mr. Ochs will be -- he's just getting done with Judge Grossman, so he'll be getting on.

THE CLERK: Mr. Brown.

(No audible answer.)

THE CLERK: Scott Brown.

MR. BROWN: Oh. Good afternoon, your Honor. Scott Brown Bast Amron, local counsel for the state of North Carolina.

THE CLERK: Thank you.

Robert Gusrae.

MR. GUSRAE: Robert Gusrae for Charnella Rosenthal.

THE CLERK: Peter Siddiqui.

MR. SIDDIQUI: Good afternoon. Peter Siddiqui, Katten Muchin Rosenman on behalf of Monroe Capital.

THE CLERK: Jordi Guso.

MR. GUSO: Good afternoon, your Honor. Jordi Guso of Berger Singerman also on behalf of Monroe Capital.

THE CLERK: Wanda Murray.

(No audible response.)

THE CLERK: Raychelle Tasher.

MS. TASHER: Good afternoon, your Honor. Raychelle Tasher on behalf of the United States of America, Department of Housing and Urban and Development.

THE CLERK: Nicole Noel.

MS. NOEL: Good afternoon, your Honor. Nicole Noel on behalf of various creditors, your Honor.

THE CLERK: Ingrid Garcia.

No audible response.

THE CLERK: Benjamin Waisbren.

(No audible response.)

THE CLERK: Megan Nyman.

MS. NYMAN: Megan Nyman on behalf of the official committee of HBA holders.

THE COURT: Ms. Nyman, just -- your sound is terrible. So you might to, while Ms. Leonard continues to call parties, figure out what it is. You might need to turn your camera off, because I noticed the image was juttering (phonetic).

Go ahead Ms. Leonard.

THE CLERK: John (distorted audio) -- sorry. John Kucera.

(No audible response.)

THE CLERK: Simon Lean (phonetic).
(No audible response.)
THE CLERK: Margerie Brinkley (phonetic).
(No audible response.)
THE CLERK: Jordan Serlin.
MR. SERLIN: Good afternoon, your Honor. Jordan Serlin, chairman of the creditor committee.
THE CLERK: Stuart Wilson-Patton.
MR. WILSON-PATTON: Good afternoon, your Honor. Stuart Wilson-Patton for the State of Tennessee.
THE CLERK: Ellen Lyons.
MS. LYONS: Good afternoon, your Honor. Ellen Lyons for the State of Florida, attorney general.
THE CLERK: Deborah Warring.
MS. WARRING: Good afternoon, your Honor. Deborah Warring from the Commonwealth of Pennsylvania, Office of Attorney General.
THE CLERK: David Dudely.
MR. DUDELY: Good afternoon, your Honor. David Dudely for the Consumer Financial Protection Bureau.
THE CLERK: Kira Wilpone-Welborn.
MS. WILPONE-WELBORN: Good afternoon, your Honor. Kira Wilpone-Welborn with the Consumer Protection Division of the Office of the Attorney General of Maryland.

THE CLERK: Jacqueline Kneidel.

MS. KNEIDEL: Good afternoon, your Honor. Jackie Kneidel with the state of Georgia, Office of the Attorney General.

THE CLERK: Lauren Michaels.

MS. MICHAELS: Good afternoon, your Honor. Lauren Michaels on behalf of the Pennsylvania Office of Attorney General.

THE CLERK: Daniel Bahls.

(No audible response.)

THE CLERK: Heather Crockett.

MS. CROCKETT: Good afternoon, your Honor. Heather Crockett, here on behalf of the State of Indiana, Office of the Indiana Attorney General.

THE CLERK: Travis Garrison.

MR. GARRISON: Good afternoon. Travis Garrison here on behalf of the Ohio attorney general's office.

THE CLERK: Brian Rabinovitz.

MR. RABINOVITZ: Good afternoon. Brian Rabinovitz on behalf of the State of North Carolina, and I also have my colleague, Keith Clayton, appearing on behalf of the State of North Carolina with me.

THE CLERK: Laura Rivercomb.

MR. HAINES: Justin Haines and Laura

Rivercomb representing New York state, Office of the New York State Attorney General.

THE CLERK: John Granthan (phonetic).

(No audible response.)

THE CLERK: Joseph Pack.

MR. PACK: Good morning, your Honor. Joseph Pack with Pack Law on behalf of the National Consumer Law Center. I'm here today with my colleague, Jessey Krehl, and counsel that I think you entered the order pro hac'ing in John Rao, R-A-O.

THE CLERK: Very good.

Sui Poon.

(No audible response.)

THE CLERK: Daniel Sells.

(No audible response.)

THE CLERK: Gwendolyn McClam (phonetic).

(No audible response.)

THE COURT: You're here in the courtroom. We'll wait until later, Ms. McClam. Thank you.

THE CLERK: Gerald Mead.

(No audible response.)

THE CLERK: Mary Garrow.

MR. GARRISON: Good afternoon. This is Mary Garrow. I'm representing Arizona.

THE CLERK: William Moleterno, Molenterno

(phonetic). Sorry.

MR. MOLETERNO: William, I'm here. William Moleterno right here.

THE CLERK: Andre Breneville.

(No audible response.)

THE CLERK: Christ Dellinger.

(No audible response.)

THE CLERK: Jovany Barraza.

(No audible response.)

THE CLERK: And Valerie Daniely.

THE COURT: Ms. Daniely, we just called out your name, and I see your hand raised. You're on mute right now. If you would like to talk, you can unmute yourself. There's a little button at the bottom.

There you go.

MS. DANIELY: Here.

THE COURT: There you go. Good afternoon.

And Andre Breneville, you're camera is off, which is fine, but can you hear us.

UNIDENTIFIED SPEAKER: Christ Dellinger is here as well.

THE COURT: Very good, Mr. Dellinger.

All right. Is there anyone else on Zoom?

We have a very large list of listen only participants, and you don't need to speak if you don't

intend to speak at all during the hearing.

Is there anyone else on Zoom who wishes to make an appearance, meaning announce yourself?

MR. OCHS: Your Honor, Martin Ochs, United States trustee. I just want to note for the Court that I'm here. My colleague Ms. Feinman is in the courtroom as your Honor is aware. Thank you.

THE COURT: Yes. Thank you, Mr. Ochs.

MR. BAHLS: Your Honor, Daniel Bahls for the Commonwealth of Massachusetts. My apologies. My microphone was not turned on.

THE COURT: Very good. Good afternoon. That happens to even me.

Anyone else?

(In Unison: Good afternoon, your Honor.)

THE COURT: Okay. Hold on. One at a time.

Let's see, who was next?

UNIDENTIFIED SPEAKER: I don't know if you called my name already, but --

THE COURT: Ms. Shaw.

MS. SHAW: I'm Shawna Shaw, just want you to know I'm here. Hi. How are you?

THE COURT: That's Shana (phonetic) Shaw. Good afternoon.

MS. SHAW: Good afternoon, your Honor.

THE COURT: Anyone else?

MR. WILLIAMS: Good afternoon, Judge. Alan Williams for the Office of the Illinois Attorney General.

THE COURT: Mr. Williams.

Anyone --

MR. LEONARD: Justin --

THE COURT: -- else?

Go ahead, Mr. --

MR. LEONARD: Justin Leonard. Sorry.

THE COURT: Go ahead, Mr. Leonard.

MR. LEONARD: Justin Leonard on behalf of the State of Oregon.

THE COURT: Thank you.

Is there anyone on Zoom? Two hands are raised. Oh, Ms. Johnson.

MS. JOHNSON: Yes. Good afternoon, your Honor. Christina Johnson with MV Realty.

THE COURT: Thank you. Mr. Brancato.

MR. BRANCATO: Nathaniel Brancato on behalf of the Missouri attorney general's office.

THE COURT: Thank you.

Anyone else who I haven't heard from on Zoom?

MS. QUINN: Good afternoon, your Honor. Rebecca Quinn and Addison Kilte (phonetic) from the State

of Connecticut, Office of the Attorney General.

THE COURT: Thank you. Good afternoon.

Now, I see four people with hands raised, but I think I've heard from all of you. So you might want to turn those off if you can. Just a moment.

UNIDENTIFIED SPEAKER: You're it. I see a hand right there.

UNIDENTIFIED SPEAKER: I know, but I need to tell him I'm here.

UNIDENTIFIED SPEAKER: No, you don't.

UNIDENTIFIED SPEAKER: I don't?

UNIDENTIFIED SPEAKER: No.

THE COURT: Well, we can -- whoever is speaking we can all hear you, so if you don't want me to hear you, you need to mute yourself. If you do want to appear, it's time to say your name.

Anyone else on Zoom?

(No audible response.)

UNIDENTIFIED SPEAKER: Brown.

THE COURT: Oops, yes, Ms. Brown. That's Gwendolyn Brown. Good afternoon.

MS. POON: Sui Poon.

THE COURT: Sui Poon, good afternoon.

MS. POON: Thank you.

THE COURT: All right. Anyone else?

(No audible response.)

THE COURT: Very good. And here in the courtroom.

Mr. Seese.

MR. SEESE: Good afternoon, your Honor. May it please the Court, Michael Seese, appearing this afternoon on behalf of the debtors.

THE COURT: Thank you.

Ms. Feinman.

MS. FEINMAN: Good afternoon, your Honor. Heidi Feinman for the U.S. trustee.

THE COURT: Mr. Fender.

MR. FENDER: Good afternoon, your Honor. This is Steven Fender for the Commonwealth of Massachusetts.

THE COURT: Very good.

Now, anybody in the courtroom, you're not required to appear. If you would like to appear, please come forward and let us know your name.

Yes, ma'am.

Thank you. Good afternoon.

MS. McCLAM: Good afternoon, your Honor. My name is Gwendolyn McClam.

THE COURT: Ms. McClam, good afternoon. Thank you.

MS. McCLAM: Thank you.

THE COURT: Yep.

MS. GERMAN: Good afternoon, everyone. I'm Sabrina German.

THE COURT: Ms. German, good afternoon. Thank you.

And at sometime later, I'll offer all of you an opportunity to speak about what we have being heard today.

Yes, sir.

MR. JEAN-LOUIS: Good afternoon, your Honor. My name is Gary Jean-Louis.

THE COURT: How do you spell your last name?

MR. JEAN-LOUIS: J-E-A-N, Louis, L-O-U-I-S.

THE COURT: Oh, like, Jean-Louis.

MR. JEAN-LOUIS: Jean-Louis.

THE COURT: Okay. Thank you very much.

MR. JEAN-LOUIS: Thank you so much.

THE COURT: Yep, thank you very much.

Good afternoon.

MS. ELLS: Good afternoon, your Honor. My name is Rosilee Ells.

THE COURT: Ms. Ells, good afternoon.

If everybody on Zoom could please put yourself on mute, so you're not drowning anyone out.

Yes, ma'am.

MS. JONES: Good afternoon, your Honor. My name is Valerie Jones.

THE COURT: Ms. Jones, good afternoon.

Yes, sir.

MS. ROBINSON: Good afternoon, Judge. On Zoom I was just trying to get in, and I just got it in. My name is Ellen Robinson, and I'm just a listener.

THE COURT: Ms. Robinson, thank you. Good afternoon.

Yes, sir.

MR. FITZ: Good afternoon, your Honor Christopher Fitz.

THE COURT: Mr. Fitz, good afternoon.

Ma'am, if you could just let me know your name. How are you?

MS. THOMAS: Good afternoon. My name is Cassia (phonetic) Thomas.

THE COURT: Ms. Thomas, thank you.

MS. TOUSSAINT: Good afternoon, Court. My name is Losie (phonetic) Toussaint.

THE COURT: Ms. Toussaint, good afternoon.

MS. VOLCY: Good afternoon, your Honor. My name Maricelle Volcy (phonetic).

THE COURT: Good afternoon.

Yes, sir.

MR. DIAZ: Good afternoon, your Honor. My name is Orlando Diaz.

THE COURT: Mr. Diaz, good afternoon.

MS. SIMMONS: Good afternoon, your Honor. My name is Joan Simmons.

THE COURT: Ms. Simmons, good afternoon.

Very good. Thank you.

Oh, yes, sir. Good afternoon.

MR. JACOBS: Good afternoon, your Honor. My name is Stuart Jacobs.

THE COURT: Mr. Jacobs, good afternoon.

All right. So couple things before we begin. We have two motions to dismiss. One has been filed by the committee of the homeowner benefit agreement holders. The other has been filed by the Office of the United States Trustee.

Before we jump into that, I do have a request for the National Consumer Law Center to file a friend of the court brief.

Does the debtor have a position on that, Mr. Seese?

MR. SEESE: I'm sorry, your Honor?

THE COURT: On the National Consumer Law Center request to file a brief.

MR. SEESE: No, we have no opposition to that, your Honor, as long as we're given an opportunity to respond.

THE COURT: Understood. And we'll get to that in a moment.

MR. SEESE: Yes, your Honor.

THE COURT: Ms. Feinman.

MS. FEINMAN: No objection, your Honor.

THE COURT: All right. So I apologize, I can't remember who is representing the National Consumer Law Center this afternoon.

MS. FEINMAN: Mr. Rao.

THE COURT: Ah, Mr. Rao, Row -- I don't know how to pronounce your --

MR. RAO: Yes, your Honor. Thank you.

THE COURT: You can tender a proposed order if you would, but instead of the one that you had submitted, please have the order say that you will file independently a copy of the brief which I've already read.

MR. RAO: Thank you, your Honor.

THE COURT: Okay. Very good.

Was there any discussion between the movants on who would like to address the matter first? I do have something I want to say before we get there.

But, yes, Ms. Feinman.

MS. FEINMAN: Your Honor, between the U.S. trustee and the committee?

THE COURT: And the committee, yes.

MS. FEINMAN: No, your Honor. There has been no discussion on that.

THE COURT: All right. Now, I should let all of know, as usual I've read everything including the proposed brief filed by the National Consumer Law Center. Based on -- and the debtor's response, of course. Based on what I've seen, it seems extremely unlikely that I would grant or deny the motion today at this hearing.

I note that the committee, in the preamble to their own motion, asked the Court to treat this as a status conference for the purposes of addressing scheduling, what discovery might be necessary, and the like. And I'll certainly want to hear from each of you on those issues.

Before you begin your presentation or at least as some component of what I hear today, I want you to give some thought to, in your view, what factual issues would be in dispute in connection with a potential hearing. Because as all the lawyers know, the first question that I will ask is, "Do I need evidence," and if so, how much and when, how much time is necessary, will you need to have discovery to address it? It could be,

for example, that the U.S. trustee suggests they don't need any evidence. I don't know. But I've seen the response filed by the debtor, and I'm sure Mr. Seese will want to address that issue. So please keep that in mind in presentation.

Also keep in mind that, as I said, it seems extremely unlikely that I would rule on the motions today during this session, so -- and I have read everything, so I do have some questions. But I think it's useful to begin with a presentation as you see fit.

So who would like to go -- I have no preference whether it be the committee or the U.S. trustee.

Yes, Mr. Seese?

MS. FEINMAN: Go ahead, you can --

MR. SEESE: No, no, no, no. I'm not going to steal your thunder.

But I just have a question. If your Honor is more inclined to treat this as a status conference, hear some preliminary arguments from both the trustee and the committee as well as a response --

THE COURT: And you.

MR. SEESE: -- yes, your Honor. I'm just looking for guidance, because I certainly don't want to take up these folks time or the Court's time --

THE COURT: I think they've all traveled here to hear what's going to happen and the arguments that are presented, and so we're not taking up their time. I think they all want to hear it, and also they might want to speak.

MR. SEESE: No, and that's fine, your Honor. We welcome it. But do you want us to go through our full argument, or do you want us to just hit some high points?

THE COURT: I would stress the things that you think are the most important in your response.

MR. SEESE: Okay.

THE COURT: Okay. And, obviously, you're going to respond, to some extent, to what is presented orally here today --

MR. SEESE: Sure.

THE COURT: -- as well.

MR. SEESE: Okay. Thank you, your Honor.

THE COURT: If you wish to present everything in the response, that's perfectly fine. I'm not discouraging you.

MR. SEESE: Okay. Thank you, your Honor.

THE COURT: All right. I don't know who would like to go first. I have no preference.

Ms. Feinman, would you like to go first?

MS. FEINMAN: Your Honor, I'm happy to go

first. I have not spoken to the committee, and I think the Court -- probably the committee's -- the committee's motion is a little different than the U.S. trustee's motion, because I think their motion seeks a dismissal with a bad faith filing, which is something that the U.S. trustee is not looking for. So maybe some of our arguments are the same. Maybe they're not. But I'm happy to go first.

THE COURT: I think they do adopt some of your arguments as well, but you're correct. I believe that that's the primary difference between the two motions.

MS. FEINMAN: Correct, your Honor.

So as far as evidence is concerned, your Honor, everything that I have raised in my motion is related to documents that are filed with the court. That would be monthly operating reports, which are signed under penalty of perjury, the schedules, which are signed under penalty perjury, the transcript of the 341 meeting, which has been filed as an exhibit in a adversary proceeding, so the Court has a copy of that transcript because it is on the docket.

The only things that were not mentioned in the U.S. trustee's motion to dismiss or convert would be the actual invoices that the U.S. trustee has received

from professionals, and other than that I don't think that there's anything else.

So I'm happy to proceed with my argument --

THE COURT: Yes.

MS. FEINMAN: -- and then we can go from there.

THE COURT: And then the invoices would not disagree with the amounts that the debtor agrees are outstanding, I assume?

MS. FEINMAN: I have no idea. I mean, the invoices that I have received are not the same number that is on the monthly operating reports.

THE COURT: I see, okay.

MS. FEINMAN: So to the extent that Mr. Seese disagrees with what's been emailed to the U.S trustee from his professionals, the debtor's professionals, or Bois Shiller, I don't know.

THE COURT: Okay. Thank you.

MS. FEINMAN: I mean, the numbers are different because they're being paid under a cash collateral order versus the actual full number of the invoices.

So, your Honor, I think as the Court is well aware and everybody is pretty much aware, we all understand the operations of the debtor, and I don't want

to belabor those facts. They're included in the motion. They're included in the debtor's response and every pleading that the debtor has filed in this case.

I just want to bring the Court to the following items. Paragraph 5 of the case management summary which is filed by the debtors at ECF 9 states that debtors incurred significant legal fees related to litigation in the state actions, and those were defined as the actions filed by the states of Florida, Pennsylvania, Massachusetts, Ohio, North Carolina, New Jersey and Indiana.

Specifically, the case management summary says, quote, "The debtors commenced these Chapter 11 proceedings to protect and maximize the value of their assets and for the purpose of implementing one or more strategies aimed at alleviating or otherwise minimizing the financial strain of the state actions," close quote. There's no mention about issues with Monroe that caused the filing of the bankruptcy or Good Wood. I'm only -- this is what the debtor filed.

The case management summary also disclosed that the salaries were increased either just prior to the filing -- basically, just prior to the filing of the petition for David Manchester, raising his salary from 200,000 to 250,000, and that was beginning September 1st,

2023, and for Amanda Zachman, whose salary was raised from 150,000 to 200,000 beginning August 1st, 2023, and they are both listed as sales manager.

The schedules were filed on October 31st, 2023, and the 341 occurred on November 7th, 2023. Mr. Mitchell and Ms. Christina Johnson both testified under oath. And as I indicated, the transcript is filed in Adversary Proceeding 23-1211 at ECF 67-four.

The salient information that was testified to at the meeting is, most importantly, the debtors are no longer originating HBA's. All of the financial activities occurred in the PBC Realty case, the main case, that's the 23-17590, and no income or expenses are accounted for separately by any of the other entities.

The schedules at the time stated that the total values of the HBA's were $91 million. But the debtors stated that they believed the value to be closer to a hundred million -- a hundred-twenty million dollars, your Honor. And we found that out -- that that's actually what they now believe because they filed an amendment four-and-a-half months after the case was filed, after the 341 actually. The debtors stated that they believe the HBA's have no liquidation value due to the state actions and the other AG lawsuits. They testified that the business has never been cash flow positive. They

testified there are no unencumbered assets. Further they testified at the meeting that the debtor had 90 employees and over a hundred independent contractors.

The debtors testified that the HBA values that are listed on the schedules -- that are listed as intangible -- or intellectual property, and it's valued at a present value that is completed by some quantative analysis that created a fixed value for these items. But they testified that the valuation provided on the schedules is the net present value for each particular state. And as we know, the HBA's themselves are listed as executory contracts on schedule G of each of the debtors' schedules.

At the 341 it was clear afterwards that the debtor needed to amend their schedules to address several items. It took the debtors until March 19th to file those amended schedules, and that is not -- the parties have been asking for those amendments to be filed. It wasn't just -- we were waiting and waiting and waiting, and they were filed just now.

Only when this Court conducted the hearing on U.S. trustee's motion to extend the bar date on November 29, 2023 did the parties and the Court for the first time learn that not all HBA parties were notified of the bankruptcy proceedings. In fact, there were

approximately 2850 former HBA parties who paid termination fees, but never received notice of the proceedings until the Court ordered the debtors to notify them. The bar date was extended to February 1st, 2024 for all creditors and only for the HBA holders to April 1st, 2024.

Again, this is background, but I think it's important, on October 11th, as this Court is aware, the debtors filed their adversary proceeding against the states seeking the injunctive relief, and on February 7th, 2024, the Court entered an order denying the debtors' attempts to obtain a TRO, a preliminary injunction, and abstain from taking any actions. And that adversary proceeding has now been dismissed.

On December 8th, 2023, MV Realty of North Carolina filed a similar adversary proceeding asking for injunctive relief against the North Carolina Real Estate Commission. After the entry of February 7th, 2024 abstention order in the other proceeding, the debtors -- the parties filed a joint stipulation of dismissal on February 20th, 2024. And as this Court is also aware, the Court has entered several orders holding that the state actions by the AG's are exempt from the automatic stay with the exception of collection of monetary awards.

So the amendments were filed -- to the schedules were filed after the U.S. trustee's motion to

dismiss or convert was set for hearing. They were filed on March 19th and 20th. The amendments added $27 million in HBA values to the MV Realty PBC, which is the Florida HBA, and an additional two million in value to the MV Realty of Ohio. Other amendments included adding officers and directors to the Statement of Financial Affairs and additional arbitration and litigation claims.

One other amendment was, in MV Realty PBC, LLC, the main case, was a change to the treatment -- or the statement of Holland & Knight's claim. So in the original schedules, Holland & Knight, who is the prepetition, I believe, counsel for the debtor, their claim was listed in an undisputed amount, 2.35 million. In the amendment it's now been claimed to be disputed. I note this, because, your Honor, this was filed after the bar date. Holland & Knight has not filed a proof of claim. I'm not sure if Holland & Knight is aware that their claim has now been changed from undisputed to disputed. There's nobody from Holland & Knight that I have found that has filed a notice of appearance in this case.

To date and this is the one part that it's up to -- Mr. Seese can agree or disagree, I have received invoices in excess of $3.3 million in professional fees from all the parties. The debtors' fees in December,

$536,246.50 and expenses at 46,303; committee, the fees requested were 212,556 and expenses of twenty-one eighteen point six-one. In January the debtors' fees were nine-twenty-eight seven-sixty fifty and expenses of $97,421.33. The committee's fee request was for 332,583 and expenses of $3,764.92. The February fees from the debtor were $761,755 and expenses of $136,813.48. The committee's fee request was $241,518, with expenses of $5,983.73. If you add that all up, the debtors total fee invoices that the U.S. trustee has received is $2,226,000 -- $2,226,762 and expense requests of 276,773.16. The committee fee request to date, based on the invoices presented, are $786,657 and expenses of $11,867.23.

Monthly operating reports have been filed, your Honor. I don't need to -- I can refer to the ECF numbers, but they're all in the record. Some of the comments that I would like to address about the reports are this. The ending cash balance as of the February 2024 MOR is $1,000,210 -- $210,968, $1,210,968. On that same report, the outstanding post-petition accounts payable for that same period is $1,377,790, which exceeds the cash on hand. That does not include all of the invoiced fees that I stated previously, so it would be even higher if all those fees were due and payable, total receipts from the

petition date to end of February are $7,168,808.

Pursuant to the testimony at the 341 Meeting, those receipts were derived from the closings of real estate transactions under the HBA's and termination fees, so the harvesting of the HBA's. The total assets should include the value of the HBA's, which, as I stated earlier, the debtor testified as to the present valuation of those. And while the debtors allegedly stated that the values are about a hundred-twenty million, which is also included in the amended schedules, the total assets on the MOR's is in the $64 million range. In the February report, the prepetition unsecured debt somehow declined from 4.7 million in the prior month and in the prior monthly reports to $500,000 in the February report, so I think that might be a typo, but it's a big typo.

THE COURT: I spent sometime with the monthly operating reports. It's only a five-month-old case from that point of view, and I was extremely confused by the change in accounting method --

MS. FEINMAN: Yeah.

THE COURT: -- which as far as I can see is not supported by the instructions to the very form itself --

MS. FEINMAN: That's correct.

THE COURT: -- that the only time that one

should use cash as a reporting basis is if the business used cash as a reporting basis prior to the filing of the case or if I've entered an order, which I certainly didn't do. It made it extremely difficult to compare the data from September -- or excuse me, from December, for example, to February --

MS. FEINMAN: Right.

THE COURT: -- so I think we should -- you might want to address that, perhaps not today. I assume you've been talking with the debtor about this.

MS. FEINMAN: No, your Honor. The debtor did put a note in its January report, right, and you are correct the instructions to the month -- how to prepare those monthly operating reports don't give the debtor the option to just take off the accounts receivable. The debtor did that. So the reports can't be -- and this is part of the problem. There's no rational relationship between what you see on those monthly operating reports to what's in the schedules. We've lost half the value of the HBA's if you just look at the value of what's being listed on the schedules, which is the present value and it's a set value pursuant to debtor's testimony, and what is listed on the monthly operating reports --

THE COURT: Right --

MS. FEINMAN: -- and I want to --

THE COURT: -- but hold on. I mean, you -- on the schedules they might do an analysis, which would not be permitted under GAAP, and so the GAAP number is probably different. So I -- I don't know, I'm not suggesting you're wrong. I'm just suggesting that your argument -- you're unable to even analyze it adequately --

MS. FEINMAN: Correct.

THE COURT: -- right now because I don't know what the current GAAP numbers are.

MS. FEINMAN: Correct, your Honor. And I'm not disagreeing with you, and that is part of the problem in this case. It's all part of the big picture, is nobody knows what's going on. And I want to take that a step further, your Honor.

If the receipts were 7,000 -- $7,168,808 and they're coming from the HBA's, the accounts -- the asset value for that inventory should have declined, but it's only declined by, I think, a nominal amount, maybe a million dollars. So -- and that's all assets. I'm just looking at the total asset number. I didn't even break it down between what's an HBA and what other assets. I mean, I know there's fixed assets, which are the office assets at 80,000. But there's no dollar-for-dollar decline in what the inventory of HBA is versus the cash that's been received if --

THE COURT: I understand. It wouldn't actually be necessarily a dollar-for-dollar decline --

MS. FEINMAN: No.

THE COURT: -- compared to the scheduled value, because the scheduled value of each one --

MS. FEINMAN: Correct.

THE COURT: -- is likely to be a statistical analysis of when the payment will result and the time value until that date. And if it's realized all of the sudden next month, it's going to be a huge difference. But, yes, there should be some reduction.

MS. FEINMAN: Correct, your Honor.

Payments to insiders -- and actually the number is -- the total decline in total assets from the petition date is $758,959. So receipts of seven million, 7.1 million, decline in assets, total assets, 758,000.

THE COURT: And these are receipts based on?

MS. FEINMAN: Harvesting HBA's, your Honor that's what --

THE COURT: No, I don't mean that. Well, Mr. Seese is going to tell us that 450,000 has come from commissions separate from the HBA's, but -- I believe that was the number, but that's not my point.

These are literally cash receipts. When we use the word "receipts," we mean cash. These are not

profit or income, right?

MS. FEINMAN: I took the receipts based on what the -- if you look at the MOR's, it says "receipts," very -- part one, here's your beginning balance --

THE COURT: Right.

MS. FEINMAN: -- these are your receipts --

THE COURT: This is on the new --

MS. FEINMAN: -- these are your disbursements.

THE COURT: -- on the new form itself.

MS. FEINMAN: Correct --

THE COURT: Yes. Okay. Go ahead.

MS. FEINMAN: -- correct, your Honor.

Payments to insiders since the petition date through February is approximately $450,000 --

THE COURT: Salary.

MS. FEINMAN: -- salaries paid out.

THE COURT: Right.

MS. FEINMAN: Employees have declined from 78 to 68. Actually they started at 90 at the testimony at the 341, 80, now to 68. Whether or not the reason behind it -- maybe they are becoming independent contractors, but there is a decline and that means that the salaries have declined, the payroll has declined as well and everything that goes with it. Debtors operated at a net loss for

three of the five-and-a-quarter months that have been reported.

These motions have been pending for some time, your Honor. I've had discussions -- I had discussions with Mr. Seese before the motion was filed. I asked about a plan. He was working on a plan. The plan was filed at two o'clock yesterday, your Honor. It just seems to be along the same lines as the amendments coming four-and-a-half months after the 341.

Your Honor, I think there's sufficient cause to dismiss or convert these cases. Under 1112(b)(4)(A), your Honor, I think that the valuations have no rational when compared to the schedules filed. I think you've raised that issue yourself. There's no explanation on the monthly operating reports, nor should we have to ask for the explanation. It should be there. These are the debtors' reports. This is -- bankruptcy is a land of disclosure, and we shouldn't have to be looking for it.

The debtors have incurred net losses, as I indicated, November, December '23, January 2024. The work force has declined either 15 percent or 24 percent, depending on how you determine what the actual numbers are. Accounts payable have increased to 1.37 million, and that doesn't include the 20 percent of holdback of fees in the amount $322,362 for professionals. Again, we've

talked about the accounts receivable not being listed, because they've changed it to the cash basis.

The overwhelming majority of those accounts payable are related to professional and bankruptcy related fees. In fact, 96.25 percent of the accounts payable listed in the February report is related to professionals or other fees including Epiq, and as I indicated that doesn't include the 20 percent holdback. The average net cash flow through February is about a hundred and ten thousand dollars. The debtors haven't paid Monroe at all during the pendency of these cases.

And with the Court abstaining and sending everything back to the states, the debtors are back to defending the state litigation at the very states, the same place they were when they came into bankruptcy. And post-petition, your Honor, more states have filed complaints against the debtor, including Georgia and California. The fees are going to continue to accrue as this litigation moves forward in the states.

The debtors only source of income is harvesting those HBA's. There's no new business being generated. They are not generating new HBA's. They've testified that they weren't going to do that. Those value of assets are going to decrease, if they aren't decreasing now, as those HBA's are either monetized through the

debtor actually doing the closing or receiving the termination fee. Your Honor, that is a diminution in value.

Now, the question to the issue, is whether this debtor is actually reorganizing or rehabilitating. 1112(b)(4) talks about rehabilitation. It doesn't talk about reorganization. But in this case, your Honor, the debtor is winding down. The debtor is not reorganizing. It may not be in year one; it may not be in year ten, although, the projections that were attached to the disclosure statement I think were for ten years. But in time this business is going to cease operations. It may be sooner if the AG's were all successful, and that may change -- and that changes the value of what the debtors' assets are, your Honor.

Courts have defined rehabilitation as the reestablishment of a business operation, your Honor. I've included cites in my argument in my motion. These debtors will never be put back in good condition or reestablish operations on a sound basis. They are just going to continue operating -- monetizing those HBA's.

The debtors indicate that the plan will propose the debtors will continue to either receive money by obtaining a refund, and I think you've read -- if you've read the plan, I read it briefly. The plan

provides -- it gives a short period of time for the HBA holders to either return the money they received, and they all walk away, I think it's hundred-twenty days, or they can ask the debtor, through a committee, to deem it void for various reasons, and if the committee of people decide that they are not voidable, they're not going to avoid -- they're not going to agree to that, well, the time to return the $1,000 is passed, and then the only option is to do arbitration, where they both split the fees.

THE COURT: I thought if the special committee denied the request that there was still an opportunity -- although, I don't know what the number is. There isn't? I thought it was set up so that --

MS. FEINMAN: I didn't see that.

THE COURT: -- yes, I think there is. There's still an opportunity to exercise the cash payment, although it doesn't say what that is --

MS. FEINMAN: Right.

THE COURT: -- it says it will be provided independently.

MS. FEINMAN: There's lot of empty or questionable -- it raises more questions, your Honor. But at the end of day, if a party even understands that, which I'm not speaking for them, I can only tell you that I've received 500-plus phone calls, people don't understand

even what this is about, they're certainly not going to understand what an arbitration is, and I have no idea whether they could even afford to repay the money that they received. So these parties -- we're not talking about the plan, but that is what the plan is about.

But at the end of the day, your Honor, this is not a reorganization. This is just a continuation. I think 11 -- as I indicated, I think 1112(b)(4)(A) is met, but more importantly, your Honor, I think the dismissal or conversion of this case is in the best interest of the creditors and the estates, and that includes these HBA holders who are here as well. There is no intention to restart the business. As I said, I don't want to keep repeating what the source of income is.

The Court was very clear in its opinion when it abstained from the state court litigation, and I felt that that statement that you made in your opinion was very, very on point. The debtors want this Court to bless their ongoing reliance on the HBA's to collect from the homeowners, forcing the states to continue litigation while their citizens suffer. That is a quote from your opinion.

It's not in the best interest of the HBA holders to keep these cases in Chapter 11. We've -- these parties are confused. They think they may lose their

homes, your Honor. They don't understand why they are receiving notices. They don't even understand if they owe money or if they're owed money. And I think the Court just need to ultimately determine whether or not this place, the Bankruptcy Court, is the right place to force an HBA holder to come up with money they don't likely have, within a certain period of time, to get out of this contract that they likely didn't understand to begin with, or pay a hefty termination fee or liquidation damages if they sell their home without using MV Realty, money they probably also can't afford to give up, because they are selling their home. Whether they need to wait the 40-year period out or until the debtors decide that the cost benefit no longer exists to continue operating and then hope and pray the clouds on their titles are cleaned up or whether they should just -- whether this Court should just let all of this go back to the states and let the states do what they need to do with respect to these HBA's. At the end of day, your Honor, the HBA holders are the pawns in this bankruptcy case. They have no control over what happens, either here or in the state court, but staying in Chapter 11 certainly doesn't appear to be in their best interests.

Your Honor, the secured creditors will likely not see a sufficient recovery either. If you

looked at the projections, they are not very -- it's not -- quite a long time for creditors to get paid. While the debtors have scheduled unsecured claims in the amount that they did, I wanted to note and I think the Court is aware HUD filed proofs of claim in excess of $80 million, in not only the main case, but each of the subsidiaries.

THE COURT: Who filed that?

MS. FEINMAN: HUD, Housing --

THE COURT: HUD, okay.

MS. FEINMAN: Right.

If this is a valid claim, any percentage of recovery to the unsecured will be reduced that much more. I think, your Honor, at the end of day the Court has wide discretion to determine whether cause exists or to dismiss or convert this case to Chapter 7. The U.S. trustee submits that it is in the best interest of the creditors and these estates to dismiss or convert this case.

THE COURT: Let's talk about that for a minute.

MS. FEINMAN: Mm-hmm.

THE COURT: So, you know, the initial standard is cause, and 1112(b) has a nonexclusive list.

MS. FEINMAN: Mm-hmm.

THE COURT: You've pointed to a specific one, (b)(4)(A), which is substantial or continuing loss or

diminution to the estate in absence of a reasonable possibility of rehabilitation. I may have paraphrased slightly.

MS. FEINMAN: Likelihood, yeah.

THE COURT: Right.

But it seems that your other argument, I know you mentioned multiple times in the best interest of parties in interest, that's the standard that happens next if there is cause. But it seems to me that part of your argument is not a specifically listed item. It is, essentially, that the purpose of the case is not consistent with the goals of Bankruptcy Code and the bankruptcy system.

MS. FEINMAN: Well, your Honor, that is correct. I -- you know, and some of that comes up in 1129, and I'm not here to argue whether a plan is confirmable as well.

THE COURT: Well, unfortunately, there's a little bit of a gray area in addressing (b)(4)(A). We do have a plan. That doesn't mean I evaluate only that plan. It also doesn't mean whether I fully evaluate that plan. The question is a little bit amorphous than that, and that is what can these debtors -- and I want to focus everybody on the fact that I think it's 36 -- I may have the wrong number. Is it more than 36?

MS. FEINMAN: Thirty-six.

THE COURT: No, it's 36. That it's 36 debtors, and while they are jointly administered, they are not consolidated. So I still have 36 separate debtors.

Let's go back to the rehabilitation argument, perhaps this is not the best comparison, and I'm curious about your thoughts, and there was no motion to dismiss in this case I'm about to mention, but I did have, for example, a viatical case, viatical --

UNIDENTIFIED SPEAKER: Is that me?

THE COURT: -- viatical entities obviously --

UNIDENTIFIED SPEAKER: Sound -- (inaudible.)

THE COURT: -- can't be -- let me just mute that person.

Viatical entities obviously can't be formed in the United States, and they can't be marketed in the United States, and so this was -- well, they can be formed. They can't be marketed in the United States, and all of the investors were abroad. The plan provided for a wind down of the trust without the purchase of any new life insurance policies over a period of time.

Is that an inappropriate use of Chapter 11? If there had been a motion under 1112(b)(4)(A), would I have been required to dismiss it? Maybe the answer is,

it's unclear whether there was a substantial or continuing loss. I will tell you there was.

MS. FEINMAN: Right.

THE COURT: They had to borrow more money --

MS. FEINMAN: Right, and --

THE COURT: -- in order to -- right.

MS. FEINMAN: -- right. And I think there is a difference. I think you can have a liquidation under Chapter 11. It happens all the time. We see liquidation plans all the time. But if a motion is filed under 1112(b)(4)(A), I think it does cut -- the rehabilitation then becomes an issue. It doesn't mean that you have to look at it every time you have a case, but I think if the motion to dismiss or convert is presented under (b)(4)(A), then I think the Court does need to consider what does rehabilitation mean.

THE COURT: But certainly the debtor is not required to continue the business which it had prepetition necessarily.

MS. FEINMAN: No.

THE COURT: I can think of -- I'm really aging myself now, but I can think of one of the first cases I worked on, Wayne Laboratories, where the result of the case was a dramatically different, much, much smaller services company. So they shed not just their utter skin,

but almost everything, really.

Here your concern is that it looks like a liquidation? I know I'm getting a little bit into the committee's argument.

MS. FEINMAN: Right. So what I'm looking at is a plan that doesn't say the debtor is going to start a new business. It's not. It says it's not. Otherwise it would be in the disclosure statement, "Yes, we're going to open up this branch and we're going to do this, we're going do" -- no. The debtor truly is going to just harvest these HBA's. That's all it is.

THE COURT: If it were a real estate investment company with a limited pool -- for example, a single development and their goal was to simply -- we're going to stop building. Let's say it Abacoa in Jupiter --

MS. FEINMAN: Mm-hmm.

THE COURT: -- we're going to stop building, we're just going to sell off the properties that we have currently under development and what's left, that would be a problem under (b)(4)(A)?

MS. FEINMAN: If somebody filed a motion and the Court believed that it was, again, not -- if the Court believed that it was in the best interest of the parties --

THE COURT: And accompanied by substantial

or continuing loss, et cetera.

MS. FEINMAN: Right, right, all of that, then, yes, I think the Court would need to consider that.

I think this is a situation that is different because what they're harvesting -- it's what they're harvesting. And I think that that becomes the issue. And I am not -- your Honor, with all due respect, I'm not getting up here to say that these HBA's are legal, illegal. I'm not -- I have no position on that. That is for the state AG's to determine.

My concern, your Honor, is that to continue to allow this debtor to continue in bankruptcy, while the state litigation is going on, the AG's who are arguing this very issue and creating a plan that says, "We're going to continue to harvest, and we're going to give them these options to repay us, and if they don't do A, B, C, then they are irretrievably bound to this agreement," is that appropriate? And like I said, that's not in the best -- I don't think that's in the best interest of the parties.

THE COURT: Is it your belief that confirmation of the plan that has been filed would eliminate the possibility of any of the existing state actions, one of them is a federal court action, I believe, any of the existing state actions or future, to, for

example, invalidate the agreements, seek restitution, et cetera?

MS. FEINMAN: Your Honor, with all due respect, I received the plan at 2:30 yesterday afternoon. I cannot speak to that, and I don't know if any of the state AG's can opine on that either, because it's -- they literally -- it's just been --

THE COURT: I don't --

MS. FEINMAN: -- filed 24 hours ago.

THE COURT: The problem is that much of the relief requested in the complaints that I have read, and I think there's one that I have not read, the nature of the relief, the primary relief, is not something that's a claim under section 101.

Also it seems amorphous to suggest that an action would not be subject to the stay, except with regard to collection of a claim, and then say that confirmation of a plan would prevent any of that relief from happening. I don't think that's what Mr. Seese is going to tell me they are up to in connection with the plan that he filed, but I might be wrong.

Anything else you wish to address on that?

MS. FEINMAN: No, your Honor.

THE COURT: Mr. Seese, would you like to wait until the end or go twice?

MR. SEESE: Your Honor, I think I would rather go twice.

THE COURT: Fine, yep.

MR. SEESE: I think it would be easier.

THE COURT: Does anybody need a break? Does anybody need a break?

MR. SEESE: Anyone need a break?

THE COURT: No.

All right. Go ahead.

MR. SEESE: Your Honor -- thank you very much, your Honor.

THE COURT: Sure.

MR. SEESE: What I would like to do, your Honor, as a matter of presentation is, I'm going to address -- start with the legal part of it, and then I'm going to go back and address the points that have been raised by the United States trustee in the motion, and then respond to a lot of new points that have been raised for the first time today. Many of the arguments that have been made by Ms. Feinman do not appear in her motion to dismiss, and so on the fly I'm going to respond to those. And that's kinda why when you invited, do I want to go now or wait, I'd rather address it while it's fresh in my head.

THE COURT: Go ahead.

MR. SEESE: So, your Honor, Section 1112(b) governs dismissal or conversion of Chapter 11 cases for cause as your Honor has noted. There is no particular test, and while 1112(b) sets forth an enumerated list of factors, the decision as to whether cause exists is not determined by one of those factors. It is rather the totality of the circumstances that matters.

THE COURT: Well, if you prove one of those factors, isn't that cause under 1112(b)?

MR. SEESE: Well --

THE COURT: I think it is. The totality of the circumstances is the better argument that you would make in response to the committee's motion to dismiss based on bad faith filing, which is definitely a totality of the --

MR. SEESE: Your Honor, I'm not --

THE COURT: Right.

MR. SEESE: Sorry, I didn't mean to interrupt.

THE COURT: But if, for example, failure to comply with an order of the court is one of the those subsections, if you fail to comply with an order of the court, that is cause, and then I go to the next step.

MR. SEESE: But, your Honor, I think in response, and I'll reserve rights in the event that we're

going to have an opportunity to brief this more fully, which I hope, but, for example, if your Honor says that one of the factors under 1112 is failure to comply with a court order --

THE COURT: Or failure to file a plan by a deadline.

MR. SEESE: Well, that's different.

THE COURT: No, it's not. If I establish a hard deadline to file a plan, it is actually one of the enumerated --

MR. SEESE: Well, I think --

THE COURT: -- provisions.

MR. SEESE: -- I think that's different. I do. Because if I don't comply with a court order that provides that a plan deadline be filed, then that's one thing.

What I was doing from a demonstration standpoint is if your order compelled the production of documents, and we believed reasonably that we produced all the documents that were responsive to the request in compliance with that order, and it turned out that we inadvertently did not, technically speaking we did not comply with that court order, but I think that's why the totality of the circumstances -- because I think your Honor respectfully has -- I don't want to say an

"obligation" to your Honor, but I think the relevant circumstances surrounding the noncompliance are relevant.

THE COURT: There's -- there is a burden shifting provision in 1112 --

MR. SEESE: Right.

THE COURT: -- that allows the debtor to explain --

MR. SEESE: Correct.

THE COURT: -- what the unusual circumstances are that would merit the court not dismissing or converting in that instance.

MR. SEESE: Understood, your Honor.

THE COURT: Right. But I'm just saying, congress has set up this system, is there cause? These are not factors. They are each independent bases. So the U.S. trustee argued under (b)(4)(A). There are actually two components to (b)(4)(A), and so if that's proven, then there's cause, and the burden shifts back to the debtors to explain what circumstances would negate the determination to -- and then if the debtor doesn't meet that burden, then we get to the weighing of conversion or dismissal.

MR. SEESE: Understood, your Honor.

THE COURT: Unfortunately, I've done this too many times.

MR. SEESE: And, your Honor, I have tremendous respect for you, as you know.

THE COURT: Yeah.

MR. SEESE: So if it's 1112(b)(4) and it is a continuing loss or diminution in the estate or an inability to rehabilitate --

THE COURT: Has to be both.

MR. SEESE: -- we would love the opportunity to respond to that and put forth evidence that would dispute that or refute that allegation.

But, again, your Honor, 1112(b) sets forth the factors. We can argue another day as to whether -- but I'll accept if there's one, we have a opportunity to respond, et cetera, et cetera.

And then the committee has mentioned a bad faith filing, and then I think you get to the Phoenix Piccadilly factors in the Eleventh Circuit and --

THE COURT: That's not the only applicable standard.

MR. SEESE: Understood, it's not the only one, your Honor. But it is the seminal case in this circuit --

THE COURT: For single asset cases, yes.

MR. SEESE: But it has been applied in cases that aren't single asset real estate cases as well. So,

your Honor, we think when we have an opportunity to present evidence to refute these factors that there is not cause to either dismiss or convert the case.

But even so, your Honor, taking a step back, what is in the best interest of the creditors. Well, that depends on who the creditors are. Ms. Feinman argues the case as though the HBA parties and the states are the only creditors in the case. Only six states have filed proofs of claims in the case. And while about two weeks ago there were 691 claims filed by HBA parties, only a hundred and twenty-five of those claims based on our estimate were filed by parties who actually paid money to the debtors. And if you take into account a termination fee, which is the three percent at the median value of the home, you're talking about damages of less than a million and half dollars.

So aside from that, though, we have 118 other creditors that are owed between 50 and $60 million, some of which had commenced collection actions prior to the bankruptcy case. We also have two secured creditors who are collectively owed $50 million and who have not been paid since early 2023. And Monroe had issued a written notice of default with the full reservation of rights, and as I mentioned in our response, the parties executed a stock pledge agreement, as well as a security

agreement, and there were serious concerns under New York law, which applies to these loan documents, as to whether Monroe could exercise its rights under the pledge agreement and exercise those rights to the detriment of all other creditors without further notice to the debtors. And so that was one of the major precipitating events to this bankruptcy.

Yes, your Honor, I'm not going to stand here and sound foolish by suggesting that the state litigation was not one of precipitating factors. The debtors were spending on average $800,000 a month in attorney's fee. But guess what, to avail yourself of the automatic stay is not, per se, evidence of a lack of a good faith filing. In fact, there's case law that would suggest to the contrary, that availing yourself of the automatic stay because of litigation is an appropriate means for filing bankruptcy, appropriate reason. But if this were a two-party dispute and it was only the states and only the debtors, maybe the argument of the United States trustee would have more merit. But there is a whole other group of parties that have an interest in the outcome of this bankruptcy case.

I'm going to go a little bit off topic here, and I'm going to talk about the litigation. The debtors operate in approximately 32 states. There are nine states

that have filed litigation, seven or eight of which were very active during this bankruptcy case. In the other states they have not commenced litigation, in the 23 other states. Even if we lose in the primary states, the nine states, the debtor can still reorganize. And your Honor brought up a very good hypothetical, which is one that I alluded to in my response, and that is if a debtor's business, a developer's business, was building apartment buildings and managing those properties, collecting rents, paying operating expenses, and they stop developing properties, and instead just managed the properties, collect rent, service the properties, that is still a business operation. That's exactly what we have here. The debtor's management acted responsibly.

When the State of Florida commenced litigation at the end of 2022, they immediately made a decision to cease originating HBA's, not just in Florida, but across the board, until the outcome of that litigation was determined.

And I would also backup one step further because a lot of people may not be aware, this debtor hired a renown national law firm for purposes of representing its interests in connection with this program. They also hired local counsel in each of the jurisdictions to opine and weigh in on this business.

These debtors also met with many, I think more than 20, state attorneys general, where they discussed this program, including the term of the agreement, the fact that memoranda would be recorded and the termination fee and received no pushback. I know that's not a signoff on the program, but nobody objected to it. And so the debtors then rolled out the program. They raised over a hundred million dollars in financing and equity financing and implemented the program, and then, like that, started to be investigated. And then they got sued by the State of Florida. So that's when they stopped issuing the HBA's. The U.S. trustee relies upon the cessation of originating HBA's as something bad. It's not. It was something good.

Now, let me address, your Honor, some of the factors under 1112(b). First, we dispute that there's a substantial or continuing loss or diminution of the estate. If we have an opportunity to present evidence, we would call our accounting person and possibly another individual from the company that would explain why, as you're collecting under HBA's, why the values aren't being reduced accordingly. It's because of the way they're booked. The book -- they're booked at what we pay the consumer at the beginning of the case, plus the commissions, plus the out-of-pockets, the recording fees

and so forth, which was one of the reason -- and I hear what your Honor says about switching from accrual to cash.

That was one of the reasons why we did it. We had incurred over a million-two in expenses that, like depreciation and amortization, were not actual cash outlays. These were expenses that were incurred years ago when the HBA was originated, but recorded at the time the transaction event occurs. And so it gives the appearance that we had a million-two in expenses during the bankruptcy when we did not, and it skewed the numbers tremendously. And, in fact, we had received calls, in fact, from -- one state had reached out regarding confusion over the MOR's and how things were reported and so forth. And so a decision was made internally -- I apologize if that was not appropriate the way we did it, but a decision was made to report it on cash, so it would show the actual results, cash in, cash out, and then you could factor into that the accounts payable. When you --

THE COURT: Right. I don't want a big sideshow on this issue --

MR. SEESE: Okay.

THE COURT: -- today.

MR. SEESE: Sure.

THE COURT: But that -- the debtor should not have done that. The U.S. trustee guidelines, which

were updated just last year, by the way, require that you maintain GAAP if you had a prepetition GAAP presentation, and the way to deal with that is augment the reporting with further cash flow analysis, so that people can see what's happening. But right now, you know, what entities -- the only type of entity I can think of that would normally account on a cash basis would be -- I can't think of one, a law firm?

UNIDENTIFIED SPEAKER: Restaurant.

THE COURT: What's that?

UNIDENTIFIED SPEAKER: A restaurant.

THE COURT: A restaurant, exactly, and so it becomes very confusing. Is it possible to have a cash based balance sheet, for example? Yes, of course. But in this business, it doesn't make a heck of a lot of sense. So I look at the documents, and it's actually very confusing, and there's no way to compare December to January really.

MR. SEESE: We have provided retroactive -- I think it was filed as part of one of the MOR's. We had provided retroactive back to the petition date on a cash basis, on a monthly basis, to make it easier to understand, and I would note that we did notes to the MOR's in which we explained this. And while the United States trustee raised this issue today, never before was

the issue raised. There was no objection. There was --

THE COURT: Well, I was raising the issue actually. I don't think Ms. Feinman mentioned it. It was as a result of my review and preparation for today's hearing, and then I realized how confusing it was.

MR. SEESE: But, your Honor, we reported it, we noted, we disclosed --

THE COURT: Yes, I saw.

MR. SEESE: -- and nobody said anything. So, again, I apologize.

THE COURT: Right.

MR. SEESE: So we dispute that there's substantial or continuing loss or diminution of the estate, and we think the evidence will fully support that.

Second, we do believe that there's a reasonable likelihood of reorganizing. This case has been pending for approximately six months, involves 36 related debtors, and we all know what has been going on with the state litigation and the adversary proceeding. It has been a tremendous amount of work during that three-month period, and we have prepared what we think is a good faith plan of reorganization and disclosure statement. We spent a tremendous amount of time on it and tried to put forth best what we could.

And we do think that the plan of

reorganization provides distributions for unsecured creditors that would not otherwise exist outside of a bankruptcy, that includes HBA parties, who may have filed a proof of claim in the bankruptcy. It provides for Monroe and Good Wood to be paid off within ten years. And, more importantly, it implements and adopts the HBA program, which provides every HBA party an opportunity to rescind the HBA agreement for cause, without having to pay anything, and if there's no cause, for simply returning the money that was paid at the inception of the contract without interest.

And the committee that we established includes an independent member that will be selected by the Court, by the committee, and it provides for them to review. It also provides that that 120-day option period can be extended by vote of the -- by the review committee. And so -- and that is afforded -- there's been a lot of talk in this case about access to justice and HBA parties not having an opportunity to file a proof of claim because they didn't understand the process. And, candidly, you know, in fairness to these HBA parties, I represent a lot of Chapter 11 debtors over the years, and I've had businesses, where other businesses have contacted me and there was confusion how to file a proof of claim, why they received a notice in the bankruptcy. It certainly isn't

limited to this case because of the involvement of consumers. I've had this in nonconsumer cases too. But what we tried to do was come up with this HBA program, and that right is afforded to the HBA parties regardless of whether they filed a proof of claim. So it is being offered to every single HBA party under an active HBA, which we think is a substantial benefit to the HBA parties. We also -- again, your Honor, I think there is substantial benefit to being afforded an opportunity to going forward with confirmation. We're not seeking third-party releases.

To answer or respond to a question that your Honor raised, we're not seeking to stop the litigation in the state courts. That has been one of big internal topics, how are the states being harmed by us being given an opportunity to go forward with a confirmation process? Your Honor has already determined that the automatic stay doesn't apply. We acknowledge that it was a police and regulatory power. The litigation is pursuing, and the only limitation, the only limitation, that your Honor imposed upon that was if you got a claim, you have to come back here and assert a claim, and then that would be treated in connection with the Chapter 11 process. So we're not stopping the state litigation. The only impact that that litigation will have on these debtors, even on a

reorganized basis, is if we lose those HBA's.

And, your Honor, we're not talking about a long time here. There's a hearing -- my colleagues at Saul Ewing are at a hearing this afternoon that started at 1:30 involving the Florida state litigation on the motion for partial summary judgment as to the retroactivity of the newly enacted Florida statute, it's retroactive affect on these HBA's. My understanding is the hearing on the preliminary injunction for Florida is set at the end of this month, I think in three weeks or so. And then it's my understanding that trials are set in the remaining litigation within the year. So we're not talking about a large delay here. But we're also talking about nine states, and in some of those states there's a relative nominal amount of HBA's. In the other states, there are HBA's that will fund this organization on a go-forward basis, afford distributions to creditors.

Under the plan there's a lockbox mechanism where all collections run through a lockbox that is set up with the consent of the secured lenders. There is a budget that is approved by the board. A new board is being constituted which includes an independent member that has decision making authority on major decisions, such as settlement of litigation, hiring new counsel, approving a budget. So we tried to draft this plan in a

manner that was insightful and fair to the parties. We're not impacting the states. We're not stopping the litigation. We're affording every HBA party, regardless if they filed a proof of claim, an opportunity to rescind the agreement, and we have this independent board that's being committed and an independent review committee to deal with the HBA's, with a provision that it could be extended. We think that is a substantial benefit that doesn't exist outside of Chapter 11.

Going on with the factors under --

THE COURT: I have two questions about --

MR. SEESE: Yes your Honor.

THE COURT: -- the plan.

MR. SEESE: Yes, sir.

THE COURT: I don't want to focus too much on the plan. I did look at it yesterday --

MR. SEESE: Thank you, your Honor.

THE COURT: -- but a couple things. One, why did you not include the concept of the amount to be offered to each of the HBA holders? It's not in there. There's no -- it doesn't say return of the amount paid. It leaves it open. Is there a reason?

MR. SEESE: Are you talking in the cash flow projections?

THE COURT: No, in the plan itself. It

actually -- the description of the program does not talk about how much would be offered.

MR. SEESE: It says the amount that we paid them at the inception of the --

THE COURT: It does?

MR. SEESE: Yep --

THE COURT: Okay --

MR. SEESE: -- yeah, absolutely.

THE COURT: -- I didn't see that.

MR. SEESE: It does, your Honor.

THE COURT: Is there a concept of substantive consolidation in the plan? I notice there's voting independently.

MR. SEESE: Yeah, your Honor, that's a great point that you raise. And we've raised -- we've thought about that a lot, and here's the reason why we didn't do that. Because if you have --

THE COURT: Well, I can see why you didn't do it. I'm just asking, it's not there?

MR. SEESE: No, no, no, we were --

THE COURT: Okay. Thank you.

MR. SEESE: -- not seeking substantive consolidation under the plan.

THE COURT: It's the administrative combination of 36 separate plans.

MR. SEESE: Correct, your Honor.

THE COURT: Okay. Thank you.

MR. SEESE: Correct, your Honor, yes.

Next there's never been any suggestion of mismanagement, let alone gross mismanagement.

THE COURT: Right, I saw how you treated this in your response. These are not factors. They are independent bases under subsection (4), so you don't have to say there's not gross mismanagement, because no one has alleged there was gross mismanagement.

MR. SEESE: Okay.

THE COURT: Okay. So that's the point I'm trying to make. The way 1112 -- and I'll say this also for --

MR. SEESE: I understand.

THE COURT: -- the individuals who are here. I have two different groups that have asked -- two different parties that have asked to either dismiss the bankruptcy completely. The bankruptcy would go away. It's as though it was never filed except for the very large cost in the meantime. The other would be to convert the case, meaning a trustee would be appointed. That's a person who takes charge of the entire company, in this case 36 companies, to decide what will happen going forward. Ms. Feinman is not a bankruptcy trustee. She's

the assistant United States trustee. Here that is an arm of the Justice Department that has the right to appear in all bankruptcy cases.

So what I am asked to do first is determine whether there is cause under the Bankruptcy Code. There's whole list of things that can be cause and the U.S. trustee, for example, has argued one specific one of them, which is there's a great reduction in assets or money and the debtor cannot rehabilitate. I'm just paraphrasing. If -- and the committee of the homeowner benefit agreement holders is going to argue in a few moments that there's a separate basis, lack of good faith, which is not specifically listed in the statute, but is still a potential basis for dismissal.

If there is cause then the debtor has to explain why, in spite of cause, I should not dismiss or convert, and there's an extremely complicated standard that has multiple steps in order for the debtor to prove that. If the debtor is unable to respond, then I have cause, and there aren't special circumstances, and then I have to decide whether the case will be dismissed or converted, assuming all those things happen. And then the standard is, what's in the best interest of creditors and the estate. So this is a multistep process.

So going back to your response, your

response went through every single subsection of 1112(b)(4) --

MR. SEESE: Yes.

THE COURT: -- you don't have to prove all of those. You only have to disprove, I'm pretty sure, (4)(a), maybe something else, for the U.S. trustee, and whatever the U.S. trustee argued, plus lack of good faith in the committee. But I'm sure I'll hear from the committee counsel in a few minutes.

MR. SEESE: And I hear your Honor loud and clear. I will -- I addressed the issue of continuing loss and diminution and the ability to reorganize or rehabilitate.

I'd only point out one thing on the basis of rehabilitation or the point of rehabilitation, excuse me, your Honor, and that is these honors -- these honors -- sorry, these debtors, big difference, stopped originating HBA's back at the end of 2022. So from the end of '22 up until the filing of this case in September of 2023, they were operating the business without originating HBA's. So that when it went into Chapter 11, they effectively were operating as they were operating prepetition, and so we dispute the fact that they are liquidating.

But as your Honor correctly noted under 1129(a)(11), it clearly provides that a plan of

reorganization can be confirmed without the need for further reorganization or liquidation, unless the plan contemplates liquidation, and our plan does contemplate, even though we dispute we're liquidating, because you're going to have 68 employees that are going to be continuing to serve the portfolio. You have agents that are going to continue to list the properties. So there is -- make no mistake about it, there's an operation there. The operation has changed prepetition, carrying over to the petition date, because we're just not originating HBA's. And so I think that that factor cannot be sustained. I just don't.

And on the last point of rehabilitation, the United States trustee cites a case in support of that point, but that case is hugely differentiated from this case. In that case the debtor failed to file monthly operating reports, allowed insurance to lapse, was not paying post-petition taxes, and there was one other thing that the debtor was --

THE COURT: So far you've given three different bases for cause.

MR. SEESE: Yeah, so we -- we dispute that there is cause under 1112(b)(4)(A). The U.S. trustee's argument is primarily financially based.

And I think we should -- your Honor, asked

me about -- or asked us both what evidence. I think that there will be evidence, heavily related on the financials in opposition to the motion to dismiss under 1112(b)(4)(A).

And so the committee is the one that raised bad faith filing, so I will reserve until they go, but what I'd like to do at this point, your Honor, is I'd like to go through each of the additional points, according to my notes, that the U.S. trustee has raised.

The U.S. trustee raised the issue of the case management summary as well as -- in which she said -- first of all, the case management summary is not mentioned in the motion to dismiss. I'm hearing about that today for the first time. Although she does reference --

THE COURT: I think it was quoted.

MS. FEINMAN: It was quoted, your Honor.

MR. SEESE: I'm sorry, did I not --

THE COURT: I'm pretty sure she read the part that was quoted in the U.S. trustee's motion.

MS. FEINMAN: Your Honor, it's on page 3 of my motion.

THE COURT: Just respond to it, rather than argue. I'm pretty sure it's there.

MR. SEESE: It says according's to the -- mismanagement -- was founded in 2014 as a real estate

brokerage in the fall 2018 --

MS. FEINMAN: It's paragraph 11 --

MR. SEESE: -- commenced the HBA -- okay.

MS. FEINMAN: -- the very last sentence.

MR. SEESE: Okay. Subject -- telemarketing -- well, there's no question that the bankruptcy was filed to protect and maximize value of assets.

THE COURT: But that isn't the quote, though.

MR. SEESE: Not -- well, that's part of it. Not only to -- in response to the state litigation, which we think was appropriate, but also because of other things that occurred prepetition.

As far as the amendments, let me touch on that briefly because those were raised. The U.S. trustee alleges that we did not disclose the officers and directors in response to the Statement of Financial Affairs, No. 28. However, the directors were all disclosed on the petition in the resolutions that were attached as an exhibit to the petition. We also disclosed all of the insiders, including the compensation that they received in the year leading up to the bankruptcy, and they were also disclosed on the case management summary, as far as the compensation that was received. There was

nothing that we were attempting to hide or conceal. It was an inadvertent omission.

As far as the HBA value for MV Ohio, on the schedules it said "294,000." The actual value was 2,294,000. There was an error in putting the number into the software.

We did amend question 16 of the Statement of Financial Affairs to disclose the privacy policy and the types of personally identifiable information that we retain and the policy. But, again, that's no secret to anybody. The states have been investigating for years.

And then we also -- we added an unsecured creditor who had already filed a proof of claim in the case, and there was confusion on behalf of the debtors because the claim arose from a settlement agreement that wasn't supposed to commence until after the bankruptcy, and so there was some confusion there. Nothing nefarious there.

The U.S. trustee also raised an issue with respect to the nondisclosure of the HBA parties that had paid fees to the debtor, whether it's a termination fee or a commission. Honestly, your Honor, those were not disclosed because the HBA's were done. The properties were sold, and there was not even consideration of there being a claim. When it was raised during the hearing, I

think on November 23rd or November 28th, we did not oppose an extension of the claims bar deadline for those folks, and the debtors paid for the service of that, and so -- and at the time it was raised during the November 29th hearing, although not expressly stated in the motion, there was no allegation of any nefarious intent in not including those people as part of the bankruptcy.

Let me go through the other points that were raised. I think the confusion as far as the net present value -- and I don't have the people with me today, because this was scheduled for non-evidentiary, ten minutes, but the net present value, I think that 90 million relates to the Monroe portfolio. But there's also a net present value to the Good Wood portfolio, because we report those separately.

Let's see, I'm just going through my notes. The U.S. trustee mentioned the dismissal of the claim against North Carolina Real Estate Commission. That was initiated by us. That was not a dismissal order that was entered by your Honor. We contacted counsel and said, "In light of the dismissal of the primary adversary in the case, you know, would you enter into a stipulation of dismissal," and we did.

There was mention of debtors' counsel's fees of $2.2 million. My fees have been 350,000 over the

six-month period. Most of those fees, I think it's 1.7 million, have been incurred by Saul Ewing, who is the special litigation. And quite candidly, your Honor, those fees likely would have been much higher if it wasn't in the Chapter 11, because as a result of the adversary proceeding, albeit that was dismissed, we were able to conduct a tremendous amount of discovery over a very short period of time, and it is not likely that that discovery will be materially duplicated in the individual state actions. So we believe the fees would have been less. If we were back in the state court litigation, there would have been discovery conducted in each of those matters, and so we think, even though the fees are what they are, it was incurred in connection with the litigation.

Again, there was the allegation that the companies have lost money throughout this Chapter 11. It's not true. We have operated -- I know you don't want to get into this, and we'll save it for another day --

THE COURT: No, I do. Actually that is --

MR. SEESE: -- but on a --

THE COURT: -- that is -- let me just point out, that is one of the two prongs --

MR. SEESE: Yes, your Honor.

THE COURT: -- of (b)(4)(A). So you're saying there hasn't been substantial --

MR. SEESE: No --

THE COURT: -- and continuing loss.

MR. SEESE: -- the companies have been cash flow positive during the period -- through February 29th, 2024, and they've operated at a net profit of approximately $650,000 through February 29th, '24. We do agree with the United States trustee that they operated at a loss in the month of January, but the month of January was the single highest month for attorneys' fees, much of which was incurred by Saul Ewing. I think over $800,000 incurred in connection with preparing for the hearing that was scheduled to go forward on February 12th. So one month loss, cumulative profit, $650,000.

And coincidentally, your Honor, although the United States trustee points to the fees that have been incurred in this case, I think it's relevant to the ability to rehabilitate and the ability to reorganize. Because post-confirmation, you're not going to have my fees. I was in the budget for $75,000 a month. I've been every month less than that, but my firm was in there for $75,000 a month. The CRO was in there for $25,000 a month. Committee counsel was in there for $50,000 a month. That alone is $150,000 a month, at six months is $900,000. At the $650,000 net profit, on a cash basis, you're talking about a million-five-fifty of net profit

over a six-month period in the bankruptcy when you take out the nonrecurring administrative costs that won't be experienced post-confirmation.

There was mention about the employees being reduced from 80 to 68. I'm confounded somewhat by the allegation, as though there's something wrong with that. A debtor is supposed to look at his expenses during a Chapter 11, and the reduction from 80 to 68 was on a net basis. We actually -- six of those 12 moved over to being 1099's. They were agents, and we hired one new person. So the net reduction was 12, but six of those were converted to 1099 folks, not W-2 employees.

There was also mention that the plan was filed on April 2nd, as though that's a bad thing. Again, this case has been pending for six months, maybe a little bit less, around six months, let's say, and we had the plan on April 2nd. This is a case involving 36 related debtors, complex issues in the case. We have probably responded to 50 or 75 motions for relief from stay. We had two adversary proceedings. We had an adversary proceeding involving eight state defendants. And by the way, the claims bar deadline just closed on April 1st, and we filed the plan on April 2nd. So I think filing the plan when we did is a positive for these debtors, certainly not a negative. And if we are -- if your Honor

affords us an opportunity to go along with a confirmation process, and hopefully that's the track we're on, I've seen other cases and have been involved in other cases where motions to dismiss or convert have been filed, they've been rolled over to coincide with the disclosure statement hearing, with confirmation, to ride out the confirmation process.

Now that this plan has been filed, I think we are certainly on the right track. Maybe now we can have some discussions with the committee, address any concerns that the U.S. trustee's office has, but that plan is filed.

THE COURT: Was there input from the committee of HBA parties --

MR. SEESE: Your Honor, there's --

THE COURT: -- in putting together the plan? Let me finish the sentence. Yes.

MR. SEESE: No, I was responding to let you finish.

There was not input from the committee. We have had conversations with the committee, me, and I have discussed certain aspects of the plan that would be included, such as the HBA program. Although at the time there was not a decision made to afford the right of rescission to all HBA parties. It was limited to those

who filed proofs of claims, and we all collectively decided, not the committee, on this side, and with the lenders, decided to afford the right of rescission to all HBA parties.

As far as the litigation, again, neither this Chapter 11, nor a plan if confirmed by your Honor, is going to impede the state litigation. That was done a month or two ago. They are proceeding with the litigation, and regardless of whether we are in Chapter 11 or outside of Chapter 11, those fees are going to be incurred. The only difference is in a Chapter 11, we have the benefit of the automatic stay, and per your Honor's prior directive, if the states obtain a claim and they bring it back to this court, it is subject to the stay. It is subject to 1141 and 524. It will be treated under a plan and would not impact the other creditors of the estate. So we think that's a nonfactor, to be honest, your Honor.

We've also -- there were a couple of points raised by United States trustee as far as whether the homeowners are obligated to repay the money, whether they're -- I forget what the other point is. But let me be clear on the record, we have made mention under Article VI of the plan dealing with the HBA's that we are not going to be foreclosing on any right that we may have with

respect to the property that is subject to HBA's. There was no obligation whatsoever for any HBA party to repay the money that was paid to them at the time the HBA was originated.

The only exception to that is if, under the HBA program, a HBA party has an opportunity to say -- under the HBA program, just to highlight it, there's a period of time where an HBA party can say, "I'm fine with the HBA," or they can say, "I want out of the HBA." They give notice to the independent committee. Then there's an opportunity for them to present cause. For example, I've heard on a couple of occasions where an HBA party said, "I tried to cancel the agreement within the three-day period, I couldn't reach anybody; they didn't return my phone call; they didn't respond to an email." That would be cause. If you can demonstrate that you tried to cancel the agreement within that three-day rescission period, you will be out. You don't have to pay us anything. If there's no -- if there's cause found by the independent committee, then they can get out of HBA. They don't have to pay anything to us. They're done. We will be done with the HBA, terminate the memorandum.

If on the other hand, there's no cause, they just don't want to deal with MV or they claim that they tried to rescind by email and it's not true -- and to be

candid with your Honor, as a result of discovery that was handled and conducted during the adversary proceeding, we deposed some HBA parties, and it was different than what was stated in declaration. But, nevertheless, if there's no cause, then they still can have the opportunity to get out of HBA by simply repaying the money that was paid to them up front, whether it's $400, $300, whatever it is. And, in fact, yesterday I received an email from a party that was out-of-town, and they said, "Can't we just simply repay the money that was paid to us and be done with this?" Under the HBA program, the answer would be yes.

THE COURT: Okay. Let me just interrupt because we have a lot of homeowners, some here in the courtroom and some on Zoom, to make it clear that what Mr. Seese is describing is in a proposed plan that has not been confirmed. That program does not exist right now. I just want to make it clear --

MR. SEESE: Yes.

THE COURT: -- in case all of you were asking yourself that question.

Go ahead, Mr. Seese.

MR. SEESE: Yes, your Honor.

That is just one of the benefits, one of the benefits, to the plan of reorganization.

And, your Honor, I know the United States

trustee didn't say this, and, you know, we've known each other a long time and we don't always agree, sometimes we do agree, but it's always been fairly professional, and I know she wasn't suggesting that the timing of the plan was for some delay purpose. That plan has been in process for some time. And if you go back to the plan that was filed in February, at the beginning, just prior to the hearing on the motion for preliminary injunction, this plan is not too dissimilar from that plan. That plan was 85 percent of what is on the table now, at least 85 percent. And so we have given a lot of time, we have gone back and forth with our lenders, redline versions of the plan have gone and back a multitude of times, this is not something that was done over the weekend. This is something that has been well in process for the last month, and we tried tremendously to have this done in advance of the hearing so that people would see what we have in mind and that we are serious. And we think that there is tremendous benefit to the parties.

And what I'll close with with respect to the United States trustee, your Honor, is the simple fact that the states are not the only parties here. They are not the only creditors. In fact, six states have filed proofs of claim. The creditors in this case are the 118 people who were owed money, 50 to $60 million. The creditors in

this case are the secured lenders who put up over $50 million. None of them are supporting dismissal or conversion of the case.

Now the HBA parties, I understand that there's confusion, why they received notice of the bankruptcy, maybe confusion over the proof of claim, but we did everything in our power to make that process as easy as could be. We sent notices out. We coordinated with Epiq to create a website. We coordinated with Epiq to open a call center. We made it possible to get access to pleadings, to file electronic proofs of claim. We did everything in our power to make it as easy as possible for parties to file a proof of claim.

And in many instances, the issues that are being encountered in this case are no different from any other nonconsumer case. In other cases, again, I've received countless calls from people, "Why did I receive notice of the bankruptcy?" You know, "What's a proof of claim. Do I have to file a proof of claim?" And what's difficult in communicating with some of the HBA parties who are not used to the court system or anything like that is we can't give them legal advice. We can't tell them what to do. That would be inappropriate. And so, again, we've tried our hardest to make that easy.

But, you know, the states got what they

wanted. They're litigating. There's nothing preventing them from proceeding. The only caveat is if they get a claim, they have to come back here, but only six of them filed claims. The people who are impacted are the unsecured creditors, the secured creditors and the HBA parties, I think, benefit tremendously, because they each are given an independent voice under the plan as to whether they want to continue with the HBA. We have over a thousand declarations from HBA parties that say, "I understood what I was signing, and I'm fine with it." Now some -- those who don't, they can get out. So we've tried to make it fair for everybody. And so --

THE COURT: And your argument is that plan represents an example of what rehabilitation would be in this case.

MR. SEESE: Yes, your Honor.

THE COURT: That's the argument.

MR. SEESE: Yes, your Honor. That's absolutely correct.

Your Honor, can I just have 30 seconds to review some texts that people have been sending me.

THE COURT: Sure.

MR. SEESE: Okay.

THE COURT: And while you're doing that I'm going to say something for the benefit of the homeowners.

I know this has been going on for awhile, and I have yet to hear from the committee, which is the other motion.

It's possible that not all -- I intend to give every homeowner who wants to speak an opportunity to speak today. It's possible that not all of your questions will be answered. I wanted to point out to all of you that there is a video that you can watch in relation to this case. If you were to go into Google or any search engine and simply type in Miami Bankruptcy Assistance Clinic, Miami Bankruptcy Assistance Clinic, and you can ask me to repeat it again later, that will pull up as the first hit the Miami Bankruptcy Assistance Clinic that is part of the University of Miami School of Law. They prepared a video.

I want to give a great deal of thanks to Peter Kelly who is the cochair of our pro-bono committee and Professor Redmond and all the students at the University of Miami who worked on that fabulous video. It is designed to help you understand a case, this case, and why you got those notices in the mail, among other things. So I encourage you to go and look at that. The deadline to file a proof of claim has unfortunately passed as of this hearing, as Mr. Seese pointed out, but there's other important information there. And that doesn't mean you should not speak later when I give you the opportunity to

speak if you wish to.
All right. Mr. Seese, back to you.
MR. SEESE: Just one final point, your Honor, and it relates to the video. Ms. Feinman was kind enough to forward the video to me. I don't know if she was inviting comment, but she sent it to me --
THE COURT: It's way to late for comment, I think. But go ahead.
MR. SEESE: Well, unfortunate, because there is a section in the video that it's like 14 minutes and 38 seconds or something --
MS. FEINMAN: Forty-eight.
MR. SEESE: -- 14:48 in which they affirmatively state that the memorandum is a lien against the property, and we dispute that strongly, and I don't -- and I think even your Honor has previously made a comment in passing that --
THE COURT: Okay. Well, let's not dwell on that too much. But I do point out there's at least one state, I believe there's only one, where the documents recorded were, in fact, mortgages.
MR. SEESE: Two states.
THE COURT: Two states.
MR. SEESE: Pennsylvania and Massachusetts.
THE COURT: But the debtors do not intend to

seek to foreclose using those mortgages, even in those states.

MR. SEESE: That is correct, and it's set forth in the plan.

THE COURT: The primary purpose of the recorded documents, based on what I've seen so far in this case, is to set up a system where the debtors are informed of the potential to collect the three percent fee.

MR. SEESE: In the event of a breach by the homeowner.

THE COURT: Right.

MR. SEESE: Yes, your Honor.

THE COURT: It's a flagging mechanism.

MR. SEESE: So, your Honor, I reserve the right for rebuttal if Ms. Feinman has additional comments. We reserve the right to respond to the committee when they --

THE COURT: Understood.

MR. SEESE: -- present.

THE COURT: This is not going to be the only hearing, but I wanted to make sure that -- and the reason I -- the only reason I'm asking the homeowners to wait till the end is because I want you to hear everything that's been said before you talk. But I realize this is going on a while.

All right. Yes.
MR. SEESE: Thank you.
UNIDENTIFIED SPEAKER: We have kids to pick up.
THE COURT: You have kids to pick up, all right. Understood.
And I want to ask you a question, then I -- I might -- I would like to -- if some of you need to leave, I would rather I hear from you before you have to leave.
Ms. Feinman, let me ask you one question.
MS. FEINMAN: Yes.
THE COURT: Your argument is really limited to (b)(4)(A) or not?
MS. FEINMAN: Yes, your Honor, (b)(4)(A).
And if I could just make two comments. I just want to refer the Court to an Eighth Circuit opinion, it's Loop Corp. v. U.S Trustee, 379 Fed.3d 511, it's a 2004 case --
MR. SEESE: Is that in the motion?
MS. FEINMAN: I believe it is mentioned in the motion.
THE COURT: Okay.
MS. FEINMAN: It talks about, in this case, the debtor was toning its operations, and this also

discusses the difference between rehabilitation and liquidation and that the Court has wide discretion. So I just wanted you to be aware of that if you wanted to look at that. I wanted to also clarify --

MR. SEESE: What's the cite?

MS. FEINMAN: It is 379 Fed.3d 511 --

MR. SEESE: Thank you.

MS. FEINMAN: -- a 2004 case.

I just want to clarify one thing that Mr. Seese stated. He said that the debtor was cash flow negative only one month. I want to be clear. I said that the net -- there was net losses for three out of the five months reported or five-and-a-quarter months, so I just want to be clear. The November report showed a net loss of $330,600. The December report had a net loss of 246,136, and January had a net loss of 157,305. That's from the MOR's.

Those are the only things I wanted to add, your Honor.

THE COURT: Thank you.

All right. Does anybody -- I don't want to take a break unless anybody needs to take a break. I don't need to. I would rather give the homeowners a chance to -- especially the ones that are here, and then I'll go to the video, and then we'll hear from the

committee.

One of detriments is you won't have heard the other argument before you talk, and that's fine, you can all stay. But if anybody wants to -- if you need to leave and you want to address the Court now, I'd be glad to hear from you. Don't be timid.

MS. FEINMAN: Don't be afraid.

THE COURT: Yeah, really.

UNIDENTIFIED SPEAKER: There's still a lot to --

THE COURT: There's a lot, yes.

UNIDENTIFIED SPEAKER: -- a lot, I'm not sure who is in favor of us, whether it's the U.S. trustee or Mr. Seese.

THE COURT: Well, okay, I'm not going to comment on that.

UNIDENTIFIED SPEAKER: It seems like it's going to be an ongoing --

THE COURT: Well, this is --

UNIDENTIFIED SPEAKER: -- case.

THE COURT: Just so you all know, what will happen after this is I will ask all the lawyers for how much time they think they need to present, essentially, a trial, and I'll set it over for an evidentiary hearing, and there will be people testifying and documents and the

like. This is just the initial argument, but I would like to hear what you have to say.

Could you repeat your name.

MS. TOUSSAINT: Losie Toussaint.

THE COURT: Good afternoon, Ms. Toussaint.

MS. TOUSSAINT: Good afternoon, your Honor.

THE COURT: Go ahead.

MS. TOUSSAINT: So, yeah, he mentioned earlier that we was given options to --

THE COURT: Not yet.

MS. TOUSSAINT: Not yet -- to propose.

THE COURT: Yes.

MS. TOUSSAINT: Okay. So it's just --

THE COURT: That's the company's proposal that would be in a plan that would go out for a vote by creditors.

Did you file a proof of claim in the case?

MS. TOUSSAINT: Not -- no.

THE COURT: Okay. So you wouldn't end up getting a ballot to vote. The people who have contracts who did vote -- excuse me, did get a ballot -- excuse me, did file a proof of claim would be able to vote. But you would be able to be heard in connection with the plan nonetheless.

MS. TOUSSAINT: Okay.

THE COURT: But that isn't before the Court today.

MS. TOUSSAINT: Okay.

THE COURT: Right. Go ahead.

Do you have questions or something you want me to know?

MS. TOUSSAINT: I just don't have anyone's contact information, just so if I leave today to get a follow-up on what was said with the other party that has to --

THE COURT: Now, there -- oh, whose contact information are you most interested in?

MS. TOUSSAINT: Both parties, Mr. Seese and the U.S trustee.

THE COURT: Well, they're easy to get -- they're about to give to you.

MS. TOUSSAINT: Yeah, I received this notice in the mail yesterday, so I really didn't make proper arrangements for today's hearing. So that's why I won't be able to stay a little late this evening.

THE COURT: That's fine.

MS. FEINMAN: Email me. I will say if anybody takes my card, please email me.

MS. TOUSSAINT: Email you.

MS. FEINMAN: Responding to your phone calls

is not a good way to get a hold --

MR. SEESE: By the way, maybe the easiest thing is to go on to Epiq website, because it has everyone's contact information --

THE COURT: Right, but --

MR. SEESE: -- phone numbers, emails addresses.

THE COURT: -- Ms. Feinman has cards, so --

MR. SEESE: If you type in MV Realty Epiq, E-P-I-Q, it will take you to the case website, you can access all the pleadings, and there's a section that has contact information for all the lawyers.

MS. TOUSSAINT: Okay.

THE COURT: For those of you who didn't hear that. One of the main pieces of information in the case is a website that's maintained by a company hired by the debtors. You don't even have to type in Epiq. If you type in MV Realty proof of claim in any browser, it will pull up the Epiq site as the first hit. I tried it before the hearing.

MS. TOUSSAINT: Okay.

THE COURT: So you can easily get that. Every single document filed in the case, ever order, a variety of other information, all the proofs of claim that had been already filed. There's $2 billion of proofs of

claim filed to date. Yes, I know, they are repetitive. But they're there. You can find a lot of information there, also all the contact information.

MS. TOUSSAINT: Okay.

THE COURT: Including representatives of the committee that the U.S. trustee appointed to represent the people who have contracts such as you.

I assume you're homeowner that has --

MS. TOUSSAINT: Yes, I am.

THE COURT: -- one of the contracts?

MS. TOUSSAINT: Yes.

THE COURT: Okay. Do you have anything else you'd like to say or questions?

MS. TOUSSAINT: No, that was all. Thank you.

THE COURT: Of course, yeah.

MR. SEESE: Thank you.

THE COURT: Yes. Welcome back. If you could tell me your name again.

MS. JONES: Valerie Jones.

THE COURT: Ms. Jones.

MS. JONES: Well, when you said -- what is it you said, Miami bankruptcy claim --

THE COURT: Miami Bankruptcy Assistance Clinic.

MS. JONES: Oh, assistance clinic.

Okay. And my other question --

THE COURT: And you'll have to scroll down, but you'll see it. It's all on the first page.

MS. JONES: -- is that I didn't file either by April 1st. So what do I do after that?

THE COURT: I cannot advise you, I'm sorry to say, in connection with that. You may be able to get some guidance by contacting the bankruptcy clinic through that page, okay?

MS. JONES: Thank you.

THE COURT: Yes, of course.

No other questions or anything else you want me to know? You have a contract too, I suppose? Yes.

Okay. Yes, sir.

MR. DIAZ: Good afternoon, your Honor. Orlando Diaz again.

THE COURT: Mr. Diaz.

MR. DIAZ: I think that it would be easy if they would send you the check that they send to us together with the notice, so that way you know where it come from, because they send you the explanation they got with the bankruptcy, but we don't know anything about it, you know, 'til we came here.

THE COURT: So -- and all you got was the

notice, you didn't get the motions as well?
MR. DIAZ: No, only I get -- this only -- this letter that come here today.
THE COURT: Will you look at, Ms. Feinman?
MS. FEINMAN: Yes.
THE COURT: I'm curious what he got.
MR. SEESE: Do you mind if I look as well?
THE COURT: Yeah, of course.
MS. FEINMAN: Your Honor, I think it's the motion to dismiss or convert --
THE COURT: Okay.
MS. FEINMAN: -- and the notice of hearing.
THE COURT: All right.
MS. FEINMAN: But -- right, and I think what the gentleman is saying is --
THE COURT: He doesn't know why --
MS. FEINMAN: -- he doesn't understand --
THE COURT: -- he's getting it.
MS. FEINMAN: Correct.
THE COURT: Okay. Let me help explain why you all got this.
MR. SEESE: Yes.
THE COURT: So you -- when the MV Realty companies filed their bankruptcy, they filed a list of everyone they had a contract with, so that any notices

that go out in the bankruptcy also go to all of you. You're not required to be here.

Would you be effected if the case was dismissed or converted? Yes. If it's dismissed there's no bankruptcy case at all. If it's converted, then there's somebody else in charge. But nothing that's happened so far in this bankruptcy case effects your contracts. There are -- all of you are in Florida, I assume, that are in the courtroom, yes?

MR. DIAZ: Yes.

THE COURT: Okay. So the attorney general of the State of Florida has filed a lawsuit, and they are trying to do a number of things, including get rid of all the contracts that you have. I have said that that lawsuit can go forward. That lawsuit is proceeding. I don't know when that will be done.

But you get notice of everything here in the Bankruptcy Court just so you know and you can be informed. If there's something that anybody is asking for that is aimed specifically at you, they have to tell you that. So it's going to be fairly obvious that it's aimed specifically at you.

Do you see what I'm saying?

MR. DIAZ: Right.

THE COURT: Okay. So none of you had to be

here today. I'm glad you're here, because you're hearing some of this. It's important. But you're not required to be here.

Yes, ma'am.

MS. GERMAN: Yeah, I'm Sabrina German, and I think everybody came because they wanted to protect they homes, and they want to see what was going on when they don't know --

THE COURT: Yes, yep, and you -- I think it's wise for you to come and learn what is going on. Absolutely.

MS. GERMAN: I --

THE COURT: You should know that any hearing that I have that is not what witness on the stand, you can sign up to participate by Zoom. You can even use your phone to listen in if you want to. You don't have to physically be here. You're always welcome here, but you don't have to physically be here. We had a woman who was saying she has to go pick up her children --

MS. GERMAN: Yeah.

THE COURT: -- I don't people to be missing that.

But if you want to, you can register. You can go on the website for the Court, just type in bankruptcy Southern District, Florida, and under my name

there's place where you can sign up for the hearings by Zoom. Almost any hearing --

MS. GERMAN: I'm not good with technology, so that's why I came.

THE COURT: That's fine. That's fine. You can even do it by phone by the way.

MR. SEESE: Your Honor, the link is also in the notice of hearing.

THE COURT: Yes, the link is not notice of hearing, but you have to type in 56 letters and --

MS. GERMAN: So they was saying something about filing a claim, but I don't -- I didn't receive anything concerning that. I wasn't expecting to hear from these people.

THE COURT: It might be helpful if you look at the video that we were talking about earlier. There were three separate -- four notices, at this stage? Maybe four.

MS. FEINMAN: One, 2, 3, yeah, 3 or 4.

MR. SEESE: Three.

MS. GERMAN: Yeah, I didn't -- this is only thing I received, was the notice to be here.

THE COURT: You received nothing before that, ever?

MS. GERMAN: Nothing prior to that, nope.

THE COURT: Wow, okay.

MS. GERMAN: And I have no issues with my mail. I get everything, so I don't know what that was about.

THE COURT: All right.

MR. SEESE: I'm sorry, what is your name again? How do you spell it?

MS. GERMAN: Last name German, G-E-R-M-A-N, is the last name.

THE COURT: Ms. Leonard, yes?

THE CLERK: (Inaudible.)

THE COURT: Okay. I'll go to her in a moment.

MR. SEESE: We'll check to make sure.

MS. GERMAN: Yeah, we didn't -- so that mean I missed the deadline of whatever the claim was about, because I didn't even receive it.

THE COURT: Okay. I can't do anything about that today.

MS. GERMAN: I know, but I'm just putting it out there that I didn't --

THE COURT: Understood.

Is anybody else in the same boat?

(In Unison: Yes.)

THE COURT: Oh, okay.

MS. GERMAN: We didn't receive it I don't think.

THE COURT: Well, then, one of the people that you can contact on the Epiq website is there's a person who is a representative for the homeowner -- the HBA person is still there, so the homeowner benefit agreement, there's a contact person. There's a special committee who is representing your interests, not you personally, but your interests as a body in the case.

Do you understand what I'm saying? You can contact them and ask questions about the proof of claim deadline and the like.

Does anybody misunderstand that, no?

MS. GERMAN: This just seems to be, like, something that was misled, so I'm going to follow-up with it, with everything.

THE COURT: Good. Thank you. Excellent. Yes.

MS. GERMAN: This is something that was --

THE COURT: I am concerned about --

MS. GERMAN: -- not right.

THE COURT: -- it, and Ms. Feinman is probably concerned as well, and so you may want to get her email address and contact her.

MS. GERMAN: Yeah, I hope that we can get

some help with this, though.

THE COURT: Very good. Thank you.

MR. SEESE: We will also contact Epiq and make sure that --

THE COURT: That she's on the list.

MR. SEESE: Yes.

THE COURT: If anybody feels you haven't gotten prior notices, could you please email both Mr. Seese and Ms. Feinman and let me them that that is the case?

Okay. Yes, ma'am.

MS. THOMAS: Yes, I just wanted to know if I could pay back the $700 they gave me?

THE COURT: If the bankruptcy case goes forward and the debtors' plan is confirmed, yes.

MS. THOMAS: Okay.

THE COURT: Understood. Could you tell me your name again ma'am.

MS. THOMAS: Cassia Thomas.

THE COURT: Ms. Thomas, thank you. So pay attention to what you're getting in the mail.

MS. THOMAS: Okay.

THE COURT: Okay. Anyone else?

You all don't have to leave, by the way, you can -- I know you may not want to stay, but you don't have

to leave. Oh, good luck to you.

Anyone --

UNIDENTIFIED SPEAKER: Yes, sir.

THE COURT: -- else?

UNIDENTIFIED SPEAKER: I would.

THE COURT: Just a moment. Ms. Interiano, I'll get to you in a moment. I want to make sure things are cleared up here in the courtroom before I proceed.

UNIDENTIFIED SPEAKER: Is this the end?

THE COURT: Nope. It's going to go on for a while. I still have other people to hear from. You don't need to stay, but you can.

UNIDENTIFIED SPEAKER: I gotcha. I gotcha.

THE COURT: It's up to you.

UNIDENTIFIED SPEAKER: I gotcha. No, it's okay.

THE COURT: All right. Everyone --

All right. Let me go back to Zoom. Ms. Interiano you wanted to be heard.

MS. INTERIANO: Yes, hi. How are you? Thank you for this opportunity for us to hear in and be part of this.

So I am actually a realtor and the people that I'm representing, they are actually family members, and I did not have an idea that they even had a memorandum

in their title until -- because I'm realtor, you know, they asked me to please help them to sell the properties, and the problem (distorted audio) and we start the title searches when I find out that there's this memorandum. I immediately start calling this company, left numerous messages. The homeowner did the same thing, and they never act.

So at some point as realtors in a different -- you know, it's different scenario here, but as a Realtor, you know, we're trapped, not only us Realtors, but our homeowners are also trapped, because they're forced to pay this three percent to a company that is not even answering the messages. So they're not doing their job as representing the homeowners on the sale as they promised that they are doing (distorted audio.) So that's an issue.

THE COURT: Understood, yes.

Is that it Ms. Interiano?

MS. INTERIANO: That is it, yes. And thank you --

THE COURT: And by the way, where are you? Are you here in Florida, or are you in another state?

MS. INTERIANO: (Distorted audio) here.

THE COURT: I'm sorry, you were breaking up just then. What was the answer?

MS. INTERIANO: Yes, I am in Miami, and definitely my client just received all these notifications. I read through it, and that's why she asked me to be please stand in, and I can translate to them just, because they are in elderly couple and they don't understand what's going on. And the only conversation I had with them initially is, like, do you have any record of you signing these documents, and her answer was no.

So I am very curious how this even happened. I understand they got a thousand dollars, so the question was, can we have them pay them back and the answer (distorted audio), and I read everything online about this program, and it also says (distorted audio) the only way to pay it back is by three percent. Three percent we're talking about $15,000 for this particular --

THE COURT: Understood. Currently that -- unless the State of Florida is successful in its lawsuit and/or the debtor's plan is confirm, there's not currently a method for paying back the amount received and having the agreement terminated.

MR. SEESE: Your Honor, may I inquire of Ms. Interiano, what is the name of the family member, so that I can give to the company and find out why if -- why you would not have been -- why the call would not have

been returned. Do you have the name of the --

THE COURT: Yes, their name.

MS. INTERIANO: Yes, of course. Yes. The family is Damarys Marante Roberto Marante, that's M-A-R-A-N-T-E, and they are in Miami, Florida, and their address was --

MR. SEESE: Well, don't --

MS. INTERIANO: -- (inaudible.)

MR. SEESE: -- don't give me the address, but could you give me the last name, please.

THE COURT: M-A-R-A-N-C-E (sic).

MS. INTERIANO: No, M-A-R-A-N-T-E, Marante.

THE COURT: Oh, T-E, T-E, yes.

MR. SEESE: And then that's the last name?

MS. INTERIANO: That's the last name. First names are Damarys and Roberto.

MR. SEESE: Okay. D-E-M-A-R-I-S.

MS. INTERIANO: I'm sorry?

MR. SEESE: D-E-M-A-R-I-S?

MS. INTERIANO: D-A-M-A-R-Y-S, Damarys.

MR. SEESE: And Roberto?

MS. INTERIANO: And Roberto, that's correct.

MR. SEESE: Okay. And let me give you my email address, so that you can contact me, and I will inquire of the company to get to the bottom of this. It's

M as in Michael --

MS. INTERIANO: Okay.

MR. SEESE: -- S as in Sam, E as in echo, E as in echo, S as in Sam, E as in echo at, the same last name, S-E-E-S-E, L-A-W dot com.

MS. INTERIANO: Wonderful. Thank you so much. I even had my real estate attorney reach over to the office. Still no response.

MR. SEESE: I will look into it Ms. Interiano.

MS. INTERIANO: I thank you for that.

MR. SEESE: Thank you.

THE COURT: All right. Thank you.

Ms. Daniely. Your video has frozen.

MS. DANIELY: Yes.

THE COURT: All right. Are you -- go ahead.

MS. DANIELY: Yes.

Okay. I was in that same boat. I had a purchase here in Georgia. They sent me a check for like 500, I think, and they didn't get all the paperwork signed, and after -- but I didn't find that out until after I received the $500, so they didn't get all their paperwork signed, so I was trying to reach MVR Realty about that, but I could never get anybody to answer the phone call.

So later on I decided to sell my house myself through Zillow Home Realty. Now, I have my bill of sale here from Zillow, and my bill of sale from Zillow, my home was purchased at -- was sold for $224,200, but I only received a check for 188, and withheld 5,000, but they sent MVR Realty over $9,000 worth of my money, I believe it was. It's not in my bill of sale, in my contract here. (Inaudible) exactly it was, but they sent I think it was a little over $9,000 or more probably to MVR Realty. But because MVR Realty did not get all their paperwork signed, they forged my name on the paperwork and submitted it to Clayton County courts to receive their hands on the deed to my house. So when I got ready to sell it to Zillow, it was brought up on my -- it was brought up at my closing.

THE COURT: But the house did sale, you're saying?

MS. DANIELY: And I had signed off on my paperwork, so that was nothing that the (unintelligible) McCloud Heller, attorney offices for Zillow, they handled the closing on my home, and they had already sent the money to MVR Realty, and I had no idea that MVR Realty had their hands on the deed, a copy of deed to my house, because as of to this date, I still have the original copy of the deed to the home that I sold.

THE COURT: Okay. Did you actually sell the

home -- the home sold. It's gone, you don't own it anymore?

MS. DANIELY: Right through Zillow --

THE COURT: And you did receive a lot of the proceeds, but you're saying 9,000 of it went to MV Realty?

MS. DANIELY: Over $9,000, I believe it was, may have been more. I'm not sure because of the proceeds that I received at closing was 1,800 -- $188,484.29, and they -- we pay off $5,000 of it, and the taxes that was due owed on my home at the time was $169.17, look like here.

THE COURT: All right. Ms. Daniely, so today what I have is two requests that I either dismiss the whole bankruptcy case or appoint a trustee over the bankruptcy cases.

Would you like to tell me what your view is on that?

MS. DANIELY: I would appreciate it if you dismiss it.

THE COURT: Understood.

And have you filed a claim in the --

MS. DANIELY: Because -- (distorted audio.)

THE COURT: -- in the bankruptcy -- did you file claim in the bankruptcy case?

MS. DANIELY: This needs to be held in court

in the -- receive money from her on the individual cases --

THE COURT: Did you --

MS. DANIELY: -- in court.

THE COURT: -- did you file a claim in the bankruptcy case?

MS. DANIELY: Yes, I did.

THE COURT: You did. Okay. Good.

And I assume it's the full amount that was held back from your sale, yes? How much was --

MS. DANIELY: Yes, I did.

THE COURT: Nine thousand, good. Okay. Thank you very much.

Is there anything else you would like me to know?

I think her video might be frozen. All right. Ms. Daniely, I'm going to go over to somebody else, and then I'll go to committee.

MR. SEESE: Your Honor, may I ask is the home -- was the home in the name of Ms. Daniely?

THE COURT: Ms. Daniely, did you own the home in your own name?

Her signal is terrible.

MR. SEESE: I just want to look --

MS. DANIELY: I can't hear you.

MR. SEESE: -- into it.

THE COURT: Did you own the home in your own name?

MS. DANIELY: Sir?

THE COURT: If you can turn off your video -- I will do it. Hold on a second.

Ms. Daniely, Ms. Daniely, did you own the home in your own name?

MS. DANIELY: Yes, I did.

THE COURT: Okay. Thank you. Then the debtor's counsel can look into it, but you did file a claim you said, and I assume it was for $9,000 or about?

MS. DANIELY: Yes. At the time I was not married, my last name was Hall --

THE COURT: How do you spell that?

MS. DANIELY: -- and then I married this year.

THE COURT: How do you spell that?

MS. DANIELY: H-A-L-L, Valerie Anne Hall, H-A-L-L.

THE COURT: Hall, H-A-L-L. Valerie Anne Hall, Mr. Seese.

MS. DANIELY: And now I'm married, and my last name is Daniely.

THE COURT: Okay. Good. Thank you.

All right. I think I have two more homeowners, and then I'll hear from the committee, unless somebody needs a break. It's very late. I understand. But I do want to hear from everybody and committee has yet to present.

Ms. Brown, if you could.

MS. BROWN: Yes, I just wanted to say that -- I don't know whether I'm saying anything new, but the MVP Realty put a 40-year lien on my house, and I think that's a lot of everyone is fussing about. And when it was time for me to sell my house, I didn't know that there was a lien on my house until it was almost the time of closing, and they took over $8,000 in exchange for five or six or $700 that they gave me. I don't have the exact amount in front of me.

And I would -- you know, they didn't do any work for that. The realtors locally did the work for that, and the fine print was that 40-year lien on my house, even if it passed to another -- to my children, they would have still had that lien on my house, and that's the part that -- the unethical part that I had with that --

THE COURT: Ms. --

MS. BROWN: -- and the realtor that I was working with tried to contact them to make some kind of

agreement, and they refused to work with my realtor, and that's another part of the unethical part that, you know, people don't -- I don't know whether anyone else had that experience, but that was my experience. And $8,000 in exchange for $700 is really, like, an unfair transaction, you know. And to me it's just the ethics of what is going on with someone being able to exchange that small amount of money and in fine print, in order for them to rake you over the coals at a time when you're vulnerable for, you know, the next level in your life.

And that's the type of people that we're dealing with here, and I really want them held accountable for that, because even though I don't consider myself some person -- a person that would over-read fine print, it was at a vulnerable point in my life when I needed funds, and I would never think that someone would be able to do such unethical things. And when you think about people who are lower income, less educated and other -- other descriptions, they've been able to do things like that, it really speaks very badly of the business community --

THE COURT: Thank --

MS. BROWN: -- and that's what I wanted -- thank you.

THE COURT: -- you, Ms. Brown. No, thank you for your comments.

Did you file a claim in the bankruptcy case?

MS. BROWN: Yes, I did.

THE COURT: Okay. Good, understood.

Is there anything else you would like me to know.

MS. BROWN: Not at this time.

THE COURT: Thank you very much.

Ms. Armpriester (phonetic).

MS. McKNIGHT: Hi, yes, this is Shandly McKnight, actually. I'm the daughter of Shirley Armpriester.

THE COURT: How are you this afternoon?

MS. McCLAM: Good, good.

THE COURT: Go ahead.

MS. McCLAM: This was just brought to our attention right before the deadline to make that claim. My mother had handed me the envelope, because she did not understand why this stuff was coming to her. And luckily I read through it, and we put the claim in in time.

THE COURT: Good.

MS. McCLAM: But when I -- because I did not know my mother did this, and again to follow or piggy-tail on what the lady just said prior, they targeted these people who have lost thousands, who need money, and the thing that she told me that was told to her that day was

that, "Oh, we'll just help you sell your property, and we give you this money just to let us try and sell your house." Never was it mentioned about 40-year mortgage, lien, or whatever put on the home, never mentioned about how much the value of the house was going to go for.

So my question was, how did you value someone's home in this contract? Her house ain't even worth $185,000 right now, but in the contract it's saying we have to pay three percent at a value of $285,000. So how those values got into the document, I have no idea.

And the other thing is, who made the decision on how much money these people got? She got $880. I hear people got $700. I hear people got a thousand dollars. How was that valued?

THE COURT: Understood.

Now, the -- I'm sorry, you said your name was Night, correct, Ms. Night?

MS. McCLAM: McKnight, M-C-K --

THE COURT: McKnight, McKnight, I apologize. I keep looking at your mom's name on the screen.

Now, your questions are important questions. The real answer is that it was in the agreement that was tendered to your mom.

The thing I'm trying to focus on today is two motions asking me to either completely dismiss the

bankruptcy or to appoint a trustee. And those are the things I'm trying to focus on. I think it's important to hear these things, but those -- some of those questions won't necessarily be answered in my ruling on the motions I have now.

Do you understand that?

MS. McCLAM: Yeah, understood.

THE COURT: Yes, understood.

Is there anything else you would like me to know?

MS. McCLAM: I guess my question is, because I'm coming in at this at the very end and just trying to get involved in this --

THE COURT: Well, this is not --

MS. McCLAM: -- I know --

THE COURT: -- this is not the very end Ms. McKnight, to let you know.

MS. MCKNIGHT: Oh, no, no, no, but with me coming at this part of this.

THE COURT: Right, yes.

MS. MCKNIGHT: I'm from Pennsylvania, so I know our attorney general is actually doing -- filing a lawsuit as well here in Pennsylvania.

THE COURT: Correct, yep.

MS. MCKNIGHT: So I just wanted to, you

know, make sure that we're staying up to date on what's going on, and I don't understand what the difference is as far as if this bankruptcy is dismissed, does that hurt us, or does that help us? I guess we're confused about --

THE COURT: It will not have -- it won't have any impact on the litigation going forward in Pennsylvania.

MS. MCKNIGHT: Okay.

THE COURT: Okay. Either way. If the state of Pennsylvania is successful, part of their relief is asking for money, part of it is other things. If it's money, then they would -- and the bankruptcy still exists, they would need to bring the claim back here. But that litigation moving forward -- is going to continue to move forward, as Mr. Seese pointed out a little while ago, no matter what happens here in the Bankruptcy Court.

MR. SEESE: Your Honor?

MS. MCKNIGHT: Okay.

THE COURT: Yes, just a moment. I want to make sure I'm done with Ms. McKnight.

MR. SEESE: I just want to confirm that her mother's name is the homeowner and that's Ms. Armpriester.

THE COURT: And your mom's name is Armpriester, and she's the owner of the home; is that right?

MS. MCKNIGHT: Yes, correct.
THE COURT: Okay.
MR. SEESE: Thank you.
THE COURT: All right. I think I would like to at this point go back to committee counsel, unless anybody needs a break. I don't need a break. I know we've been here for a very long time, but I would rather hear from the committee counsel, if I can, at this point.
Who would like to present?
MR. KUCERA: Your Honor, this is John Kucera. I'm speaking from my cell phone as I was having audio issues, but I hope you can hear me?
THE COURT: I can hear you. Try to just -- try to speak slowly if you can.
MR. KUCERA: Will do.
THE COURT: So the sound is not ideal.
So go ahead.
MR. KUCERA: Well, here, let's try that.
Does that help?
THE COURT: Maybe. Let's hear your presentation.
MR. KUCERA: All right. I don't have a lot to add, your Honor. I think -- I've now discussed with Monroe's counsel, with the debtor, and also made the U.S. trustee aware of our expected position, which is we expect

that we are going to be withdrawing our motion with the hope that your Honor will allow us to file, potentially, a joinder, or to brief on the U.S. trustee's motion. This is done for a couple reasons.

I think we've been over taken by events. I think the U.S. trustee's motion is going to allow us to move more efficiently. Also we were waiting on a lot of the actions at the states. As the states have now made their positions known, that has allowed us to take a more backseat in what we're doing.

The other thing that I thought was important to bring to the Court's attention as our fees have been mentioned many times in this hearing and also previous hearings, we've now communicated this as well to Monroe, debtor's counsel, and the U.S. trustee, and while I don't have authority from my firm to do this yet, we expect that that authority will be forthcoming. We've unilaterally offered to reduce our fees by 58 percent, a reduction reflecting a total fee amount today -- or rather as of the last application of a little over $323,000. So hopefully that will impact a little bit what the debtors are able to do in terms of the fees that are anticipated from administrative expenses.

I don't really have much to add other than that, given our position with this motion. Maybe the one

thing I should mention is that I've been in discussions with Mr. Siddiqui, and we have, sort of in keeping with our effort to minimize all of our costs and to take a backseat to the actions of the U.S trustee, we've asked to suspend any obligation by Monroe to answer, as well as Good Wood to answer, the committee's initiated adversary proceeding until -- I think we gave them until the beginning of May by agreement, and we have no objection to extending that further. The goal there being, let's see what happens with the U.S trustee's motion before anyone is asked to undertake additional work on this or additional expense related to that work.

THE COURT: Now, you have not withdrawn the motion yet, but you're saying that you intend to withdraw it, yes?

MR. KUCERA: Yes, that's correct.

THE COURT: And you've suggested that the committee of HBA holders would like to and -- of course, any party in interest can join in a pending request for dismissal or conversion.

Would your joinder restate or add -- excuse me, I guess I should say, restate arguments in your own motion that are not already in the U.S. trustee's motion? I ask that because your motion was the only one that alleged lack of good faith. If you withdraw it, that is

not in the U.S. trustee's motion.

MR. KUCERA: Understood. And at the moment, we do not see any reason to add any additional allegations to the U.S trustee's motion. Again, the reason for that, you know, to the extent the Court wants to get into it --

THE COURT: I don't need the reason --

MR. KUCERA: -- it might happen in the future. I can't -- (inaudible.)

THE COURT: -- I don't need the reason. You can keep --

MR. KUCERA: Certainly.

THE COURT: -- your strategy to yourself. I just want to make sure --

MR. KUCERA: All right.

THE COURT: -- because you should know that in my mind, I have just narrowed down the entire consideration to 1112(b)(4)(A) and the remainder of the burden shifting under 1112(b). That's my focus at this point, and I'll --

MR. KUCERA: Understood, your Honor.

THE COURT: -- be asking if anybody else thinks otherwise, but right now that is my focus based on what you've told me. And that may affect how much time we need to get to a further hearing, which would be evidentiary, whether there will be need for discovery.

When you have a request to dismiss or convert a case based on lack of good faith, the discovery is often enormous, and the presentation is often very complex, because there is no clear edge to what might be considered by the Court in connection with such a matter, and I often have to simply limit the amount of time permitted for presentation.

When you're focusing on -- and I know here, whether rehabilitation is possible, is both a legal and a factual issue, but 1112(b)(4)(A) analysis is usual quite a bit more -- a lot more conscribed, closely conscribed than the question under lack of good faith.

All right. Anything else that the committee would like me to know?

MR. KUCERA: No, your Honor.

THE COURT: All right. Let me just go back to two more homeowners before I hear from counsel for the states if they wish to weigh if. I note that I have taken note of the joinders that have been filed and which states have taken which position.

Mr. Moleterno, would you like to be heard?

You're currently on mute. I don't need to see a video. That's fine.

Yes, go ahead.

MR. MOLETERNO: I -- I -- (unintelligible.)

I stand with the other lady who was previously done about the 40-year lien. And, again, they came at me not much longer after my wife passed away, in a vulnerable state. And right now I don't know how much they gave me, but the other situation is if they can wipe it away and pay what they loaned me that would be fine, but I don't know when that's gonna happen, because you said that's not gonna happen yet.

THE COURT: The debtors have proposed, but it isn't before the Court for approval at this point. If the case is dismissed, it would never be approved, and the debtors have proposed that there be a system that would allow you to pay back the sum received as one option for eliminating the homeowner benefit agreement that you have.

And it's your own agreement, not your spouse? I'm very sorry to hear about your wife, by the way.

MR. MOLETERNO: Yeah, (unintelligible.) Yeah, it was my agreement. They came to me right after she passed away because I was in need of some money, and I went ahead and got the money from them, and then I found out I cannot do anything without them being off the lien or the lien being off me.

THE COURT: Are you trying to sell the house now?

MR. MOLETERNO: I was thinking about it, yes. But I found out, they can't do anything with that people on a loan.

THE COURT: Where are you located, Mr. Moleterno?

MR. MOLETERNO: I'm in Arizona.

THE COURT: In Arizona, okay.

All right. Is there anything else you would like me to know, Mr. Moleterno?

MR. MOLETERNO: No, but I would like -- I have the same -- I never got any of the proceedings on the bankruptcy until a week ago --

THE COURT: Interesting.

MR. MOLETERNO: -- so if I can be kept updated on things.

THE COURT: All right. Mr. Seese, could you look into whether he's on the list.

MR. SEESE: Yeah, but I don't understand -- I have no reason not to believe Mr. Moleterno, and I too share condolences, but I have no reason why they would get served with the motion to dismiss --

THE COURT: One thing, but nothing else.

MR. SEESE: Yeah, it's the same list --

THE COURT: Good question.

MR. SEESE: -- Epiq has had.

THE COURT: All the distributions are coming out of Epiq.

All right. I would look at the order extending the bar date and see if Mr. Moleterno is on it, and I'll ask that one of my law clerks do that.

Yes.

MR. SEESE: The only I do say in defense of Epiq is your -- we had notice procedures that were approved. There were only certain things that were going to be served on the homeowners. Everything else was going to be posted on the website --

THE COURT: Well, one would --

MR. SEESE: -- that may be --

THE COURT: I know, but there should be three orders moving the bar date --

MR. SEESE: No, no, no. And I believe --

THE COURT: -- or two. Four, okay.

MR. SEESE: -- I believe those were all served.

THE COURT: Okay. And, Mr. Moleterno, did you by chance file a claim in the bankruptcy? It sounds unlikely, but I just want to ask the question.

MR. MOLETERNO: No, I didn't, because I didn't even know about it.

THE COURT: Okay.

MR. MOLETERNO: (Inaudible.)

THE COURT: When did you first learn about the MV Realty bankruptcy?

MR. MOLETERNO: This year, about two weeks ago when I got that -- no, in January, I remember. I remember I got it this year, and that was the first time I heard about it.

THE COURT: So it was probably the bar date order, is my guess.

All right. Thank you, Mr. Moleterno.

All right. One other person before I hear from some other lawyers. Sui Poon.

MS. POON: Yes, your Honor. How are you?

THE COURT: Good. Good afternoon.

MS. POON: Good, good. Question, I'm actually representing my mother-in-law. She was in Arizona, and she signed this agreement back in January of 2022, and the reason we found out about it is because five months later she signed another agreement with a real estate agent, and we had to hire an attorney to void that contract in June, because she was diagnosed with moderate dementia. She was not aware what she was signing and everything. Somebody come in and just and just say, "Well, here's $1,223. We could represent you for the next 30 years to sell your property." So she just signed it,

but now she's got an advanced stage of Alzheimer's, so we are trying to sell the house. We'd rather pay back this amount that's due MV Realty, not a problem, but we really need to get this house sold before she passes on.

THE COURT: Understood. Thank you for telling me this. There's not anything I can help you with in that regard today, Ms. Poon.

Can you give me the name of your mother-in-law?

MS. POON: Last name is Stotz, S-T-O-T-Z.

THE COURT: S-T-O-T-Z.

MS. POON: First name is Janet.

THE COURT: Janet, okay, in Arizona.

MS. POON: And she's in Avendale, Arizona.

THE COURT: Avendale, right.

All right. And you've been working with a lawyer on this or not?

MS. POON: Well, we don't -- you know, he was charging so much we could not afford that, so ask him to kind of drop it, and we'll take over from about three weeks ago.

THE COURT: Understood.

As it stands right now -- is Arizona one of the states with a lawsuit? I don't think so --

MS. POON: I don't think so.

THE COURT: -- no. Georgia is a recent one, yes?

MR. SEESE: But that would be cause under the program.

THE COURT: Right, exactly, but that isn't approved yet.

So Mr. Seese is pointing out that if the debtor moves forward with their plan, meaning I haven't dismissed or converted the case, and the plan is approved that that would probably be cause under the program that they're proposing, but that is months after at this point.

I thank you for weighing in and --

MS. POON: We can't even sell the property --

THE COURT: -- and for waiting.

MS. POON: -- then, Judge.

THE COURT: What's that, Ms. Poon?

MS. POON: We can't sell the property because of the lien on it.

THE COURT: Well, you can sell the property, but the result is you'd have to pay the fee that's owing, but you might -- Mr. Seese.

MR. SEESE: Yes, but I -- I -- I won't say anything on the record. I have some ideas I have to discuss with the client.

THE COURT: All right. And maybe -- you pay end up being contacted. If you want to, you can attempt to email Mr. Seese.

And, Mr. Seese, why don't you give me your email address on the record in case Ms. Poon wants to email you.

MR. SEESE: M as in Michael, S as in Sam, E as in echo, E as in echo, S as in Sam, E as in echo, at S-E-E-S-E-L-A-W, Mseese@seeselaw.com.

MS. POON: I got --

THE COURT: Do you get that?

MS. POON: -- it. Thank you.

THE COURT: Yeah, email him.

MS. POON: Okay. Perfect. Thank you. I do appreciate your time, and it really helped.

THE COURT: Of course. All right. Let's -- I'm sorry to hear about your mother-in-law. That's a terrible illness.

MS. POON: Yeah, thank you. Have a good one.

THE COURT: All right. Let's go back to -- I know a number of states have joined in.

Do any of you wish to be heard, before I start talking with counsel for the U.S trustee and the debtor about planning a hearing?

Mr. Bahls.

MR. BAHLS: Yes, your Honor, I can do the very short version.

While I have tremendous respect for Attorney Seese, he and I have a different view on the interest and perspective of the states, and while I can only state for Massachusetts, the proposed plan is profoundly inadequate to address our concerns of our ongoing illegal conduct by MV, so --

UNIDENTIFIED SPEAKER: Oh, absolutely.

(Laughter.)

MR. BAHLS: -- as an example, Ms. Brown received $800 and despite receiving no service had to pay MV, $9,000 when she needed to sell her home. And this is the case for at least 80 percent of these current harvests, according to their monthly operating reports, that is ten times repayment for no services.

More than 50 percent of the HBA's are in states that are currently suing MV, saying that it is illegal to collect these early termination fees. Another 25 percent are located in the states that are currently investigating. Nothing can be inferred from the remaining quiet states. Missouri was not an investigating state, but just sued a couple of weeks ago. So due to the homeowners immediate need to close real estate

transactions, MV has been able to leverage its title cloud created by its mortgages and the memoranda to collect these early determination fees as an immediate source of revenue. But the bulk of these are occurring in states that considers this to be an illegal action, and I think commensurately increases the liability both to the state and to the consumers.

So the ongoing actions of MV that, without taking a position on the law of any other state, at least the entities charged with enforcing those laws think are illegal and likely to sort of lead to the liability side of the ledger for MV, is also something that I think is appropriately considered in sort of whether MV's liabilities are increasing or decreasing as this goes on.

THE COURT: Because in addition to what you said, and I think one of things that you said implies but you didn't say it directly, some of the relief requested including by Massachusetts, North Carolina, and others, would have a monetary impact greater than the amount actually originally received by the homeowners.

MR. BAHLS: Correct. We believe that if an early termination fee were collected in Massachusetts -- and I can't speak for other states who have statutes, but there's similarities, there's liabilities to the states for the full amount of that early termination fee, plus up

to $5,000 in civil penalties, plus likely liability to the consumer of three times that amount. So collecting $10,000 is more than $30,000 in liability, assuming, you know, action is brought.

This is not to say that, you know, the Court -- you know, so we're not -- obviously, these cases are still ongoing, and I'd be absolutely (distorted audio) to defend ourselves. We're just in the unusual state -- situation where MV is requesting, I believe, among other things a channeling injunction to deal with another tidal wave of liability facing it, but has not stopped doing the thing that is causing that liability, which is an unusual situation to be in and I think is relevant to the sort of efforts to rehabilitate.

THE COURT: Thank you.

Any of the other states?

I see Mr. Dudely. I'll get to you.

Any of the other states?

I think -- Ms. Lyons, I think, had raised her hand.

MS. LYONS: Yes.

THE COURT: Yes. Mrs. Lyons.

MS. LYONS: Yes, I did, and earlier I raised my hand, because I wanted to tell the consumers in the courtroom my phone number, because they do -- they're

always reaching out trying to find answers, and it's been really difficult in this bankruptcy.

So in any event, Florida is one of the states where MV is continuing to operate, it's subjecting them to additional penalties. Our penalties are $10,000 per violation and $15,000 if the person is a senior. It doesn't matter if you were targeting seniors. If the person was a senior, it's a $15,000 penalty.

And the motion for summary judgment that the court was hearing today was about whether 479.27 -- 475.279 Florida statutes is being applied retroactively in this case. The court did not -- he decided to defer the motion. He said it was not appropriate to handle this before our injunction hearing, but that statute subjects them to additional penalties. The initial violation, which is the misrepresentation, the deceptive sales pitch, the unconscionable terms, the unfair method of execution, all of those are going to be penalties. But continuing to use liens or memoranda to collect money from proceeds of real estate closings is an another set of violations of Florida Deceptive and Unfair Trade Practices violations.

And so there is continuing harm and really a diminution of assets by this company continuing to harvest 80 percent of these HBA's as early termination fees. This case really shouldn't even be in bankruptcy. The real

problem isn't about money here, your Honor. It's about clouds on title, and there's no plan to get rid of clouds on title when MV decides collecting -- or when enough states create a critical mess that MV decides that they are just going to walk away from these agreements. These are zombie agreements that could cloud title for years, and people going to have to go through the court system in order to have these clouds removed. I know, your Honor, we've had some exchanges about whether they are liens or not liens, but they absolutely cloud title. They absolutely hold up real estate closings, and that has to stop. There's no plan to address that, and it's very big problem.

We have a hearing in Florida on April 23rd or 26th, and we'll come back to you after that hearing and let you know what the results are, but the real issue here is that the relief that people need isn't a claim in bankruptcy. The relief that people need is addressing the cloud on their title, and this Court isn't going to be able to do that with the plan. There's not going to be a determination about that --

THE COURT: In fact --

MS. LYONS: -- I read the.

THE COURT: -- I believe I've abstained from that question, haven't I?

MS. LYONS: You've abstained from the state litigation --

THE COURT: Yes.

MS. LYONS: -- but there's also -- the people who making claims are making the same claims --

THE COURT: Oh, I see there are --

MS. LYONS: -- that Florida.

THE COURT: -- independent claims, okay.

MS. LYONS: Correct.

Okay. So I read the plan yesterday. I'm unclear about the effect of discharge, and so I want to, you know, state that it's certainly not clear what's going to happen. Really it just doesn't address the fact that the memorandum which says it's a covenant running with the land, even though it's contract for personal services or an agreement to agree, should have never been recorded in the first place, your Honor.

This bankruptcy isn't going to address those core issues. They're not clean. They are not things that this Court really is in a position to address. You've already abstained on the adversary proceeding to stop our state court actions, and so let's just dismiss this bankruptcy. Let's go back to where we need to be, and if there are judgments -- it's almost as if this is premature. It's almost, like, this needs to be filed in a

year or so, if there's going to be some kind of liquidation, after there's been determination about what the assets of the company really are. And so I have doubts about the confirmation of the plan. I don't understand the implications of the discharge. I'm going to keep reading that plan. But, your Honor, this case shouldn't be in bankruptcy. So thank you very much.

THE COURT: Thank you.

Ms. Lyons, if there's a state court ruling on the retroactivity question in connection with the new Florida statute, I hope you'll find a way of letting me know that there's been a ruling.

MS. LYONS: Of course, your Honor. Absolutely. I'll file the order that got entered today.

THE COURT: Well, no, don't just file everything. I'm just curious about that question. You don't need to file any orders --

MS. LYONS: Okay.

THE COURT: -- but that question is actually also before me.

All right. Thank you.

Mr. Dudely.

MR. DUDELY: Thank you, your Honor. David Dudely from the Consumer Financial Protection Bureau. We are a federal governmental agency tasked with protecting

consumers from violations of federal consumer financial law.

I just wanted to briefly appear today, because the bureau has an ongoing investigation with respect to MV Realty and the homeowner benefit agreements. We filed proofs of claim and just wanted to state that the bureau supports the U.S. trustee's motion to dismiss.

THE COURT: Thank you.

Mr. Leonard.

MR. LEONARD: Thank you, your Honor.

I just want to make three clarifications, actually. So I filed a joinder on behalf of the State of New York, Oklahoma, Oregon, South Carolina, Tennessee, and Washington. I represent the State of Oregon.

The debtors' counsel referred to the fact that only a few states filed proofs of claim, and that's because states like ours, I don't think we have a claim. We are here because we have hundreds of citizens who have been damaged and -- with clouds on title, and we are here to speak up for them and to seek either dismissal or conversion.

We also heard today that there's only a minority of the states that have filed actions against MV Realty. That does not -- and Oregon is one that has not taken any action yet, and that is not because these are

legal in Oregon. It is because of the lack of resources, the fact that we're still getting up to speed, and it should not speak to whether or not -- you know, whether this is just a minority of states where this is permissible.

And, finally, I wanted to address -- I appreciated the National Consumer Law Center's brief, and I think generally it's accurate. I did take issue with the discussion about conversion, because the states that prefer conversion, we are doing so not because we believe that these HBA's are assets that can be sold in a sale free and clear of liens under 363(f). We agree with the amicus that these aren't saleable, and we are just seeking conversion because we see this as the fastest way of stopping the harvesting of home equity from our most vulnerable citizens.

Again, conversion -- you know, the debtors availed themselves of bankruptcy jurisdiction, and we appreciate the transparency that that provides, and the idea of the appointment of an independent fiduciary to independently evaluate avoidable transfers, federal crimes, is appealing to the states seeking conversion.

And I'd just end by asking, if it's appropriate for our federal bankruptcy system to be effectively supporting this business, if it chooses to go

down the path of confirming a plan, to allow the continued harvesting of HBA's from our country's most vulnerable citizens.

Debtors' counsel who stood up noted that these stopped in the end of 2022. There's a reason why they stopped issuing HBA's, and it's because they are not appropriate, they're not legal, and the mechanisms that they used to put them in place are inappropriate. And so I appreciate your Honor's consideration of these issues.

THE COURT: Mr. Seese, you don't have to jump up, because you may have other comments to make. So let me hear from everyone --

MR. SEESE: As long as I have an opportunity --

THE COURT: -- and then we'll come to you.

MR. SEESE: -- to respond.

THE COURT: Of course.

MR. SEESE: Thank you, your Honor.

THE COURT: Right. I do hope to leave sometime tonight, but I want to hear from everyone.

MR. SEESE: As I do I.

THE COURT: Right.

Ms. Tasher.

MS. TASHER: Good afternoon, your Honor. Raychelle Tasher on behalf of the United States of

America, Department of Housing and Urban Development.

Your Honor, HUD did file close to $82 million in claims in this case. HUD is very much considering, what it expresses to the Court, the potential causes of violation of Fair Housing Act and particularly the effect that these agreements have had on minorities, specifically based on race and national origin. So I just wanted to advise the Court and the other states on here that my office, the United States attorney's office for the Southern District of Florida, as well as main justice, we are looking into these matters.

THE COURT: Thank you.

I had -- as you know the proof of claim register is maintained by Epiq, and so it's little bit less, I should say, from my point of view, less convenient for me to review the proofs of claim. Also there's more than a thousand of them at this point. So I had not seen HUD's claim, nor was aware of it until today, by the way.

Anything else you wish to add, Ms. Tasher?

MS. TASHER: No, your Honor. Thank you.

THE COURT: Very good.

Mr. Rabinovitz.

MR. RABINOVITZ: Thank you, your Honor. I'll try to be brief.

I just wanted to say on behalf of the State

of North Carolina that we strongly support the U.S. trustee's motion and believe that the case should be dismissed. We think there's no reasonable likelihood that the debtors are going to be able to rehabilitate or successfully reorganize and just a few highlights on that point.

The debtors have been clear from the beginning of the case that the litigation by the states against MV Realty was the primary reason for their bankruptcy. They've now added other additional reasons, but I think your Honor is very familiar with the preface -- preparatory statement that the debtors have made at the beginning of nearly every filing they've made with this Court, which refers to the state litigation against debtors and the role that that played in their filing bankruptcy.

Generally the state enforcement actions allege that the debtors engaged in unfair or deceptive practices and they seek relief, including invalidation of HBA's and report of memoranda. Preliminary injunction orders have been entered against debtors in several states, and they show the strength of these actions and the likelihood of their success. Again, this is not, you know, to deny or diminish the fact that the debtors have a right to defend themselves in these actions, but I think

it's at least some indication, because these are determinations made based on the likelihood of success.

Other state regulatory actions challenge debtors' licenses to operate in several states, and, ultimately, these state actions challenge the validity of debtors' sole source of income generation, the HBA's, as well as the debtors' ability to operate in these states.

Meanwhile, the debtors have incurred and continue to incur massive administrative fees from this litigation. Prepetition the debtors say they were spending over $800,000 per month to defend against litigation from seven states. During the bankruptcy, in large part related to the debtors' failed adversary proceeding against the states, they've incurred seven figure litigation costs and fees up to this point.

The number of state enforcement actions against debtors has only increased since debtors filed bankruptcy. So although I certainly agree there was an intense period of litigation and discovery during the adversary proceeding, I don't find it credible to predict that these litigation costs are going to diminish significantly going forward. In fact, the debtors have trials coming up that are already scheduled in several states.

In North Carolina we're about to enter into

an extremely intensive discovery period where debtors have asked to take -- be allowed to take depositions of all of the consumers who, not only filed affidavits on behalf of the state, but who have filed complaints about MV Realty with the state. So we're talking about, I think, somewhere in the neighborhood of probably a hundred at this point. They want to take, they say, a deposition of, you know, everyone who could possibly be a witness against them who has complained to the state, so that's going to be extremely expensive.

Also in North Carolina, the debtors are simultaneously defending against the state's case in the trial court and appealing an interlocutory order, and then the North Carolina Real Estate Commission, which I believe your Honor knows had entered an oral ruling, just recently issued it's written order revoking debtors' North Carolina Real Estate License. The debtors cannot enter into new listing agreements in North Carolina and have to cease all listing activity in fewer than 120 days. The debtors, you know, may appeal this. But, once again, the cost of doing so will only add to the overwhelming administrative costs that are already there in the case.

And I don't know if your Honor has a copy of that order from the real estate commissioner, if your Honor would like us to provide that the Court, to file

that in the record, but we're happy to do so if that would --

THE COURT: If it becomes --

MR. RABINOVITZ: -- be informative.

THE COURT: -- if it becomes useful as evidence in connection with the hearing that I would have in this matter or any other, yes. Otherwise, no.

MR. RABINOVITZ: Okay. Very good.

The debtors claim in their response to the chapter -- sorry. The debtors claim in their response that their Chapter 11 will benefit homeowners of HBA's more than dismissal of the case, because it will give them an option to pay to rescind the HBA's. But homeowners shouldn't have to pay anything to extract themselves from contracts the debtors obtained through practices that are very likely illegal under numerous state laws and are also, we contend, unfair and deceptive.

In reality, the supposed option the debtors purport to offer to homeowners through their plan is nothing more than a thinly veiled attempt to insure that most homeowners remain locked in HBA's and to cut off any future recourse these homeowners may have.

I think the Court is already very aware, you know, that we have 34,000 or so homeowners in the United States that are in HBA's, that great effort has been made

to make sure that these homeowners have notice of the claims bar date. We've heard from several homeowners today. There continues to be widespread confusion, and, you know, I think the fact that only a very small percentage have come forward and filed claims, despite the large number who have, you know, called in the U.S. trustee's office, to the debtor, to Epiq, demonstrates what's likely to happen if this option is presented to consumers, which is very few consumers will have the sophistication to -- or the wherewithal, the funds, to pursue this type of option. And the effect that the plan will have is that those homeowners will have been deemed to have waived any objection that they might have in the future. We think that's highly -- we think that's highly problematic.

There's more I could say, but I know that we're getting late, and I want to allow your Honor to hear from others. So I'll just close by saying, you know, again, we strongly support the U.S. trustees's motion and believe that debtors' bankruptcies should be dismissed.

THE COURT: Thank you.

MR. RABINOVITZ: Thank you.

THE COURT: Mr. Williams.

MR. WILSON-PATTON: Hi, Judge. I'll just be very brief, otherwise I'd be saying, "Good evening,

Judge." And I won't talk your ear off with some things you've already heard. Again, this is Alan Williams for the Office of the Illinois Attorney General.

I really speak to just one voice, the Office of the Attorney General's support for the trustee's motion. The other thing I would, you know, draw the Court's attention to, it's been sort of pointed out by Florida and Massachusetts and now North Carolina, you know, we have serious concerns with the plan as proposed by debtors.

For one, obviously, to the extent that Mr. Seese has made a big deal about this option that consumers would be able to pay back this incentive payment and be able to get out of the contract, you know, our concern with that is, you know, there's been some concerns that we have that, you know, most consumers won't have the ability to raise the funds necessary to pay back that payment, you know, the payment that was advertised to consumers as having no strings attached. So it's highly unlikely that many of them saved that money.

There's also, you know, concerns that even the type of consumer that the debtors were targeting was a consumer not in need of future real estate services, but a consumer in need of this upfront cash payment. So that's a concern of ours.

The other thing I just want to speak briefly about is, we're also very concerned about the ability of the plan to address harm faced by consumers outside of just the repayment of the direct cash payment or just letting them of the contract. You know we've seen some title insurance companies do post-notices to their employees on publicly available websites, and we have seen some title companies say, you know, we are not going to insure over this memorandum that is filed in consumers' chain of title.

I believe the Court briefly referred to the memorandum that debtors filed as sort of simply fulfilling a notice requirement. You know, we here in Illinois doesn't necessarily see it the same way. And that is a potential damage that is not what we're seeing by the debtors' plan. If a consumer attempts to refinance their home, it's a three percent. They are prevented from doing so by this memorandum in their chain of title, this cloud on their chain of title, and then they are only able to do so after conversations with the debtors, after, you know, paying this fee, and then they get to refinance at a higher rate. That's potential harm that consumers face that is not necessarily remedied by the plan.

So, I mean, I won't bore the Court anymore, but that's everything for us. Thank you.

THE COURT: Thank you.

Mr. Brancato.

MR. BRANCATO: Your Honor, I just want to briefly state the State of Missouri's support for the removal of the case from Chapter 11 with no preference for either conversion or dismissal.

THE COURT: No preference for either? Okay.

MR. BRANCATO: Just -- no, no specific preference for one or the other out, but the removal through either of those channels.

THE COURT: Understood. Thank you.

Ms. Garrow, Mary Garrow. You're on mute.

MS. GARROW: Yes, your Honor. Thank you for the opportunity to speak. I appreciate this.

I did file a Chapter 7 in reference to MV, and they retaliated by not giving me appropriate addresses for Arizona and Florida and -- but I eventually got it, and I was thankful for that, and I did include them in my creditors list.

They were very criminal in reference to how they presented themselves and how they took advantage of people of color, especially, in reference to discrimination, retaliation, concealment, and the unconscionable contract. I just wanted to bring it to your attention.

I definitely agree with the dismissal. I think that would be very appropriate, and moving forward I will definitely never ever -- if I ever see MV Realty again, I will never do any type of business or anything with them, because they were concealing information, and they did not give an explanation. Oh, oh, they stated that the notary should have done that. No, no, no, no. No, no, no. You the business, you have the information, and I have a right to know and give me that disclosure, letting me know what is this all involved and what's the details in reference to it.

And they criminally conducted their business. They operated in bad faith, and they better be glad I'm not lawyer. I'm definitely a pro se litigant, and I will pursue them as necessary. I did meet the deadline of April 1 for the claim. I filed two claims against Arizona, as well as -- actually one against Arizona and one against Florida.

THE COURT: Ms. Garrow, what state are you in?

MS. GARROW: I'm in Tucson, Arizona.

THE COURT: Okay. And you personally filed a Chapter 7, did you say that?

MS. GARROW: Yes, I did.

THE COURT: When?

MS. GARROW: Yes, I included MV --

THE COURT: When?

MS. GARROW: It discharged July 19th of last year.

THE COURT: July 19th of -- okay.

MS. GARROW: 2023, correct.

THE COURT: As a result of that bankruptcy filing, the homeowner benefit agreement was likely automatically rejected.

Did you know that?

MS. GARROW: It wasn't rejected on my side. It was expunged --

THE COURT: No --

MS. GARROW: -- through the bankruptcy.

THE COURT: Oh, there -- well, is there a separate order from the Bankruptcy Court addressing that.

MS. GARROW: I believe it was all conclusive --

THE COURT: Okay. No, but did --

MS. GARROW: -- in reference to my debts, debtors and --

THE COURT: -- I get it. Yep, I'm very familiar with how a Chapter 7 works. My question is --

MS. GARROW: Thank you. Thank you.

THE COURT: -- my question is, did you ask

for the Bankruptcy Court in Arizona to enter a specific order that references MV Realty, any MV Realty entity?

MS. GARROW: Yes, I did. I did. And also I -- I also applied the Homestead Act as well to, you know, realize and make known that they -- even if they wanted to go after me, even after the proceedings, it would only be up to -- you know, 250,000.

THE COURT: Okay. So after your bankruptcy, did you try to sell your home, or was it sold?

MS. GARROW: Oh, no, no, no. I told them up front -- when they came to my house, they only gave me a thousand. I found out later that, "Oh, okay, so I see that you guys are taking an advantage of homeowners," and I'm 62, and I realized -- and they told me, "Oh, no, some people get 5,000, some people" -- they Only gave me a thousand, and I was, like, that's good, because my house is two-story home here in Tucson. And I was, like, "Oh, okay, so discriminating, you're giving some people this, some people that, you know that's a discrimination. You should you put everybody in the same category and be equal and you did not do that," and so that's -- when I filed my Chapter 7, I decided specifically to zero in on MV Realty.

THE COURT: Understood. All right. Thank you very much for your -- for speaking today.

MS. GARROW: Thank you.

THE COURT: Yep.

MS. GARROW: Thank you.

THE COURT: Ms. Kneidel.

MS. KNEIDEL: Yes, your Honor. I'm sorry I should have recognized I needed to raise my hand.

THE COURT: It's fine. I would have called out to all the states anyway, but it helps today.

MS. KNEIDEL: Well, thank you. I'll be very brief.

Of course I join in all of my colleagues comments that were made before me. Georgia does agree with many of the points that were made by the NCLC in their brief. In Georgia litigation is just beginning. We just received an answer to our lawsuit this week, along with the motion to dismiss, so we know the fees will start churning in our case.

We have some real concerns about the consumers affected in Georgia. We know for a fact over a thousand of the 3400 consumers effected are over the age of 60 in Georgia, 60 being -- 60 and older qualifies you as an elderly consumer and that --

THE COURT: Oh, darn, I'm quickly approaching it.

MS. KNEIDEL: I know. Well, me too so.

But that does avail the state of the right

to seek additional penalties and that could be quite substantial.

THE COURT: I don't like to think of myself as elderly, Ms. Kneidel. Please, no, go ahead.

MR. SEESE: Silver -- (inaudible.)

MS. KNEIDEL: I don't either.

And so but I think it also bears mentioning, after hearing from the consumers today about not having gotten any notice until just now, I don't know how the debtors could possibly insure the integrity of the process --

MR. SEESE: Oh, come on.

MS. KNEIDEL: -- for this adjudication program. I mean, I just don't see it.

But I also think it bears mentioning the disclosure statement that was filed is woefully short of the standards that are going to be required under Section 1125. There needs to be robust disclosures, and they need to be written in a way that consumers can easily understand. And that is not the case.

And I will end with that, your Honor. Thank you.

THE COURT: Thank you, Ms. Kneidel. Mr. Rao.

MR. RAO: Yes. Thank you, your Honor. I'm

not representing an AG. I am an amicus curiae for National Consumer Law Center.

Given the hour, I just wanted to sort of stress one point that I believe Mr. Rabinovitz has already made, and that is we already know based on the information that's been provided in the response by MV Realty that only about two percent of HBA consumers actually filed proofs of claim, and it is -- in the best case scenario, under this adjudication program, it's likely that probably about 95 percent of HBA consumers will not participate in the program. And I understand that the plan is not before you today, but it bears repeating, as Mr. Rabinovitz said, that for those homeowners who do not participate in the program they will have their claims -- any claims or defenses that they have eliminated, and that even includes under the terms of the plan, at least as proposed, the rights to rescind and recoupment.

So while ordinarily in bankruptcy, obviously, if someone losses a -- or an obligation to pay is precluded by a bankruptcy plan, that's one thing, the obligation to pay. For these HBA consumers it's more than that. There's also a cloud on your title, and this will prevent them, the bar that would be issued in the -- under the plan that would waive all of their rights to defend themselves against the obligation will be lost, and they

will have no ability to remove these clouds on their title.

And I just would say that there are at least, as I think you had mentioned, 23 states where there's no state AG action. If that continues then all of the consumers in those states will have no ability to address the clouds on their title for the next 40 years or the length of these plans.

Thank you, your Honor.

THE COURT: Thank you.

Mr. Moleterno, your hand is still raised.

Would you like -- were you done, or are you just listening?

MR. MOLETERNO: Hold on a minute. Yes, I'm not done. I just wanted to make another statement, because I heard that you could sell your house, but they take $8,000. Here in Arizona, since I've tried to sell it, no Realtor will take it since they have that lien on my house.

THE COURT: I see. Understood. Thank you.

MR. MOLETERNO: Yeah, and I'm one in the elderly age. I'm -- when they came to me, I was 71. I'm 73 right now.

THE COURT: Understood. Thank you.

All right --

MR. MOLETERNO: You're welcome.

THE COURT: -- are there any other states that wishes to be heard? And then, Mr. Seese, very briefly, and then I'm going to tell you what we do next?

You don't have to respond to all these things.

MR. SEESE: I want to.

THE COURT: You want to. Try to -- you'll have another chance to respond, I promise there will be an evidentiary hearing.

MR. SEESE: Your Honor, you can keep a timer on me, I'll be less than 30 seconds. I want to go home too.

THE COURT: Okay. Go ahead. I don't want to rush anybody, but I mean --

MR. SEESE: No, no, no, we'll have opportunity it respond --

THE COURT: Yes.

MR. SEESE: -- if I understand your Honor's -- what I think you're going to do. But it's hard to sit tight and listen to some of this stuff.

You know, if the states had their way, we would just shut down the business before there's been any adjudication on the merits. And, quite candidly, your Honor, that was the whole purpose of the adversary

proceeding, was so that you can't take action against the assets until there's a trial on the merits. They want the effect of a pre-judgment writ of garnishment without posting any bond and before there's ever a trial on the merits. So shut down the business, and if the debtors end up prevailing at trial, it is what it is. It's not fair to the debtors, the creditors, the investors, and the lenders that put in $50 million to this company.

Secondly, it's interesting to me, although it may bear some bearing on your ultimate decision after an evidentiary hearing, but on the one hand the states profoundly, vehemently, argued in favor of abstention. We don't want your Honor to try any of these issues, but yet hear we are repeatedly, time and time, at all these hearings they raise the same issues, try to argue the merits of their claims, but yet they don't want you to decide it, but they want to use it as a basis in support of the motion to dismiss. You can't have it both ways.

As far as one of the folks that spoke, and I mean no disrespect by not naming them, but they focused on the payment right of rescission. You know, this HBA program wasn't entered into lightly, wasn't come up with lightly. If anybody has input, we're all ears. We would love to hear from you. We're open to modifying it to make it work, to address concerns that people have, but I want

to stress that there's not only a payment right of rescission, there's non-payment right of rescission. And I want to stress that if the states with litigation pending prevail and a state court says, the agreements are rescinded, those agreements are gone. We can't pursue those. We can't enforce those. What we're talking about with a payment right of rescission is if there is no cause, if there isn't a determination that the agreements are unenforceable.

And one of the states, I think it was New York, argued that they hadn't commenced litigation because it's resource issue. Well, every single HBA party, including in the 23 states that haven't commenced litigation, will have the opportunity to present any evidence, whether they tried to exercise the right of cancellation, you know, whatever it is, that will be determined by an independent review board as to whether there's sufficient cause. If there is, they don't have to pay a dime. And if there's no cause, they still have a right to rescind.

Ms. Garrow, I will look into the Chapter 7 in Tucson. I'll take a look at that issue.

And then the other issue is, you know, amidst all of this litigation with the states and it started back in November, I think November of 2022, with

Florida, there have been two states that obtained a preliminary injunction, two states, Massachusetts, and North Carolina. In preparation for today's hearing, I went back and I read those, and both of those injunctions, for the most part, related to the recordation of mortgages or memoranda. Even in North Carolina, under that's court's preliminary injunction, the judge contemplated enforcement of the HBA, suing for breach with certain limitations --

THE COURT: I know that.

MR. SEESE: -- but there's no determination that these agreements are invalid, and that's what I find so troublesome in all of this, and why I squirm in my seat because everybody wants us to just stop operating. Everybody wants us to shut down. But there has been never one determination since inception that these agreements are invalid or they are unenforceable. And so it is unfair to the debtors who sought the advice of counsel before rolling out these programs, to the lenders who sought the advice of counsel before making the loans, to the hundred and eighteen creditors who owed 50 or $60 million, it's unfair to them to say, convert the case to a Chapter 7, shut it down or dismiss it, and let the secured creditors pursue their rights, without there being any trial on the merits.

The states argue for the states, for the consumers, the states, the consumers, but no one is arguing or taking into consideration the interest of the 118 unsecured creditors, the two secured creditors. I don't know if we'll hear from Monroe this afternoon, but, you know, the fact remains there are people who have a lot money involved in these businesses that would be harmed if there was dismissal or especially conversion.

And I just -- we look forward to an evidentiary hearing on these issues, because, your Honor, what everyone is advocating in support of is simply not fair. It's not fair. If a state litigation is adversely determined to the debtor, and a court says they are invalid, they are unenforceable, so be it. We accept that ruling. We're done. And the HBA parties get out of it. Which is why we came up with the HBA program in part to address HBA parties in states where they haven't commenced litigation, to give those parties a right.

So then we hear about the disclosure statement being deficient. Well, pick up the phone and call me. Pick up the phone and tell me how you think it needs to be amended or modified. If you have a problem with the HBA program, you think it could be better, pick up the phone and call me, as opposed to just showing up and say, dismiss, convert, we don't care about the

legitimate creditors. We think it should be shut down, even though our trial is not set for the end of the year.

So I look forward to having this case tried by your Honor. Thank you for the opportunity to respond, and one other thing. I took copious notes when the various consumers were speaking, and I am going to look into whether there was a notice issue.

But I am reminded of one thing, during the 341 Meeting, there was a person who was up and down for, like, eight to ten minutes and turned out they weren't even a customer, so my silence is in no way consent to what's being alleged as true, but I did write down their names. I know Mr. Mitchell did, and we will look into that as well. And if there is an issue with notice, we will rectify it, but I will look into it.

Thank you, your Honor.

THE COURT: Very good.

All right. I hesitate to ask if there's anyone else who wants to be heard, and then I have a plan for how we should deal with this. I think everyone has had several hours of presentation. Normally I would be talking about scheduling and the like.

I think it's much better if we discuss that next week. I'll set aside half an hour, and I do mean half an hour to talk about scheduling. I want to focus on

the fact that this is -- because the committee will withdraw their motion, I know there will be joinders. There have already been joinders, but the primary moving party will be the United States trustee. I encourage all of you to get together and talk about who will be involved in presentation.

There are two things that you should know. When the adversary was filed and I suggested that there should be an evidentiary hearing on the preliminary injunction, I think in November, and it ended up being scheduled several months later, that's not happening. That is not happening on this motion. This is not going to be heard in July. I just want to make this clear. So when you come back next week, you better be ready for a tight schedule.

The next is, this is not going to be a two-week trial. There's no need for a two-week trial in this. I am not going to hear on every issue in connection with confirmation of the proposed plan. That is not the purpose of 1112(b). I am not going to hear the merits of every claim raised by every state in all the pending litigation, two in North -- actually, no, one of them is done, I guess, and all the other actions. That's not happening. You need to focus on the issues that are relevant.

I will not prevent parties from taking part, but I want to make it clear that we are not going to have 12 parties presenting the motion. That's not happening. You need to figure out how to decide who is going to carry the banner, and if there are multiple witnesses, who's going to question each witness. I'm not going to have direct examination by five people. Not happening. Okay? So please be prepared to talk about those issues.

I will use as my format, I have a scheduling order that is essentially identical to the ones used for adversary proceedings in this district, which includes a variety of deadlines, exchange of documents, et cetera, discovery. I will eliminate from it the motion for summary judgment. There will be no motion for summary judgment. If anybody files one, it will set for trial. Do not file one, because I intend to get to the evidentiary hearing quickly. This is not about delay. But you should look at every other deadline in that order, because I expect to be addressing each of them in whatever order I enter scheduling the evidentiary hearing.

Are there any questions on those issues?

Things -- you will think of other things after you leave today.

Yes, Mr. Seese.

MR. SEESE: Your Honor, it may be helpful if

you would give us, if you would, some understanding or idea of how far out you intend to do this, so we can work backward.

THE COURT: I think you need to tell me first, because the issues have been somewhat narrowed by there not being a lack of good faith argument, which has a big impact, by the way, on the nature of evidence that would be presented. I have had over 15 years of at least one trial a year based on lack of good faith in a Chapter 11 case, and they are extremely time consuming because the nature of the facts that can be presented is amazingly broad. It's essentially unlimited.

MR. SEESE: Your Honor, I just whispered to Ms. Feinman, we can talk off line maybe sometime tomorrow, and try to discuss between us what would be appropriate, how much time we need, what witnesses we need, if you could give us the date and time for the scheduling conference --

THE COURT: Next week on Wednesday.

MR. SEESE: And do you want an order submitted before then or --

THE COURT: No --

MR. SEESE: -- prepared to present then?

THE COURT: -- no. I want you to be prepared to talk about it.

MR. SEESE: Okay. Perfect.

THE COURT: Yeah. And then walk through and we'll chose what the deadlines are. If you have -- and remember, it's not just Ms. Feinman. There are, I think, 13, plus the committee, plus the amicus curiae, there's a whole bunch of parties, I don't know if everybody is going to want to participate.

One of the things I suggest that you consider is whether we should have opening statements filed ahead of time, so that anybody can file a document and the debtor can respond to that. That way we don't use -- I generally like opening statements, I need to let you know, but if we have a lot of parties who wish to be heard, both at the opening and close, that could use up a great deal time. And I don't want to eliminate the possibility of any party in interest being able to present the arguments that they think are important.

So the goal of this is not to eliminate the opportunity for somebody to participate, but I want to make sure that we don't eat up all the evidentiary presentation time with argument. Today we had how many hours at this point? Four, but it's good -- it's necessary. I mean, how often do we have the homeowners show up, and I wanted to make sure they could all be heard.

MR. SEESE: Of course.

THE COURT: Yes.

MS. FEINMAN: Your Honor, I just want to put on the record, timing-wise I'm going to be out-of-town May 8th through the 15th. It is my son's graduation from law school. So I just want to put that on the record, so that the parties here know.

THE COURT: Are not going to be asking for at that time period.

MS. FEINMAN: Thank you.

THE COURT: Yes, I get it. I get it.

MS. FEINMAN: But we will talk tomorrow. I need to talk to my client in the morning --

THE COURT: Yes, of course.

MS. FEINMAN: -- and then Mr. Seese and I will circle back.

THE COURT: And, Ms. Leonard, what do we have next Wednesday? Is it full up?

THE CLERK: We actually have -- (inaudible.)

THE COURT: This case has a two o'clock?

THE CLERK: No, I mean, we have nothing set for two.

THE COURT: All right. Let's put it at two next week.

MR. SEESE: So it's April 10th at 2:00 p.m.?

THE COURT: Yes. This is just to talk about scheduling issues.

MR. SEESE: Will your Honor be issuing a notice of hearing? Okay. Thank you.

THE COURT: Just do a continued notice, that's it, and it need not be served on the whole world. I'm announcing it on the record, so you don't need to serve it on anybody.

MR. SEESE: Your Honor, thank you very much for your time this afternoon.

THE COURT: Oh, of course, yeah. Again, I didn't want to short anybody. We had an extremely large number of people who appeared, and I wanted to make sure everybody could be heard at least on a preliminary basis.

All right. Is there anything else we need to address before I say good-bye to you this afternoon?

MR. SEESE: No.

MS. FEINMAN: No. Thank you for your time.

THE COURT: Of course. That's why we're here.

MR. SEESE: Thank you, your Honor.

THE COURT: Very good. Court is adjourned.

(Whereupon, the hearing was concluded.)

CERTIFICATION

STATE OF FLORIDA :
COUNTY OF BREVARD :

I, Anna M. Meagher, Shorthand Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing proceedings were transcribed by me from a digital recording held on the date and from the place as stated in the caption hereto on Page 1 to the best of my ability.

WITNESS my hand this 8th day of April, 2024.

ANNA M. MEAGHER, Shorthand Reporter
and Notary Public in and for the
State of Florida at Large
Commission #HH59960
January 9, 2025